IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| NETKEY, INC.,<br> a Delaware Corporation, | ) | CASE NUMBER: 3:00 CV 1364 (AVC) |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| NETSHIFT SOFTWARE, LTD.,<br>AUTOMOBILE CLUB OF HARTFORD,<br>MONTEGONET, LLC, | ) | |
| | ) | |
| Defendants/Counter-Claimants. | ) | November 22, 2003 |
| | ) | |

## DEFENDANTS' *MARKMAN* BRIEF

**DATED:** November 22, 2003.

**COOKSEY & COOKSEY, P.A.**
Michael G. Cooksey, # 12761
1700 Broadway, Suite 1700
Denver, Colorado  80290
(303) 860-0101
ATTORNEYS FOR DEFENDANTS

## <u>TABLE OF CONTENTS</u>

Page

TABLE OF CONTENTS ........................................................................... i

TABLE OF AUTHORITIES ..................................................................... ii, iii

INTRODUCTION.................................................................................... 1

I.      THE LAW OF CLAIM CONSTRUCTION........................................ 1

II.     PROPOSED JURY INSTRUCTIONS.............................................. 3

III.    CLAIM INTERPRETATION ISSUES – THE '071 PATENT........................ 5

IV.     PLAINTIFF NETKEY'S PROPOSED CLAIM
        INTERPRETATION – THE '071 PATENT..................................... 6

V.      DEFENDANTS' PROPOSED CLAIM
        CONSTRUCTION – '071 CLAIMS................................................ 15

VI.     CLAIM CONSTRUCTION ISSUES – THE '848 PATENT........................... 15

VII.    OVERVIEW OF THE '848 PATENT............................................... 17

VIII.   DEFENDANTS' PROPOSED CLAIM
        INTERPRETATION – '848 CLAIMS.............................................. 19

IX.     DEFENDANTS' PROPOSED CLAIM
        CONSTRUCTION – '848 CLAIMS................................................. 25

CERTIFICATE OF SERVICE...................................................................... 26

# <u>TABLE OF AUTHORITIES</u>

CASES:                                                          PAGE(S)

*Amhil Enters., Ltd. v. Wawa, Inc.*,
    81 F.3d 1554 (Fed. Cir. 1996)........................................................................ 11

*Athletic Alternatives, Inc. v. Prince Mfg., Inc.*,
    73 F. 3d 1573 (Fed. Cir. 1996).................................................................... 1

*Augustine Medical, Inc. v. Gaymar Industries, Inc.*,
    181 F.3d 1291 (Fed. Cir. 1999)................................................................... 17

*Bell & Howell Document Management Products Co. v. Altek Systems*,
    132 F.3d 701 (Fed. Cir. 1997)..................................................................... 2

*Ethicon Endo-Surgery v. United States Surgical Corp.*,
    93 F.2d 1572 (Fed. Cir. 1996)................................................................ 11, 20

*Fromson v. Anitec Printing Plates, Inc.*,
    132 F.3d 1437 (Fed. Cir. 1997)................................................................... 10

*Hoganas AB v. Dresser Industries, Inc.*,
    9 F.3d 948 (Fed. Cir. 1993) ............................................................... 1, 14, 17

*In re Gosteli*,
    872 F.2d 1008 (Fed. Cir. 1989).............................................................. 13, 25

*In re: Warmerdam*,
    33 F.3d 1354 (Fed. Cir. 1994).................................................................... 17

*Lockwood v. American Airlines, Inc.*,
    107 F.3d 1565 (Fed. Cir. 1997)............................................................. 13, 25

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995) (en banc)................................................ 1, 2, 3, 4

*Martin v. Mayer*,
    823 F.2d 500 (Fed. Cir. 1987).................................................................... 13

*McAbee Construction, Inc. v. U.S.*,
    97 F.3d 1431 (Fed. Cir. 1996) .................................................................... 2

*New Railhead Mfg. v. Vermeer Mfg. Co.*,
    298 F.3d 1290 (Fed. Cir. 2002)........................................................... 13, 14, 25

*Reiffin v. Microsoft Corp.*,
    214 F.3d 1342 (Fed. Cir. 2000)............................................................ 13, 14, 25

*Renishaw PLC v. Marposs Societa Per Azioni*,
    158 F.3d 1243 (Fed. Cir. 1998).......................................................... 3, 10, 11, 20

*Rexnord Corp. v. Laitram Corp.*,
    274 F.3d 1336 (Fed. Cir. 2001)......................................................................... 2

*Scripps Clinic & Research Foundation v. Genentech, Inc.*,
    927 F.2d 1565 (Fed. Cir. 1991)....................................................................... 4

*Slimfold Manufacturing Company, Inc. v. Kinkead Industries, Inc.*,
    810 F.2d 1113 (Fed. Cir. 1987)....................................................................... 6

*SRI International v. Matsushita Elec. Corp. of America*,
    775 F. 2d 1107 (Fed. Cir. 1985) (en banc)..................................................... 2

*Standard Oil Co. v. American Cyanamid Co.*,
    774 F.2d 448 (Fed. Cir. 1985)................................................................... 3, 20

*Unique Concepts, Inc. v. Brown*,
    939 F.2d 1558 (Fed. Cir. 1991)..................................................................... 12

*United States v. Adams*,
    383 U.S. 39, 178 U.S.P.Q. 479 (1966).......................................................... 3

*United States Surgical Corp. v. Ethicon, Inc.*,
    103 F.3d 1554 (Fed. Cir. 1997)....................................................................... 6

*Vas Cath, Inc. v. Mahurkar*,
    935 F.2d 1555 (Fed. Cir. 1991)................................................................ 13, 25

*Vitronics Corp.v Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996)............................................................. 1, 2, 3, 19, 20

*Wang Laboratories, Inc. v. America Online, Inc.*,
    197 F.3d 1377 (Fed. Cir. 1999)..................................................... 2, 3, 12, 13, 25

*Watts v. XL Systems, Inc.*,
    233 F.3d 877 (Fed. Cir. 2000)................................................................. 2, 11


RULES AND STATUTES


35 U.S.C. §112 ............................................................................ 2, 3, 12, 13, 14, 17, 25

37 C.F.R. §1.75(i) ........................................................................ 21

Defendants, above-named, by and through their undersigned counsel, submit the following *Markman* Brief, as follows:

## INTRODUCTION

Plaintiff Netkey states that, "Defendants have admitted to infringement of many of the claims at issue." *See* Netkey's *Markman* Brief, at p.2. Defendants have admitted no such thing. Infringement of all of the claims in both the '071 and the '848 Patents remains contested, either because the respective claims do not read on any accused products, or due to invalidity or unenforceability of said claims.

The meaning of certain disputed claims must be construed, as discussed *infra*.

## I.   THE LAW OF CLAIM CONSTRUCTION

Throughout the claim construction process, it is useful to keep in mind the purpose of patent claims and the corresponding evidentiary context in which claim construction rules are applied. In this regard, the Federal Circuit Court of Appeals has pointed out that the function of claims is "putting competitors on notice of the scope of the claimed invention," ***Hoganas AB v. Dresser Industries, Inc.***, 9 F.3d 948, 951 (Fed. Cir. 1993); and that where there is an equal choice between a broader and a narrower meaning of a claim, the notice function is better served by adopting the narrower meaning. ***Athletic Alternatives, Inc. v. Prince Mfg., Inc.***, 73 F. 3d 1573, 1581 (Fed. Cir. 1996). To ensure that this notice function of claims is accomplished, the Federal Circuit has repeatedly emphasized the importance of "intrinsic" evidence rather than "extrinsic" evidence in interpreting claims. Intrinsic evidence is evidence directly from the patent process itself, which is readily available to the public. Intrinsic evidence includes the claims, the specification, and the file history; extrinsic evidence includes all other types of evidence. ***Markman v. Westview Instruments, Inc.***, 52 F.3d 967, 978-79 (Fed. Cir. 1995) (en banc).

The Federal Circuit has ruled that it is improper to rely upon extrinsic evidence unless the claim remains ambiguous after a careful review of the intrinsic evidence. ***Vitronics Corp.v Conceptronic, Inc.***, 90 F.3d 1576, 1583 (Fed. Cir. 1996). "Such instances will rarely occur." *Id.*

at 1585. The court is not prohibited from examining extrinsic evidence, only from relying upon it except in the rare instance where the intrinsic evidence leaves the claim genuinely ambiguous. ***Bell & Howell Document Management Products Co. v. Altek Systems***, 132 F.3d 701, 705-06 (Fed. Cir. 1997). The evidence rules of ***Markman*** and ***Vitronics*** are essentially the parol evidence rule applied to patents. As the Federal Circuit pointed out in ***Markman***, 52 F.3d at 978, "[t]he patent is a fully integrated written instrument." (*See **McAbee Construction, Inc. v. U.S.**,* 97 F.3d 1431, 1434-35 (Fed. Cir. 1996) for the Federal Circuit's views on parol evidence.) Thus, the patent claims should be interpreted by looking first and foremost to the patent itself for guidance as to their meaning and scope.

Netkey argues that the claims should be read "as broadly as appropriate." (*See* Netkey's *Markman* Brief, at p. 6) Of course, it is hard to argue with reading the claims with an appropriate scope, but this still leaves open the question of what that scope is. Netkey begins to address the question of the appropriate claim scope by quoting ***Rexnord Corp. v. Laitram Corp.***, 274 F.3d 1336, 1341-43 (Fed. Cir. 2001) (citing ***SRI International v. Matsushita Elec. Corp. of America***, 775 F. 2d 1107, 1121 (Fed. Cir. 1985) (en banc), as authority that "the applicant is not required to describe in the specification every conceivable and possible future embodiment of his invention." (*See* Netkey's *Markman* Brief, at p. 6) However, the issue in the present case is not one of whether the patent is required to describe in the specification every conceivable and possible future embodiment of the invention. Rather, as discussed *infra*, this is a case of the '071 Patent disclosing invention of only one type of "masking," with Netkey belatedly seeking a revised reading of the Patent's disclosure to support a second type of "masking" invention which the Patentee had not actually invented as of the filing date of the '071 Patent.

The Federal Circuit has on several occasions addressed cases similar to the present one, and has uniformly held that the claims can never be broader than the invention disclosed in the specification. *See*, *e.g.*, ***Watts v. XL Systems, Inc.***, 233 F.3d 877, 883 (Fed. Cir. 2000); and ***Wang Laboratories, Inc. v. America Online, Inc.***, 197 F.3d 1377, 1382-83 (Fed. Cir. 1999) (both ***Watts*** and ***Wang*** are discussed *infra*). As a condition of patentability, 35 U.S.C. §112 requires that:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains to make and use the same...
>
> The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

Since Section 112 defines a condition of patentability, failure to satisfy the requirement of Section 112 results in invalidity of a patent; and since claims are to be construed whenever possible to preserve their validity, they should not be read to include an alternative embodiment not adequately disclosed under Section 112. **Wang Laboratories, Inc.**, 197 F.3d at 1383.

It is a long-standing rule of claim construction that "claims are to be construed in light of the specification and both are to be read with a view to ascertaining the invention." *See* **United States v. Adams**, 383 U.S. 39, 178 U.S.P.Q. 479 (1966); *see also* **Renishaw PLC v. Marposs Societa Per Azioni**, 158 F.3d 1243, 1250 (Fed. Cir. 1998). The Federal Circuit recently affirmed the importance of the specification of a patent in interpreting the claims in **Markman v. Westview Instruments, Inc.**, *supra*, ruling that "[c]laims must be read in view of the specification, of which they are a part." 52 F.3d at 979. The Federal Circuit further expanded this rule in **Vitronics Corp.v Conceptronic, Inc.**, *supra*, holding that:

> The specification acts as a dictionary when it expressly defines terms used in the claims, or when it defines terms by implication...The specification contains a written description of the invention which must be clear and complete enough to enable those of ordinary skill in the art to make and use it. Thus, the specification is always highly relevant to the claim construction analysis. Usually it is dispositive; it is the single best guide to the meaning of a disputed term.

90 F.3d at 1582. The specification is the "primary basis for construing the claims," because "the words of the claims must be based on the specification." **Standard Oil Co. v. American Cyanamid Co.**, 774 F.2d 448, 452 (Fed. Cir. 1985).

## II. PROPOSED JURY INSTRUCTIONS

Plaintiff Netkey, as part of its *Markman* Brief, seeks to inject jury instructions on infringement

into the claim construction process before this Court. However, jury instructions on the issue of infringement are untimely in a *Markman* claim construction process. This Court's Order of August 11, 2003 granted Defendants' Motion of April 25, 2003, "to the extent the motion requests a *Markman* scheduling order...". The Court further ordered briefs "concerning claim construction." The issue of infringement is thus outside the scope of the Court's Order. In *Markman* itself, the Federal Circuit specifically chose not to decide any infringement issues, stating that, "It is...claim construction or interpretation that is at issue in this appeal." 52 F.3d at 976. In claim construction, the words of the claims are construed independently of the accused product, in light of the specification, the prosecution history, and the prior art. ***Scripps Clinic & Research Foundation v. Genentech, Inc.*** 927 F.2d 1565, 1580 (Fed. Cir. 1991). Plaintiff Netkey's jury instructions on infringement should therefore be given no weight at this claim construction juncture of the case.

Defendants disagree with Netkey's proposed jury instructions as to the construction of "masking" or "to mask," for the reasons argued *infra*. On this matter, Defendants propose the following jury instructions be adopted:

> The technique disclosed in the '071 Patent to achieve masking is to size and position on the screen an image or images so as to overlay unwanted browser controls, thereby rendering those controls inaccessible. This technique is described and claimed in Claim 1 of the '071, which reads as follows:
>
> > 1. A self-service computer, comprising:
> >
> > a monitor having a display screen;
> >
> > a microprocessor coupled to said monitor for controlling what is displayed on said screen;
> >
> > browser software executable on said microprocessor for accessing and displaying documents in response to user input, the graphical user interface (GUI) of said browser software comprising controls for said browser software and a document viewing area; and
> >
> > at least one image positioned for display on said screen so as to mask the controls for said browser software, said image thus rendering the controls inaccessible to a user of the self-service computer to resist tampering with said browser software.
>
> In Claim 1, and wherever it is found in the '071 Patent, the verb "mask" means to overlay or cover. The masking technique also appears in Claims 2-13, and 17-21.

Defendants also disagree with Plaintiff Netkey's proposed jury instructions as to the meaning

of "software executables" in paragraphs 3 and 4 of Claim 1 of the '848, for the reasons argued *infra*. On this matter, Defendants propose the following jury instruction:

> Claim 1 of the '848 Patent reads as follows:
>
>> 1. A self service computer, comprising:
>>
>> a monitor;
>>
>> a microprocessor coupled to said monitor for controlling what is displayed on said monitor;
>>
>> software executable on said microprocessor for generating a document viewing window on said monitor, and for accessing and displaying a plurality of documents in the viewing window in response to user input, said software capable of performing a plurality of functions with respect to the plurality of documents; and
>>
>> software executable on said microprocessor for displaying at least one image on said screen so as to provide navigational controls for at least one authorized function of said accessing and displaying software with respect to the plurality of documents, but without also permitting tampering with said accessing and displaying software by not displaying images providing controls for unauthorized functions with respect to the plurality of documents.
>
> The term, "software executable," in the third and fourth paragraphs of Claim 1 of the '848 Patent means a program ready to run in its current format. The software of the third paragraph of Claim 1 is separate from the software of the fourth paragraph of Claim 1. The software of each of the two paragraphs is capable of running as a program independently of the software of the other paragraph.

### III.   CLAIM INTERPRETATION ISSUES – THE '071 PATENT

As discussed in detail, *infra*, Plaintiff Netkey attempts to limit the claim construction issue in the '071 Patent to the interpretation of the term "to mask." While the definition of "to mask" is a part of the claim construction issue, the full issue involves interpretation of the entirety of paragraph 4 of Claim 1, in particular, the phrase, "at least one image positioned for display on said screen so as to mask the controls for said browser...". (*See* the '071 Patent, attached hereto and incorporated herein by this reference as Exhibit "A")  That phrase can only be interpreted correctly by looking to the specification, contrary to Netkey's attempts to interpret "to mask" almost without reference to how it is used in the specification.  However, as the Federal Circuit has consistently confirmed, "[C]laims are not interpreted in a vacuum, but are part of and are read in light of the specification." ***Slimfold Manufacturing Company, Inc. v. Kinkead Industries, Inc.***, 810 F.2d 1113, 1116 (Fed. Cir. 1987).

It is not necessary for the Court to construe all of the claim terms; only disputed claim terms must be interpreted. *United States Surgical Corp. v. Ethicon, Inc.,* 103 F.3d 1554, 1568 (Fed. Cir. 1997).

## IV.    PLAINTIFF NETKEY'S PROPOSED CLAIM INTERPRETATION – THE '071 PATENT

### A.  Disputed Claim Language

At the outset, a brief overview of the '071 Patent's disclosure and claims is useful in placing the claim construction process in a proper context.  There are three distinct types of techniques for securing a browser disclosed in the specification of the '071 Patent (Note: The "specification" of a patent technically includes the claims of the patent, but for convenience is often used to mean the portion of the patent other than the claims.  It is the latter use which is intended in this brief unless otherwise noted).  The simplest and most basic technique is to disable system functions.  This is nothing more than a long-known common sense technique based upon the fact that access to certain system functions cannot be allowed in a publicly accessed computer kiosk system.  For example, the well known "Ctrl-Alt-Del" keystroke combination for rebooting the computer must be disabled, when a publicly accessible keyboard is used in the kiosk system.  If this system function were not disabled, users of the kiosk would be able to restart the system, which would be a security problem.  The disclosure of disabling system functions occupies a very small fraction of the '071 specification, and the interpretation of portions of '071 Claims involving disabling system functions is not in dispute.

The second technique for securing the kiosk system is that of masking, with substantially the entire '071 Patent's specification being devoted to disclosing how masking is accomplished.  The masking technique involves covering unwanted browser controls with an overlaying image or images positioned on the screen so that those controls are not accessible, thereby preventing tampering with the system.  It is necessary to take precautions against tampering with the kiosk system because a standard browser is used in the '071 system, and has controls that present a security risk.  Claim 1 is the broadest masking claim, with the fourth paragraph being the only paragraph in dispute.  Therefore, a construction of the fourth paragraph of Claim 1 will resolve all construction issues with

respect to the "masking" portions of the '071 claims ('071 Claims which include some recitation of "masking" are Claims 1-13, and 17-21). The fourth paragraph of Claim 1 reads as follows:

> at least one image positioned for display on said screen so as to mask the controls for said browser software, said image thus rendering the controls inaccessible to a user of the self-service computer to resist tampering with said browser software.

(*See* Exhibit A, the '071 Patent, at Column 7, lines 49-53)

The third technique disclosed in the '071 Patent for securing the kiosk system is the "single executable program" approach, which involves writing code to create from scratch a browser having a custom graphical user interface (hereinafter "GUI") specifically designed for use in a kiosk system. Since the single executable program thus created is designed specifically for kiosk use, the GUI has no unwanted controls and there is thus no need to mask controls to secure the system. There is one passage in the specification of the '071 which discloses the "single executable program" approach, as follows:

> It is understood that the same result may be achieved by coding a browser together with the GUI desired for use in a kiosk as a single executable program. This could conveniently be achieved by including browser API calls into the NetKey.TM. product. It is further understood that in such a product, overlying windows would not need to be used and there would be no need to modify an existing GUI.

(*See* Exhibit A, the '071 Patent, Column 5, lines 4-14)

In a nutshell, Plaintiff Netkey's approach to claim interpretation in the '071 Patent is to conflate the "masking" and "single executable program" approaches of the '071 into a single approach, which it labels "masking." As Defendants will show, this is a revisionist attempt to expand the scope of "masking" in the '071 disclosure and claims beyond that which is appropriate to any invention actually disclosed in the '071 as of its filing date. In order to rationalize this enlarged scope, Netkey proposes a very broad definition of "masking," one which is not supported by a correct reading of the '071. In reaching its inaccurate reading of the '071 as to "masking," Netkey ignores significant portions of the Patent, as well as several widely accepted canons of claim construction.

Netkey begins its argument by framing the '071 claim construction issue as centering around "[t]he language at issue in paragraph four of claim 1, of the '071 patent, '...so as to mask the controls for said browser software...' ". (*See* Netkey's *Markman* Brief, at pp. 8-9)  In thus narrowly framing the claim construction issue to focus only on "to mask," Netkey completely ignores the additional highly pertinent claim language of Claim 1, paragraph 4,  specifying how the masking of Claim 1 is accomplished by an image positioned on the screen.  The full phrase properly at issue in Claim 1 is:

> **at least one image positioned for display on said screen so as to mask** the controls for said browser software...(emphasis added)

(*See* Exhibit A, the '071 Patent, Column 5, lines 4-14).

Thus, while the definition of "to mask" in Claim 1 is certainly part of the claim construction issue, it is more accurate to say that the entire foregoing phrase, involving an image positioned on the screen to accomplish the masking, must be interpreted as a coherent whole in order to correctly construe Claim 1.  This is consistent with the disclosure in the specification and claims of the '071, in which the word "mask" appears a total of fifteen (15) times, and each time is associated with a positioned image which accomplishes the masking.  (As reflected in the copy of the '071 Patent, Exhibit A hereto, each of the fifteen (15) instances of the word "mask" have been highlighted for the Court's convenience).  Further, the *only* way disclosed in the '071 to position an image on the screen to mask browser controls is by sizing the image so that it overlays non-optional portions of the browser GUI.  The use of images positioned on the screen is depicted in Figure 4 of the '071 Patent (*see* Exhibit A), and is discussed in detail in the '071 beginning at Column 4, line 55, and continuing through Column 6, line 18 (*see* Exhibit A).  In particular, images 40, 42, 44 of Figure 4 are repeatedly and exclusively described in the specification as being "sized to mask" various controls, and as "overlying" certain windows.  (*See*, *e.g.,* Exhibit A, Column 4, lines 55 through Column 5, line 7.) The images are also described as forming "a visually pleasing singular frame member...around the document viewing area 14."  (Exhibit A, Column 5, lines 14-20).  In other words, the images are being pieced together to form something like a picture frame around the outer edges of the viewing window of the browser, thereby covering the controls usually visible there.  There is no other significant discussion in the '071 which explains how the use of images to mask controls is

accomplished. Netkey, on the other hand, having first incorrectly framed the claim construction issue as involving merely a definition of "to mask," then proceeds directly to its conclusion that "to mask" means "to prevent from being displayed, to hide or block." (*See* Netkey's *Markman* Brief, at top of p. 9) No reasoning or authority for this definition of "to mask" is offered anywhere in Plaintiff Netkey's *Markman* brief, nor is any to be found in the '071 itself.

Netkey then goes on to make the strained argument that the '071 discloses two techniques to achieve masking, the first being the use of overlaying images to mask unwanted browser controls, and the second being the single executable program technique described at Column 5, lines 4-14 of the '071. (*See* Netkey's *Markman* Brief, at pp. 9-10) The following excerpt from Netkey's brief accurately sums up the heart of its position as to the interpretation of "masking:"

> In the '071 Patent, ***masking is achieved by these two techniques, image overlay, and editing the browser window by coding (i.e., browser software controls are removed, then an image is displayed on the screen in the position of the removed controls).*** Thus, the term "to mask" is used in the claims to encompass both these techniques disclosed in the specification, and would be understood by one skilled in the art as such.

(*See* Netkey's *Markman* Brief, at p. 10, emphasis added). A closer look at the foregoing argument reveals its serious underlying flaws. Netkey begins by stating that in the '071 Patent, "masking" is achieved by image overlay, and by "editing the browser window by coding (i.e., browser software controls are removed, then an image is displayed on the screen in the position of the removed controls)." (*See* Netkey's *Markman* Brief, at p.10) This is a remarkable revision of the plain language of the lone relevant passage in the specification (cited by Netkey, *see* Netkey's *Markman* Brief, at p. 10), which discloses:

> It is understood that the same result may be achieved by ***coding a browser together with the GUI desired*** for use in a kiosk as a single executable program. This could conveniently be achieved by including browser API calls into the NetKey product. It is further understood that in such a product, overlying windows would not need to be used and there would be no need to modify an existing GUI.

(*See* '071 Patent, Exhibit A, Column 5, lines 4-14, emphasis added). The foregoing passage is the sole disclosure in the entire '071 specification of any alternative to the approach of masking browser

controls with an overlaying image.  Yet nowhere in that lone passage is there any mention of "editing the browser window," much less by "coding" the browser window.  Rather, the passage discloses "coding a browser together with the GUI desired..."  Nor is there any disclosure at all in the passage of removing browser software controls, then replacing them on the screen with an image, as asserted by Netkey.  In fact, there is not even a mention in the passage of an "image," or of "masking."  Notwithstanding all these inconvenient gaps, Netkey is not deterred from offering this brief passage as disclosing "masking" using an "image" as found in Claim 1.

Netkey's interpretation of the lone passage in question as describing a second type of "masking" is also inconsistent with "masking" as used elsewhere in the '071.  According to the literal language of that passage, when using the alternative technique described -- which Netkey insists is simply a second "masking" technique -- "there would be no need to modify an existing GUI." ('071 Patent, Exhibit A, Column 5, lines 13-14)  Yet in the *Summary of the Invention* portion of the '071, one of the objects of the invention is stated as "including software **for modifying the graphical user interface (GUI)** of the browser software by including at least one image which masks controls for the browser software" ('071 Patent, Exhibit A, Column 2, lines 44-47, emphasis added). Clearly this indicates that, as the terms are used in the '071, using an image to mask the controls constitutes "modifying the GUI."  Words in the claims must be read in the same way as in the specification.  *See Renishaw* 158 F.3d at 1252; *see also **Fromson v. Anitec Printing Plates, Inc.***, 132 F.3d 1437, 1442 (Fed. Cir. 1997).  Thus, when Claim 1 calls for using an image to mask the controls, it is also necessarily calling for modifying the GUI.  Therefore, Netkey's attempt to take the alternative method, which specifically does *not* modify an existing GUI, and characterize it as "masking" using an image, is clearly inconsistent with the manner in which those terms are used in the '071 itself.

The Federal Circuit has frequently addressed cases similar to the present one, in which the patentee has sought to expand his claims beyond the limits imposed by the specification.  When seeking an overly broad claim construction, the patentee predictably tries to avoid limitations from the specification being read into the claims.  In one such case, with the patentee seeking a broader construction than the patent specification supported, the Court disposed of just such an argument by ruling that, "[h]ere, the district court did not import an additional element into the claim; instead, it

looked to the specification to aid its interpretation of a term already in the claim – an entirely appropriate practice." *Ethicon Endo-Surgery v. United States Surgical Corp.*, 93 F.2d 1572, 1578 (Fed. Cir. 1996).

This is precisely the situation in the present case, where Netkey seeks to interpret "to mask" as though using "at least one image positioned on said screen so as [to mask]" was not relevant to the meaning of "to mask." However, not only is the use of an image relevant to the interpretation of masking, but as discussed, *supra,* there is only one way disclosed in the '071 Patent to use such an image to accomplish masking, namely by overlaying the browser controls with an image or images positioned on the screen so as to cover them. As also argued, *supra*, Netkey's assertion that there is disclosed in the '071 Patent a second type of masking technique is not supported by the specification, and in fact is inconsistent with the plain language of the specification as to "masking" with an image. In *Renishaw PLC*, *supra*, the patentee sought to expand the scope of a claim limitation through the use of a broad dictionary definition. The Court instead looked for guidance first to the claim language, and then to the specification, ultimately settling on a narrower construction which better matched the scope as set forth in the patent itself.

The Federal Circuit has held that the court must "review the entire specification" in the claim construction process. *Amhil Enters., Ltd. v. Wawa, Inc.*, 81 F.3d 1554, 1559 (Fed. Cir. 1996). In a case similar to the present one, the Federal Circuit found that, "[t]he specification does not explicitly discuss an embodiment without misaligned taper angles...," and went on to narrowly construe the claims, finding that the claimed invention *required* misaligned taper angles. *Watts v. XL Systems, Inc.*, *supra*, 233 F.3d 877 at 883. The same situation prevails in the '071, in which the specification does not ever discuss or even hint at any form of masking other than the use of overlaying images to cover the browser controls. Claim 1 explicitly calls for the use of an image positioned on the screen to mask browser controls, and the *only* way shown in the specification to accomplish that is by sizing the image and positioning it on the screen so as to cover the controls. Essentially, Netkey is seeking to broaden the meaning of "masking" by pointing to a lone, short, vague passage from a single paragraph in the '071 specification as disclosing a second type of masking. As discussed, *supra*, Netkey makes this assertion despite the fact that the passage does not even mention "masking"

or an "image," and also contains language that is inconsistent with "masking" with an image, as that terminology is used elsewhere in the specification.  In another case much like the present one, the Federal Circuit addressed a similar reliance by a patentee on a single paragraph in the specification to broaden his claim impermissibly, stating:

> The statute requires that an inventor particularly point out and distinctly claim the subject matter of his invention.  35 U.S.C. §112 (1988).  It would run counter to this statutory provision for an applicant to expressly state throughout his specification and in his claims that his invention includes right angle corner border pieces and then be allowed to avoid that limitation in a later infringement suit by pointing to one paragraph in his specification stating an alternative that lacks that limitation, and thus interpret the claim contrary to its plain meaning.

*Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1562 (Fed. Cir. 1991).  In the present case, Netkey seeks to do exactly what the Court prohibited in *Unique Concepts*.

When only one embodiment of an invention is disclosed in the specification, then reading a claim to include a second alternative embodiment not adequately disclosed under 35 U.S.C. §112 is not permissible, because to do so would render the claim inherently invalid for failure to meet a condition of patentability, namely the requirement of enabling a person of ordinary skill in the art to make and use the invention.  *Wang*, *supra*, 197 F.3d at 1383.  In the '071 Patent, the only embodiment of masking disclosed at all is that of using an overlaying image to cover the browser controls.  Therefore, Netkey's attempt to find disclosure of a second masking embodiment in a vague passing reference to what is actually an *alternative* to masking is certainly inadequate under §112.  As the Court found in *Wang, supra*, "...when the subject matter that is claimed is the only subject matter that is described and enabled in the specification, that is the invention itself, and not simply a 'preferred' example of a broader invention that is not described and enabled."  197 F.3d at 1383.

In addition to the enablement requirement, Section 112 also gives rise to a separate and distinct written description requirement, when it states that the specification shall "contain a written description of the invention...".  *Vas Cath, Inc. v. Mahurkar*, 935 F.2d 1555, 1560 (Fed. Cir. 1991).  In *Vas Cath*, the Federal Circuit recognized that there had been some confusion in regards to the

12

written description requirement, and set forth a thorough review of the law in this area, "with a view to improving the situation." *Id*. at 1560-64. "The purpose of [the written description requirement] is to ensure that the scope of the right to exclude, as set forth in the claims, does not overreach the scope of the inventor's contribution to the field of art as described in the patent specification." *Reiffin v. Microsoft Corp.*, 214 F.3d 1342, 1345 (Fed. Cir. 2000). The description must clearly allow persons of ordinary skill in the art to recognize that the inventor invented what is claimed. *In re Gosteli*, 872 F.2d 1008,1012 (Fed. Cir. 1989). Since the purpose of the written description requirement is to show that the inventor actually invented what is claimed, the written description requirement is actually stricter than the enablement requirement of Section 112. The disclosure may *enable* a person of ordinary skill in the art to make and use the invention, but still not *describe* the invention in the manner required by Section 112. *Vas Cath*, 935 F.2d *at* 1561-62. For example, it is not enough to satisfy the written description requirement that the claimed invention be made obvious, it must be described with all its limitations. "One does that by such descriptive means as words, structures, figures, diagrams, formulas, etc., that fully set forth the claimed invention." *Lockwood v. American Airlines, Inc.*, 107 F.3d 1565,1572 (Fed. Cir. 1997). *See also Martin v. Mayer*, 823 F.2d 500, 504 (Fed. Cir. 1987). The disclosure must show that the inventor had invented each feature that is included as a claim limitation. *New Railhead Mfg. v. Vermeer Mfg. Co.*, 298 F.3d 1290, 1295 (Fed. Cir. 2002).

By contrast, the single passage in the '071 Patent which Netkey cites as disclosing its alleged second masking technique does not even mention "masking" or the use of an "image," both of which are required limitations of Claim 1. Further, it is an even greater reach to argue, as Netkey does, that the lone cited passage from the '071 describes the supposed second masking technique as "editing the browser window by coding (i.e., browser software controls are removed, then an image is displayed on the screen in the position of the removed controls.)" (*See* Netkey's *Markman* Brief, at p. 10) As discussed, *supra*, this reading is an extreme variation from the actual language of the cited passage.

That Netkey would even attempt to argue for such a revised reading of the specification is an illustration of just how much additional detail necessarily has to be read into the written description

in order to find in it Netkey's supposed second masking technique. The Federal Circuit addressed a similar case involving an inadequate written description in **New Railhead**, *supra*, finding that "passing references" in a single paragraph to a claimed limitation did not satisfy the written description requirement as a matter of law. 298 F.3d at 1297. In order to adequately support the claim under Section112, the written description must disclose the claimed invention either explicitly or inherently. **Reiffin**, *supra*, 214 F.3d at 1346.

It is clear that Netkey's alleged second masking technique is not explicitly found in the '071 specification; nor is that technique found inherently in the '071, as inherency requires that a person of ordinary skill in the art would *necessarily* recognize such a disclosure. *Id.*

Finally, as noted *supra*, the Federal Circuit has held that the function of claims is to put competitors on notice of the scope of the claimed invention. **Hoganas**, *supra*, 9 F.3d at 951. Netkey itself has said that "the plain, ordinary English language of the claims should apply." (*See* Netkey's *Markman* Brief, at p. 8) In plain, ordinary English terms, one thinks of a "mask" as something like a costume mask, including a first thing which covers a second thing. That is, in common usage there are always two things involved in masking, one thing covering and one thing being covered. Yet Netkey seeks to expand the definition of "mask" to include a first thing without a second thing. Specifically, Netkey would interpret Claim 1 as using an image to "mask" unauthorized browser controls which were never there in the first place because the GUI software was written to have no such controls. This highly unusual interpretation does not even match Netkey's own Computer Desktop Encyclopedia definition, which calls for "software that is able to cut out or knock out one part of an image." (*See* Netkey's *Markman* Brief, at p.9) According to the single 10-line passage which Netkey points to as disclosing its second type of masking, there is "no need to modify an existing GUI;" yet surely "cutting out" or "knocking out" part of an image would be modifying that image.

Finally, just how confusing the whole idea of "masking" without a thing which is masked can be was amply illustrated in one bit of deposition testimony of Plaintiff Netkey's technical expert, Dr. Frederick Sayward. When asked if, by Netkey's definition of "masking," the Headless Horseman of Sleepy Hollow was masked, Dr. Sayward replied that he (the Headless Horseman) was indeed

14

"masked," even though he had no head. (Deposition of Dr. Sayward, pp. 92-95, attached hereto as Exhibit "B"). Such a non-standard definition of "mask," one which cannot be found anywhere in the '071, and one which runs counter to common sense, cannot be counted upon to fairly put competitors on notice of the scope of the claimed invention of the '071 Patent.

## V.    DEFENDANTS' PROPOSED CLAIM CONSTRUCTION – '071 CLAIMS

Based on the foregoing arguments, Defendants propose that the fourth paragraph of Claim 1 of the '071 Patent be construed as follows:

> at least one image positioned for display on said screen so as to
> *overlay* the controls for said browser software, said image thus
> rendering the controls inaccessible to a user of the self-service
> computer to resist tampering with said browser software. (Emphasis
> added)

## VI.    CLAIM CONSTRUCTION ISSUES – THE '848 PATENT

Plaintiff Netkey does not address any claim construction issues with respect to the Claims of the '848 Patent (a copy of same is attached hereto as Exhibit "C"), stating that it is "not aware of any disputes as to the meaning of other language in the claims of the '071 and '848 Patents." (*See* Netkey's *Markman* Brief, at p.11)  However, the Parties have clearly and repeatedly disagreed over the interpretation of the '848 Claims throughout this litigation.  In fact, these issues were framed in detail in Defendants' *Memorandum Brief in Support of Their Rule 56( c) Motion for Summary Judgment* (*see* pp. 27-34 and, especially, pp. 31-33 re: claim construction), and in Plaintiff Netkey's *Response in Opposition* thereto (pp. 31-33).  In addition, Defendants' technical expert, Timothy Daw, raised the issue in his Expert Report (*see* Expert Report of Timothy Daw, attached hereto as Exhibit "D", at pp. 15-16); and Plaintiff's expert, Dr. Sayward, responded on the issue in his Expert Rebuttal Report. (*See* Expert Rebuttal Report of Dr. Sayward, attached hereto as Exhibit "E", at pp. 14-15).[1]

---

[1]    The ongoing dispute between the parties as to construction of the '848 Patent's claims has been readily manifest throughout this litigation, so much so that the

In a nutshell, Defendants interpret the "software executables" recited in each of paragraphs 3 and 4 of Claim 1 of the '848 Patent as two separate sets of software, one in each paragraph. Paragraphs 3 and 4 of Claim 1 read as follows:

> software executable on said microprocessor for generating a document viewing window on said monitor, and for accessing and displaying a plurality of documents in the viewing window in response to user input, said software capable of performing a plurality of functions with respect to the plurality of documents; and
>
> software executable on said microprocessor for displaying at least one image on said screen so as to provide navigational controls for at least one authorized function of said accessing and displaying software with respect to the plurality of documents, but without also permitting tampering with said accessing and displaying software by not displaying images providing controls for unauthorized functions with respect to the plurality of documents.

(Exhibit C, the '848 Patent, at Claim 1, ¶¶3-4)

Plaintiff Netkey, on the other hand, reads those two paragraphs alternately as either: (1) not requiring two sets of software (*see* Dr. Sayward's Expert Rebuttal Report, Exhibit E, at pp. 14-15); or (2) as "permitting" two sets of software (*see* Deposition of Dr. Sayward, Exhibit B, at pp. 147-148); or (3) as "a distinction without a difference" (see Netkey's *Memorandum Brief in Opposition to Defendants' Rule 56( c) Motion for Summary Judgment*, at p.30).

The aforementioned '848 claim construction issue is highly material for a number of reasons. First of all, as argued in Defendants' *Memorandum Brief in Support of Rule 56( c) Motion for Summary Judgment*, at pp.27-34, the '848 will be invalid without the benefit of the filing date of the '071 Patent. In order to qualify for that filing date, the subject matter of the '848 Claims must be

---

omission by Plaintiff Netkey in its *Markman* Brief of any discussion of this issue is surely not attributable to mere oversight. For whatever reason, Netkey appears to have voluntarily abandoned its opportunity to offer its interpretation of the claims of the '848. Defendants, however, anticipate that Netkey, in its Reply to this *Markman* Brief, may belatedly attempt to rebut Defendants' position expressed herein as to construction of the '848 claims. If this occurs, Defendants will have unfairly been deprived of the opportunity to respond to Netkey's position on '848 claim construction, and will move the Court, in that event, to either strike that portion of Netkey's Reply, or in the alternative, for leave to file a sur reply to the extent necessary to address Netkey's anticipated untimely arguments.

adequately disclosed in the '071; and in order to determine whether the '848 Claims are adequately disclosed in the '071, the precise meaning of those claims, particularly as to paragraphs 3 and 4 of Claim 1, must be made clear.

Secondly, there is the possibility that the '848 Claims will read on prior art, depending upon how the third and fourth paragraphs of Claim 1 are construed (*see* Expert Report of Timothy Daw, Exhibit D, at pp.15-16). Finally, potential infringers must be put on notice of the legitimate scope of the '848 Claims. Without knowing how to read paragraphs 3 and 4 of Claim 1, potential infringers will have no fair notice of the correct scope of the '848 claims. As the Federal Circuit has made clear, the purpose of the claims of a patent is to put competitors on notice of the scope of the claimed invention. *Hoganas AB v. Dresser Industries, Inc.*, *supra*, 9 F.3d at 951. Defendants believe that the '848 Claims are definite and clearly call for two sets of software as discussed, *supra*. However, if the Court should determine that the claims are so indefinite that they cannot be interpreted by a person of ordinary skill in the art when read in light of the specification, then the Claims are invalid as being indefinite under 35 U.S.C. § 112. *In re: Warmerdam*, 33 F.3d 1354, 1361 (Fed. Cir. 1994).

## VII.   OVERVIEW OF THE '848 PATENT

The '848 Patent is a continuation-in-part of the '071 Patent (Exhibit C, '848 Patent, Column 1, lines 5-7), and, as such, includes some of the disclosure found in the '071, while adding some new disclosure. *Augustine Medical, Inc. v. Gaymar Industries, Inc.*, 181 F.3d 1291, 1302 (Fed. Cir. 1999). In terms of technology, the browser security technique of the '848 is an evolution from the techniques found in the '071 Patent. As discussed, *supra*, the '071 was primarily devoted to masking technology, but also disclosed the use of a single executable program with a custom-designed GUI which needed no masking. In principle, the single executable program approach was a highly effective way of solving the problem of browser kiosk security. However, it suffered from one major drawback: whenever browser technology, Internet protocols, and/or document presentation and HTML standards changed, as often occurs, the entire program had to be re-written. This made the single executable program approach prohibitively expensive for commercial use, as a great amount of programming time was required to entirely re-write the single browser-GUI program, and required

that browser programming specialists be constantly kept on staff for such work. (*See* Expert Report of Timothy Daw, Exhibit D, at pp. 15-16). One of the inventors of the '071 and the '848 Patents, Jason Bernstein, confirmed this when he testified that Netkey (then known as Lexitech) dropped the idea of developing its own browser because it was too difficult and time-consuming to re-write the browser whenever standards changed. (*See* Deposition of Jason Bernstein, attached as Exhibit F hereto, at pp.90-91).

Later, Microsoft introduced Active X browser controls, which essentially provided a standard browser without a GUI, and which was designed to be used in conjunction with a vendor's own GUI control program. (*See* Expert Report of Timothy Daw, Exhibit D, p.6) Thus, by running the Active X browser along with their own custom-designed GUI control software, vendors could achieve the same results as with the single executable program approach, but without all the re-writing problems associated with the use of the single executable program approach. Netkey argued this very advantage in prosecuting their '848 application before the U.S. Patent Office. In its response of October 12, 1999 to an office action of the Patent Office, it stated:

> An added advantage of the invention is that the very best and latest browsing technology, such as Active X controls or Netscape source code, can be obtained from a number of vendors and easily adapted. It is not necessary for the kiosk owner to keep on staff or under contract web browser programming specialists. Easily usable software can be obtained from vendors and adapted to the public computer concept of the invention.

(S*ee* p.7 of Exhibit "G", attached hereto)

Thus Netkey particularly pointed out the advantage of using separate programs for the browser and GUI control software in arguing the patentability of its invention to the Patent Office. As discussed, *infra,* the third paragraph of Claim 1 of the '848 recites the browser software program, which may be an Active X control (*see* Claim 2 of the '848 Patent), while the fourth paragraph of Claim 1 recites the GUI control software program.

## VIII.  DEFENDANTS' PROPOSED CLAIM INTERPRETATION – '848 CLAIMS

Claim 1 of the '848 Patent is the broadest claim of the '848, and resolution of claim construction issues related to Claim 1 will resolve all '848 claim construction issues.  In particular, the construction of the third and fourth paragraphs of Claim 1 are at issue.  Both paragraphs begin by reciting "software executable on said microprocessor for..."  (*See* the '848 Patent, Exhibit C hereto) Plaintiff Netkey defines "software executable" as "... instructions for the computer which are able to be run as a program in their current format."  (*See* Plaintiff Netkey's Proposed Jury Instructions, Exhibit A to Plaintiff's *Markman Brief*, at p.5)

Put more simply, "software executable" is a *program* which is ready to run in its current format.  This is in line with Plaintiff Netkey's own cited definition of "program," as a "set of instructions that perform a particular task" (*see* Plaintiff's *Markman* Brief, p. 11);  it is also in line with Plaintiff's own definition of "software executable," as "instructions for the computer which are able to be run as a program in their current format."  In addition to being simpler and equally accurate, calling the software executable a "program" is also in agreement with the '848 specification itself, in which "browser software" – the "software executable" of paragraph 3 of Claim 1 –  is defined as "any *program* for accessing and displaying documents and files."  (Exhibit C, '848 Patent, Column 3, lines 64-65) (emphasis added).

As noted earlier in arguing the construction of the '071 Claims, the Federal Circuit commented on the importance of the specification to claim construction in ***Vitronics Corp.v Conceptronic, Inc.****, supra*, holding that:

> The specification acts as a dictionary when it expressly defines terms used in the claims, or when it defines terms by implication...The specification contains a written description of the invention which must be clear and complete enough to enable those of ordinary skill in the art to make and use it.  Thus, the specification is always highly relevant to the claim construction analysis.  Usually it is dispositive; it is the single best guide to the meaning of a disputed term.

90 F.3d at 1582. The specification is the "primary basis for construing the claims," because "the words of the claims must be based on the specification." ***Standard Oil Co. v. American Cyanamid Co.****, supra*, 774 F.2d at 452.  More particularly, words in the claims must be used in the same way

19

as they are used in the specification. *See **Renishaw PLC**, supra*, 158 F.3d at 1252. In the present case, Plaintiff Netkey's suggested construction of the "software executables" of paragraphs 3 and 4 as being either a single program or two programs is too broad to be supported by the specification of the '848. The appropriate practice for interpreting these elements, which are already in the claims, is to look to the specification to aid in the interpretation. ***Ethicon Endo-Surgery v. United States Surgical Corp.***, *supra*, 93 F.2d at 1578.

As stated above, Paragraph 3 of Claim 1 presents the browser portion of the claimed invention:

> software executable on said microprocessor for generating a document viewing window on said monitor, and for accessing and displaying a plurality of documents in the viewing window in response to user input, said software capable of performing a plurality of functions with respect to the plurality of documents; and

The browser software of paragraph 3 matches the browser software as disclosed in the specification of the '848, particularly in the following definition offered in the specification: "By 'browser software' is meant any program for accessing and displaying documents or files. Browser software may include, but is not limited to Netscape source code and Active X controls." (See Exhibit C, the '848 Patent, at Column 3, lines 64-67). Paragraph 4 of Claim 1 recites the GUI control software of the claimed invention:

> software executable on said microprocessor for displaying at least one image on said screen so as to provide navigational controls for at least one authorized function of said accessing and displaying software with respect to the plurality of documents, but without also permitting tampering with said accessing and displaying software by not displaying images providing controls for unauthorized functions with respect to the plurality of documents.

The GUI control software is described in the specification at Column 4, lines 1-52, and in the flowchart of Fig. 3 (*see* Exhibit C). Essentially, the GUI software places selected windows, bitmap images, and buttons on the screen (Exhibit C, Column 4, lines 49-52); and when one of the buttons is touched by a user of the kiosk, the GUI control software instructs the browser program to perform

the corresponding function (Exhibit C, Column 4, lines 12-23). Only images for authorized functions are displayed, at the selection of the operator of the kiosk (Exhibit C, Column 4, lines 33-35).

Each paragraph in a claim of a patent represents a particular element of the claimed invention. This format is required by Patent and Trademark Office ("PTO") regulations, which provide that, where a claim sets forth multiple elements, each element should be separated by a line indentation. 37 C.F.R. §1.75(i). Thus paragraph 3 of Claim 1 recites the browser software element of the claimed invention, which by Netkey's own construction of "software executable" is browser software ready to run as a program in its current format. Since by PTO regulation the browser software of paragraph 3 is a separate element from the GUI control software of paragraph 4, and further is, by Plaintiff's own definition of "software executable," ready to run in its current format, it follows that the browser software is ready to run regardless of the status of the GUI software of paragraph 4. That is, even without the GUI control software, the browser software is ready to run as a program. It is therefore a distinct program apart from the GUI program. This interpretation is in line with the disclosure of the two programs in the specification, which shows that while the two programs work together, they can each run alone. How they work together is recited in paragraph 4 of Claim 1, which defines the task of the GUI program as "to provide navigational controls for at least one authorized function" of the browser (Exhibit C, Column 6, lines 21-23).

That the browser software of paragraph 3 and the GUI control software of paragraph 4 are separate and distinct programs is clearly confirmed by the specification of the '848, which consistently shows the browser and GUI executables[2] to be separate programs. First of all, as noted, *supra*, the specification defines "browser software" as "any program for accessing and displaying documents and files." (Exhibit C, Column 3, lines 64-65). "Browser software" is thus defined as a program, with no mention of GUI control software included in the definition, thereby implying that the browser program is separate from the GUI program. The specification goes on to state that Active X controls are one type of browser software. (Exhibit C, Column 3, lines 65-67). Active X controls are well

---

[2]    "Executable" may also be a noun, meaning a program ready to run. See Exhibit C to Plaintiff Netkey's *Markman* Brief, at p.331.

known in the art as programs having no GUI of their own, and are designed for use in conjunction with GUI software designed by the user of the Active X control. (*See* Expert Report of Timothy Daw, Exhibit D, at p.16)  An Active X browser would thus be expected to run on its own, like the software of paragraph 3 of Claim 1; with the GUI software, just as in paragraph 4,  providing controls for the authorized functions of the browser.

The '848 specification further indicates the separateness of the GUI control software and the browser software in its description of how remote updating of the two executables may be accomplished. (Exhibit C, Column 5, lines 28-60)  In particular, the remote updating is described as follows:

> The GUI control software settings, the security control software settings, and the browser settings 20 of the kiosk system may be remotely modified... (Column 5, lines 32-35)
>
> In either case, the update is made by closing the executable and replacing it with a new version having different settings and/or by replacing an .ini file or the like ***associated with the executable to be modified***. (Column 5, lines 45-49) (Emphasis added.)

That the specification discloses updating by closing the executable and replacing it with a new version, and/or by replacing .ini files associated with the executable to be modified, clearly shows that the executables may be shut down and/or modified separately.  This would not be possible if the programs were not separate from one another.  Claims 5 and 6 also recite remote updating (Claim 5), and shutting down (Claim 6), of the GUI control software *and/or* the browser software.  Claims 5 and 6 thus show, by the use of the "and/or" phrase,  that the GUI software or the browser software may be shut down or modified separately.  Again, these separate operations would not be possible if the GUI control software and the browser software were not separate programs.

Additional evidence of the separateness of the programs of paragraphs 3 and 4 of Claim 1 is evident by examining the way in which Claim 1 itself is drafted.  Paragraph 3 recites software executable for performing several functions, including generating a document viewing window, accessing and displaying documents, and performing a plurality of functions with respect to the documents.  If the software of paragraph 4 were not a separate program from the software of

paragraph 3, there would have been no reason not to include the functions of paragraph 4 in paragraph 3 as well. Further, not only is the GUI control software of paragraph 4 placed in a separate paragraph from the browser software of paragraph 3, but paragraph 4 actually recites software which acts upon the software of paragraph 3, "so as to provide navigational controls for at least one authorized function of said accessing and displaying software..." (Exhibit C, Column 6, lines 21-23). The software executable of paragraph 4 acting upon the software executable of paragraph 3 in this way only makes sense if the two executables are in fact separate from one another. This is made even more clear by the plain language of the specification in describing how the GUI software works with the browser: "...the browser is instructed by the GUI control software to perform the corresponding function." (Exhibit C, Column 4, lines 17-19).

Additionally, Figure 3 discloses GUI control software only. There is no evidence in Figure 3 of any connection of the GUI control software to the browser software, indicating that the GUI control software is entirely capable of operating independently of the browser software. Figure 3 is discussed in the specification (Exhibit C, at Column 4, lines 22-52). There is no Figure in the '848 to provide a flowchart for the browser software, which is in accordance with the browser software being an off-the-shelf program such as Active X browser controls, to be purchased from an outside vendor.

Not only does the '848 specification consistently and clearly indicate that the "software executables" of paragraphs 3 and 4 of Claim 1 are separate programs, but there is never even a hint of them being combined into a single program. In fact, the only mention in either the '848 or the '071 of a single executable program occurred in the specification of the '071 (Exhibit A, the '071 Patent, at Column 5, lines 7-10), and that language was deleted from the '848 specification. In addition, Claim 16 of the '071 Patent recites an invention based upon the aforementioned "single executable program" disclosure of the '071, and thus illustrates how a single executable program having both a browser and a GUI in the program would properly be claimed. The fourth paragraph of Claim 16 of the '071 is the single paragraph of Claim 16 reciting software having both the browser and the GUI contained therein, and reads as follows:

> software including browser application programming interface (API)
> calls executable on said microprocessor for accessing and displaying
> documents in response to user input, the graphical user interface
> (GUI) of said software displaying only the document viewing area;

(*See* Exhibit A, the '071 Patent, at Claim 16, Column 8, lines 59-63).

For several reasons, it may be seen that this paragraph is reciting the single executable program disclosed in the '071 (Exhibit A) at Column 5, lines 7-14. First of all, the browser and the GUI are recited as one piece of software, in a single paragraph. The paragraph first recites the "software ...for accessing and displaying documents," i.e., the browser software; it then goes on to recite the GUI "of said software," making it clear that the GUI is included in the software. The paragraph is thus reciting a single piece of software including both the browser and the GUI. Secondly, the paragraph recites "browser API calls," and there is only one place in the '071 specification which speaks of browser API calls, and that is at Column 5, lines 10-11 (*see* Exhibit A). API calls are mentioned at only one other place in the '071 specification, and that is at Column 4, line 65, through Column 5, line 7. However, those API calls are "Windows API" calls, not "browser API calls." In addition, it is clear from the context of that portion of the specification that those Windows API calls are being used to facilitate masking, as there is a discussion of "bitmap images sized to match the corresponding window" (Exhibit A, Column 5, lines 3-4), and of "overlying windows and bitmap images," all of which indicates a masking function is being performed. By contrast, Claim 16 makes no mention at all of masking, nor does it include any language which even hints at masking. Thus, the fourth paragraph of Claim 16 is reciting a single program having both a browser and a GUI included therein, and it recites that single program in a single paragraph, exactly as would be expected. This is in marked contrast to Claim 1 of the '848, which sets out the browser program and the GUI control program in two separate paragraphs.

In summary, the discussion of "software executables" in the '848 specification clearly indicates that the browser software of paragraph 3 of Claim 1 and the GUI control software of paragraph 4 of Claim 1 are consistently described as separate programs. Further, there is no embodiment even mentioned which would indicate combining the two programs into a single executable program. As the Federal Circuit ruled in ***Wang Laboratories***, *supra*, claims ought not

to be read to include an alternative embodiment not adequately disclosed under 35 U.S.C. §112. *Wang*, 197 F.3d at 1383. As discussed, *supra*, two requirements arise under Section 112, the enablement requirement and the written description requirement. *Vas Cath, Inc.*, *supra*, 935 F.2d at 1560. "The purpose of [the written description requirement] is to ensure that the scope of the right to exclude, as set forth in the claims, does not overreach the scope of the inventor's contribution to the field of art as described in the patent specification." *Reiffin*, *supra*, 214 F.3d at 1345. The description must clearly allow persons of ordinary skill in the art to recognize that the inventor invented what is claimed. *In re Gosteli*, *supra*, 872 F.2d at 1012. The invention must be described with all its limitations. "One does that by such descriptive means as words, structures, figures, diagrams, formulas, etc., that fully set forth the claimed invention." *Lockwood*, *supra*, 107 F.3d at 1572. The disclosure must show that the inventor had invented each feature that is included as a claim limitation. *New Railhead Mfg.*, *supra*, 298 F.3d at 1295. Since the '848 specification discloses only the use of separate and distinct "software executables," the '848 claims must be interpreted this way as well.

### IX. DEFENDANTS' PROPOSED CLAIM CONSTRUCTION – '848 CLAIMS

Based on the foregoing arguments, Defendants propose the following construction of paragraphs 3 and 4 of Claim 1 of the '848 Patent:

> "Software executable" means a program ready to run in its current format. The software of the third paragraph of Claim 1 is separate from the software of the fourth paragraph of Claim 1. The software of each of the two paragraphs is capable of running as a program independently of the software of the other paragraph.

**DATED** November 22, 2003.

Respectfully submitted,

**COOKSEY & COOKSEY, P.A.**

By _(Originally Duly Executed_)
       Michael G. Cooksey, Esq.
       (Ct 21024)
       1700 Broadway, Suite 1700
       Denver, Colorado  80290
       (303) 860-0101
       ATTORNEYS FOR THE DEFENDANTS

## CERTIFICATE OF SERVICE

      I HEREBY CERTIFY that on November 22, 2003, a true and correct copy of the foregoing **DEFENDANTS' *MARKMAN* BRIEF** was placed in the U.S. Mail, postage prepaid and addressed to:

Clerk of the U.S. District Court      (by Federal Express, Tracking Number 840565864293, on
 District of Connecticut                   November 22, 2003)
450 Main Street
Hartford, CT  06103

Gene S. Winter, Esq.
ST. ONGE, STEWARD, JOHNSTON & REENS, LLC
986 Bedford Street
Stamford, Connecticut 06905-5619

Matthew J. Becker, Esq.
DAY, BERRY & HOWARD, LLP
City Place I
Hartford, CT 06103-3499

         _(Originally Duly Executed_)