UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

NETKEY, INC.,
  Plaintiff,

v.  :  Civil No. 3:00CV1364 (AVC)

NETSHIFT SOFTWARE, LTD.,
AUTOMOBILE CLUB OF HARTFORD,
AND MONTEGONET LLC.
  Defendants.

### RULING ON CLAIM CONSTRUCTION FOR '071 AND '848 PATENTS

This is an action for damages and equitable relief, brought pursuant to 35 U.S.C. §§ 271 and 281. The plaintiff, Netkey, Inc. ("Netkey"), alleges that the defendants, Netshift Software, LTD. ("Netshift"), Automobile Club of Hartford ("ACH") and Montegonet, LLC., have infringed on two of the its patents, namely United States Patent No. 5,761,071 (the "'071 patent") and United States Patent No. 6, 078, 848 (the "'848 patent").[1] Presently before this court is the parties' request (document no. 118) that this court construe two claims of the patents in suit.

The issues presented are: (1) whether the term "to mask" as used in paragraph four of claim one of the '071 patents means "to overlay" or "to prevent from being displayed; to hide or block" ; and (2) whether the term "software executable" as used in paragraphs three and four of claim one of the '848 patent requires that the software be two sets of instructions capable of running independently of one another.

---

[1] The individual defendants are hereinafter referred to collectively as Netshift.

For the reasons that hereinafter follow, the court concludes that within the meaning of these patents: (1) the term "to mask" means "to overlay"; and (2) that the term "software executable" does not require that the software be two sets of instructions capable of running independently of one another.

## BACKGROUND

Netkey, is the owner of the '071 and '848 patents. Both of those patents concern, generally speaking, self service computer kiosks that access and display documents to enable the users to view information. Both inventions also allegedly provide the owner of the kiosk a method of protecting and securing the computer system from accidental and intentional alteration by the user. Netkey alleges that the defendants have infringed claims 1, 2, 3, 4, 6, 7, 10, 11, 12, 13, 14, 15, 17, 18, 20, 21, and 22 of the '071 patent. Netkey also alleges that the defendants have infringed claims 1, 3, 4, 5, 8, 10, 11, 12, 14, 16, 17 and 19 of the '848 patent. Specifically, Netkey alleges that the defendants infringed these patents by the use, sale, or offer for sale of a product and use of a method of operating a kiosk, and that they indirectly infringed said patents by contributing or encouraging others to directly infringe.

## STANDARD

"Victory in an infringement suit requires a finding that the patent claim covers the alleged infringer's product or process, which in turn necessitates a determination of what the words in the claim mean." Markman v. Westview Instruments, Inc., 517 U.S. 317, 375 (1996) (quotation marks omitted; citations omitted). The process of determining what the words in a claim mean, commonly referred to as claim construction, is a question of law for the court to decide. Markman v. Westview Instruments, Inc., 517 U.S. 317, 391. "In construing claims, the analytical focus must begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use to 'particularly point[ ] out and distinctly claim[ ] the subject matter which the patentee regards as his invention.' 35 U.S.C. § 112, ¶ 2." Texas Digital Systems, Inc. v. Telegenix, Inc., 308 F.3d 1193, 1201-02 (Fed. Cir. 2002) (alterations in original). "The terms used in the claims bear a 'heavy presumption' that they mean what they say and have the ordinary meaning that would be attributed to those words by persons skilled in the relevant art. . . . Moreover, unless compelled otherwise, a court will give a claim term the full range of its ordinary meaning as understood by persons skilled in the relevant art." Telegenix, Inc., 308 F.3d 1193, 1202 (citations omitted).

"It has been long recognized . . . that dictionaries,

encyclopedias and treatises are particularly useful resources to assist the court in determining the ordinary and customary meanings of claim terms." <u>Telegenix, Inc.</u>, 308 F.3d 1193, 1202. "Indeed, these materials may be the most meaningful sources of information to aid judges in better understanding both the technology and the terminology used by those skilled in the art to describe the technology." <u>Telegenix, Inc.</u>, 308 F.3d 1193, 1203. Additionally, "[w]hen determining a claim term's ordinary meaning, we also look to the usage of the disputed claim term in context." <u>E-Pass Technologies, Inc. v. 3COM Corp.</u>, 343 F.3d. 1364, 1368 (Fed. Cir. 2003).

"Once a disputed claim term is identified by the parties and its plain meaning to the ordinarily skilled artisan is ascertained by the court, the next step is to examine the written description and the drawings to confirm that the patentee's use of the disputed terms is consistent with the meaning given to it by the court." <u>Rexnord Corp. v. The Laitram Corp.</u>, 274 F.3d 1336, 1342 (Fed. Cir. 2001).

> This confirmatory step is necessary for several reasons. First, patent law permits the patentee to choose to be his or her own lexicographer by clearly setting forth an explicit definition for a claim term that could differ in scope from that which would be afforded by its ordinary meaning. . . . Second, because a claim construction that would exclude the preferred embodiment is rarely, if ever, correct and would require highly persuasive evidentiary support, . . . a court mindful of this canon of construction would need to examine the written description and the drawings to determine whether the preferred embodiment falls within the scope of a construed claim. . . . Furthermore, an examination of the written description and drawings is necessary to determine whether the

4

>patentee has disclaimed subject matter or has otherwise limited the scope of the claims. . . . And, of course, if the term or terms chosen by the patentee so deprive the claim of clarity that there is no means by which the scope of the claim may be ascertained" by one of ordinary skill in the art from the language used, a court must look to the specification and file history to define the ambiguous term in the first instance.

Rexnord Corp. v. The Laitram Corp., 274 F.3d 1336, 1342 (Fed. Cir. 2001) (citations omitted; internal quotation marks omitted).

Nevertheless, a court must be mindful that the written description or drawings cannot be used to read limits into a claim. See Legget & Platt, Inc. v. Hickory Springs Manufacturing Co., 285 F.3d 1353, 1357 (Fed. Cir. 2002). Likewise, neither can the written description or drawings be used to expand the terms of a claim to include inventions that are incongruous with the ordinary meaning of a claim. See Novo Nordisk of North America, Inc. v. Genentech, 77 F.3d 1364, 1369 (Fed. Cir. 1996).

## DISCUSSION

1. The '071 Patent

The first dispute revolves around a portion of paragraph four of claim one of the '071 patent. The relevant portion of paragraph four of claim one states: ". . . at least one image positioned for display on said screen so as to mask the controls for said browser software, said image thus rendering the controls inaccessible to a user of the self-service computer to resist tampering with said browser." Patent No. 5,761,071 Col. 7, Lines 49-54.

Netkey contends that the term "to mask" means "to prevent from being displayed; to hide or block." Further, according to Netkey, "masking includes both covering a display and not revealing a display." Relying on this definition, Netkey contends that "[i]n the '071 patent, masking is achieved by two techniques, [(1)]image overlay, and [(2)] editing the browser window by coding (i.e. browser software controls are removed, [so that] an image is displayed on the screen in the position of the removed controls)." This second technique ("browser editing") would require changing the code for the browser so that the controls are not displayed.

Netshift, on the other hand, contends that the term to mask as used in claim one means "overlay." Thus, Netshift does not dispute that the term mask includes the first technique, namely, image overlay. Netshift, however, contends that the second technique, browser editing, does not fall within the meaning of the term "to mask." Specifically, Netshift argues that Netkey's contention that paragraph four of claim one includes browser editing is "a revisionist attempt to expand the scope of 'masking' in the '071 disclosure and claims beyond that which is appropriate to any invention actually disclosed in the '071 patent as of its filing date."

The pertinent dispute therefore is whether paragraph four of claim one can be said to include browser editing.

Webster's Dictionary defines the verb mask as "1a: to

6

conceal from view (as with a screen or obstacle) . . . b: to make indistinct or imperceptible <successive sounds blur and mask each other . . .> <masks undesirable flavors . . .> c: to cover up (as a thing, fact, state, quality or emotion) so as to mislead concerning its true nature . . . ." Webster's Third New International Dictionary (Unabridged) at 1387 (1961). The Oxford English Dictionary defines mask as "1 cover with a mask. 2 conceal from view; disguise . . . 3 cover so as to protect during a specific process . . . ." Oxford Concise English Dictionary at 876 (3d Ed. Revised 1999). The American Heritage Dictionary defines mask as: "1. To cover with a protective mask. 2. To make indistinct or blurred to the senses: spices that mask the strong flavor of the meat. 3. To cover in order to conceal, protect, or disguise." The American Heritage Dictionary of the English Language (4th Ed. 2000). Each of these definitions indicate that the process of masking infers the existence of something to be hidden or protected. In other words, implicit within the definition of mask, is the concept that there is a 'thing' that the mask prevents from display. Consequently, absent the masking agent, the 'thing' would be displayed. The most obvious example being that a face is masked by a mask, and, without the mask, the face would be displayed. Thus, these definitions support the contention that the term mask means, at the minimum, image overlay.

Netkey also contends, however, that the term mask covers the

browser editing method. Under the browsing editing method, the browser software is edited so that the controls are never displayed; thus, there would no "thing" to protect or prevent from disclosure. Apparently, Netkey presumes that browser editing would fall under the portion of its proffered definition that mask means "to prevent from being displayed." However, the term mask is more particular than just "to prevent from being displayed." Rather, as the definitions indicate, the term mask indicates a particular method by which something is prevented from being displayed, namely, covering or disguising. Consequently, the ordinary and customary meaning of "to mask" does not support Netkey's claim that the term to mask encompasses browser editing.[2]

Moreover, examination of the disputed claim term in the context of the claim as a whole indicates that Netkey's definition is inappropriate. See E-Pass Technologies, Inc. v. 3COM Corp., 343 F.3d. 1364, 1368 (Fed. Cir. 2003) ("[w]hen determining a claim term's ordinary meaning, we also look to the usage of the disputed claim term in context"). The claim states

---

[2]Netkey contends that a definition of "masking software" contained within the Computer Desktop Encyclopedia supports it proffered definition. That definition defines masking software as: "Software that is able to cut out or "knock out" one part of an image." The court is not persuaded. This definition does not support the proffered definition as it is clear from the definition that an image is otherwise displayed. The browser editing method, however, removes the buttons; thus, there is no image to cut out or knock out. Moreover, the definition provided is a definition for masking *software*. The claim, however, indicates that it is an *image* - not software - that does the masking.

that "at least one image" is positioned "so as to mask the controls for" the browser software, "thus rendering the [browser] controls inaccessible to a user . . . to resist tampering with said browser software." Thus, the language of the claim indicates that, absent the image, the controls would be accessible to a user. The image therefore acts as a block and protects the otherwise accessible browser controls from tampering by the user. In addition, the language employed indicates that the masking image is, in fact, separate from, and independent of, the browser software. Nothing in the claim indicates that the browser software would render the controls inaccessible by removing them from display by altering the software. Consequently, the court concludes that the language of the claim indicates that masking relates to image overlay and not browser editing.

There is, arguably, some support for Netkey's position in the patent's specifications.[3] The specifications first articulate the image overlay embodiment of masking. It states:

> [i]n the embodiment shown [in the drawings], each of these [overlaid] images . . . is a window overlying the full screen Netscape Navigator window. Each of the overlying windows is created and precisely located with Windows API (application programming interface) function calls. The [overlaid] windows are filled with bitmap images sized to match the corresponding

---

[3]The specification is that portion of a patent that contains "a written description of the invention, and of the manner and process of making and using it, . . . [as well as] one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. 112.

> window and stored in memory. These overlying windows and bitmap images are created by a GUI [(graphical user interface)] control software developed by the inventors which is currently available commercially as NetKey.

The specification continues by stating:

> It is understood that the same result may be achieved by coding a browser together with the GUI desired for use in a kiosk as a single executable program. This could conveniently be achieved by including browser API calls into the NetKey product. It is further understood that in such a product, overlying windows would not need to be used and there would be no need to modify an existing GUI.

Patent No. 5, 761, 071 Col. 4, Lines 65-67 - Col. 5, Lines 4-14.

Relying on the second portion of the specification recited above, Netkey contends that "the specification . . . includes and describes the [browser editing] . . . technique, which would be understood by one of skill in the art to effectuate masking without overlay." Although this portion of the specification admittedly presents a much closer question, the court is not persuaded that this single paragraph requires the broader definition sought by Netkey. "[C]ourts can neither broaden nor narrow claims to give the patentee something different than what he has set forth." Texas Instruments, Inc. v. United States Int'l Trade Comm'n, 988 F.2d 1165, 1171 (Fed. Cir. 1993). Consequently, "[w]hile claims are to be interpreted in light of the specification, all that appears in the specification is not necessarily within the scope of the claims and thus entitled to protection. What is not claimed, even though disclosed as part of the 'invention,' cannot be enjoined." Novo Nordisk of North

America, Inc. v. Genentech, Inc., 77 F.3d 1364, 1369 (Fed. Cir. 1996). For, after all, it is "[t]he claims . . . [and] not the specification, [that] measure the protected patent right to exclude others." Novo Nordisk of North America, Inc. v. Genentech, Inc., 77 F.3d 1364, 1369 (Fed. Cir. 1996).

By choosing the term mask, the claim identifies a method of securing the kiosk that runs counter to browser editing. Thus, to permit the specification to define the term "to mask" in a manner inconsistent with its ordinary meaning, would permit Netkey to expand its claims beyond what the ordinary meaning of the language permits. In addition, nothing in the relied upon specification indicates that the patentee intended to act as his own lexicographer and define the term mask to include browser editing. Further, the language relied on by Netkey is hardly determinative. More specifically, the last sentence of the portion of the specification relied on by Netkey states that "[i]t is further understood that in such a product, overlying windows would not need to be used . . . ." The claim, however, states that an "image" is "positioned for display" on the screen that renders the controls inaccessible. The claim language therefore indicates that an overlying window, namely, the "image," would be used. This is in contravention of the specification relied on by Netkey.

The court therefore concludes that Netkey's reliance on the specification is misplaced, and that the ordinary meaning does

11

not support Netkey's contention that the term "to mask" includes browser editing. The court concludes that the term "to mask" means: "To overlay".

2. <u>The '848 Patent</u>

The parties next dispute the language of paragraphs three and four of claim one in the '848 patent. Those paragraphs state:

> software executable on said microprocessor for generating a document viewing window on said monitor, and for accessing and displaying a plurality of documents in the viewing window in response to user input, said software capable of performing a plurality of functions with respect to the plurality of documents; and
>
> software executable on said microprocessor for displaying at least one image on said screen so as to provide navigational controls for at least one authorized function of said accessing and displaying software with respect to the plurality of documents, but without also permitting tampering with said accessing and displaying software by not displaying images providing controls for unauthorized functions with respect to the plurality of documents.

Patent No. 6, 078, 848 Col 6, Lines 13-28.

Netkey argues that the term "software executable" means: "instructions for the computer, able to be run in their current format, either as a single set of instructions or multiple sets of instructions." Additionally, Netkey argues that "it is well known to one skilled in the art of software programming that software can be written as a single executable program or a multiple executable program with the functionality of the program maintained." Thus, "the term 'software

12

executable' as used in paragraphs three and four does not require the software to be either: (1) a single set of instructions that performs both the generating function (paragraph three) and the displaying function (paragraph four), or (2) multiple sets of instructions to accomplish these functions."

Netshift responds that the term "software executable" means: "a program ready to run in its current format." Netshift further contends that"[t]he software of the third paragraph of claim one is separate from the software of the fourth paragraph of claim one. The software of each of the two paragraphs is capable of running as a program independently of the software of the other paragraph." Thus, Netshift claims that the term "software executable" only permits for two separate software programs.

The relevant dispute presented is whether the claims at issue provide only for two separate software programs capable of running independently of one another.

Both parties rely extensively on the Computer Desktop Encyclopedia in making their respective arguments. The Computer Desktop Encyclopedia defines software as: "Instructions for the computer. A series of instructions that performs a particular task is called a 'program.' . . ." It defines executable as: "Able to run in its current format."[4] Thus, the definition of

---

[4]The Computer Desktop Encyclopedia also provides that the noun form of "executable" means "a program file ready to run in a particular environment." Because both parties apparently agree that this is not the relevant definition, the court adopts the undisputed definition of executable proffered

the term "software executable" based on the Computer Desktop Encyclopedia would be: "instructions for the computer, able to run in its current format."[5]

The relevant dictionary definitions allow Netkey's interpretation. A set of instructions could be part and parcel of another set of instructions yet still perform different tasks. Thus, there is nothing inherent in the relevant definition of "software executable" that requires that the "software executable" of paragraph three be separate and independent from the "software executable" of paragraph four. Consequently, the court concludes that the ordinary meaning of the terms employed in the patent do not require Netshift's limitation.

Netshift nevertheless maintains that the structure of paragraphs three and four of the claim require its interpretation. Specifically, Netshift contends that, because the elements are identified in separate paragraphs they are separate "software executables". The court is not persuaded. Although "each element or step of the claim should be separated by a line indentation", 37 C.F.R. § 1.75(I), that does not

---

by the parties.

[5]Netshift contends that the court should substitute the term "program" for the definition "set of instructions." As the definition of software indicates, the word "program" is a term for a series of instructions that perform a particular task. Thus, a program is in fact a specific term and not simply a definition for the term software. Because the court's duty at this stage is to arrive at the meaning of the terms employed in the claim, usage of the term program would not answer the question of what the term software means. Therefore, the court does not employ the term program.

correlate into the conclusion that the "software executables" are therefore independent. Paragraphs three and four do define two elements of the claim: they define separate functions of a set of instructions. This, however, does not mean that the two "software executables" are therefore independent. Consequently, the court concludes that nothing inherent in the structure of the claim or the claim's ordinary meaning lead to the limitation sought by Netshift.

Netshift further contends that the specifications and prosecution history indicate that the "software executables" are indeed independent. The court disagrees. "Generally speaking, we indulge a 'heavy presumption' that a claim term carries its ordinary and customary meaning." CCS Fitness, Inc. V. Brunswick Corp., 288 F.3d 1359, 1366 (Fed. Cir. 2002). "An accused infringer may overcome this 'heavy presumption' and narrow a claim term's ordinary meaning, but he cannot do so simply by pointing to the preferred embodiment or other structures or steps disclosed in the specification or prosecution history. . . . Indeed, . . . our case law makes clear that a patentee need not 'describe in the specification every conceivable and possible future embodiment of his invention.'" CCS Fitness, Inc. V. Brunswick Corp., 288 F.3d 1359, 1366 (Fed. Cir. 2002) (citations omitted). One of the few manners that the heavy presumption of a claim's ordinary meaning may be overcome is "if the intrinsic evidence shows that the patentee distinguished that term from

15

prior art on the basis of a particular embodiment, expressly disclaimed subject matter, or described a particular embodiment as important to the invention." CCS Fitness, Inc. V. Brunswick Corp., 288 F.3d 1359, 1366-67.

In this case, Netshift maintains that the intrinsic evidence limits the terms of the claim because it only speaks of the "software executables" as two separate executables, and further, that Netkey failed to identify in its specification that the "software executables" could indeed be a single "software executable". The court is not persuaded. First, the portions of the specification relied on by Netshift only tangentially indicate that the "software executables" are in fact separate. Second, even if we were to credit Netshifts' interpretations of these portions of the specifications, the wording of the relevant specifications and prosecution history do not indicate that the patentee expressly intended that this be the sole embodiment or interpretation of the disputed term. Kegel Co., Inc. V. AMF Bowling, Inc., 127 F.3d 1420, 1427 (Fed. Cir. 1997) ("[w]ithout an express intent to impart a novel meaning to a claim term, the term takes on its ordinary meaning"). Likewise, the fact that Netkey did not identify a single executable method in its specification is not determinative. See CCS Fitness, Inc. V. Brunswick Corp., 288 F.3d 1359, 1368 (alleged infringer "cannot use the intrinsic evidence's silence to narrow the ordinary meaning of an unambiguous claim term"); see also CCS Fitness,

Inc. V. Brunswick Corp., 288 F.3d 1359, 1366 ("patentee need not 'describe in the specification every conceivable and possible future embodiment of his invention.'"). Consequently, because the court concludes that the intrinsic evidence relied upon by Netshift is simply insufficient to overcome the ordinary meaning of the terms at issue, the court rejects Netshift's construction of the claim.

The court therefore adopts the construction proffered by Netkey, and construes the term "software executable" to mean: "Instructions for the computer, able to be run in their current format, either as a single set of instructions or multiple sets of instructions."

## CONCLUSION

It is so ordered this 31st day of January, 2004, at Hartford, Connecticut.

Alfred V. Covello
United States District Judge