IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| NETKEY, INC. | ) |
| | ) |
| Plaintiff | ) |
| | ) Civil Action No. 00 CV 1364(AVC) |
| v. | ) |
| | ) |
| NETSHIFT SOFTWARE, LTD. and | ) |
| AUTOMOBILE CLUB OF HARTFORD | ) |
| | ) |
| Defendants/Counter-Claimants. | ) |

**MEMORANDUM IN SUPPORT OF MOTION FOR RECONSIDERATION OF
'071 PATENT CLAIM CONSTRUCTION ON GROUNDS OF CLEAR ERROR**

Netkey, Inc. ("Netkey") moves for reconsideration of the January 31, 2004 Ruling on Claim Construction for U.S. Patent No. 5,761,071 (hereinafter "the '071 patent") on grounds of clear error. In support of its motion, Netkey submits this Memorandum of Law along with portions of the prosecution file history of the '071 patent attached hereto as Exhibit A.

**Introduction**

The Court's Ruling on Claim Construction states:

> [T]o permit the specification to define the term "to mask" in a manner inconsistent with its ordinary meaning, would permit Netkey to expand its claims beyond what the ordinary meaning of the language permits.
>
> \* \* \*
>
> The Court therefore concludes that Netkey's reliance on the specification is misplaced, and that the ordinary meaning does not support Netkey's contention that the term "to mask' includes browser editing.

See January 31, 2004 Ruling on Claim Construction for the '071 and '848 Patents by Judge Covello, Docket #138 (hereinafter "Ruling"), pp. 11-12. The Court's conclusion to adopt, as its construction of the '701 patent, the plain ordinary meaning of the claim term "to mask" is a clear error when the patentee clearly set out in the specification of the '701 patent a definition of the term "to mask" which is inconsistent with the plain ordinary meaning of the term.

**Argument**

Even assuming arguendo that the Court's determination that the plain ordinary meaning of "to mask" is correct, the Court's ultimate construction of the claim term "to mask" is erroneous as a matter of law in view of *Vitronics Corp. v. Conceptronic Inc.*, 90 F.3d 1576 (Fed.Cir.1996); See also *Renishaw plc v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1247 (Fed.Cir.1998) (Federal Circuit in determining whether the district court made errors of claim construction cites *Vitronics* when setting forth rules at the "core of claim construction methodology" which "provide guideposts for a spectrum of claim construction problems."); *Tate Access Floors, Inc. v Macess Techs., Inc.*, 222 F.3d 958 (Fed.Cir.2000); *Hockerson-Halberstadt Inc. v. Avia Group International Inc.*, 222 F.3d 951 (Fed.Cir.2000); *Optical Disc Corp. v. Del Mar Avionics*, 208 F.3d 1324 (Fed.Cir.2000); *Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225 (Fed.Cir.2001); *Forest Labs, Inc. v. Abbott Labs.*, 239 F.3d 1305 (Fed.Cir.2001); *MSM Investments Company, LLC v. Carolwood Corporation*, 259 F.3d 1335 (Fed.Cir.2001); and *DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314 (Fed.Cir.2001).

In *Vitronics*, the Federal Circuit articulated the procedure to be followed by a District Court in construing claims of U.S. Patents. The starting point of the analysis is the plain ordinary meaning of the claim term to be construed. *Vitronics* at 1583.

As a matter of law, however, the plain ordinary meaning of a claim term is not the correct construction of the claim term where, as in this case, the inventor has used claim terms in the patent in "a manner inconsistent with their ordinary meaning". *Id.* As stated by the court, "the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive." *Id.*

In its Ruling, the Court determined that the ordinary and customary meaning of the term "to mask" is simply, "to overlay." *See* Ruling at p. 12. Even assuming that this determination of the ordinary and customary meaning is correct, this Court did not follow the *Vitronics* analysis and erroneously refused to construe the claim term according to the definition set out by the patentee in the specification.

*Vitronics* makes clear that claim terms shall be construed according to their plain and ordinary meaning UNLESS the patentee inconsistently uses and defines the term in the specification in which case the patentee's definition of the claim term is the legally correct construction.

In this case, as set out above, the Court explicitly acknowledges that the patentee used the claim term in the specification in a manner inconsistent with the Court's determination of its plain and ordinary meaning, but then erroneously concludes that this is the reason to reject the patentee's definition. Indeed, the

3

law is clear that this is precisely a situation in which the Court must substitute the inconsistent definition from the specification for the plain ordinary meaning to arrive at a legally correct construction.

While there is a presumption that the claims carry their ordinary accustomed meaning to those of skill in the art at the time of the invention, a patent applicant may overcome this presumption by clearly using a word in the specification, prosecution history, or both in a "manner inconsistent with its ordinary meaning." *ResQNet.com Inc. v. Lansa Inc.*, 346 F.3d 1374, 1378 (Fed. Cir 2003) ("[A] patent applicant may consistently and clearly use a term in a manner either more or less expansive than its general usage in the relevant community, and thus expand or limit the scope of the term in context of the patent claims.")

In reviewing the specification, there is a disclosure of effectuating masking by the browser coding technique. The patent specification states:

> "It is understood that the same result may be achieved by coding a browser together with the GUI.... It is further understood that in such a product, <u>overlying</u> windows would not need to be used."

'071 patent, col. 5 lines, 7-13, emphasis added. The Court acknowledges that the patentee has used the claim term "to mask" in a manner inconsistent with its plain ordinary meaning in its Ruling at pages 9-10: "There is, arguably, some support for Netkey's position in the patent specification....Although this portion of the specification admittedly presents a much closer question, the court is not persuaded that this single paragraph requires the broader definition sought by Netkey."

Under *Vitronics*, the Court must rely on this language in the patent specification to fully define the claim term "to mask" as intended by the patentee precisely for the reason that the definition offered by the patentee diverts from the ordinary and customary meaning of the term. It is clear error to substitute "overlay" for "mask" where the specification states that an "overlying" technique need not be used.

Assuming the Court's determination that the ordinary and customary meaning of "to mask" is "to overlay" is correct, review of the specification of the '071 patent requires the Court to alter the ordinary and customary meaning and give the term its full meaning as meant by the inventor to arrive at the legally correct claim construction. The Court acknowledges that there is such a description in the specification to support expansion of the ordinary of customary meaning of "to mask" to include the concept that masking, as envisioned by the inventor, may be achieved by coding the browser window.

Not only does the specification support Plaintiff's proposed construction of "to mask" as including the browser coding technique, but the prosecution history does as well. Upon review of the file history, claim scope was not disavowed during prosecution of the '071 patent. A patent applicant may use a word in the specification, prosecution history, or both in a "manner inconsistent with its ordinary meaning." *ResQNet.com* at 1378. The prosecution history supports Plaintiff's consistent use of mask as it is used in the specification according to Plaintiff's proposed construction. The language of the original claims was never amended to change or limit the meaning of "to mask" to something less than

5

what was fully disclosed in the specification, that is, both the overlay and browser coding techniques. No arguments were made to limit the scope or change the definition of this claim language in order to obtain allowance of the patent. *See* portions of the file history, including claims as filed, dated August 27, 1996 Amendment dated July 28, 1997, and Request for Reconsideration dated October 21, 1997, all attached at Exhibit A.

Nowhere does the prosecution history limit Plaintiff's proposed construction of "to mask" to simply "to overlay." In order to disavow claim scope, the patent applicant must clearly and unambiguously express surrender of subject matter during prosecution. *Middleton, Inc. v. Minn. Mining & Mfg. Co.*, 311 F.3d 1384, 1388 (Fed. Cir. 2002) Disavowing statements and actions made during prosecution, must be both clear and unmistakable in order to be used to limit the scope of the claims. *ResQNet.com* at 1378. Such disavowal of claim scope cannot be found in the specification nor the prosecution history and limiting the plain ordinary meaning of "to mask" to simply "to overlay" is an unwarranted error of law.

## Conclusion

For the reasons set forth above, Netkey respectfully requests that this Court grant its Motion for Reconsideration and construe the claim term "to mask" in the legally correct manner intended by the patentee as set out in the specification of the '701 patent in accordance with *Vitronics*.

Respectfully submitted,

2/13/04
Date

*Gene S. Winter*
Gene S. Winter, ct05137
Helen M. Limoncelli, ct24332
St. Onge Steward Johnston & Reens LLC
986 Bedford Street
Stamford, Connecticut 06905-5619
Telephone: (203) 324-6155
Facsimile: (203) 327-1096

Attorneys for Plaintiff

90 F.3d 1576  
65 USLW 2124, 39 U.S.P.Q.2d 1573  
(Cite as: 90 F.3d 1576)

Page 1

United States Court of Appeals,  
Federal Circuit.

VITRONICS CORPORATION, Plaintiff-Appellant,  
v.  
CONCEPTRONIC, INC., Defendant-Appellee.

No. 96-1058.

July 25, 1996.

Patentee brought action against competitor, alleging infringement of its patented method for reflow soldering of surface mounted devices to printed circuit boards. The United States District Court for the District of New Hampshire, Martin F. Loughlin, J., entered judgment in favor of competitor, and patentee appealed. The Court of Appeals, Michel, Circuit Judge, held that: (1) "solder reflow temperature" within meaning of patent meant peak reflow temperature, rather than "liquidus temperature," and (2) trial court erred in relying on expert testimony in interpreting claim.

Reversed and remanded.

West Headnotes

[1] Patents 226.6  
291k226.6 Most Cited Cases

Literal patent infringement analysis involves two steps: proper construction of asserted claim and determination as to whether accused method or product infringes asserted claim as properly construed.

[2] Patents 314(5)  
291k314(5) Most Cited Cases

[2] Patents 324.5  
291k324.5 Most Cited Cases

Patent claim construction is matter of law, which Court of Appeals reviews de novo.

[3] Patents 165(2)  
291k165(2) Most Cited Cases

[3] Patents 167(1)  
291k167(1) Most Cited Cases

[3] Patents 168(2.1)  
291k168(2.1) Most Cited Cases

In interpreting asserted patent claim, court should look first to intrinsic evidence of record, i.e., patent itself, including claims, specification and if in evidence, prosecution history; such intrinsic evidence is most significant source of legally operative meaning of disputed claim.

[4] Patents 165(2)  
291k165(2) Most Cited Cases

In interpreting patent claim, Court of Appeals first looks to words of claims themselves, both asserted and nonasserted, to define scope of patented invention.

[5] Patents 162  
291k162 Most Cited Cases

Although words in patent claim are generally given their ordinary and customary meaning, patentee may choose to be his or her own lexicographer and use terms in manner other than their ordinary meaning, as long as special definition of term is clearly stated in patent specification or file history.

[6] Patents 167(1.1)  
291k167(1.1) Most Cited Cases

In interpreting patent claim, it is always necessary to review specification to determine whether inventor has used any terms in manner inconsistent with their ordinary meaning; specification acts as a dictionary when it expressly defines terms used in claims or when it defines terms by implication.

[7] Patents 167(1)  
291k167(1) Most Cited Cases

Patent specification contains written description of invention which must be clear and complete enough to enable those of ordinary skill in the art to make and use it; thus, specification is always highly relevant to claim construction analysis.

[8] Patents 167(1)  
291k167(1) Most Cited Cases

Usually, specification is dispositive when discovering patent claims; it is single best guide to meaning of disputed term.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

90 F.3d 1576
65 USLW 2124, 39 U.S.P.Q.2d 1573
**(Cite as: 90 F.3d 1576)**

Page 2

**[9] Patents ☞168(2.1)**
291k168(2.1) Most Cited Cases

Court may consider prosecution history of patent, if in evidence, in interpreting patent claim.

**[10] Patents ☞168(2.1)**
291k168(2.1) Most Cited Cases

"Prosecution history" contains complete record of all proceedings before Patent and Trademark Office (PTO), including any express representations made by patent applicant regarding scope of claims; as such, record before PTO is often of critical significance in determining meaning of claims.

**[11] Patents ☞168(1)**
291k168(1) Most Cited Cases

Included within analysis of file history, when interpreting patent claim, may be examination of prior art cited therein.

**[12] Patents ☞159**
291k159 Most Cited Cases

In most situations, analysis of intrinsic evidence alone will resolve any ambiguity in disputed patent claim term; in such circumstances, it is improper to rely on extrinsic evidence.

**[13] Patents ☞159**
291k159 Most Cited Cases

In those cases where public record unambiguously describes scope of patented invention, reliance on any extrinsic evidence is improper.

**[14] Patents ☞159**
291k159 Most Cited Cases

Claims, specification, and file history, rather than extrinsic evidence, constitute public record of patentee's claim, record on which public is entitled to rely.

**[15] Patents ☞227**
291k227 Most Cited Cases

Competitors are entitled to review public record, apply established rules of claim construction, ascertain scope of patentee's claimed invention and, thus, design around claimed invention.

**[16] Patents ☞101(2)**
291k101(2) Most Cited Cases

"Solder reflow temperature" within meaning of patent for reflow soldering of surface mounted devices to printed circuit boards, meant peak reflow temperature, rather than "liquidus temperature," where preferred embodiment in specification would have fallen outside scope of claim if term was meant to mean "liquidus temperature."

**[17] Patents ☞165(1)**
291k165(1) Most Cited Cases

Interpretation of patent so that preferred embodiment falls outside of patent claim is rarely, if ever, correct and would require highly persuasive evidentiary support.

**[18] Patents ☞159**
291k159 Most Cited Cases

Even if trial judge permissibly decided to hear all possible evidence before construing patent claim, expert testimony, which was inconsistent with specification and file history, should have been accorded no weight.

**[19] Patents ☞159**
291k159 Most Cited Cases

In instances in which intrinsic evidence is insufficient to enable court to determine meaning of certain patent claims, extrinsic evidence may also properly be relied on to understand the technology and to construe claims.

**[20] Patents ☞159**
291k159 Most Cited Cases

"Extrinsic evidence" is that evidence which is external to patent and file history, such as expert testimony, inventor testimony, dictionaries, and technical treatises and articles.

**[21] Patents ☞159**
291k159 Most Cited Cases

Extrinsic evidence in general, and expert testimony in particular, may be used only to help court come to proper understanding of patent claims; it may not be used to vary or contradict claim language.

**[22] Patents ☞159**

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

291k159 Most Cited Cases

Extrinsic evidence may not contradict import of other parts of patent specifications.

**[23]** Patents ⚷159
291k159 Most Cited Cases

Where patent documents are unambiguous, expert testimony regarding meaning of claim is entitled to no weight.

**[24]** Patents ⚷162
291k162 Most Cited Cases

Testimony concerning inventor's objective intent as to claim's scope, when unexpressed in patent documents, cannot guide court to proper interpretation of patent when patent documents themselves do so clearly.

**[25]** Patents ⚷161
291k161 Most Cited Cases

Court in its discretion may admit and rely on prior art proffered by one of the parties, whether or not cited in specification or file history, when interpreting patent; this prior art can often help to demonstrate how disputed claim term is used by those skilled in the art.

**[26]** Patents ⚷159
291k159 Most Cited Cases

As compared to expert testimony, which often only indicates what particular expert believes patent term means, prior art references may be more indicative of what all those skilled in art generally believe certain term means; reliance on such evidence is unnecessary and improper, however, when disputed terms can be understood from careful reading of public record.

**[27]** Patents ⚷167(1.1)
291k167(1.1) Most Cited Cases

**[27]** Patents ⚷168(2.1)
291k168(2.1) Most Cited Cases

Prior art may not be used to vary patent claim terms from how they are defined, even implicitly, in specification or file history.

**[28]** Patents ⚷162
291k162 Most Cited Cases

Regardless of how those skilled in the art would interpret patent term in other situations, where those of ordinary skill, on reading of patent documents, which conclude that documents preclude term being given meaning propounded by expert witness, court must give it meaning indicated by patentee in patent claim, specification and file history.

**[29]** Patents ⚷159
291k159 Most Cited Cases

Trial court erred in considering extrinsic evidence when determining meaning of claim term "solder reflow temperature" in patent for method of reflow soldering of surface mounted devices to printed circuit boards, where specification clearly and unambiguously defined term.

**[30]** Patents ⚷159
291k159 Most Cited Cases

Prior art documents and dictionaries are to be preferred over opinion testimony, whether by attorney or by artisan in field of technology to which patent is directed, when interpreting patent claim.

Patents ⚷328(2)
291k328(2) Most Cited Cases

4,654,502. Cited.
*1578 James J. Foster, Wolf, Greenfield & Sacks, P.C., Boston, Massachusetts, argued, for plaintiff-appellant. With him on the brief were Lawrence M. Green and Brett N. Dorny.

Paul J. Hayes, Weingarten, Schurgin, Gagnebin & Hayes, Boston, Massachusetts, argued, for defendant-appellee. With him on the brief was Dean G. Bostock.

Before MICHEL and LOURIE, Circuit Judges, and FRIEDMAN, Senior Circuit Judge.

MICHEL, Circuit Judge.

Vitronics Corporation ("Vitronics") appeals the September 27, 1995 order of the United States District Court for the District of New Hampshire, Civil Action No. 91-696-L, entering judgment as a matter of law that Vitronics did not prove that

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Conceptronic, Inc. ("Conceptronic") infringed claim 1 of U.S. Patent No. 4,654,502 ("the '502 patent"). The appeal was submitted for decision after oral argument on May 8, 1996. Because we conclude that the specification of the '502 patent dictates a claim interpretation in accordance with the plaintiff's proposed construction, and that, so construed, the '502 patent may have been infringed, we reverse the trial court's decision and remand for further proceedings.

## BACKGROUND
**The Patented Invention**

Vitronics and Conceptronic both manufacture ovens used in the production of printed *1579 circuit boards. The ovens are used to solder electrical devices (such as resistors, capacitors and integrated circuits) to the boards. Several methods of soldering devices to boards have been developed; the '502 patent, assigned to Vitronics, is directed to one of those methods.

Specifically, the '502 patent is directed to a method for the reflow soldering of surface mounted devices to a printed circuit board in which the circuit board is moved by a conveyor through a multizone oven. In this process, a solder paste is placed on the circuit board and the devices to be soldered (with attached connectors) are placed on the paste. The circuit board is then placed on what is basically a conveyor belt running through an oven and passing through several different heating zones. In the final and hottest zone, the solder paste melts and forms a connection between the device and the circuit board. The boards remain in the last heating zone for only a short duration, allowing the solder to reach a temperature high enough to cause the solder to melt and reflow while maintaining the devices themselves below the solder reflow temperature. Due to this temperature differential, the solder flows up the device connectors to form a solid connection.

Claim 1 of the '502 patent, the only claim at issue in this appeal, reads as follows (with added emphasis on the disputed terms):
1. A method for reflow soldering of surface mounted devices to a printed circuit board comprising:
moving a printed circuit board having solder and devices disposed on a surface thereof through a first zone and in close proximity to a first emitting surface of at least one nonfocused infrared panel emitter, said first emitting surface being at a first panel temperature;
moving said board through a second zone and in close proximity to a second emitting surface of at least one nonfocused infrared panel emitter, said second emitting surface being at a second panel temperature lower than said first panel temperature; and
moving said board through a third zone and in close proximity to a third emitting surface of at least one nonfocused infrared panel emitter, said third emitting surface being at a third panel temperature higher than said second panel temperature, said third emitting surface heating said board and said solder to *a solder reflow temperature* for a period of time sufficient to cause said solder to reflow and solder said devices to said board while maintaining the temperature of said devices below *said solder reflow temperature.*

**Proceedings Before the District Court**

This action was brought on November 26, 1991 by Vitronics against Conceptronic for infringement of both the '502 patent and U.S. Patent No. 4,833,301 ("the '301 patent"). [FN1] At the time the suit was filed, Conceptronic was selling the "Mark series" line of ovens. Conceptronic later discontinued the Mark series and began selling the "HVC series" line of ovens. Prior to trial, the parties stipulated that every limitation of claim 1 of the '502 patent was met by the HVC series of ovens, except the limitation requiring the utilization of "nonfocused infrared panel emitters" and the limitation that the temperature of the devices must be maintained below the "solder reflow temperature." [FN2]

FN1. A jury returned a verdict of non-infringement of the '301 patent. Vitronics does not appeal that verdict.

FN2. Whether the Conceptronic ovens utilize nonfocused infrared panel emitters is not before this court.

Vitronics, by way of a request for a jury instruction, asked the court to construe the meaning of the "solder reflow temperature" limitation. The specific instruction sought by Vitronics was as follows:
In considering the question of whether the '502 method patent has been infringed by the Mark and HVC Series ovens, you have to decide whether, in use, those ovens maintain the temperature of the devices below the solder reflow temperature. The

phrase "solder reflow temperature" in the '502 patent means the temperature reached by the solder during the period it is reflowing during the final stages of the *1580 soldering process, sometimes referred to as the "peak solder reflow temperature." It does not mean the "liquidus temperature," the temperature at which the solder first begins to melt. Thus, if the temperature of the devices stays below that of the solder, the '502 method patent is infringed by the Mark and HVC Series ovens.

Thus, Vitronics contended that, as used in the claim, solder reflow temperature means peak reflow temperature, *i.e.*, a temperature approximately 20° C above the liquidus temperature, at which the solder is completely melted and moves freely. Conceptronic, on the other hand, contended that solder reflow temperature means 183° C, *i.e.*, the liquidus temperature of a particular type of solder known as 63/37 (Sn/Pb) solder. [FN3]

> FN3. The specification of the '502 patent describes three exemplary types of solder which can be used in the solder reflow process-- 60/40 (Sn/Pb), 63/37 (Sn/Pb) and 62/36/2 (Sn/Pb/Ag)--each of which, it indicates, has a liquidus temperature of about 190° C and a peak reflow temperature of about 210° to 218° C. At trial, the parties appear to have discussed only 63/37 (Sn/Pb) solder, which has a liquidus temperature of 183° C. However, the claims are not limited to that particular solder or a solder with that particular liquidus temperature.

The district court delayed construing the disputed language until the close of testimony, at which time it ruled in favor of Conceptronic and concluded that the term "solder reflow temperature" as used in claim 1 refers to 183°>>>>>C. Vitronics then conceded that the court was required to grant judgment as a matter of law in favor of Conceptronic, as Vitronics had not presented any evidence of infringement under the court's interpretation of solder reflow temperature. This appeal followed.

**Claim Construction Aids Before the District Court**

In spite of Vitronics' early request for a jury instruction on the proper claim construction, the district court delayed announcing its claim construction until hearing all the evidence put forth at trial. During trial, and in their briefs to the district court in support of their respective claim constructions, the parties discussed the patent specification, expert testimony, prior testimony and writings of Vitronics and its employees, and technical references. The most pertinent materials are discussed below.

*The Patent Specification*

Vitronics relied heavily upon the patent itself to support its asserted claim construction. Although Vitronics conceded that the term "solder reflow temperature" may be ambiguous when considered in isolation, it argued that the specification clearly shows that, as used in the claim, solder reflow temperature means peak reflow temperature rather than the liquidus temperature. In particular, Vitronics pointed to that part of the specification that describes a preferred embodiment:

> A preferred embodiment of the invention for reflow soldering of surface mounted devices to printed circuit boards will now be described. The printed circuit boards are typically made of epoxy-glass, such as fire retardant 4(FR- 4), or polyamide glass. These boards typically degrade above temperatures of 225° C. The solder may be, for example, 60/40 (Sn/Pb), 63/37 (Sn/Pb), or 62/36/2 (Sn/Pb/Ag), all of which have a liquidus temperature (i.e. begin to melt) of about 190° C. and a peak reflow temperature of about 210°-218° C. Thus, to effect reflow soldering without damaging the board, the solder must be allowed to reach a temperature of at least 210° C., but the board cannot reach a temperature of 225° C.
>
> . . . . .
>
> The board is then sent into a fifth zone 5 to bring the temperature of the board up to a temperature of approximately 210° C., the devices up to approximately 195° C., and the solder up to approximately 210°>>>>> C. for a period of time of from about 10 to about 20 seconds to cause the solder to flow. Because the devices are cooler than the board, the solder flows up the devices.... The board spends approximately 60 seconds in the fifth zone, but only about 10 to 20 seconds at 210° C. Thus, the board is at the solder reflow temperature for only a short period of time and the *1581 devices never reach the solder reflow temperature.

Vitronics pointed out that, in the example described as the preferred embodiment, the temperature of the solder is raised to 210° C, the peak reflow temperature, and the temperature of the devices is

raised to 195°>>>>> C, 5° above the 190° C liquidus temperature. Thus, as argued by Vitronics, the term "solder reflow temperature" must be construed so that it refers to the peak reflow temperature because the claim requires that the temperature of the devices be maintained below "said solder reflow temperature"; if solder reflow temperature were construed to refer to liquidus temperature, the preferred embodiment would not be covered by the patent claims.

*Expert Testimony*

Conceptronic relied heavily on the expert testimony of Dr. Rothe. Dr. Rothe testified that the meaning of the term "solder reflow temperature" in claim 1 is synonymous with liquidus temperature. Dr. Rothe further testified that the solder reflow temperature for 63/37 (Sn/Pb) is 183° C. Dr. Rothe likewise testified at trial that several technical articles written by those skilled in the art supported his view that solder reflow temperature refers to liquidus temperature.

*The Testimony of Mr. Hall*

Conceptronic also relied on the testimony of Mr. Hall, the Chief Engineer at Vitronics. At trial, Mr. Hall confirmed that during his deposition he had testified that the reflow temperature of solder was 183°> C. Mr. Hall also testified that, during his deposition, he had used solder reflow temperature to refer to liquidus temperature. However, at another point in his trial testimony, Hall explained that, while in his earlier deposition testimony he had used solder reflow temperature to refer to liquidus temperature, he did not suggest that was how the term was used in the patent. Rather, Hall testified the patent uses the term to refer to the peak reflow temperature.

*Paper Written By Former Vitronics Employee*

Conceptronic also introduced into evidence a paper written by Phillip Zarrow, a former employee of Vitronics, defining solder reflow temperature in the following manner: "As the temperature of the solder paste on the interconnect passes the solder alloy's melting point and the solder enters a molten state, the assembly enters the reflow region of the process. For 63 Sn/37 Pb, a eutectic solder and the most common SMT alloy, reflow occurs at 183° C." Phillip Zarrow, *Convection/Infrared and Convection Dominant Reflow Soldering of Fine Pitch SMT Devices*, § 10.3.3 (1994). However, that same paper later describes the solder reflow process as taking the temperature of the solder above liquidus: "Most solder manufacturers recommend bringing the interconnection temperature approximately 15 to 25° C above the alloy melting point to achieve full liquidus and assure good solder flow and aid fillet formation." *Id.*

*Memorandum of Plaintiff Vitronics Corporation in Opposition to Motion for Summary Judgment of Defendant Conceptronic Corporation and In Support of Plaintiff's Cross-Motion for Summary Judgment of Patent Validity and Infringement*

In its brief supporting its proposed construction of claim 1, both at the trial court level and here on appeal, Conceptronic similarly relied on a memorandum written by Vitronics which contains the following language: "Tin/lead solders commonly used by the electronic products industry have a 'liquidus' or 'reflow' temperature in the order of 183° C, or about 361° F." However, this phrase is in the background section of the memorandum and later in the same memorandum, Vitronics discussed the issue of infringement as being whether the temperature of the devices was maintained below "the temperatures of the leads at which the solder is reflowing."

Without indicating which evidence it relied upon, the district court simply ruled that solder reflow temperature meant 183° C.

ANALYSIS
**The Use of Intrinsic and Extrinsic Evidence in Claim Construction**

[1][2] A literal patent infringement analysis involves two steps: the proper construction *1582 of the asserted claim and a determination as to whether the accused method or product infringes the asserted claim as properly construed. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976, 34 USPQ2d 1321, 1326 (Fed.Cir.1995) (in banc), *aff'd*, 517 U.S. 370, ----, 116 S.Ct. 1384, 1393, 134 L.Ed.2d 577 (1996); *Hormone Research Found., Inc. v. Genentech, Inc.*, 904 F.2d 1558, 1562, 15 USPQ2d 1039, 1042 (Fed.Cir.1990), *cert. dismissed*, 499 U.S. 955, 111 S.Ct. 1434, 113 L.Ed.2d 485 (1991). The first step, claim construction, is a matter of law, which we review *de novo*. *Markman*, 52 F.3d at 979, 34 USPQ2d at 1329. Claim construction is the only step in the infringement analysis at issue in this appeal. [FN4]

FN4. No assertion was made that defendant infringed under the doctrine of equivalents.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

In determining the proper construction of a claim, the court has numerous sources that it may properly utilize for guidance. These sources have been detailed in our previous opinions, as discussed below, and include both intrinsic evidence (*e.g.,* the patent specification and file history) and extrinsic evidence (*e.g.,* expert testimony).

[3] It is well-settled that, in interpreting an asserted claim, the court should look first to the intrinsic evidence of record, *i.e.,* the patent itself, including the claims, the specification and, if in evidence, the prosecution history. *See Markman,* 52 F.3d at 979, 34 USPQ2d at 1329. Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language.

[4][5] First, we look to the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention. *See Bell Communications Research, Inc. v. Vitalink Communications Corp.,* 55 F.3d 615, 620, 34 USPQ2d 1816, 1819 (Fed.Cir.1995). Although words in a claim are generally given their ordinary and customary meaning, a patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history. *Hoechst Celanese Corp. v. BP Chems. Ltd.,* 78 F.3d 1575, 1578, 38 USPQ2d 1126, 1129 (Fed.Cir.1996) ("A technical term used in a patent document is interpreted as having the meaning that it would be given by persons experienced in the field of the invention, unless it is apparent from the patent and the prosecution history that the inventor used the term with a different meaning.") (citations omitted); *Hormone,* 904 F.2d at 1563, 15 USPQ2d at 1043 ("It is a well-established axiom in patent law that a patentee is free to be his or her own lexicographer and thus may use terms in a manner contrary to or inconsistent with one or more of their ordinary meanings.") (citations omitted).

[6][7][8] Thus, second, it is always necessary to review the specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning. The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication. *Markman,* 52 F.3d at 979, 34 USPQ2d at 1330. As we have repeatedly stated, "[c]laims must be read in view of the specification, of which they are a part." *Id.* at 979, 52 F.3d 967, 34 USPQ2d at 1329. The specification contains a written description of the invention which must be clear and complete enough to enable those of ordinary skill in the art to make and use it. Thus, the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.

[9][10][11] Third, the court may also consider the prosecution history of the patent, if in evidence. *Id.* at 980, 52 F.3d 967, 34 USPQ2d at 1330; *Graham v. John Deere,* 383 U.S. 1, 33, 86 S.Ct. 684, 701-02, 15 L.Ed.2d 545, 148 U.S.P.Q. 459, 473 (1966). This history contains the complete record of all the proceedings before the Patent and Trademark Office, including any express representations made by the applicant regarding the scope of the claims. As such, the record before the Patent and Trademark Office is often of critical significance in determining the meaning of the claims. *See Markman,* 52 F.3d at 980, 34 USPQ2d at 1330; *Southwall *1583 Tech., Inc. v. Cardinal IG Co.,* 54 F.3d 1570, 1576, 34 USPQ2d 1673, 1676 (Fed.Cir.1995) ("The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution.") (citations omitted). Included within an analysis of the file history may be an examination of the prior art cited therein. *Autogiro Co. of America v. United States,* 181 Ct.Cl. 55, 384 F.2d 391, 399, 155 USPQ 697, 704 (1967) ("In its broader use as source material, the prior art cited in the file wrapper gives clues as to what the claims do not cover.").

[12][13][14][15] In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term. In such circumstances, it is improper to rely on extrinsic evidence. *See, e.g., Pall Corp. v. Micron Separations, Inc.,* 66 F.3d 1211, 1216, 36 USPQ2d 1225, 1228 (Fed.Cir.1995) ("In construing the claims we look to the language of the claims, the specification, and the prosecution history. Extrinsic evidence may also be considered, *if needed* to assist in determining the meaning or scope of technical terms in the claims.") (citations omitted, emphasis added); *Hormone,* 904 F.2d at 1562, 15 USPQ2d at 1043 ("Claim interpretation involves a review of the specification, the prosecution history, the claims (including unasserted as well as asserted claims), and, *if necessary,* other extrinsic evidence, such as expert testimony.") (citations omitted, emphasis added). In those cases where the public record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper. The claims, specification, and file history, rather than

extrinsic evidence, constitute the public record of the patentee's claim, a record on which the public is entitled to rely. In other words, competitors are entitled to review the public record, apply the established rules of claim construction, ascertain the scope of the patentee's claimed invention and, thus, design around the claimed invention. *See Markman,* 52 F.3d at 978-79, 34 USPQ2d at 1329. Allowing the public record to be altered or changed by extrinsic evidence introduced at trial, such as expert testimony, would make this right meaningless. *See Southwall,* 54 F.3d at 1578, 34 USPQ2d at 1678 ("A patentee may not proffer an interpretation for the purposes of litigation that would alter the indisputable public record consisting of the claims, the specification and the prosecution history, and treat the claims as a 'nose of wax.'" (quoting *Senmed, Inc. v. Richard-Allan Med. Indus., Inc.,* 888 F.2d 815, 819 n. 8, 12 USPQ2d 1508, 1512 n. 8 (Fed.Cir.1989))). The same holds true whether it is the patentee or the alleged infringer who seeks to alter the scope of the claims.

**The Proper Construction of the Claim Term "Solder Reflow Temperature"**

[16][17] As can be readily seen from those portions of the specification set forth above, the meaning of the disputed term "solder reflow temperature" in claim 1 of the '502 patent is clear from a reading of the claim itself and the patent specification. The "peak reflow temperature" and "liquidus temperature" are clearly defined in the specification as having distinctly different meanings. Specifically, for the solders described in the specification, liquidus temperature is about 190° C and the peak reflow temperature is about 210° to 218° C. Moreover, in the preferred embodiment described in the patent, the solder is heated to a temperature of 210° C but the temperature of the devices is maintained at approximately 195° C, *i.e.,* below the peak reflow temperature (210° C) but above the liquidus temperature (190°>> C). Therefore, in order to be consistent with the specification and preferred embodiment described therein, claim 1 must be construed such that the term "solder reflow temperature" means the peak reflow temperature, rather than the liquidus temperature. Indeed, if "solder reflow temperature" were defined to mean liquidus temperature, a preferred (and indeed only) embodiment in the specification would not fall within the scope of the patent claim. Such an interpretation is rarely, if ever, correct and would require highly persuasive evidentiary support, which is wholly absent in this case. *See Modine Mfg. Co. v. United States Int'l Trade Comm'n,* 75 F.3d 1545, 1550, 37 USPQ2d 1609, 1612 (Fed.Cir.1996); *see also Hoechst,* 78 F.3d at 1581, 38 USPQ2d at 1130 ("We *1584 share the district court's view that it is unlikely that an inventor would define the invention in a way that excluded the preferred embodiment, or that persons of skill in this field would read the specification in such a way.").

*The District Court's Reliance on Extrinsic Evidence*

[18] Since the claim, read in light of the patent specification, clearly uses the term "solder reflow temperature" to mean the peak reflow temperature, rather than the liquidus temperature, that should have been the end of the trial court's analysis. [FN5] Only if there were still some genuine ambiguity in the claims, after consideration of all available intrinsic evidence, should the trial court have resorted to extrinsic evidence, such as expert testimony, in order to construe claim 1. Moreover, even if the judge permissibly decided to hear all the possible evidence before construing the claim, the expert testimony, which was inconsistent with the specification and file history, should have been accorded no weight. *Southwall,* 54 F.3d at 1578, 34 USPQ2d at 1678; *Markman,* 52 F.3d at 983, 34 USPQ2d at 1333.

> FN5. The file history was apparently not put into evidence.

[19][20][21][22][23][24] Here, the trial judge considered not only the specification, but also expert testimony and other extrinsic evidence, such as the paper written by the former Vitronics employee. No doubt there will be instances in which intrinsic evidence is insufficient to enable the court to determine the meaning of the asserted claims, and in those instances, extrinsic evidence, such as that relied on by the district court, may also properly be relied on to understand the technology and to construe the claims. *See Markman,* 52 F.3d at 979, 34 USPQ2d at 1329. Extrinsic evidence is that evidence which is external to the patent and file history, such as expert testimony, inventor testimony, dictionaries, and technical treatises and articles. [FN6] *Id.* at 980, 34 USPQ2d at 1330. However, as we have recently re-emphasized, extrinsic evidence in general, and expert testimony in particular, may be used only to help the court come to the proper understanding of the claims; it may not be used to vary or contradict the claim language. *Id.* at 981, 52 F.3d 967, 34 USPQ2d at 1331. Nor may it contradict the import of other parts

90 F.3d 1576
65 USLW 2124, 39 U.S.P.Q.2d 1573
**(Cite as: 90 F.3d 1576)**

Page 9

of the specification. Indeed, where the patent documents are unambiguous, expert testimony regarding the meaning of a claim is entitled to no weight. *Southwall,* 54 F.3d at 1578, 34 USPQ2d at 1678. "Any other rule would be unfair to competitors who must be able to rely on the patent documents themselves, without consideration of expert opinion that then does not even exist, in ascertaining the scope of a patentee's right to exclude." *Id.* at 1578, 34 USPQ2d at 1678-79. Nor may the inventor's subjective intent as to claim scope, when unexpressed in the patent documents, have any effect. Such testimony cannot guide the court to a proper interpretation when the patent documents themselves do so clearly.

> FN6. Although technical treatises and dictionaries fall within the category of extrinsic evidence, as they do not form a part of an integrated patent document, they are worthy of special note. Judges are free to consult such resources at any time in order to better understand the underlying technology and may also rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents.

[25][26][27] In addition, a court in its discretion may admit and rely on prior art proffered by one of the parties, whether or not cited in the specification or the file history. This prior art can often help to demonstrate how a disputed term is used by those skilled in the art. Such art may make it unnecessary to rely on expert testimony and may save much trial time. As compared to expert testimony, which often only indicates what a particular expert believes a term means, prior art references may also be more indicative of what all those skilled in the art generally believe a certain term means. Once again, however, reliance on such evidence is unnecessary, and indeed improper, when the disputed terms can be understood from a careful reading of the public record. *See Kearns v. Chrysler Corp.,* 32 F.3d 1541, 1547, 31 USPQ2d 1746, 1750 (Fed.Cir.1994). Nor may it be used to vary claim terms from how *1585 they are defined, even implicitly, in the specification or file history.

[28][29] Unfortunately, here the trial judge did use the extrinsic evidence to vary or contradict the manifest meaning of the claims. The trial judge was presented with expert testimony and other evidence that some of those skilled in the relevant art, including certain Vitronics employees, sometimes used the term "solder reflow temperature" and "liquidus temperature" interchangeably. He apparently relied on this testimony in reaching his conclusion that, as used in claim 1, solder reflow temperature meant 183°> C. [FN7] However, regardless of how those skilled in the art would interpret a term in other situations, where those of ordinary skill, on a reading of the patent documents, would conclude that the documents preclude the term being given the meaning propounded by the expert witnesses, we must give it the meaning indicated by the patentee in the patent claim, specification and file history. Thus, expert testimony tending to show that those skilled in the art would, in certain circumstances, understand "solder reflow temperature" to mean the solder liquidus temperature is entitled to no weight in light of the clear contrary meaning shown in the specification. *See Southwall,* 54 F.3d at 1578, 34 USPQ2d at 1678 ("Even if Southwall could show that 'sputter-deposited dielectric' has a meaning to one skilled in the art different from the definition in the '745 specification and file history, the definition in the patent documents controls the claim interpretation."). Because the specification clearly and unambiguously defined the disputed term in the claim, reliance on this extrinsic evidence was unnecessary and, hence, legally incorrect.

> FN7. Although the trial judge's reasoning does not appear in the record, he must have relied on the testimony presented by Conceptronic that "solder reflow temperature" and "liquidus temperature" were synonymous and the undisputed testimony that the liquidus temperature of 63/37 (Sn/Pb) solder is 183° C.

[30] Had the district court relied on the expert testimony and other extrinsic evidence solely to help it understand the underlying technology, we could not say the district court was in error. But testimony on the *technology* is far different from other expert testimony, whether it be of an attorney, a technical expert, or the inventor, on the *proper construction* of a disputed claim term, relied on by the district court in this case. The latter kind of testimony may only be relied upon if the patent documents, taken as a whole, are insufficient to enable the court to construe

disputed claim terms. Such instances will rarely, if ever, occur. Indeed, this case did not present such an instance. Even in those rare instances, prior art documents and dictionaries, although to a lesser extent, are more objective and reliable guides. Unlike expert testimony, these sources are accessible to the public in advance of litigation. They are to be preferred over opinion testimony, whether by an attorney or artisan in the field of technology to which the patent is directed. Indeed, opinion testimony on claim construction should be treated with the utmost caution, for it is no better than opinion testimony on the meaning of statutory terms. *See Markman,* 52 F.3d at 983, 34 USPQ2d at 1332-33 ("First, the testimony of Markman and his patent attorney on the proper construction of the claims is entitled to no deference.... This testimony about construction, however, amounts to no more than legal opinion--it is precisely the process of construction that the court must undertake.").

**Other Issues**

Conceptronic further argues that, even if we were to reverse the district court's decision regarding the proper interpretation of the term "solder reflow temperature," the district court's ultimate conclusion of no infringement as a matter of law can still be affirmed on the alternative ground that Vitronics' evidence does not prove infringement because Vitronics failed to test the temperature of all of the various devices on the boards and because certain of the Vitronics tests demonstrated that many of the devices reached temperatures above the peak reflow temperature. Vitronics, of course, disputes these assertions and points to supporting documentation to the effect that the Conceptronic *1586 ovens do indeed maintain the temperature of the devices below peak reflow temperature. The trial court made no decision on this issue. Moreover, such a determination at this stage would require our weighing substantial but conflicting evidence, an impermissible exercise for an appellate court. Accordingly, we must remand.

CONCLUSION

For all the foregoing reasons, the judgment of non-infringement as a matter of law is reversed and the case is remanded for further proceedings consistent with this opinion.

*REVERSED AND REMANDED.*

COSTS

Costs in favor of Vitronics.

90 F.3d 1576, 65 USLW 2124, 39 U.S.P.Q.2d 1573

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works