0001
1
2   UNITED STATES DISTRICT COURT
    DISTRICT OF CONNECTICUT : CASE# 3:00CV1364 (AVC)
3   - - - - - - - - - - - - - - - - - - - - -
4   NETKEY, INC.,
    a Delaware Corporation,
5
               Plaintiff,
6
      -against-
7
    NETSHIFT SOFTWARE, LTD.,
8   AUTOMOBILE CLUB OF HARTFORD,
    MONTEGONET, L.L.C.,
9
               Defendants/Counter-Claimants.
10  - - - - - - - - - - - - - - - - - - - - -
11      ST. ONGE, STEWARD, JOHNSTON & REENS, LLC
               986 Bedford Street
12         Stamford, Connecticut 06905-5619
13             November 19, 2002
14               10:00 A.M.
15
16
17
18      DEPOSITION OF FREDERICK SAYWARD, Ph.D. taken at
19  the above place, date and time, before Blase J.
20  Spinozzi, a Senior Court Reporter and Notary Public
21  within and for the State of New York.
22
23
24             SULLIVAN REPORTING
               One North Broadway
25         White Plains, New York 10601
0002
1
2   A P P E A R A N C E S :
3   ST. ONGE, STEWARD, JOHNSTON & REENS, LLC
        Attorneys for Plaintiff
4    986 Bedford Street
       Stamford, Connecticut 06905-5619
5   BY:  GENE S. WINTER, ESQ.
6
7
8   COOKSEY & COOKSEY, P.A.

      Attorneys for Defendants
9     5503 South University Boulevard
      Littleton, Colorado 80121-1702
10  BY:  MICHAEL G. COOKSEY, ESQ.
11
12  ALSO PRESENT:
13     MR. TIMOTHY DAW
14     DOUG VINCENT, ESQ.
15
16
17
18
19
20
21
22
23
24
25
0003
1
2     IT IS HEREBY STIPULATED AND AGREED, by and
3  between the attorneys for the respective parties
4  hereto, that this examination may be sworn to before
5  any Notary Public.
6
7     IT IS FURTHER STIPULATED AND AGREED that the
8  sealing and filing of the said examination shall be
9  waived.
10     IT IS FURTHER STIPULATED AND AGREED that all
11  objections to questions except as to form shall be
12  reserved for trial.
13
14
15
16
17
18
19
20
21
22
23
24
25
0004

1     - Frederick Sayward, Ph.D. -
2         (Prior to the commencement of the
3     deposition, the following exhibits were
4     marked.)
5         (Defendants' Amended Notice of
6     Deposition of Dr. Frederick Sayward marked
7     Defendants' Exhibit H.)
8         (Curriculum Vitae Frederick G. Sayward
9     marked Defendants' Exhibit I.)
10        (Frederick Sayward Expert Witness
11    Report dated March 5, 2002, marked
12    Defendants' Exhibit J.)
13        (Frederick Sayward Expert Witness
14    Report dated May 24, 2002, marked
15    Defendants' Exhibit K.)
16        (Frederick Sayward Expert Witness
17    Rebuttal Report dated September 20, 2002,
18    marked Defendants' Exhibit L.)
19        (Defendants' Endorsement of Expert
20    Witness Mitchell Hoffman, Andy Pinkard and
21    Timothy Daw dated February 15, 2002, marked
22    Defendants' Exhibit M.)
23        (AMA '98 Annual Symposium document
24    marked Defendants' Exhibit N.)
25        (United States Patent 5,761,071 marked
0005
1     - Frederick Sayward, Ph.D. -
2     Defendants' Exhibit O.)
3         (United States Patent 6,078,848 marked
4     Defendants' Exhibit P.)
5         (Applied Informatics Document marked
6     Defendants' Exhibit Q.)
7         (Document entitled "Welcome to the 2nd
8     Annual NII Awards marked Defendants'
9     Exhibit R.)
10        (Netkey, Inc.'s Response to
11    Defendants' First set of Interrogatories
12    marked Defendants' Exhibit S.)
13        (Document entitled "Previous Kiosk
14    Newsbits" marked Defendants' Exhibit T.)
15        (Page of Calendar marked Defendants'
16    Exhibit U.)
17        (Letter dated November 14, 2000, St.
18    Onge, Steward, Johnston & Reens, marked
19    Defendants' Exhibit V.)
20        (Declaration dated November 4, 2002,

21          marked Defendants' Exhibit W.)
22          (Letter dated November 19, 2002, St.
23          Onge, Steward, Johnston & Reens marked
24          Defendants' Exhibit X.)
25
0006
 1          - Frederick Sayward, Ph.D. -
 2   F R E D E R I C K   S A Y W A R D, Ph.D. a witness
 3      herein, having been duly sworn by a Notary Public
 4      within and for the State of New York, was examined
 5      and testified as follows:
 6   EXAMINATION BY MR. COOKSEY:
 7      Q.      Dr. Sayward, please state your name,
 8   and spell your last name for the record?
 9      A.      Frederick Sayward -- S-A-Y-W-A-R-D.
10      Q.      Okay.  And would you please state your
11   address for the record.
12      A.      14 West Haycock Point Road, Branfort,
13   Connecticut 06405.
14      Q.      And you are a Ph.D., is that correct?
15      A.      That's correct.
16      Q.      So if I refer to you as "Dr. Sayward", is
17   that okay with you?
18      A.      If you like.
19      Q.      Okay.  First of all you have been
20   noticed here for a deposition in a patent
21   infringement case.
22      A.      Yes.
23      Q.      Have you had your deposition taken
24   before?
25      A.      Yes, I have.
0007
 1          - Frederick Sayward, Ph.D. -
 2      Q.      So you do know your testimony is being
 3   given under oath?
 4      A.      Today?
 5      Q.      Yes.
 6      A.      Yes.
 7      Q.      And you are under an obligation to tell
 8   the truth?
 9      A.      Yes, sir.
10      Q.      If anything I ask you is unclear,
11   please ask me to clarify it, because otherwise I will
12   assume that you understand my question when
13   answering.
14      A.      Yes, sir.

15     Q.     Okay.  Now, let me hand you deposition
16  Exhibit H.
17          Have you seen that document before?
18     A.     No, I have not.
19     Q.     Okay.  Were you asked by Mr. Winter to
20  bring your file materials today?
21     A.     I was asked to bring just some
22  invoices.
23     Q.     Okay.  You mean your billing records?
24     A.     Hum-hum.
25     Q.     Do you have those?
0008
1        - Frederick Sayward, Ph.D. -
2     A.     I don't have them right now.
3     Q.     Where are they?
4     A.     I don't know.
5     Q.     You don't have any billing records with
6  you?
7     A.     Well, I don't have them right now.
8          I brought them here but I don't know
9  where they are right now.
10     Q.     You mean they are in the building?
11     A.     As far as I know, I don't know.
12     Q.     Well, did they leave your possession?
13     A.     Yes.  I gave them to Gene.
14     Q.     Okay.
15          MR. COOKSEY:  Can I see those?
16          MR. WINTER:  Yes.  They are being
17          copied, and we should have them here in
18          another ten or fifteen minutes.
19          We have to put on production numbers
20          and other things, but my paralegal is
21          working on numbering the documents and they
22          will be here in -- I don't know when, but
23          the next fifteen minutes probably.
24          MR. COOKSEY:  Okay.
25          MR. WINTER:  They are not voluminous.
0009
1        - Frederick Sayward, Ph.D. -
2        There is maybe --
3          THE WITNESS:  Eleven sheets.
4          MR. WINTER:  -- eleven sheets.
5          MR. COOKSEY:  Okay.
6  EXAMINATION BY MR. COOKSEY (Cont'g)
7     Q.     Are they all your billing records to
8  date on this case?

9       A.      Yes.
10      Q.      Good.
11              I will just go forward, and then we
12  will come back to that.
13              Dr. Sayward, in March of this year you
14  produced your original report, is that correct?
15      A.      I'm not sure what report you are
16  referring to.
17      Q.      Let me hand you Exhibit J.
18              You can take your time to review that
19  if you have to.
20              MR. COOKSEY:  This is off the record.
21              (Off-the-record discussion.)
22              MR. COOKSEY:  Okay.  Back on the
23      record.
24  EXAMINATION BY MR. COOKSEY (Cont'g)
25      Q.      Does that look like a report you
0010
1           - Frederick Sayward, Ph.D. -
2   authored in March of this year?
3       A.      Yes.
4       Q.      Okay.  Now, you had attached to that
5   your curriculum vitae dated September 26th, 2001.
6   And I will hand you Exhibit I.
7               Does that appear to be the curriculum
8   vitae that you had attached to that report?
9       A.      Yes.
10      Q.      Okay.  Is that curriculum vitae current
11  through today?
12      A.      Today?  No.
13      Q.      What would you have added --
14              Well, let me ask you this:  Do you have
15  an updated CV?
16      A.      I have one but I don't have one with
17  me.
18      Q.      All right.  Can you provide that to
19  Mr. Winter so we can get a copy of it?
20      A.      Yes.
21      Q.      And has your CV changed in any
22  substantive way?
23      A.      Well, I think I have another
24  publication or two, and I have been promoted since
25  this was written.  So I have a different title now.
0011
1           - Frederick Sayward, Ph.D. -
2       Q.      What is your title now?

```
3      A.     Research Scientist.
4      Q.     Is that at Yale University?
5      A.     Yes, it is.
6      Q.     And is that in the medical --
7      A.     School of Medicine.
8      Q.     School of Medicine?
9      A.     Yes.
10     Q.     Are you an M.D.?
11     A.     No, I am not.
12     Q.     You are a Ph.D.?
13     A.     Yes.
14     Q.     And your Ph.D. is in what area?
15     A.     Applied Mathematics.
16     Q.     Okay.  Now, is it true that you have
17   not testified as an expert witness in the last four
18   years?
19     A.     It is no longer true.
20     Q.     Is this case the case that changed
21   that?
22     A.     No.
23     Q.     What other case have you testified as
24   an expert in the last four years?
25     A.     I don't know how you want me to
0012
1         - Frederick Sayward, Ph.D. -
2    describe the case.  I don't know if there is a formal
3    number or --
4      Q.     Well, describe the kind of case it is?
5      A.     It is another patent infringement case.
6      Q.     Who were you working for in that case?
7      A.     The same law firm.
8      Q.     St. Onge, Steward, Johnston and Reens?
9      A.     Yes.
10     Q.     Which attorney?
11     A.     Steven McNamara.
12     Q.     And what is the area of your expertise
13   in that case?
14     A.     Computer science.
15     Q.     Can you tell me what the field is of
16   the patent involved in that case?
17     A.     The field?  Graphics, I guess is the
18   field.
19     Q.     Anything more specific than that?
20     A.     Well, I'm not sure what you mean by the
21   field.
22     Q.     Well --
```

23    A.    The subject matter?
24    Q.    What is the subject matter of the
25    patent?
0013
1         - Frederick Sayward, Ph.D. -
2    A.    The patent is Virtual Garment, Dressing
3    Room Rule.
4    Q.    Are you working for the patentee in
5    that case?
6    A.    Yes.
7    Q.    You have a patent, correct?
8    A.    Yes, I do.
9    Q.    How many patents do you have?
10    A.    One.
11    Q.    When was that issued by the PTO?
12    A.    I forget the exact date.
13    Q.    Within the last five years?
14    A.    Within the last five years.
15    Q.    What was your patent issued in, in what
16    area?
17    A.    It was on faxing, massive distribution
18    of faxes.
19    Q.    And how about before the last four
20    years, have you worked as an expert witness before
21    the last four years?
22    A.    No.
23    Q.    Okay.  Other than this one other patent
24    case that you are working on for St. Onge, Steward,
25    Johnston and Reens, have you worked as an expert
0014
1         - Frederick Sayward, Ph.D. -
2    witness in any other litigation at any time?
3    A.    No.
4    Q.    Okay.  What is your billable rate for
5    this case?
6    A.    One hundred dollars an hour.
7    Q.    Do you reimburse Yale for your time?
8    A.    No.
9    Q.    Do you have any different rate for
10    testimony versus writing reports, or is it just a
11    flat one hundred dollars per hour?
12    A.    Just one hundred dollars an hour.
13    Q.    Okay.  Now, tell me currently what you
14    do for Yale?
15    A.    Well, I work as a research scientist on
16    several projects.

17     Q.     Okay, what kind of projects?
18     A.     All of them involve computer software.
19     Q.     Okay.
20     A.     Both development, design, testing --
21   all aspects of computer software.
22     Q.     What is medical informatics?
23     A.     I guess technically it is the use of
24   computers in medical applications.
25     Q.     Okay.  Do you still work in medical
0015
1        - Frederick Sayward, Ph.D. -
2    informatics?
3      A.     Yes, I do.
4      Q.     Do you have any expert experience in
5    kiosk software design?
6      A.     No, I do not.
7      Q.     Do you know Mr. Winter?
8      A.     Yes, I do.
9      Q.     Other than your involvement in this
10   case?
11     A.     Yes.
12     Q.     Are you a friend?
13     A.     Yes.
14     Q.     How long have you known Mr. Winter?
15     A.     About twenty-two years, maybe.
16     Q.     Do you socialize?
17     A.     Yes.
18     Q.     Now, your report, Defendants' J, you
19   followed that up with a report, Exhibit K, in May of
20   this year, correct?
21     A.     Yes.
22     Q.     Okay.  Tell me why, or what the
23   difference is in those two opinions --
24            Strike that.
25            Let me ask you why you had to redo your
0016
1        - Frederick Sayward, Ph.D. -
2    report, Exhibit K, when you already did one that was
3    labeled Exhibit J?
4      A.     "K" is basically an extension of "J", based
5    on new material.
6      Q.     Okay.  What is new in the two?
7      A.     Well --
8      Q.     Let me strike that question.
9            Did you have to withdraw Exhibit J, the
10   report Exhibit J, because of misnumbering of claims

11    and things of that nature?
12        A.    I did not withdraw anything.
13        Q.    Were you asked to redo the March
14    report?
15        A.    No.
16        Q.    Okay.  Sorry for interrupting, but tell
17    me again why you wrote Exhibit K after you already
18    did "J"?
19        A.    Well, because there was additional
20    material provided.
21        Q.    After you had written J?
22        A.    After I had written "J".
23        Q.    Okay.  What additional material were
24    you given?
25        A.    Products NetShift -- the product
0017
1        - Frederick Sayward, Ph.D. -
2    NetShift version 5.5 Builder, and NetShift version
3    5.5 Runtime.
4            The second thing was the document
5    NetShift version 5.5 Users Guide.
6            And then third, the document NetShift
7    version 5.5 Reference Guide.
8            And fourth, the NetShift version 5.5
9    Source Code, and projects as applied on CD-ROM.
10        Q.    Dr. Sayward, do you have any
11    experience with kiosk systems other than your work
12    on this case?
13        A.    Yes.
14        Q.    Can you describe in detail what
15    your experience with kiosk systems is, other than
16    this case?
17        A.    I have used them on occasion.
18        Q.    Okay.  Is that in your work in Medical
19    Informatics?
20        A.    Yes.
21        Q.    Can you be more descript?
22        A.    Yeah, I once went to a conference
23    and there was a kiosk system set up so you could read
24    your E-mail.
25        Q.    Okay.  When was that?
0018
1        - Frederick Sayward, Ph.D. -
2    A.    I think around July of 2000.
3            It may have been--may have been 2001.
4    I don't remember.

5          I know I was presenting a paper.  It is
6    probably in my CV.
7       Q.      I hand you Exhibit N.  Have you ever
8    seen that before, Dr. Sayward?
9              MR. WINTER:  You are asking for this
10             exact document with all the markings on it
11             including the dates and printouts, is that
12             correct?
13      Q.      I am asking you if you ever saw the
14   original of this document?
15             MR. WINTER:  Answer the question as
16             best you can.
17      Q.      Does this document, Exhibit N, refresh
18   your recollection about what you presented a paper
19   on?
20      A.      I'm not a hundred percent sure, but I
21   don't believe -- I would have to check my records.
22   That is the only way I can know for sure.
23             I don't believe I presented this paper,
24   even though I am a joint author of it.
25      Q.      Were you personally present at --
0019
1         - Frederick Sayward, Ph.D. -
2       A.      I don't believe so.
3       Q.      Let me finish my question.
4              Were you personally present at the
5    symposium that is described in Exhibit N?
6       A.      I don't recall.  Leave it at that.
7       Q.      You might have been?
8       A.      Possibly, possibly not.  I just don't
9    recall without checking my calendar, because I am
10   listed as a joint author with two other authors.
11      Q.      Do you know the people that you are
12   listed as authors with in this exhibit?
13      A.      Yes, I do.
14      Q.      Do you know an S.J. Frawley, Ph.D., and
15   a P.L. Miller, M.D., Ph.D.?
16      A.      Yes.
17      Q.      They both appear to be from Yale
18   University, correct?
19      A.      That's correct.
20      Q.      And it looks as though in this
21   November 10, 1998, 8:30 a.m. to 10 a.m. session,
22   there was also a presentation of a paper by, among
23   others, Dr. Hripcsak from Columbia.
24             Do you see that?

25      A.      Yes.

0020

1           - Frederick Sayward, Ph.D. -

2       Q.      Do you know Dr. Hripcsak?

3       A.      No, I do not.

4       Q.      Have you ever spoken to him?

5       A.      I don't recall speaking to him.

6       Q.      Has Mr. Winter asked you to speak to

7   him?

8       A.      No, he has not.

9       Q.      Are you familiar with a patient kiosk

10  in use at Columbia University?

11      A.      Yes, I am.

12      Q.      Have you looked at it?

13      A.      No, I have not.

14      Q.      How are you familiar with it?

15      A.      Through reading about it.

16      Q.      Is that through the materials produced

17  in this litigation?

18      A.      Yes.

19      Q.      Have you ever tried to talk to

20  anybody associated with Dr. Hripcsak about that

21  patient kiosk?

22      A.      No, I have not.

23      Q.      Dr. Sayward, do you know what a person

24  of ordinary skill in the art is?

25      A.      No.

0021

1           - Frederick Sayward, Ph.D. -

2       Q.      Can you define that as best you

3   understand?

4       A.      I mean I could try to give an English

5   definition, but I don't know -- it sounds like a

6   legal term, and I'm not sure what the legal

7   definition is.

8       Q.      All right.  How about the level of

9   ordinary skill in the art?

10      A.      Again, it sounds like a legal term and

11  I don't know how those are defined.

12      Q.      So if I asked you a question about how

13  a person of ordinary skill in the art would read or

14  would construe the claims or the language of the

15  patents-in-suit in this case, you would not be able

16  to answer me?

17      A.      That's correct.

18      Q.      And same question, if I asked you what

19    the level of skill in the art was with reference to
20    the two patents involved in our case, you would not
21    be able to answer me; is that correct?
22        A.     Level -- I don't know -- I don't know
23    what --
24             From a legal point of view, I don't
25    know how to answer that.
0022
1          - Frederick Sayward, Ph.D. -
2        Q.     Okay.  Dr. Sayward, let me hand you
3    Exhibit L.
4        A.     Okay.
5        Q.     Is it true that you authored Exhibit L?
6        A.     Yes.
7        Q.     Okay, did you write that report?
8        A.     Did I write it?  Yes.
9        Q.     Did Mr. Winter assist you with the
10    writing of that report?
11        A.     Did he assist me?
12        Q.     Yes.
13        A.     No, I wrote it.
14        Q.     Okay.  Did you --
15             Well, I will tell you what I would like
16    you to do.  Will you please sign your name under the
17    signature on page 20 of the report.  Just sign it
18    exactly as it is there.
19        A.     Okay.  Sign it?
20        Q.     Underneath the photocopied signature?
21        A.     Sure.  (Witness complies.)
22        Q.     Dr. Sayward, was this signature page
23    faxed to you by Mr. Winter?
24        A.     Yes, it was.
25        Q.     Why did he have to fax it to you if you
0023
1          - Frederick Sayward, Ph.D. -
2    wrote it?
3        A.     I think, as I recall, there were
4    some final edits, and I got the entire page and
5    faxed -- the entire thing and faxed back the
6    signature page.
7        Q.     Did Mr. Winter edit the report?
8        A.     I think we -- I think he may have
9    changed something.  I'm not sure.
10        Q.     Well, let me ask you this:  Is a
11    hundred percent of the language of this report your
12    own language?

13      A.      It's not a hundred percent what I
14  originally wrote, but there are some changes to it.
15      Q.      Do you have your original draft, or
16  drafts, that were changed by Mr. Winter?
17      A.      Not with me.
18      Q.      Do you have them anywhere?
19      A.      Yes.
20      Q.      Will you produce those to Mr. Winter?
21      A.      Sure.
22      Q.      Is there some reason why you didn't
23  bring those with you today when you were asked in the
24  deposition notice to do that, to bring your file
25  materials?
0024
1           - Frederick Sayward, Ph.D. -
2       A.      I didn't see that.
3       Q.      So you've never seen Exhibit H,
4  correct?
5       A.      Right.
6       Q.      Can you tell me how your reports differ
7  from Exhibit L as you drafted them?
8       A.      As far as?
9       Q.      I want to know what substantive changes
10  Mr. Winter made?
11      A.      As I recall, there were no substantive
12  changes.  It was more stylistic changes.
13      Q.      Strictly grammar, that kind of thing?
14      A.      Yes.
15      Q.      Okay.
16          MR. WINTER:  Mike, I want to take a
17        break and get some of the documents for
18        you.
19          That may help answer some of these
20        questions.
21          MR. COOKSEY:  The billing?
22          MR. WINTER:  Yes, the billing,
23        reference to report and stuff.
24          Would that be helpful?
25          MR. COOKSEY:  Yes, I guess so.
0025
1          - Frederick Sayward, Ph.D. -
2          MR. WINTER:  Okay.  We will take a
3        break.
4          (Time noted 10:32 a.m.)
5               ***
6          (Time noted 10:40 a.m.)

7             (Letter dated November 19, 2002,
8         letterhead of St. Onge, Steward, Johnston &
9         Reens marked Defendants' Exhibit X.)
10            MR. COOKSEY:  Can we go back on the
11        record?
12   EXAMINATION BY MR. COOKSEY (Cont'g)
13        Q.    Dr. Sayward, I am going to hand you
14   Exhibit X.  And other than the fact that the first
15   page of that is a cover letter from Mr. Winter, does
16   that appear to be a compilation of all of your
17   billing on this case?
18        A.    Yes.
19        Q.    Okay.  Let me have you look at the page
20   that's date stamped NK2081, is that the earliest bill
21   that you generated in this case?
22        A.    Yes.
23        Q.    Can you tell by looking at that bill
24   what the earliest day was that you performed any work
25   in this case?
0026
1         - Frederick Sayward, Ph.D. -
2        A.    Yes.  January of 2001.
3        Q.    Can you tell by looking at Exhibit X
4    when you were retained, Dr. Sayward?
5        A.    I don't recall exactly when.  You know,
6    what month.
7             It just wouldn't have been any later
8    than January of 2001.
9        Q.    Okay.  Are you aware then that in
10   November of 2000 -- November 15 of 2000 specifically,
11   that you were identified as a person who was going to
12   testify on behalf of the Plaintiff in this case in a
13   preliminary injunction hearing that was going to be
14   held in November 2000?
15       A.    I don't recall that.
16       Q.    Were you ever asked to do work with
17   regard to a preliminary injunction motion  filed by
18   Netkey in this case?
19       A.    I don't recall that, no.
20       Q.    Let me hand you Exhibit S.  And these
21   are Answers to Interrogatories that were executed by
22   Netkey and Mr. Winter on November 15, 2000.
23            Under Response to Interrogatory Number
24   1, do you see where it discloses your name?
25       A.    Yes, I see my name.
0027

1          - Frederick Sayward, Ph.D. -
2      Q.     Okay.  Is it true that as of that date
3   that you had been retained as Netkey's technical
4   expert?
5      A.     As I said, I don't remember the date.
6   I believe I signed something at some point, but I may
7   not have --
8              I don't remember the exact date.  If
9   you have the paper that I signed, that would be the
10  date.
11     Q.     Okay.  Did you have a retention letter
12  with Mr. Winter?
13     A.     Yes, I believe so.  That's the letter
14  I'm referring to.
15     Q.     Is that in your file?
16     A.     Yes.
17     Q.     Would you please produce that to
18  Mr. Winter as well?
19     A.     Okay.  Can I take notes on this?
20     Q.     I will do that at the end of the
21  deposition.
22     A.     Okay.
23     Q.     Now, it says here, "Assuming that
24  Defendants produce the source code and other
25  technical information relating to their current
0028
1          - Frederick Sayward, Ph.D. -
2   software, Dr. Sayward may analyze this source code
3   and point out why each of the subject products
4   infringes the patents."
5              Was it a foregone conclusion,
6   Dr. Sayward, that you were going to find infringement
7   in this case?
8      A.     No.
9      Q.     Had you grabbed either of the
10  patents-in-suit on November 15, 2000?
11     A.     I don't recall.
12     Q.     Had you reviewed any NetShift software
13  as of November 15th, 2000?
14     A.     I don't recall.  I don't recall doing
15  that.
16     Q.     You would have billed for it?
17     A.     Yes.  I don't think I would have
18  slipped on that.
19     Q.     Your first bill, NK2081, would have
20  showed something other than January 2001 as your

21   starting time on this case, correct?
22       A.     I assume that's correct, but I may
23   have --
24           I mean it's possible I did something
25   and didn't bill for it.
0029
1           - Frederick Sayward, Ph.D. -
2       Q.     It doesn't show up on that bill, is
3   that right?
4       A.     Right.
5           For instance if I read and signed a
6   letter, I probably wouldn't have billed for that.
7       Q.     Let me hand you Exhibits O and P.
8           Do those appear to be the
9   patents-in-suit in this case that you reviewed,
10   Dr. Sayward?
11       A.     Yes.
12       Q.     Okay.  Now, when Mr. Winter retained
13   you, did he instruct you to read these as a person of
14   ordinary skill in the art?  Did he give you any
15   instructions on what that concept was?
16       A.     I don't recall that, any kind of
17   instructions along those lines.
18       Q.     Okay.
19           MR. WINTER:  You are talking about
20       back in the early stages, right?
21       Q.     Well, how about at any time during this
22   case.  Have you ever been given instruction by
23   Mr. Winter, or anybody else, or his firm, or anybody,
24   on what a person of ordinary skill in the art is,
25   number one, and; number 2, what the level of ordinary
0030
1           - Frederick Sayward, Ph.D. -
2   skill in the art is?
3       A.     Not with those kinds of terms.
4           I mean there is a technical level that
5   the ordinary skill in the arts -- I know that's a
6   legal term that's used in the Patent Law, but I'm not
7   familiar with exactly what it means.
8           I looked at them from a technical point
9   of view.
10       Q.     Do you know what a reasonable man is
11   under the law?
12       A.     A reasonable man?
13       Q.     Yes.
14       A.     No.

15      Q.    Let me have you look at your rebuttal
16   report again, Exhibit L.  Let's just go through that.
17   Okay?
18           On the first page you have reference
19   to -- you have reference to the "doctrine of
20   equivalents".
21              Do you see that?
22      A.    Yes.
23      Q.    Do you know what the "doctrine of
24   equivalents" is?
25      A.    Yes.
0031
1        - Frederick Sayward, Ph.D. -
2            Well, let's put it this way.  I have a
3   layman's understanding of it.  I can't say I have
4   taken any legal courses on it.
5            My understanding is that two things in
6   the legal sense can be equivalent if they essentially
7   say the same thing in essentially the same way.
8      Q.    Okay.  By the way, when you went out on
9   the break just a few minutes ago, did you have a
10   conversation with Mr. Winter?
11      A.    Yes.
12      Q.    What was discussed, as verbatim as you
13   recall?
14      A.    We talked about tennis, one thing.  He
15   was on my tennis team last year, but he is not going
16   to be on my tennis team this year.
17      Q.    Okay.  Did you talk at all about your
18   reports, and specifically Exhibit L?
19      A.    Yes.
20      Q.    Tell me exactly what was talked about.
21      A.    Well, that I had written a technical
22   level of understanding in the original report, and
23   that now I remember that's one of the things that was
24   taken out in the original draft.
25      Q.    And you have those drafts in your
0032
1        - Frederick Sayward, Ph.D. -
2   possession, correct?
3      A.    Unfortunately, I don't believe I have
4   them with me.
5           MR. COOKSEY:  I am going to seriously
6           reserve the right to reopen this depo as
7           soon as we get those.
8           MR. WINTER:  You know our position is

9       we can deal with it later, but basically
10      you never asked for them until the Notice,
11      which was served really late, and certainly
12      never subpoenaed Dr. Sayward, or directed
13      that Notice of Deposition.
14          So the fact that this thing is without
15      all those documents that you request is
16      without notice.
17          You asked me for the bills last night,
18      and since that was easy to get, I brought
19      you -- I had Dr. Sayward get out his bills
20      and make copies of them and I gave them to
21      you in correspondence today.
22          But certainly the notice to a party
23      requires thirty days advance notice.
24          MR. COOKSEY:  That's fine,
25      Mr. Winter.   We just cleared the depo's
0033
1       - Frederick Sayward, Ph.D. -
2       last week, after I begged you for a month
3       to do that, and I will let the record speak
4       for itself, and we will take it up with the
5       Court.
6           MR. WINTER:  You asked me for dates
7       of depositions, which I was glad to give
8       you and work on the dates.
9           But the fact is you never served me
10      with anything about documents, other than
11      that one notice which occurred very late.
12          MR. COOKSEY:  I served you with one,
13      and then I rescheduled it at your request.
14          MR. WINTER:  When was the first
15      notice served?
16          MR. COOKSEY:  Very shortly after you
17      cleared his deposition, which was just a
18      matter of a few days ago.
19          MR. WINTER:  Did the first notice
20      have the documents in it?
21          MR. COOKSEY:  That's correct.
22          MR. WINTER:  When was that served?
23          MR. COOKSEY:  Why don't you go look
24      at your records?  I don't have it with me.
25          MR. WINTER:  Maybe if you refresh my
0034
1       - Frederick Sayward, Ph.D. -
2       recollection.

3           Anyway, why don't we go forward with
4     the deposition.
5           MR. COOKSEY:  We will just take it up
6     with the Court.
7   EXAMINATION BY MR. COOKSEY (Cont'g)
8     Q.     Do you always let other people edit
9   your work, Dr. Sayward?
10    A.     Do I always let other people look at my
11  work?
12    Q.     Edit your work and you sign it?
13           Is that something you routinely do?
14    A.     Yes, on certain things.
15           I mean it depends what we are talking
16  about.
17    Q.     Doctor, did Mr. Winter put in the
18  statement about the "doctrine of equivalents" in your
19  report, page 1 of your report, Exhibit L?
20    A.     Yes, with my approval.
21    Q.     It was not in your original report,
22  correct?
23    A.     I wish I had the original report in
24  front of me to compare, but I don't believe so.  But
25  I'm not a hundred percent sure without having
0035
1        - Frederick Sayward, Ph.D. -
2   side-by-side documents.
3     Q.     Let me also have you look at that
4   report.  On page 2 you use the word "unpublished".
5           What do you mean by that?
6           Go ahead and take your time to find
7   it.  I'm not trying to test you on your memory here.
8     A.     Are you referring to paragraph -- a few
9   paragraphs down, "Supplied Materials"?
10    Q.     Yes.  You use the word "unpublished"
11  there?
12    A.     Yes.
13    Q.     Was that in your original draft of your
14  report?
15    A.     Yes, it was.
16    Q.     What do you mean by "un-published"?
17    A.     By unpublished I mean it has not
18  appeared in a refereed journal.
19    Q.     A refereed journal?
20    A.     Yes, which is subject to peer review.
21    Q.     Where did you get that definition from
22  of "un-published"?

23     A.     It is sort of a common definition in
24   the academic world.
25     Q.     Doctor, does Yale University have a web
0036
1          - Frederick Sayward, Ph.D. -
2   site?
3     A.     Sure.
4     Q.     Do they publish papers on their web
5   site?
6     A.     Do they publish papers on their web
7   site?
8     Q.     Yes.
9     A.     No, not in the -- not in the academic
10   sense.
11     Q.     Have you ever published a paper on a
12   web site?
13     A.     Published a paper on a web site?
14          No.  That is a contradiction in
15   terms.
16     Q.     Have you ever put a paper of yours on
17   the internet?
18     A.     Papers of mine have been placed on the
19   internet -- titles.
20          But the internet is not a forum where
21   you publish a paper.
22     Q.     Okay.  Well, have you allowed papers of
23   yours to be put on the internet?
24     A.     Allowed?
25          I have a problem with the word
0037
1          - Frederick Sayward, Ph.D. -
2   "allowed".  But papers of mine have appeared on the
3   internet.
4          No one asked my permission.
5     Q.     Well, did you ever commence the process
6   of allowing your paper to go on the internet?
7     A.     No.
8     Q.     Have you ever objected to one of your
9   papers finding its way to the internet?
10     A.     It depends on what you mean by paper,
11   you know, quote, unquote.
12          Because in the academic world a paper
13   is something that has a well-understood meaning by
14   the academic community.
15          It is something that's been officially
16   written about a technical subject.  It is something

17    that, if you are going to publish it, it has to be
18    subject to peer review.
19              There is a cycle, there is a process,
20    if you will, a protocol -- whatever you like to call
21    it.
22              Things that one writes, notes, anything
23    could be put on the internet.  I wouldn't
24    necessarily --
25              I mean you could call that a paper, but
0038
1        - Frederick Sayward, Ph.D. -
2    it wouldn't be thought of as a paper by a promotion
3    committee, for instance.
4              I don't know if that explains it.  The
5    use of the word paper, as I say, in the academic
6    community has a specific meaning.
7              I'm sure you have heard of the slogan,
8    "Publish or perish."
9              The things that matter is there are
10    papers that get published in the referee'd journals.
11    Q.       Let me just use an example for you.
12    Yale Law School publishes their Law Review on the
13    internet.
14              Now, is that not a publication?
15    A.       It's possibly a publication.  I'm not
16    familiar with it.  But I can see ways where you would
17    think of that as a publication, and ways that you
18    would not think of that as a publication.
19    Q.       Did anyone ever advise you on this
20    definition of "publish" that you have given?
21    A.       No.  That is purely the understanding
22    from an academic point of view that I have.
23    Q.       How about the term "un-reviewed" which
24    appears on page 2 of that report?
25              Do you see that?
0039
1        - Frederick Sayward, Ph.D. -
2    A.       Yes.
3    Q.       What do you mean by that?
4    A.       Again, that's part -- the review
5    process is part of the publication process for
6    papers, scholarly papers in the academic or even in
7    the industrial setting.
8              Reviewed means, in this case, peer
9    review.  A written paper gets sent out to people who
10    have knowledge in the area that the paper is written

11    on, usually by an editor of the journal, and they
12    comment on its technical value -- worthiness to be
13    published in a technical journal.
14        Q.    Well, what if the Yale Law Review put a
15    law review article on the internet.  Are you saying
16    that because it is on the internet it was not
17    reviewed?
18        A.    No.  What I'm saying is that it may or
19    may not be.
20            What I'm saying, if it is on the
21    internet, that doesn't mean it has been reviewed.
22    And if it is on the internet, that doesn't mean that
23    it hasn't been reviewed.
24        Q.    Okay.  Your statement in your report
25    on page 2, how do you know whether the papers that
0040
1            - Frederick Sayward, Ph.D. -
2    you are talking about have been reviewed or not
3    reviewed?
4        A.    Well, because, as it says here, the
5    supplied material.  It doesn't say anything about the
6    internet or not.  It says the materials that were
7    supplied were not in the form of a published paper.
8            There was no reference to where it was
9    published.  There was no dates as to when it was
10    submitted for publication, when it actually was
11    reviewed.
12            These are all things that are part of
13    the review process.
14        Q.    Okay.  Look at page 2.  You use the
15    term "obviousness".
16            Do you see that?
17        A.    No.  Whereabouts?
18        Q.    Take your time.  Excuse me, Doctor,
19    right here.  Do you see that?
20            MR. WINTER:  The question is, do you
21         see that?
22        A.    Yes, I see it now.
23        Q.    Let me ask you this.  Was the word
24    "obviousness" in your draft before Mr. Winter revised
25    your report?
0041
1            - Frederick Sayward, Ph.D. -
2        A.    I don't recall.
3        Q.    Was that a term that you knew or
4    understood before you wrote your final report?

5     A.     I don't understand the question.
6             I know what the word "obvious" means,
7     obviously.
8     Q.     Do you know what it means in the
9     context of construing patents?
10    A.     Before I wrote this, I don't remember
11    if I knew the importance of it or not, and how it is
12    tied together with other things.  I just don't
13    remember.
14    Q.     And your testimony is, without looking
15    at your draft reports that Mr. Winter edited that
16    resulted in Exhibit L, you don't recall whether you
17    had the word "obviousness" in the context that it is
18    described in page 2 of your report, you just don't
19    recall?
20    A.     I don't recall whether or not I used
21    the term "obviousness" -- that word "obviousness" in my
22    original draft.
23    Q.     Let me ask you this.  Let me back up to
24    that idea of publication and review, and that in the
25    context of the internet.
0042
1         - Frederick Sayward, Ph.D. -
2             Is it your criteria for prior
3     art --
4             Do you know what prior art is?
5     A.     I know what the term is, and it
6     probably has several definitions.
7             Maybe if you--
8     Q.     Let me ask you the question.
9     A.     -- narrow it down a bit.
10    Q.     Let me ask you the question first.
11            Is it your criteria for prior art that
12    it be reviewed?
13    A.     Prior art be reviewed?
14    Q.     Does something have to be reviewed to
15    be prior art in the context of patents?
16    A.     I don't have an opinion on that.  I
17    don't know what the law is there.
18    Q.     Do you know what a publication is in
19    the main context of patents?
20    A.     Yes.
21    Q.     Do you know what a publication is in
22    the context of prior art?
23    A.     No, that's the part that I don't
24    understand.

25      Q.      Do you think that the definition --
0043
1           - Frederick Sayward, Ph.D. -
2    your definition of publishing is a definition that
3    applies to prior art in the context of patents?
4      A.      I don't believe -- I don't know for
5    sure. I have -- I can't say that I what I gave as a
6    definition is a pretty strong definition in terms of
7    dating things, documenting things, showing that other
8    people have looked at it. And that's what's used in
9    the academic community.
10          Whether or not that is sufficient or
11   overkill for a patent world, I just don't know what
12   the realities are there.
13          For instance if someone came up with a
14   new innovative algorithm say in the area of
15   encryption, they would want to get credit for it. So
16   they would rush to publish it, and in my definition
17   of publish on academic researchers.
18     Q.      What is prior art as you understand it?
19     A.      My understanding is that prior art
20   would mean that something has been done
21   chronologically before something else, and the art
22   part is fuzzy obviously.
23          That's the part I don't understand.
24          Clearly there is something
25   chronologically of importance here. But exactly what
0044
1           - Frederick Sayward, Ph.D. -
2    constitutes --
3      Q.      Chronologically before?
4      A.      Before, yes. Prior obviously means
5    chronologically before. And prior art, since it is
6    being used in that context here, I presume it is
7    something that existed before something else, and the
8    something else is what is being challenged. But
9    exactly what makes it prior versus not germane,
10   that's a legal issue.
11     Q.      Okay. Now, --
12     A.      I'm giving technical --
13     Q.      You have statements in your rebuttal
14   for stating that something is or is not prior art.
15   Do you recall that?
16     A.      Yes.
17     Q.      Is that your language?
18     A.      Yes.

19      Q.      Was that contained in your initial
20   draft of this report, and I'm referring to
21   Exhibit L?
22      A.      Let me take a look.
23           I believe that part was added by
24   Attorney Winter.
25           But to paraphrase -- it's a paraphrase
0045
1       - Frederick Sayward, Ph.D. -
2    of what I was saying from a technical point of view.
3           But, again, without having both
4    documents side by side, I wouldn't swear on it.  The
5    documents say what they say.
6       Q.      You signed your name to it?
7           MR. WINTER:  Just a second.
8           (Pause)
9       Q.      Dr. Sayward, you signed your name on a
10   document?
11      A.      Right.  As I'm saying, you are asking
12   me if I --
13           Go ahead.
14      Q.      At least some portions of which are not
15   yours, correct?
16      A.      No, incorrect.
17      Q.      Well, so --
18      A.      It's been edited.  That doesn't mean it
19   is not mine.
20      Q.      Well, did you do a prior art analysis
21   with regard to your work in this case?
22      A.      Not in the technical sense, because I
23   didn't understand what prior art meant.  All I did
24   was look at whether or not something would pass the
25   test of technically being the same and also
0046
1       - Frederick Sayward, Ph.D. -
2    published.
3       Q.      Who did the prior art analysis for the
4    Plaintiff in this case?
5           Was that Mr. Winter?
6       A.      I can't say that.
7           I mean I -- as I said, you have to look
8    at the original, but I believe I pointed out all the
9    places along the line where there were things that
10   were the same and were not.
11           The main thing I pointed out was the
12   fact that these papers were not published and that

13    was it.
14       Q.      Do you know what it means to infringe a
15    patent?
16       A.      I have a layman's understanding of
17    that.
18       Q.      Like what is that?
19       A.      Well, there is the -- either you are
20    doing something the same way as someone else, and it
21    is after the first person did it.
22       Q.      Do you understand it on a more
23    technical level than that?
24       A.      Technical level?  I have more of a
25    technical understanding than I do of a legal
0047
1          - Frederick Sayward, Ph.D. -
2    understanding.
3       Q.      What's your technical understanding?
4       A.      My technical understanding is that you
5    are doing the same thing.  You are presenting the
6    same thing using essentially the same techniques.
7       Q.      Do you know what the elements are of a
8    claim, Dr. Sayward?
9       A.      I know it's some kind of legal ruling
10    by a judge.  That's about all I know.
11            I don't know what they are in this
12    case.
13       Q.      Do you know what a claim is in a
14    patent?
15       A.      Yes.
16       Q.      And what you are telling me is that the
17    elements of each claim are something that a Judge has
18    ruled on?
19       A.      The interpretation of the claimed
20    elements, yes.  That's something that I heard about.
21    A Judge rules on them.  Some kind of --
22       Q.      That's how you would define the
23    elements of a claim, is that correct?
24       A.      Definition of the elements of a claim?
25       Q.      Yes.
0048
1          - Frederick Sayward, Ph.D. -
2       A.      I don't know about definition.
3            I mean I know that's the final
4    interpretation of claims -- a judge rules on it.  If
5    it gets to an infringement suit -- you are asking in
6    the context of infringement?

7      Q.     Yes.
8             Okay, let me have you look at Exhibit
9    11 -- page 11 of your rebuttal report.
10     A.     Page 11?
11     Q.     Yes, if you would look at the page
12   first, unbolded language higher at the top, and let
13   me ask you this question.
14            You write there that the defendant
15   claims, quotes, this is not new, period.
16            The Columbia project uses a Marquis,
17   end of quotes.
18            In the discussion and claim above, I
19   have shown why the Columbia project does not show
20   prior art to claim 1.  This is not prior art to claim
21   13.
22            Do you see that?
23     A.     Yes.
24     Q.     Thus Defendant has not established
25   prior art for claim 13 of claim '071?
0049
1       - Frederick Sayward, Ph.D. -
2      A.     Yes.
3      Q.     Is that your original language?
4      A.     I don't remember it being that way, no.
5             As I said, the prior art statements is
6    the paraphrasing of what I did into technical -- I
7    mean from technical into legal terms.
8      Q.     This language, this found in your
9    report is Mr. Winter's language, is that right?
10     A.     I can't say again without comparing the
11   two.
12            But to the best of my recollection, the
13   prior art language in general, I believe -- and again
14   we have to look at the two documents side by side.
15     Q.     But you did not write this as it
16   appears here on page 11 of your report, isn't that
17   correct?
18            Let me strike that, and I will ask you
19   this.
20            Do you have a draft report that says
21   this in your own language?
22     A.     Says word for word this?
23     Q.     Not word for word.
24            That in substance means the same thing
25   as what I just read?
0050

1          - Frederick Sayward, Ph.D. -
2      A.      Oh, in substance means the same thing?
3      Yes.
4      Q.      Do you know what I mean when I say what
5      is the field of Netkey patents?
6      A.      The field of Netkey patents?
7      Q.      Netkey patents involved in this case?
8      A.      The field?  The area?  The technical
9      area, if that's what you mean?
10            Do you mean technical areas?
11      Q.      Yes.
12            It is kiosk systems, isn't it?
13      A.      Yes.
14      Q.      Is your field in kiosk systems?
15      A.      My field?
16            I have never written -- I have never
17      developed a kiosk system.
18            So from that sense I can't say it is my
19      field.
20      Q.      Have you ever seen a kiosk with
21      NetShift software running on it?
22      A.      A physical kiosk-in-a-box some place?
23      Q.      Yes, with NetShift software running on
24      it?
25      A.      Not to my knowledge.
0051
1          - Frederick Sayward, Ph.D. -
2            I mean it's possible I saw one, but I
3      didn't see one and say, "Oh, this is NetShift's
4      software."
5      Q.      Have you ever seen a kiosk sold or
6      distributed by Montegonet, LLC?
7      A.      Not to my knowledge.
8      Q.      Have you ever seen a kiosk at Auto Club
9      of Hartford with NetShift software on it?
10      A.      No, not to my knowledge.
11      Q.      What is a kiosk?
12      A.      A kiosk?
13      Q.      Yes, in the context of these patents?
14      A.      A formal definition is what you are
15      asking for?
16      Q.      Your definition?
17      A.      My definition of a kiosk?
18      Q.      Yes.
19      A.      I guess the first thing I would say it
20      is a specialized computer system.  In other words,

21    not a general purpose computer, but a dedicated
22    computer system, dedicated to a specific task.
23       Q.    Okay.
24       A.    And that task or tasks could vary; but
25    some of the features of it is that it is stand alone,
0052
1       - Frederick Sayward, Ph.D. -
2    operates in a potentially hostile environment.
3       Q.    What do you mean by that?
4       A.    Well, subject to people doing physical
5    damage to it, random people coming up and using it,
6    so it has -- has to have different physical
7    attributes than say an ordinary PC you put in your
8    house.
9            You don't expect someone to come in and
10    started hitting it with a hammer or something.
11       Q.    How about tampering with the operating
12    system?  Is that a feature of a kiosk in the
13    context --
14       A.    Yes, apparently -- not tampering with
15    the operating system, but tampering with the system
16    in general.  I would say there is a concern -
17            Tampering with the operating system?
18            In these days you want to some how
19    destroy the operating system.  I think that would be
20    a concern.  But that's a specific concern in a more
21    general area of concern.
22            Is that a concern that a kiosk, in the
23    contents of the patent suit in this case, tampering
24    with the operating system?
25            Sure, that would be a concern.
0053
1       - Frederick Sayward, Ph.D. -
2       Q.    How long has that been a concern with
3    kiosk in general?
4       A.    I don't know.  Probably from day one,
5    this type of kiosk.
6            I am mostly familiar with the kiosk as
7    a gatehouse.  An entrance to a gated community would
8    be a called a kiosk.
9            That was my first understanding of
10    kiosk until I got involved with this patent.
11            MR. WINTER:  I would like to make a
12            comment.  I would like you to wait until he
13            finishes his question and then answer it,
14            because what we are starting to get is

15          "okays" by Mr. Cooksey in the middle of
16          your answers, and it is getting -- it is
17          breaking down a little bit.
18              So I would like you to wait until
19          Mr. Cooksey finishes his question and then
20          answer it.
21              THE WITNESS:  Okay, yes.
22     Q.     Did I understand your testimony just a
23   few seconds ago to be that your first understanding
24   of kiosks, before your involvement in this case, was
25   the gatehouse at a residential community?
0054
1         - Frederick Sayward, Ph.D. -
2      A.     Yes, that's what I knew as a kiosk back
3   then.
4      Q.     So your first involvement in this case,
5   according to your bills, was January 2001?
6              Is it fair to say that you didn't have
7   any understanding of kiosks in the context of these
8   patents-in-suit kiosk systems -- strike that.
9              According to your bills, NK2081 found
10   in Exhibit X, your first involvement in this case was
11   January of 2001.
12              Is it true, Dr. Sayward, you did not
13   have an understanding of kiosks in the context of the
14   patents-in-suit involved in this case prior to
15   January of 2000?
16     A.     No, no, the word kiosk, I did not know
17   that to mean these kind of systems until then.
18     Q.     Okay.
19     A.     The system itself --
20              MR. WINTER:  This is exactly what I
21          don't want to get involved in.  He has a
22          question, there is an "okay" in the middle of
23          your answer, and then there is another
24          okay.
25              Let him ask the question and then
0055
1         - Frederick Sayward, Ph.D. -
2          answer it.
3              THE WITNESS:  Okay.  Yes.
4              MR. WINTER:  So go ahead and ask the
5          question.  You can go ahead and answer it.
6          That's your job.
7      Q.     Did you understand the systems involved
8   in these patents-in-suit prior to January 2001 in

9    some other name than the name kiosk?

10    A.    Yes.

11    Q.    How far back does your understanding of

12    these kind of systems go?

13    A.    Oh, I would say roughly maybe mid to

14    late 90s.

15    Q.    Do you know when these kind of systems

16    first began being developed?

17    A.    I don't know the exact date when they

18    first started being developed.

19    Q.    Did you ever talk to Alex Richardson in

20    this case?

21    A.    No, I have not.

22    Q.    Do you know who he is?

23    A.    I know he is a principal in the company

24    involved.

25    Q.    Of Netkey?

0056

1        - Frederick Sayward, Ph.D. -

2    A.    Yes.

3    Q.    Is he one of the named inventors?

4    A.    Yes.

5    Q.    Do you know the other three named

6    inventors?

7    A.    I don't know any of them.

8    Q.    Have you spoken to any of them?

9    A.    No, I have not.

10    Q.    Do you know what efforts were made to

11    secure, or to make tamperproof kiosk systems in the

12    late 80s?

13    A.    No, I do not.

14    Q.    Do you know what efforts -- same

15    question -- were made in the early 90s?

16    A.    Do I know?

17    Q.    Yes.

18    A.    I know some things about it, yes.

19    Q.    What do you know about let's say in the

20    '91 time frame, how were kiosk systems made

21    tamperproof to hostile users who, for instance, wanted

22    to tamper with the operating system?

23    A.    I don't know.

24        MR. COOKSEY:  Can we take a minute?

25        MR. WINTER:  Sure, we will take a

0057

1        - Frederick Sayward, Ph.D. -

2        break.

3              (Time noted 11:22 a.m.)
4                    ***
5              (Proceedings resumed at
6          11:40 a.m.)
7    EXAMINATION BY MR. COOKSEY (Cont'g)
8       Q.     Dr. Sayward, did you say that you had
9    described in your draft reports that Mr. Winter
10   edited, that you had described a technical level
11   before editing?
12      A.      Mr. Winter suggested some paraphrasing.
13              He didn't really edit the report.
14              You are saying he edited it.  He read
15   it and made some suggestions.
16      Q.      You said that his contribution to your
17   report was to put it on a legal level, whereas yours
18   was on a technical level, is that correct?
19      A.      Yes, paraphrased some of the things I
20   said in legal terms.
21      Q.      What was your technical level?
22      A.      I talked about what it would take to
23   build one of these systems, what kind of skill level.
24              I talked about what I thought was in
25   some of the reference materials, which I didn't think
0058
1        - Frederick Sayward, Ph.D. -
2    was properly documented or referenced, as I said.
3              I talked about where I thought it
4    failed technically to meet what was in the claims.
5              So it was more of a technical
6    presentation.
7       Q.      Okay.  What would be the level of skill
8    required for a person of average or ordinary skill in
9    the field of kiosk, do you know what that would be?
10      A.      Well, I don't know about the ordinary
11   part.
12              What kind of person would I hire if I
13   was going to build one of these?
14      Q.      I'm just asking you if you know what a
15   person of average or ordinary skill in the field of
16   kiosk would need to make and use kiosk systems?
17      A.      From an education point of view,
18   probably an Associate's Degree in Engineering,
19   Electrical Engineering.
20              That should be enough education, if
21   properly supervised, to make one of these.
22      Q.      Do you think you would have a higher

23    skill level in the area of kiosk systems?
24        A.    Yes.
25        Q.    Is that because of your education, and
0059
1            - Frederick Sayward, Ph.D. -
2    your doctorate education in computer science?
3        A.    No, because of my field experience,
4    systems I have built over the years.
5        Q.    Okay.  How about experience level?  How
6    many years experience, beyond the end of formal
7    education, would an average person of ordinary skill
8    in this field require?
9        A.    A year.
10        Q.    Doing what?
11        A.    Oh, doing firmware development,
12    possibly programing in high-level language.  That
13    kind of thing.
14        Q.    Code writing?
15        A.    Yes, software.
16        Q.    Do you think you have to be a
17    codewriter to be a person of ordinary skill in this
18    art?
19        A.    To develop a kiosk system?
20        Q.    Yes.  You would --
21        A.    Do you mean --
22            MR. WINTER:  Let's get a question and
23        answer.
24        A.    I think maybe you could repeat the
25    question.
0060
1            - Frederick Sayward, Ph.D. -
2        Q.    Do you think you need to be able to
3    write code to be ordinary skilled in the field of
4    kiosk systems?
5        A.    Yes.
6        Q.    Why do you say that?
7        A.    Well, it is software systems.  You need
8    to write software.
9        Q.    And how many years experience in
10    writing code would you need?  One year?
11        A.    Post graduation?
12            One year beyond what?
13        Q.    One year beyond Associate of Arts
14    Degree in --
15        A.    Doing what in that one year?
16        Q.    I'm asking you.

17    A.    Well, you asked if you need one year's
18  experience.  I was just giving you your test.
19    Q.    You said you needed one year.  But I'm
20  asking you one year doing what.
21    A.    Oh, one year developing production
22  software.
23    Q.    What do you mean by developing
24  production software?  Do you mean writing code?
25    A.    Yes.
0061
1    - Frederick Sayward, Ph.D. -
2    Q.    How about system architecture?  Do you
3  need any experience as a system architect?
4    A.    Yes.
5    Q.    Now, you don't have any system
6  architecture experience, do you --
7    A.    No.
8    Q.    -- in the field of kiosks?
9    A.    No.
10    Q.    And yet you consider yourself above
11  average in terms of your skill level --
12    A.    Yes.
13    Q.    -- with regard to these kind of
14  systems?
15    A.    Yes.
16       MR. WINTER:  Once again, Fred, that
17       question had two or three parts.  And what
18       we need to do is wait for Mr. Cooksey to
19       complete the question, and you must wait,
20       and then you can go and answer his
21       question.
22        Would you read back that last question
23       and answer so the witness understands what
24       I'm talking about.
25        (The court reporter read back the last
0062
1    - Frederick Sayward, Ph.D. -
2       question and answer as requested.)
3        You see with regard to waiting for the
4       question and not answering in the middle of
5       it?
6        Let him ask the full question and
7       then answer it.  And if he pauses, let
8       him complete his pause.
9        But right now you are answering
10       questions in the middle of his question,

11          and he carries on as another question what
12          was really part of the same question.
13              So go ahead and help Mr. Cooksey as
14          best you can.
15  EXAMINATION BY MR. COOKSEY (Cont'g)
16      Q.      Have you told me what you think the
17  qualifications are for a person of ordinary skill, as
18  you understand it, in the field of kiosk systems?
19      A.      Yes, I told you.
20      Q.      Associate Degree, one-year experience,
21  at least some of which is writing code, and some
22  experience in system architecture?
23      A.      Yes.
24      Q.      And even though you don't have any
25  experience in system architecture, you still would
0063
 1          - Frederick Sayward, Ph.D. -
 2  consider yourself above average in the field of kiosk
 3  systems?
 4              MR. WINTER:  Would you read the
 5          question back, because you need to listen
 6          to the question carefully.
 7            (The court reporter read back the last
 8          question as requested.)
 9      A.      Okay.  Yes.
10              Well, you say I have no experience in
11  architecture in that statement, and what I'm saying
12  is I don't have experience in architecting a kiosk
13  system.
14      Q.      Okay.
15      A.      But I do have experience in system
16  architecture.
17      Q.      Okay.  And is it a fair statement to
18  say that one who is ordinarily skilled in the art of
19  kiosk systems, that kind of person could have a
20  higher level of skill in one area, for instance
21  writing code, and lesser area of skill in another
22  area, for instance system architecture?
23      A.      Could you repeat that question?
24      Q.      Is it a fair statement, Dr. Sayward,
25  that you can have varying levels of skill in
0064
 1          - Frederick Sayward, Ph.D. -
 2  different kinds of areas that it takes to be one
 3  skilled in the art of kiosk systems?
 4              MR. WINTER:  I am going to object to

5          the question.
6               There are two questions pending now.
7               Do you want him to answer the first
8     one or the second one?
9               MR. COOKSEY:  I will just strike it.
10      All right?
11               MR. WINTER:  Okay.
12      Q.     Let me ask it to you this way:
13   Dr. Sayward, would you agree that you can be more
14   skilled in one area, for instance writing code, and
15   less skilled in another area, for instance system
16   architecture, and still be skilled in the art of
17   kiosk systems?
18      A.     I would agree with that statement.
19      Q.     Okay.  The same thought process,
20   Dr. Sayward.  Could you have more experience -- could
21   you have a higher level of experience and a lesser
22   level of education and still be a person of ordinary
23   skill in the art of kiosk systems?
24      A.     As a statement, as the question is
25   phrased, I don't know if I can answer it.
0065
1          - Frederick Sayward, Ph.D. -
2      Q.     You understand, I mean, some people in
3   the field of kiosk systems have a very high level of
4   education, such as yourself, and yet virtually no
5   experience in kiosk systems?
6      A.     Okay.
7      Q.     And the flip may be true, that somebody
8   may have virtually no formal education and yet be
9   very experienced.
10          Would you agree that on those two
11   extremes, both of these individuals can still be
12   skilled in the art of kiosk systems?
13      A.     I would agree to that statement.
14      Q.     Now, I will define a person of ordinary
15   skill in the art as someone having the level of
16   ordinary skill in the art, and that person is
17   presumed to know all the prior art at the time the
18   invention was made.
19          That's the legal definition of a person
20   of ordinary skill in the art.
21          Do you understand that?
22      A.     Could you go over that once more.
23      Q.     Sure.  I will define a person of
24   ordinary skill in the art as someone having a

25    level of ordinary skill in the art who is presumed to
0066
1          - Frederick Sayward, Ph.D. -
2    know all the prior art at the time the invention is
3    made.
4      A.    Okay.
5      Q.    Now, with that definition in mind, do
6    you think that you can give an opinion or opinions
7    on how a person of ordinary skill in the art would
8    make and use the kiosk systems described in the
9    patents-in-suit?
10           MR. WINTER:  Can you repeat the
11       question?
12           Would you read the question back for
13       Dr. Sayward, please.
14         (The court reporter read back the last
15       question as requested.)
16      A.    Maybe you can rephrase the question,
17    because I'm still not sure what you are getting at.
18      Q.    Well, I am going to define a person of
19    ordinary skill in the art as being someone who has
20    the level of ordinary skill in this art of kiosk
21    systems.
22      A.    Okay.
23      Q.    Who is presumed to know all the prior
24    art at the time the invention --
25      A.    Okay.
0067
1          - Frederick Sayward, Ph.D. -
2      Q.    -- was made.
3      A.    Okay.
4      Q.    Now you understand that to be a
5    hypothetical --
6      A.    Hypothetical person --
7      Q.    Ordinary person.
8      A.    -- who knows everything about kiosks
9    that ever been done?
10      Q.    No, who is presumed to know the prior
11    art at the time the invention is made.
12      A.    But didn't you just define prior art as
13    knowing everything about kiosks that's ever been done
14    up until the time of the invention?
15      Q.    No.
16           Is that your understanding of prior
17    art?
18      A.    No.  I'm just trying to figure out what

19    your understanding is, because it is a very long
20    definition, and it is hard to understand without
21    seeing it in writing.
22        Q.      You don't know what prior art is,
23    correct?
24        A.      I don't know what prior art is?
25        Q.      Yes.
0068
1         - Frederick Sayward, Ph.D. -
2         A.      I know what prior art is.
3         Q.      What is your definition of prior art?
4         A.      Prior art is something that has been
5     done in the past with respect to -- it has to be with
6     respect to something -- with respect to some subject
7     area.
8         Q.      Okay.  Let's talk about the
9     patents-in-suit in this case.
10             Have you reviewed the prior art
11    relating to these?
12        A.      Have I personally --
13        Q.      Excuse me.  Have you reviewed the prior
14    art relating to these two patents?
15        A.      I have reviewed documents in the area
16    of kiosks, yes.
17        Q.      Have you reviewed documents that you
18    believed, or were led to believe, was prior art with
19    respect to these two patents?
20        A.      I have reviewed documents on kiosks
21    that had technical features that I read in the
22    documents.
23        Q.      I am going to use your definition of
24    prior art as you understand it, and again I am going
25    to give you this definition and ask you if you can
0069
1         - Frederick Sayward, Ph.D. -
2     read these patents as a person having ordinary skill
3     in the art?
4         A.      Okay.
5         Q.      Again, I am going to define a person
6     of ordinary skill in the art as a hypothetical
7     person who has a level of ordinary skill in the
8     art of kiosk systems, who is presumed to know all
9     the prior art at the time the invention or
10     inventions was made.
11        A.      Okay.
12        Q.      Do you understand that definition?

13    A.    I believe it's consistent with what I
14  just said a few moments ago, that you are talking
15  about a person who knows everything about all that's
16  been done with respect to kiosks up to a certain
17  point in time.
18    Q.    Okay.
19    A.    Is that what you mean by ordinary skill
20  in the art?
21    Q.    I am going to leave that to you.
22        Do you think you can opine with that
23  definition?
24        MR. WINTER:  We now have at least two
25         or three definitions.
0070
1        - Frederick Sayward, Ph.D. -
2            When you say that definition, you have
3          the one you gave him twice, I think, and it
4          was different both times, and you have a
5          third one you were talking about.
6            So I'm going to object to the form of
7          the question, and ask you not to answer it
8          because there is no basis -- antecedent
9          basis for that definition.
10        MR. COOKSEY:  Okay.
11    Q.    I am going to give you the definition
12  again, and we will start all over again.  Okay?
13    A.    Okay.
14    Q.    Again, Dr. Sayward, when I define a
15  person of ordinary skill in the art as someone who
16  has a level of ordinary skill in the art of kiosk
17  systems, who is presumed to know all the prior art at
18  the time the invention was made.
19    A.    That's your definition?
20    Q.    Yes.
21    A.    Okay.
22    Q.    That's the legal definition.
23        Do you think that you can opine in
24  this case -- do you think you can opine, in the
25  patents-in-suit in this case, a person of ordinary
0071
1        - Frederick Sayward, Ph.D. -
2  skill in the art using that definition?
3    A.    Today?
4    Q.    Yes.
5    A.    I couldn't say that with certainty.
6    Q.    You think you could try?

7     A.     Oh, I could definitely try.
8     Q.     All right.
9     A.     But I couldn't say that with certainty,
10    because I don't know if I've done an exhaustive
11    research of all that was ever done.
12         I can certainly bring myself up to that
13    level of skill; but whether or not I have done so, I
14    don't know.
15    Q.     Okay.  Well, we are going to make that
16    effort.  Okay?
17    A.     You are going --
18    Q.     We are going to make that effort in
19    this deposition to have you answer questions as a
20    person of ordinary skill in the art in the field of
21    these patents.
22    A.     So I should say I don't have that
23    technical background, or I don't know--
24    Q.     Well, we --
25    A.     You are assuming that I know everything
0072
1        - Frederick Sayward, Ph.D. -
2    that has ever been done about kiosks.
3    Q.     I'm not assuming anything.  I'm asking
4    you if you can function as an expert and give
5    opinions as a person of ordinary skill in the art,
6    using the definition I just gave you?
7    A.     I can't say with certainty given the
8    definition you just gave.
9         MR. WINTER:  The problem is we are
10         going in circles here.  Your definition
11         assumes that he knows all the level of
12         the -- all the prior art in the field of
13         kiosks.  And right now he has opined about
14         some papers that Mr. Daw has presented, but
15         he would have to know all the prior art you
16         are talking about.
17         I assume you are eventually going to
18         give him pieces of prior to art to look at.
19         Is that where we are going?
20         MR. COOKSEY:  Yes.
21    Q.     And you will try to do that, correct,
22    Doctor?
23    A.     If I am given pieces of assumed prior
24    art, or computative prior art, I can look at the
25    papers and read them and then make opinions.
0073

```
 1        - Frederick Sayward, Ph.D. -
 2            I don't know how detailed the papers
 3    are.  I haven't seen them yet.
 4        Q.    Well, you were given hard copies of all
 5    the references in Plaintiff's -- I'm sorry,
 6    NetShift's expert's report, correct?
 7        A.    Oh, yes,
 8        Q.    Let me --
 9        A.    I have those papers and I read them.
10        Q.    Let me have you look at Exhibit M.
11            Have you seen that report before?
12        A.    I have seen something.
13            I don't know if it is exactly the final
14    version or not.
15        Q.    Go ahead and take your time.
16            MR. WINTER:  Is there a question
17        pending?
18        Q.    Have you seen that report before?
19        A.    I don't know with certainty.
20            This has an Exhibit Number on it, and
21    whether it is exactly the same, I don't know.
22            It is a very long report.  Whether or
23    not it is exactly word-for-word the same report I
24    have seen, I don't know.
25        Q.    Okay.  Well, I will represent to you
0074
 1        - Frederick Sayward, Ph.D. -
 2    that's a copy of the one and only expert report
 3    produced on behalf of the Defendants in this case.
 4        A.    If that's the case, then I have seen
 5    it.
 6        Q.    Okay.  And did you review the hard
 7    copies of the references cited therein?
 8        A.    Yes, I have.
 9        Q.    Okay.  Now, you understand that you are
10    not a person of ordinary skill in the art, that a
11    hypothetical person is a person of ordinary skill in
12    the art?
13            Do you understand that, that some
14    hypothetical person --
15        A.    Under your definition, yes, I
16    understand that.
17        Q.    Okay.  Now --
18        A.    I understand that I may not have met
19    your definition.
20            I can't say I do or I don't.
```

21      Q.    Well, here is what I want you to
22   answer, as though you were that hypothetical person.
23          Do you think you can do that?
24      A.    No, because I don't know if there are
25   things I haven't reviewed that would be germane.
0075
1        - Frederick Sayward, Ph.D. -
2       Q.    Do you think you can try to do it?  And
3    if you think that you are lacking information, then
4    you tell me that when you answer the question.  All
5    right?
6       A.    Yes.
7       Q.    Okay.  Let's start out with -- let's
8    start out with your March 24th report, Dr. Sayward.
9             MR. WINTER:  March or May?
10            MR. COOKSEY:  March.
11      Q.    Okay.  That's Exhibit K.
12            Is this the March report, Dr. Sayward?
13      A.    It should be dated.
14            MR. WINTER:  The one you have in
15         front of him is dated May 24, 2002, and
16         that's Exhibit K.
17            Why don't you take a look at Exhibit K
18         and make sure you want him to look at that
19         one.
20            We are glad to answer your questions
21         as to any of them.  I want to make sure you
22         are thinking about the right report.
23      Q.    That's the one, Exhibit K.
24      A.    Okay.
25      Q.    All right.  Now, Dr. Sayward, let me
0076
1        - Frederick Sayward, Ph.D. -
2    have you look at pages 4 to 5 of that report, and
3    also pages -- page 4 of your rebuttal report.
4            Now, you define the term "masking", do
5    you not, in those two reports on those pages?
6       A.    Yes, I gave what I view a generic term
7    of masking as it applies to computer applications,
8    and as it would be used in the patent.
9       Q.    And in the rebuttal report you actually
10   make reference to the Encarta College Dictionary?
11      A.    Yes.
12      Q.    Will you agree that the Encarta
13   definition of masking does not appear in the '071
14   patent?

15      A.      It doesn't appear in the patent?

16      Q.      Yes.

17              MR. WINTER:  I guess he is asking you

18          to go through the '071 patent, which is

19          Exhibit O, and look for the definition

20          that's here in the patent.

21              Do you want the word-for-word

22          definition?

23      Q.      All I asked you in the question was,

24  would you agree that the Encarta Dictionary

25  definition of masking that you supplied in your

0077

1           - Frederick Sayward, Ph.D. -

2   rebuttal report, does not appear in the '071 patent?

3       A.      I don't have to read through all this.

4   That word for word does not appear in the '071.

5       Q.      The Encarta Dictionary definition does

6   not appear in the '071?

7               MR. WINTER:  That's just been

8           answered, so I instruct you not to answer.

9               It is the same question.

10      Q.      I didn't hear your answer.  What did

11  you say?

12      A.      You asked --

13              MR. WINTER:  Why don't you read back

14          the answer, so you can have the answer.

15              (The court reporter read back the last

16          answer as requested.)

17      Q.      Dr. Sayward, is there any basis in the

18  '071 patent for a definition of masking, other than

19  its common meaning?

20      A.      Other than its common meaning?

21      Q.      Yes.

22      A.      I would say that as I recall there was

23  no formal definition given in the '071 patent of

24  masking.

25      Q.      Okay.  What I'm asking you is -- that's

0078

1           - Frederick Sayward, Ph.D. -

2   not the answer to the question I asked.

3               What I asked is, was there any basis in

4   the '071 patent for a definition of masking, other

5   than its common meaning?

6       A.      If you could provide me with a

7   definition of common meaning for the term masking,

8   then I can answer that.

9      Q.     Well, masking is defined in the '071
10   patent?
11      A.     I did not see a formal definition of
12   masking in the '071 patent.
13      Q.     Okay. So your answer to that question
14   is no, correct?
15              MR. WINTER:  I am not sure which
16         question you are talking about at this
17         point in time.
18              And I instruct you not to answer.
19      Q.     The question was, was there any basis
20   in the '071 patent for a definition of masking, other
21   than its common meaning?
22      A.     And my answer is, I didn't see any
23   definition -- well, I can't answer that question
24   unless you tell me what common --
25              I think as I answered, I don't know
0079
1          - Frederick Sayward, Ph.D. -
2    what you mean by the common meaning for the
3    definition of the term "masking".
4       Q.     Okay.
5       A.     I don't understand that part of the
6    question.
7               MR. WINTER:  Can we take a break?  I
8          just want to see something, and you are
9          going to read this stuff.
10              Two seconds.
11              MR. COOKSEY:  All right.
12              (Time noted 12:09 p.m.)
13                    ***
14              (The proceedings resumed at
15         12:15 p.m.)
16   EXAMINATION BY MR. COOKSEY (Cont'g)
17      Q.     Okay. Dr. Sayward, let's go to your
18   report of -- the May 24th report.  Go to page 5 and
19   you defined masking, correct?
20      A.     I defined it as I interpreted its
21   meaning in the patent.
22      Q.     And when you did that, you interpreted
23   the person as a person of ordinary skill in the art
24   as you understand it, correct?
25      A.     That's correct.
0080
1          - Frederick Sayward, Ph.D. -
2       Q.     Okay. Now, what do you mean by --

3          First of all, for the record, would you
4   read your definition of masking?
5      A.    Okay.  "Software on a computer system
6   is said to mask the displayed output, in whole or in
7   part, of the computer system if output that should
8   be displayed is prevented from being displayed, by
9   the software hiding or blocking the output."
10     Q.    Now, you put that definition in quotes,
11  do you see that?
12     A.    Hum-hum.
13     Q.    Are those your quotes?
14     A.    Yes.
15     Q.    That's not to indicate that it came
16  from some other reference, correct?
17     A.    No.  That was because I was making a
18  definition.
19     Q.    Okay.  And that's the definition of
20  masking, according to Frederick Sayward, correct?
21     A.    That's correct.
22     Q.    What do you mean by "should be
23  displayed"?
24     A.    "Should be displayed" means that there is
25  some reason -- some reason for output to be displayed
0081
1       - Frederick Sayward, Ph.D. -
2   in the software.
3      Q.    What do you mean by prevented from
4   being displayed?
5      A.    I mean some other part of the software
6   does something that stops that output from being
7   displayed.
8      Q.    Okay.  What do you mean by the software
9   hiding or blocking the output?
10     A.    Just common ordinary English
11  definition.
12          Hiding means that the software -- the
13  software part is the noun for the word prevented,
14  hiding is the action.
15          The software that's preventing the
16  output from being displayed by either hiding it or
17  blocking it.
18     Q.    Let me ask you this, Dr. Sayward --
19          By the way, your answers to all these
20  questions are in the context of a person of ordinary
21  skill in the art, and unless I ask you otherwise, do
22  you understand that?

23     A.     I understand that.  But I also say that
24   this is my own definition, and I don't necessarily
25   consider myself a person skilled in the art under
0082
1        - Frederick Sayward, Ph.D. -
2   your definition.
3     Q.     All right.  Well, I'm going to--
4     A.     Because I mean --
5          MR. WINTER:  Go ahead, why don't you
6       ask the next question.
7     Q.     When I'm asking you these questions, I
8   am asking you to answer them as a person of ordinary
9   skill in the art.
10          If you can't answer that in that way, I
11   want you to tell me that you just can't answer it in
12   that way.
13     A.     Under that definition, I can't answer
14   this.
15     Q.     Okay.  Unless I state otherwise, I'm
16   asking you --
17     A.     Well, I prefer you state --
18     Q.     Let me finish my question.  Okay?
19     A.     Okay.
20     Q.     Unless I ask you -- unless I specify
21   otherwise, the questions I'm asking you now on the
22   '071 patent are questions asking you to construe the
23   person as a person of ordinary skill in the art.
24     A.     Okay.
25          MR. WINTER:  And you can go ahead and
0083
1        - Frederick Sayward, Ph.D. -
2       do that the best way you can, based upon
3       his definition, even though we really don't
4       necessarily agree with your definition.
5          And Dr. Sayward has told you
6       repeatedly that you haven't presented him
7       with all the prior art that you are basing
8       his level of skill on.
9          But try to do the best you can with
10       those constraints.
11   EXAMINATION BY MR. COOKSEY (Cont'g)
12     Q.     Okay.  Where in the '071 patent do you
13   find support for your definition of masking?
14          MR. WINTER:  He wants you to read the
15       patent.
16     Q.     You read the patent before today, have

17    you not, Dr. Sayward?
18        A.      Yes, I have.
19        Q.      Did you read it to prepare yourself for
20    today's deposition?
21        A.      Yes, I did.
22        Q.      You have a pretty good working
23    knowledge of it?
24        A.      Yes, I do.
25        Q.      Is it going to take an extensive amount
0084
1             - Frederick Sayward, Ph.D. -
2    of reading for you to be able to answer that
3    question?
4        A.      Yes, it will.
5        Q.      Let's take whatever time you need.
6        A.      All right.
7             (Pause).
8             MR. WINTER:  Do you understand the
9        question.
10            THE WITNESS:  Yes, I think I do.
11            He wants me to find phrases in here
12        that support my statement?
13            MR. WINTER:  Okay.
14            MR. COOKSEY:  Off the record.
15            (Off-the-record discussion.)
16    EXAMINATION BY MR. COOKSEY (Cont'g)
17        Q.      All right.  To speed this up, let me
18    just have you answer the question.
19        A.      Okay.  Could you repeat the question?
20            MR. WINTER:  Well he can read it back
21        for you.
22            (The court reporter read back the last
23        question as requested.)
24        A.      I guess page NK1316, -- are these lines
25    numbered -- column 2 --
0085
1             - Frederick Sayward, Ph.D. -
2             THE WITNESS:  I need some help on how
3        I should refer to this.
4             MR. WINTER:  You can count the lines
5        down.
6        A.      In the abstract lines, lines 8, 9, 10,
7    11, 12, 13.
8        Q.      I'm sorry, under the abstract it was
9    lines 8 through 13?
10        A.      8 through 13.  Column 2, lines 40

11    through 52; column 3, lines 4 through 16; column 4,
12    lines 65, and continuing onto column 5 through lines
13    13; and column 7, lines 49 through 53.
14         Q.     Okay.  Dr. Sayward, in your definition
15    there is no use of an image to mask controls, is that
16    correct?
17         A.     That is correct.
18         Q.     Is it your position that we can just
19    ignore that word, as it is used in the claims, and
20    I'm referring to the word image?
21         A.     No, that's not my position.
22         Q.     Your definition of masking, as found in
23    your May 24th, 2002 report, page 5, is an overlaying
24    image required to mask controls under Claim 1 of that
25    patent?
0086
1          - Frederick Sayward, Ph.D. -
2          A.     No.
3          Q.     So is masking, as you defined it, the
4     same as, quote, image overlaying technique?  And I
5     will refer you to your May 24th report, page 4,
6     second paragraph from the bottom.
7          A.     What was your question again?
8          Q.     So is masking, as you defined it, the
9     same as, quote, image overlaying technique, end of
10    quotes, found in the second paragraph from the bottom
11    on page 4 of your May 24th report?
12         A.     The answer is no, based on what I'm
13    hearing you say.
14         Q.     Do you understand my question?
15         A.     I believe your question is ill-formed.
16         Q.     All right?
17         A.     I understand what you are saying.
18         Q.     Let me re-form it.  Okay.
19               Referring to the second paragraph from
20    the bottom of page 4 of your May 24th report.
21         A.     That's correct.
22         Q.     You state a technique referenced in the
23    claim, meaning Claim 1 of the '071 patent, to achieve
24    this is an image overlaying technique?
25         A.     Right.
0087
1          - Frederick Sayward, Ph.D. -
2          Q.     And I'm asking you, does your
3     definition of masking, as found on page 5 of this
4     report -- does your definition of masking as found on

5    page 5 of this report require an image overlaying
6    technique to mask controls?
7        A.     The answer is no.
8        Q.     So is masking, as you defined it, the
9    same as image overlaying technique, as found in your
10   report?
11               MR. WINTER:  He already answered that
12           question.
13               I would object to the question.
14       Q.     Is your answer no?
15           I don't recall your answer.
16               MR. WINTER:  We can go back.
17               He already answered that question.  I
18           think he said no, but we can read the
19           question and answer four things back.
20               That's the same question.
21               Okay, go ahead and read it.
22               (The court reporter read back the last
23           question and answer as requested.)
24       Q.     Now, I understand your definition of
25   masking is an image overlaying technique required to
0088
1        - Frederick Sayward, Ph.D. -
2    accomplish masking in Claim 1?
3        A.     Is this a new question?
4            Could you just repeat the question.  I
5    thought this was just repeating the previous
6    question.
7               (The court reporter read back the last
8           question as requested.)
9               MR. COOKSEY:  Let me strike the
10          pending question, and we will start all
11          over again.
12              Strike the pending question and start
13          all over again.
14       Q.     Dr. Sayward, under your definition of
15   masking, is an image overlaying technique required to
16   accomplish masking in Claim 1?
17       A.     No, it's not required, if "required" is
18   the key word.
19       Q.     Dr. Sayward, under your definition of
20   masking, is an image overlaying technique required to
21   accomplish masking in Claim 17?
22               MR. WINTER:  Do you want him to look
23          at the patent?
24               So you want him to look at Exhibit O,

25          and you want him to look at his expert

0089
1          - Frederick Sayward, Ph.D. -
2          report, too?
3                MR. COOKSEY:  Whatever he needs to
4          do to answer the question.
5      A.      Again, no, it is not required.
6      Q.      Let me have you look at figure 5 of the
7    '071 patent.
8      A.      Okay
9      Q.      Now look at items 102 and 104 on that
10   page.  Do you see those?
11     A.      Yes, I do.
12     Q.      Are you saying that these items are not
13   needed in Claim 1 in order to mask browser controls
14   as described in Claim 1?
15     A.      Could you repeat the question with the
16   numbers here which --
17     Q.      I will re-ask the question.
18          Look at items 102 and 104 on that page.
19   Do you see those, Dr. Sayward?
20     A.      Yes.
21     Q.      Okay.  My question is, are you saying
22   that these items, meaning 102 and 104, are not needed
23   in Claim 1 in order to mask browser controls as
24   described in Claim 1?
25     A.      No, I'm not saying that.

0090
1          - Frederick Sayward, Ph.D. -
2      Q.      Let me have you look at column 5, lines
3    48 and 49 of the '071 patent.
4      A.      Which line?
5      Q.      Lines 48 and 49.
6      A.      Okay.
7      Q.      Do those not describe figure 5?
8      A.      I believe they do, right.
9      Q.      Okay.  And they say as follows:
10          "The operation of the GUI control
11           software is illustrated in the flow chart
12           of figure 5."
13          Is there, Dr. Sayward, any other
14   operation of the GUI control software, other than as
15   illustrated in figure 5?
16     A.      Repeat that last question please.
17                MR. COOKSEY:  Would you read that
18          please.

19          (The court reporter read back the last
20      question as requested.)
21      A.    Yes.
22      Q.    Okay.  Where is that defined in any of
23  the figures of --
24          Where is that other method for
25  operation of the GUI control software in any of the
0091
1      - Frederick Sayward, Ph.D. -
2  figures in this patent?
3      A.    You want to know if it is described in
4  the figures?
5      Q.    Yes.
6      A.    It's not described in figures 1 through
7  6.
8          I think that's all the figures there
9  are.
10          No, it's not described in the figures.
11      Q.    Okay.  Where is it described?
12      A.    Beginning on column 4, line 65 --
13  beginning on column 4, line 65 through column 5, line
14  either 13 or 14.
15          I can't tell the numbers in between the
16  typing.  The end of the paragraph.
17      Q.    Through that entire first paragraph on
18  column 5?
19      A.    Yes.
20      Q.    Dr. Sayward, by your definition would
21  masking include concealing browser controls which
22  never existed?
23      A.    Which never existed?
24      Q.    Yes.
25      A.    No.  If it never existed --
0092
1      - Frederick Sayward, Ph.D. -
2          What was the question again?  Conceal
3  things that never existed?
4      Q.    No.  By your definition would masking
5  include concealing browser controls which never
6  existed?
7      A.    Oh, I'm sorry.  I didn't understand the
8  question.
9          Yes, you could say that.
10      Q.    Okay.  I don't mean to be silly here,
11  but you know the Lone Ranger, right?
12      A.    The Lone Ranger?

13     Q.     You remember the old character, the
14  Lone Ranger?
15     A.     Yes.
16     Q.     He had a mask, right?
17     A.     Yes.
18     Q.     And that prevented you from seeing his
19  face, right?   Masked his face?
20     A.     Right.
21     Q.     Do you know what the Headless Horseman
22  was?
23     A.     Is that in the "Legend of Sleepy Hollow"?
24     Q.     I'm just asking you --
25     A.     The "Headless Horseman"?
0093
1         - Frederick Sayward, Ph.D. -
2     Q.     Right.
3     A.     No, I don't know who the "Headless
4  Horseman" is.
5     Q.     If the "Headless Horseman" would have
6  had a head but it wasn't there, was there any need to
7  mask?
8            Is that masking when you --
9     A.     (Laughter).
10     Q.     All right.  Let me ask you this.
11           MR. WINTER:  Basically, the answer to
12         that question was a chuckle, and we didn't
13         get an answer.  And we are around to a new
14         question.
15           Is that correct?
16           THE WITNESS:  I have not answered it.
17         I don't understand the question.
18     Q.     Okay.  Was it masking in the case of
19  the "Headless Horseman" when his head wasn't there?
20     A.     It could be.
21     Q.     Under your definition?
22     A.     Under anyone's definition.
23     Q.     Okay.  If I put a pen on the table and
24  cover it with a sheet of paper, is that masking?
25     A.     Yes, it is.
0094
1         - Frederick Sayward, Ph.D. -
2     Q.     Okay.  Now, if I take the pen away from
3  there, and let's say that the pen should be there but
4  it is not there?
5     A.     Right.
6     Q.     Is that masking as well --

7     A.     Yes.
8     Q.     -- under your definition?
9     A.     Yes.
10    Q.     So under your definition of masking,
11    would not showing the start button be masking?
12    A.     Yes, it would.
13    Q.     How about the exit button?
14    A.     What exit button?
15    Q.     You don't know how to answer that
16    question?
17    A.     I don't know --
18            MR. WINTER:  Hold it.
19         He asked you -- he was uncertain.  He asked
20         you what exit button.  So there is an
21         uncertainty.
22            Can you clarify exit button?
23    Q.     How about NetShift's software?
24    A.     What about it?
25    Q.     The exit button on NetShift software,
0095
1        - Frederick Sayward, Ph.D. -
2    do you know what the exit button is on NetShift
3    software, versions 5.0 and 5.5?
4     A.     No.
5     Q.     So you can't answer that question,
6    right?
7     A.     I don't recall there being an exit
8    button there.
9     Q.     Okay.  In general, would disabling
10    system functions be masking, as you have defined
11    it?
12    A.     Yes.
13            MR. WINTER:  Mike, I would like to
14         take a lunch break.  So why don't you sort
15         of head towards a place to break.
16            MR. COOKSEY:  I have one more
17         question and then we can break.  *
18    Q.     On page 4 of your May 24th report,
19    Dr. Sayward, let me have you find this quote.
20            You say, "NetShift Release 5.5 overlays
21    bitmap images which mask at least one browser control
22    button...",  end of quotes.
23            Do you see that?
24    A.     No, I don't see it.
25    Q.     Let me see if I can find it for you.
0096

1          - Frederick Sayward, Ph.D. -
2               I'm sorry, Dr. Sayward.  I misspoke.
3     It is in your rebuttal report, page 4.
4          A.     Right.
5          Q.     And you see that quote there?
6          A.     Hum-hum.
7          Q.     And, again, I will state you quote on
8     that page of your rebuttal report that "NetShift 5.5
9     overlays bitmap images which masks at least one
10    browser control button.. ",  end of quotes.
11         A.     Yes, sir.
12         Q.     Okay.  Is that enough to infringe Claim
13    1, masking at least one browser control button?
14         A.     Yes.
15         Q.     If all the other elements of Claim 1
16    are met, is masking met by hiding or concealing at
17    least one browser control button?
18         A.     If all --
19               I don't know what you mean by all the
20    other elements.
21         Q.     Well, monitor, microprocessor --
22               Do you know what I mean by the elements
23    of Claim 1?
24         A.     If you would enumerate them, I can go
25    through them one by one.
0097
1          - Frederick Sayward, Ph.D. -
2          Q.     Okay, let's go ahead to Claim 1.
3               Claim 1 reads as follows:
4     "Self-service computer comprising" --here are the
5     elements -- "a monitor having a display screen".
6          A.     Yes.
7          Q.     "A microprocessor."
8               Those are what I mean by the elements.
9          A.     Well, my problem is that some of these
10    clauses are multiphrases and could refer to more than
11    one element.
12               That's why I asked you to enumerate the
13    exact elements you mean.
14         Q.     I can't do that other than reading
15    Claim 1.
16         A.     You can point out that this is an
17    element, that is an element, that is an element.
18               MR. WINTER:  Why don't we wait for a
19         question.
20               Let him ask a question and you can

21          answer it, if you can.
22              MR. COOKSEY:  Okay.  We will just
23          drop it.  Strike that.
24      Q.      Okay, Dr. Sayward, we are on page 4 of
25    your rebuttal report.
0098
1      - Frederick Sayward, Ph.D. -
2              We are getting too many papers right
3    here.
4              You state defendant has chosen to
5    ignore the express language of the patent.  Do you
6    see that?
7      A.      Yes, right here.
8      Q.      Right there?
9      A.      Yes.
10      Q.      Okay.  And in particular we need to
11    know what you mean by NetShift release 5.5 overlays
12    bitmap images exactly as described in the patent.
13      A.      Hum-hum?  That's with the close button.
14      Q.      I'm sorry.  Can you be a little more --
15      A.      Well, I display an image and the close
16    button is not displayed.  In other words it is masked
17    out.
18      Q.      Okay.  Let's go ahead and do lunch.
19              (Luncheon recess)
20          (Time noted 12:55 p.m.)
21              AFTERNOON SESSION
22          (Time noted 1:55 p.m.)
23  EXAMINATION BY MR. COOKSEY (Cont'g)
24      Q.      Dr. Sayward, would you look at column
25    4, line 60 of the '071 patent, please.
0099
1      - Frederick Sayward, Ph.D. -
2              Do you see the reference to masking the
3    menu bar?
4      A.      Yes, I do.
5      Q.      Okay.  Here is my question.
6              Would you agree that a product would
7    mask Claim 1 of the '071 patent if it masked only the
8    menu bar?
9              MR. WINTER:  Could you read the
10          question back.
11      A.      Would I agree --
12              MR. WINTER:  Wait.
13              Read the question back again, please.
14              (The court reporter read back the

15          last question as requested.)
16    A.    I don't understand the question.
17    Q.    Okay.  Let me ask it to you this way.
18          Would you agree that if all the other
19    elements of Claim 1 were met, that a product would
20    mask as you have defined it, if it masked only the
21    menu bar?
22    A.    Yes, I would agree with that.
23    Q.    Let me have you look at a demo here.
24    This is Mr. Daw's exhibit.
25          Dr. Sayward, I will hand you an exhibit
0100
1          - Frederick Sayward, Ph.D. -
2    that Mr. Daw created, representative figure 3 of the
3    '071 patent, and you can verify that by looking at
4    the patent.
5          I will ask you this question.  Do you
6    agree that the model that I have put in front of
7    you and Mr. Winter is holding now is essentially a
8    copy or another version of figure 3 of the '071
9    patent?
10    A.    Other than one of the ends isn't
11    squared off --
12          MR. DAW:  I never did woodwork.
13    A.    -- it looks pretty much like that.
14    Q.    Looks pretty much the same?
15    A.    Well, it doesn't have the reference
16    numbers, but other than that, yes.
17    Q.    A 27 12, things of that nature, doesn't
18    have figure 3 on it, correct?
19    A.    Right.
20    Q.    But other than that -- it doesn't have
21    the U.S. Patent reference, correct?
22    A.    Yes.
23    Q.    But other than that, it appears to be
24    the same, correct?
25    A.    Yes.
0101
1          - Frederick Sayward, Ph.D. -
2    Q.    Okay.  Now, I have placed the sheet of
3    paper over the main menu bar at the top.  Do you see
4    that?
5    A.    Hum-hum.
6    Q.    Okay.  Now, if you were shown how to do
7    that, namely covering up the menu bar, would you know
8    how to do this?

9          MR. COOKSEY:  And just so the record
10      is clear, I have put an overlay on top of
11      that model of figure 3 to create a model of
12      figure 4.
13          MR. WINTER:  I guess the question is,
14      would you know how to do this?
15          Is that what you are asking him?
16      That's what the question is?
17          MR. COOKSEY:  No.
18   Q.      If I asked you if you were shown how
19   to do that, namely cover up the menu bar?
20   A.    Yes?
21   Q.    Okay.  Now, if you were shown how to do
22   that, would you know how to do that?
23   A.      Now is this just me in particular, or
24   is this what I am --
25   Q.      A person of ordinary skill in the art.
0102
1       - Frederick Sayward, Ph.D. -
2          MR. COOKSEY:  And, for the record,
3      again I have put an overlay that changes
4      exhibit -- I mean figure 3 to figure 4.
5          MR. WINTER:  Are you asking him
6      whether physically he can do what you just
7      did with the paper and the thing?
8          MR. COOKSEY:  No.
9          MR. WINTER:  That's what you are
10      asking him.  You are asking him if he can
11      put --
12          MR. COOKSEY:  Gene, don't get
13      ridiculous.
14          Really.  That's opera room kind of
15      stuff.
16          MR. WINTER:  That's what you are
17      asking him.
18          MR. COOKSEY:  I'm asking him in the
19      context of a person of ordinary skill in
20      the art, as a kiosk systems person.
21          MR. WINTER:  On a computer system?
22          MR. COOKSEY:  Sure.
23          MR. WINTER:  Or on this demo?
24          MR. COOKSEY:  On a computer system.
25          You know that this is a model.  You
0103
1       - Frederick Sayward, Ph.D. -
2          know it is a demonstrative model, and you

3        are not going to get away with this kind of
4        stuff at trial.
5        Q.      Now, if you were shown, Dr. Sayward,
6    again how to do that --
7        A.      Hum-hum?
8        Q.      Namely covering up the menu bar, would
9    you then know how to do that?
10       A.      Me as a person skilled in the art?
11       Q.      Yes.
12       A.      I would say yes.
13       Q.      Okay.
14              And just for the record, the overlay
15    that I placed on figure 3 changes that model to
16    figure 4, isn't that correct, of the '071 patent?
17       A.      Yes.
18       Q.      Okay.  Dr. Sayward, do you know what
19    the Columbia Project is in the context of this
20    litigation?
21       A.      There was a paper that referred to it.
22    Yes.
23       Q.      Do you understand there is a patient
24    kiosk that is also part of that program?
25       A.      I vaguely remember.  I don't remember
0104
1        - Frederick Sayward, Ph.D. -
2    all the details.
3        Q.      Do you understand generally there was a
4    patient kiosk that was referred to in the July 15,
5    1995 progress report that is part of the Columbia
6    Project?
7        A.      I don't remember if it was called the
8    patient kiosk.  I forget exactly what it was called.
9        Q.      You haven't looked at that kiosk,
10    correct?
11       A.      No, I have not.
12       Q.      Let me have you look at page 5 of your
13    rebuttal report.
14              And you state, and I quote, "Thus the
15    Columbia Project does not disclose or suggest the
16    subject matter of Claim 1 of '071."  End of quote.
17              Do you see that?
18       A.      What's that?
19       Q.      You state, and I quote on that page of
20    your rebuttal report, "Thus, the Columbia Project
21    does not disclose or suggest the subject matter of
22    Claim 1," referring to the '071 patent.

23     A.     That's correct.
24     Q.     Okay.  Now, Dr. Sayward, I am going to
25     hand you Exhibit Q.
0105
1          - Frederick Sayward, Ph.D. -
2               Have you seen that before?
3     A.     I haven't seen this before, no, not the
4     first page.
5     Q.     Would you take an opportunity to look
6     at it?
7     A.     Do you want me to read through this?
8     Q.     You've never seen that?
9               That's the reference to the Columbia
10     report -- I'm sorry, the Columbia Project, and all
11     the various progress reports.
12     A.     I don't remember it looking like this.
13     I looked at it earlier than August 15th of 2002.  So
14     it may have changed.
15     Q.     Did you download it off the web?
16     A.     No.
17     Q.     Well, what changed?
18     A.     Well, you asked if I recall this?
19     Q.     Yes.
20     A.     I am saying I don't recall it looking
21     like this.  What I looked at was just a bunch of --
22               I can't remember for sure what it was.
23     I don't remember it looking like this.  So you asked
24     if I had seen this before?
25     Q.     Right.
0106
1          - Frederick Sayward, Ph.D. -
2     A.     I don't think I have.
3     Q.     If you haven't, you haven't.
4               Did you utilize Defendants' Expert
5     Report?
6               There was a web site in there that was
7     given as a reference for the Columbia Project.  Do
8     you recall that?
9     A.     As I recall there was some written
10     material that I read --
11     Q.     Okay.
12     A.     -- that was included in the package.
13     Q.     Is that part of your file?
14     A.     Yes.
15     Q.     But which you did not bring with you
16     today, correct?

17      A.      I'm not even sure I have a hard
18  copy of it still.
19              MR. WINTER:  Just for the record,
20          this document is dated 8/15/2002 and his
21          report was done well before this.
22              So this document didn't exist as of
23          the time of his report.
24      Q.      Let me ask you this, Dr. Sayward.  What
25  did you look at that you understood to be the
0107
1           - Frederick Sayward, Ph.D. -
2   Columbia Project?
3       A.      I looked at the material that was
4   provided.
5       Q.      By whom?
6       A.      By the defendant.
7               And I think I cited that in one of the
8   references, in one of the reports, and I think I
9   looked at  -- and I don't remember for sure -- I
10  looked at a web page, and it didn't seem to add
11  anything.
12              But it doesn't look -- the page I
13  looked at didn't look like this.
14      Q.      Did you look at the July 15, 1995
15  progress report that's part of this exhibit?
16      A.      Is it part of N?
17      Q.      Part of Exhibit Q.
18              You can go ahead and thumb through
19  there.
20      A.      I think I did, yes.  I think I looked
21  at the progress reports, but I'm not sure if these
22  are exactly the same as what I looked at because of
23  the date difference.
24              I would have to look at my references
25  to see exactly what I looked at.
0108
1           - Frederick Sayward, Ph.D. -
2       Q.      Did you look at everything on the
3   web for the site that you pulled up on the
4   internet --
5       A.      No.
6       Q.      -- regarding the Columbia Project?
7       A.      No.
8       Q.      Why not?
9       A.      I don't know.  I just didn't look at
10  everything.

11     Q.     Do you know what -- and this is an
12   acronym -- what TIIAP stands for?
13     A.     TI --
14     Q.     TIIAP.
15     A.     Let me write it down.
16         TIIAP?
17         No, it doesn't ring a bell.
18     Q.     If I told you Telecommunications and
19   Information Infrastructure Assistance Program.  Are
20   you familiar with that group or that program?
21     A.     Sounds like -- sounds like something --
22         Well, I'm not a hundred percent sure.
23         Again, I have to check my mailings that
24   I get from the Government, because it does seem to
25   ring a bell but I'm not a hundred percent sure.
0109
1       - Frederick Sayward, Ph.D. -
2     Q.     All right.  Do you know whether or not
3   the Columbia Project performed under a grant by the
4   U.S. Department of Commerce under TIIAP?
5     A.     I don't know off the top of my head,
6   no.
7     Q.     Have you ever received any grants?
8     A.     Have I received grants?
9     Q.     Yes.
10     A.     Yes.
11     Q.     Have you ever received any from the
12   Department of Commerce?
13     A.     I'm trying to think of what the
14   Department of Commerce encompasses these days,
15   because they did have a change in organizations, in
16   suborganizations.
17         I don't know.
18         Current grants I am involved with are
19   primarily national health.  I don't know if they are
20   under the Department of Commerce or not.
21     Q.     Okay.  Have you ever had to file
22   progress reports with the Department of Health -- I'm
23   sorry, NIH, in furtherance of those grants?
24     A.     Me personally, no.
25     Q.     Have you supervised that being done?
0110
1       - Frederick Sayward, Ph.D. -
2     A.     I assisted in that being done, but I
3   didn't personally file them.
4     Q.     Have you ever communicated your

5     progress reports to NIH by internet?
6          A.     No, I have not.
7          Q.     Do you have any reason to suspect
8     Dr. Hripcsak, or anyone else at Columbia, would have
9     filed a false report with the TIIAP at the Department
10    of Commerce with regard to any of the progress
11    reports found in Exhibit Q?
12         A.     I haven't read exhibit Q.
13         Q.     How about any of the materials you
14    looked at when you examined this earlier this year?
15         A.     I have no reason to believe that it
16    would have been false.
17         Q.     Are you familiar with the Columbia
18    Applied Informatics?
19         A.     Yes.
20         Q.     How are you familiar with them?
21         A.     There is a Dr. Jenkins there who I have
22    met --
23         Q.     Who you met?
24         A.     At conferences.
25         Q.     Does he work with Dr. Hripcsak?
0111
1          - Frederick Sayward, Ph.D. -
2          A.     I don't know.
3          Q.     Have you ever talked to him about
4     Columbia's patient kiosk?
5                 MR. WINTER:  Which doctor are you
6             talking about?
7                 MR. COOKSEY:  Dr. Jenkins.
8          A.     No, I have not.
9          Q.     And is there any reason why you
10    haven't evaluated or examined the patient kiosk at
11    Columbia?
12         A.     Any reason why I haven't?
13         Q.     Yes.
14         A.     I haven't specifically avoided it.  I
15    just haven't come to it.
16         Q.     They are only what -- fifty, sixty, a
17    hundred miles away, correct?
18         A.     Probably around eighty-five miles.
19         Q.     Do you think if you called Dr. Hripcsak
20    that he would show the device to you?
21         A.     Do I think he would?
22         Q.     Yes.
23         A.     Yes.
24         Q.     He is a peer of yours, correct?

25     A.     No, not Dr. Hripcsak.
0112
1          - Frederick Sayward, Ph.D. -
2     Q.     Let me have you look at this.  You can
3   take some time.
4              I want you to look at the July 15, 1995
5   progress report.  I will refer to it as the Columbia
6   Project.
7              If you need to take some time, fine.
8              I am going to ask you the following
9   question:  Do you have any reason to dispute that the
10   patient kiosk referenced in the July 15, 1995
11   Columbia Progress Report was put in public use in
12   April of '95?
13     A.     Do I have any reason --
14              You want me to read this and then
15   answer that question?
16     Q.     Sure.
17     A.     Now, what was the question?  Do I have
18   any reason to dispute -- yes.
19     Q.     Why?
20     A.     There is no date mentioned in here.  I
21   see no date in this document.
22              I mean there is a date of August 2002,
23   and a date of July 15th, but no date regarding --
24     Q.     And you don't have any other reason,
25   other than the absence of a date, correct?
0113
1          - Frederick Sayward, Ph.D. -
2     A.     Yes, but that's part of the question.
3     Q.     Okay.  By the way, Dr. Hripcsak --
4   excuse me, Dr. Sayward, I'm sorry -- did you know
5   that the Columbia Project won the 1996 award from the
6   National Information Infrastructure?
7     A.     I'm not aware of that.
8     Q.     Let me hand you Exhibit R.  Have you
9   ever seen Exhibit R before?
10     A.     Very nice.
11              I wasn't aware of that.
12     Q.     You state in your rebuttal report on
13   page 5 that it was not until January 15, 1996 that
14   the Columbia Project disclosed how to fully implement
15   their kiosk and handle arbitrary controls.
16              Do you see that?
17     A.     Yes.
18     Q.     Okay.  Prior to January 15 of '96, how

19    did the people at Columbia -- how did their
20    disclosure fall short of full implementation?
21        A.    Keyboard input.
22        Q.    What do you mean by that?
23        A.    Well, they didn't have a keyboard, the
24    one I just read.  They basically took the keyboard
25    out.
0114
1            - Frederick Sayward, Ph.D. -
2        Q.    That's the only reason?
3        A.    Well, that's a reason.
4        Q.    Are there others?
5        A.    I don't know without studying it.
6        Q.    Well, I'm just asking you --
7        A.    I know that's an obvious one.
8        Q.    -- to explain your report.
9        A.    The keyboard is one of them.
10        Q.    Would it have been obvious --
11        A.    Right here.
12        Q.    Would it have been obvious to a person
13    of ordinary skill in the art how to provide keyboard
14    input at that point in time?
15        A.    Obvious to provide keyboard input?
16        Q.    Yes.  Let's --
17        A.    Yes, it is obvious how to do keyboard
18    input.
19            You just write a program that reads the
20    keyboard.
21        Q.    Would it had been obvious in April of
22    '95?
23        A.    Sure.
24        Q.    After January 15, '96, did the Columbia
25    Project fully disclose Claim 1 of the '071?
0115
1            - Frederick Sayward, Ph.D. -
2        A.    I would have to --
3            If you want me to double check against
4    this, I will double check against this.  That's what
5    I wrote.  I read it.  I assume that you want me to
6    double check it.
7        Q.    I just want you to answer the question.
8    If you need to refer to the materials, that's up to
9    you.
10        A.    I have to see if this reference is the
11    one -- one of the ones listed here.  I don't have it
12    with me.  I read it and --

13          MR. WINTER:  Just for the record,
14     Mr. Cooksey, you produced copies of these
15     things that were given to Dr. Sayward.  So
16     he was working from whatever copies you
17     gave us at the time of the expert report,
18     which is not this copy because this one is
19     dated August of 2002.
20          So what Dr. Sayward had at the time
21     was what you sent us at that time.
22          Now, that may or may not be the same
23     as what you are putting in front of him
24     today.  So that's why I asked you for
25     copies so his records are what you gave us
0116
1      - Frederick Sayward, Ph.D. -
2     back then.
3          MR. COOKSEY:  And his records aren't
4     here today, are they, even though he was
5     given -- he should have been given a copy
6     of the subpoena that was served on you to
7     bring those materials, and he is not able
8     to answer this because he doesn't have the
9     file.
10          MR. WINTER:  You have the file.  You
11     gave him the documents.
12          MR. COOKSEY:  This is all I ever gave
13     you, Gene, and you know that.  I never gave
14     you another version of the Columbia Project
15     other than Exhibit Q, and you know that.
16          MR. WINTER:  This is dated 8/15/02.
17     So the version that you had back when the
18     expert report was written, which is I guess
19     9/20/2002, but he was working with these
20     documents back in May of 2002, which you
21     had given to me before then.
22          So it is really whatever you gave us
23     before then that he was working with,
24     because you tried to work with the
25     documents referred to in Mr. Daw's report.
0117
1          - Frederick Sayward, Ph.D. -
2     EXAMINATION BY MR. COOKSEY (Cont'g)
3     Q.     Dr. Sayward, can you answer the
4     question or not?
5     A.     I'd say I can't answer the question
6     without seeing the original documents.

7            I mean I have no reason to not stand by
8    what I said in the report at this point.
9        Q.      And the original document is in your
10   file, correct?
11       A.      I should have a copy of it.
12       Q.      Do you know what Mosaic is?
13       A.      Yes.
14       Q.      What is it?
15       A.      It is -- or it was, as far as I know it
16   no longer exists -- it was a browser, a web browser
17   coming out of University of Illinois, I believe.
18       Q.      When did you first become aware of it?
19       A.      Maybe 1994, 1995.
20       Q.      Would a person of ordinary skill know
21   what Mosaic is?
22       A.      Ordinary skill at what?
23            Are you back to the ordinary skill for
24   doing --
25       Q.      In the field --
0118
1       - Frederick Sayward, Ph.D. -
2    A.      -- for doing a kiosk?
3            MR. WINTER:  Just a second.
4            Why don't you stop, and you can ask
5          him the question, and he will answer it.
6          Because now you have another --
7    A.      I don't --
8            MR. WINTER:  Wait.  Let him ask you a
9          question.
10       Q.      Dr. Sayward, would a person of ordinary
11   skill in the art of these two patents know what
12   Mosaic is?
13       A.      Yes.
14       Q.      And when it became available?
15       A.      Yes.
16       Q.      How about Prospector?
17       A.      I'm not familiar with Prospector.
18       Q.      How about?
19       A.      I can't answer the question.
20       Q.      I'm sorry.  How about Lynx --  L Y N X?
21       A.      Probably not, I would rule out Lynx.
22       Q.      Do you know what Lynx is personally?
23       A.      Yes.
24       Q.      Do you know what Mosaic is in kiosk
25   mode?
0119

1            - Frederick Sayward, Ph.D. -
2      A.      No.
3      Q.      So therefore you couldn't answer the
4  question whether a person of ordinary skill in the
5  art of these two patents, what Mosaic and kiosk mode
6  is?
7      A.      I can answer that question.
8      Q.      What is your answer?
9      A.      Yes.
10            MR. WINTER:  Can you take a break?
11            MR. COOKSEY:  You want to take a
12        break.   Okay.
13          (Time noted 2:33 p.m.)
14               RECESS
15          (Time noted 2:40 p.m.)
16  EXAMINATION BY MR. COOKSEY (Cont'g)
17     Q.      Okay.  Let's go forward.
18            Would you read that last question and
19    answer back, please.
20          (The court reporter read back the last
21        question and answer as requested.)
22     Q.      I don't understand your answer.
23            MR. COOKSEY:  Can you read that
24        question and answer back again.
25          (The court reporter read back the last
0120
1            - Frederick Sayward, Ph.D. -
2        question and answer as requested.)
3      Q.      Let me ask that question this way,
4  because I still don't understand your answer.
5            Would a person of ordinary skill in the
6  art of these two patents know what Mosaic in kiosk
7  mode was?
8      A.      Under your definition that you gave
9  this morning, the answer is yes.
10     Q.      Okay.  And also would that same person
11  of ordinary skill know when Mosaic became available?
12     A.      Not necessarily.
13     Q.      The early kiosk, you already testified
14  that you didn't become aware of kiosks in this
15  area -- the area of these two patents  -- until
16  sometime in the mid 90s, is that correct?
17            MR. WINTER:  He is asking you what
18        your earlier testimony is.
19            THE WITNESS:  I don't know.  It is on
20        the record.

21      Q.      When did you first become aware of
22   kiosk, the kind of kiosk that is the subject matter
23   of these two patents?
24      A.      Late 90s -- late 1990s.
25      Q.      Do you know whether kiosk systems --
0121
1         - Frederick Sayward, Ph.D. -
2      A.      I didn't know them as kiosk systems.
3      Q.      Do you know when kiosk systems first
4   came into being?
5      A.      No, I do not.
6      Q.      Do you know how the earliest kiosk
7   systems stopped hostile users from tampering?
8      A.      No, I do not.
9      Q.      Do you know when the first kiosk system
10   utilizing the disablement of system functions became
11   available?
12      A.      No, I do not.
13      Q.      Would a kiosk system to be a true kiosk
14   system have to disable system functions?
15      A.      Are you asking me as the
16   all-knowledgeable person?
17      Q.      As a person of ordinary skill in the
18   art.
19      A.      Yes.
20            Did you say disable all system
21   functions or just disable --
22      Q.      Disable system functions?
23      A.      Well, could you clarify which functions
24   you are talking about?
25      Q.      One or more.
0122
1         - Frederick Sayward, Ph.D. -
2      A.      One or more?
3      Q.      Yes.
4      A.      Yes.
5      Q.      So your answer is unchanged?
6      A.      Well, as long as it doesn't say all
7   system functions, because --
8      Q.      Yes.
9      A.      I didn't quite get that part when I
10   asked for the clarification.
11      Q.      I didn't say all.
12      A.      One or more, definitely yes.
13      Q.      Dr. Sayward, are you personally
14   knowledgeable of what kiosk mode in browsers is?

15    A.    Now you are asking me myself?
16    Q.    Personally.
17    A.    No, I'm not.
18    Q.    Would a person of ordinary skill in the
19  art of these two patents know what kiosk mode in
20  browsers is?
21    A.    Yes.
22    Q.    So you would not know how to define
23  kiosk mode, is that correct, personally?
24    A.    I would not act as an authoritative
25  answer on that without doing some research.
0123
1         - Frederick Sayward, Ph.D. -
2    Q.    What system functions are disabled by
3  the host --
4          Excuse me.  Strike that.
5          What system functions, Dr. Sayward, are
6  disabled by the 'O71 invention?
7    A.    What system functions are disabled?
8    Q.    Yes.
9          MR. WINTER:  By the invention?
10          Do you mean the invention different
11         than the patent?  You want him to look at
12         the invention?
13    Q.    By the invention described in the '071
14  patent.
15          Look at Claim 14, please.
16          MR. WINTER:  This is a new question
17         about Claim 14?
18          The other question has not been
19         answered.  So this is just to get your
20         train of thought, right?  This is a new
21         question.
22    A.    No, specifically --
23          MR. WINTER:  Wait.  There is no
24         question.
25          MR. COOKSEY:  Yes, there is.
0124
1         - Frederick Sayward, Ph.D. -
2    Q.    What system functions are disabled by
3  the invention of the '071 patent?
4          MR. WINTER:  Why is he looking at
5         Claim 14 if there is no question about
6         Claim 14?
7          So you don't want him to answer about
8         Claim 14.  Just about the patent in general?

9           MR. COOKSEY:  All right, let me
10      qualify the question.
11           I will strike that.
12      Q.      What system functions are disabled by
13  the invention set forth in Claim 14 of the '071
14  patent?
15      A.      No specific system functions are stated
16  in Claim 14.
17      Q.      Which functions might be disabled?
18      A.      Might be disabled?
19      Q.      Yes.
20      A.      Any that would permit the user to
21  tamper with the kiosk system.
22           That's what it states in the claim.
23      Q.      What would those be?
24      A.      Breakout functions would be one.
25      Q.      How about control or delete?
0125
1       - Frederick Sayward, Ph.D. -
2       A.      Break out functions could be a
3  different key sequence on a different computer, but
4  in general break out.
5           Stop commands, reset buttons.
6           The list could go on quite lengthily.
7           I mean, I think you want me to keep
8  thinking about any I can think of?
9       Q.      Let me ask you this.  Let me have you
10  look at Plaintiff's Expert Report -- I'm sorry,
11  Defendants' Expert Report, and on pages 9 and 10,
12  starting at the bottom of 9, there is a list of
13  system functions, is there not?
14      A.      Some look like systems options and some
15  don't.
16      Q.      System functions?
17      A.      I mean system functions and some don't.
18      Q.      Which ones on that list don't look like
19  system functions?
20      A.      Bookmark,
21      Q.      I'm sorry.  Do look like system
22  functions,
23      A.      Download.  Saving binary files to disk
24  in the download menu.  Exec -- Execution of scripts.
25  Using "go to" file.  Disallow.  Shell and Escapes.
0126
1       - Frederick Sayward, Ph.D. -
2           That's the end of the list.

3      Q.     Okay.  Thank you.
4            Let me have you look at page 4 of your
5    May 24th report.
6            It is getting pretty messy here.
7            MR. WINTER:  What's the date you are
8        looking for?
9            MR. COOKSEY:  May 24th.
10     Q.     Let me have you look at page 4.
11           You state on that page that the masking
12   technique referenced in Claim 1 of the '071 patent
13   has an image overlaying technique.
14           What do you mean by that?
15     A.     Whereabouts on page 4 is this?
16     Q.     The second-to-the-last paragraph.
17     A.     Okay.  Could you repeat the question?
18     Q.     You state that the masking technique
19   reference in Claim 1 of the '071 patent is a, "Image
20   overlaying technique," end of quotes.
21           Do you see that?
22     A.     Yes.
23     Q.     What do you mean by that?
24     A.     Writing a bitmap image to a display
25   memory as a last step before the display is
0127
1        - Frederick Sayward, Ph.D. -
2    refreshed.
3      Q.     You just lost me.
4            Is that as lay terms as you can
5    describe that portion of your report?
6      A.     Are you familiar with --
7            MR. WINTER:  Wait, he is asking you a
8        question, is that as lay a term as you can
9        use?
10           THE WITNESS:  No.
11     Q.     Can you reduce it to utter basics for
12   me?
13     A.     Yes.  If you have --
14           I'll use your example.  If you have
15   sheets that represent images that could be displayed
16   on a CIT display, a monitor, these are virtual in the
17   sense they are kept in memory.
18           Now, when the display gets written, you
19   have to have an exact image of what you want to be
20   displayed on the screen.  So you could have several
21   virtual ones that you could combine.
22           In other words, do a bullion operation

23   on them.  So by the last one, you know, if you keep
24   overlaying things on top, and the last one to use the
25   right bullion operation would be that which gets
0128
1         - Frederick Sayward, Ph.D. -
2   displayed.
3             That's what I mean by an overlaying
4   technique.
5        Q.     Okay.  Thank you.
6             What do you mean by a virtual image?
7        A.     A virtual image would be a computer
8   rendition stored in memory of a 2-D image that could
9   be displayed on a monitor.
10       Q.     But is not displayed on a monitor?
11       A.     Might be, or might not.
12       Q.     Dr. Sayward, would you agree with me
13   that several different people, including David
14   Heyliger, Columbia, Netkey, NetShift and others were
15   working on a solution to provide security-secure
16   kiosks in 1995 and 1996?
17       A.     I don't know.  I can't agree with you.
18       Q.     Do you think a person of ordinary skill
19   in the art would know the answer to that question?
20       A.     No.
21       Q.     Let me have you look at the patents set
22   forth on the faces of the '071 and '848 patents,
23   Exhibits O and P.
24             Have you looked at those patents that
25   are reflected on the front page of each of those
0129
1         - Frederick Sayward, Ph.D. -
2   patents?
3        A.     You are citing references?
4        Q.     Yes.
5        A.     No, I have not.
6        Q.     Would you agree that the dates of
7   those patents begin in 1990 and end in approximately
8   1996?
9        A.     Assuming they are listed in
10   chronological order?
11       Q.     Yes.
12       A.     Yes.
13       Q.     All right.  Do you have any idea why or
14   what in the art of these two patents may have caused
15   this?
16             Let me be a little clearer.

17          MR. WINTER:  Are you striking the
18      question?
19          MR. COOKSEY:  I'm striking it.
20          MR. WINTER:  Okay.  Now, new
21      question.
22      Q.      Dr. Sayward, all the patents listed in
23  these references are from 1990 to 1997, isn't that
24  correct?
25      A.      The issue date?
0130
1       - Frederick Sayward, Ph.D. -
2       Q.      Yes.
3       A.      The earliest listed date is November of
4   1990, and the latest is March of 1997.
5       Q.      Now, what in the art may have caused
6   this sudden activity in the field of these two
7   patents?
8       A.      I don't know.
9       Q.      There is nothing before 1990, correct?
10      A.      Listed?
11      Q.      Yes.
12      A.      There is nothing cited, no.
13      Q.      Okay.  And you don't have any
14  understanding of why you have all this activity in
15  patents -- in the area of these two patents during
16  this time frame?
17      A.      No, I do not.
18      Q.      Could it have been the rise of internet
19  use?
20      A.      It could be anything.
21      Q.      Nothing that you are personally aware
22  of, correct?
23      A.      That's correct.
24      Q.      Would you agree that only a relatively
25  short period of time was required to solve the
0131
1       - Frederick Sayward, Ph.D. -
2   problem that all these patents were attempting to
3   address?
4       A.      I don't know what they were attempting
5   to address.
6           MR. WINTER:  All these patents are
7       the ones that are listed, as references
8       to the ones you are phrasing?
9           MR. COOKSEY:  Correct.
10      A.      I don't know what they are addressing.

11    Q.    All right.
12        MR. WINTER:  If you want,
13    Mr. Cooksey, I have the patents back in my
14    office.  We can go through them.  I think I
15    can find them.
16        MR. COOKSEY:  No, you don't need to
17    do that.
18    Q.    Dr. Sayward, you already said that you
19    did not talk to the four inventors of the
20    patents-in-suit, correct?
21    A.    That's correct.
22    Q.    Have you spoken to anybody else about
23    the dates of invention describing the two patents?
24    A.    You mean anyone in the whole world?
25    Q.    Yes.
0132
1        - Frederick Sayward, Ph.D. -
2    A.    About the dates?
3    Q.    Of the invention of the -- the
4    inventions described in the two patents?
5    A.    No.  I mean they just state what they
6    state to be.
7    Q.    Do you know when the inventions
8    described in the two patents occurred?
9    A.    No, I don't know the filing dates.  I
10    only know the filing dates and the issue dates.
11    Q.    Do you know when these inventions were
12    conceived, number one, and; number 2, when they were
13    reduced to practice?
14    A.    No, I do not.
15    Q.    Have you ever, Dr. Sayward, reviewed a
16    product known as kiosk-in-a-box?
17    A.    No, I have not.
18    Q.    Okay.  Have you ever heard of that?
19    A.    I have heard of it.
20    Q.    In what context?
21    A.    I believe it was referenced in one of
22    the documents provided by the defendants.
23    Q.    Okay.  Is there any reason why you did
24    not look at that?
25    A.    Yes.
0133
1        - Frederick Sayward, Ph.D. -
2    Q.    Why?
3    A.    I couldn't find the reference.  I
4    couldn't find the citation.

5      Q.      How about Web Kiosk Commander, have you
6  ever looked at that product?
7      A.      No, I have not.
8      Q.      Same question, is there any reason why
9  not?
10     A.      I had never heard of it.
11             I'm not sure if it was referenced or
12  not.
13     Q.      And if I were to tell you that Web
14  Kiosk Commander was kiosk-in-a-box rewritten in
15  another language, would you have any reason to doubt
16  that that was true?
17     A.      You can tell me anything about that.  I
18  just never heard of it.
19     Q.      Okay.
20             MR. COOKSEY:  We will take a little
21        break.
22             (Time noted 3:07 p.m.)
23                  RECESS
24             (Time noted 3:20 p.m.)
25  EXAMINATION BY MR. COOKSEY (Cont'g)
0134
1        - Frederick Sayward, Ph.D. -
2      Q.      Dr. Sayward, in July, 1996, if you had
3  personally seen the invention of Claim 1, '071
4  patent, would you have known how to -- would you
5  personally known how to come up with the invention of
6  Claim 1 of that same patent?
7      A.      Me personally in 1996.
8      Q.      July, '96?
9      A.      No.
10     Q.      Would a person of ordinary skill in the
11  art have been able to do that?
12     A.      When?
13     Q.      In July '96?
14     A.      I think not.
15     Q.      Why do you say that?
16     A.      Well, because these are all new
17  techniques.  They weren't known in July of '96.
18     Q.      Had any kiosk accessed the World Wide
19  Web prior to July 1996?
20     A.      I don't know.
21     Q.      Would a person of ordinary skill know
22  that?
23     A.      A person of ordinary skill in 1996?
24     Q.      Yes.

25     A.     Would they know the answer?
0135
1          - Frederick Sayward, Ph.D. -
2     Q.     Would they --
3     A.     They should know the answer.  I just
4  don't know what the answer would be.
5     Q.     In July 1996, if you personally had
6  known how to make and use the invention of Claim 1 of
7  the '848 patent --
8     A.     We switched to the other patent now?
9     Q.     That's the second patent.
10          -- would you have been able to come up
11  with the invention of Claim 10?
12          MR. WINTER:  Can you read the
13       question back, please.
14          (The court reporter read back the last
15       question as requested.)
16          THE WITNESS:  Okay.  One more time on
17       the question.
18          (The court reporter read back the last
19       question as requested.)
20     A.     I personally, no.
21     Q.     Same question but with respect to a
22  person of ordinary skill in the art?
23     A.     In 1996?
24     Q.     July, 96?
25     A.     I don't know.
0136
1          - Frederick Sayward, Ph.D. -
2     Q.     Okay.  Same question, but instead of
3  Claim 10, Claim 11?
4          And first I would like you to answer,
5  you personally.
6          MR. WINTER:  Are you saying just the
7       speaker, or are you including Claim 10,
8       because Claim 11 includes Claim 10.
9          I'm not sure.  Are you just asking
10       about the speaker, or all of Claim 10 plus
11       11?
12     Q.     Let me ask you this question.
13          MR. COOKSEY:  I am striking that last
14       question.
15     Q.     In July 1996, if you had personally
16  known how to make and use the invention of Claim 1 of
17  the '848 patent, would you had been able to come up
18  with the invention of Claim 11 of the '848 patent?

19    A.    If I knew which one?
20          MR. WINTER:  Isn't that just the same
21    question you just asked?  You just asked
22    that question, didn't you?
23          MR. COOKSEY:  Strike it.
24          MR. WINTER:  Okay.  He is striking
25    the question.
0137
1       - Frederick Sayward, Ph.D. -
2          MR. COOKSEY:  I struck the question.
3    Q.    Dr. Sayward, if you had personally
4    known of the invention in Claim 10 of the '848 patent
5    in July, 1996, would it had been obvious to you
6    personally to do Claim 11?
7    A.    No.
8    Q.    Would it had been obvious to a person
9    of ordinary skill in the art?
10   A.    I don't know.
11   Q.    Same question but with regard to Claim
12   12, and I'll ask it this way.
13         If you personally knew about the
14   invention in Claim 10 in July 1996, would it had been
15   obvious to you personally how to do Claim 12?
16         MR. WINTER:  You know, once again
17         Claim 12 includes Claim 11, which includes
18         Claim 10.
19         So he already answered that question,
20         I think, by --
21         THE WITNESS:  By inclusion.
22         MR. WINTER:  By inclusion.
23   A.    So the answer is no.
24   Q.    And same question for a person of
25   ordinary skill in the art in July 1996?
0138
1       - Frederick Sayward, Ph.D. -
2    A.    Again, I don't know.
3    Q.    Dr. Sayward, have you seen the W3
4    conference papers from 1994?
5    A.    If they are in the references, I have
6    seen them and read them.
7          I don't know the titles of what you are
8    talking about.
9    Q.    Do you know what they are in general?
10   A.    Can you show me where they are
11   referenced?
12   Q.    Let me ask you this:  Do you know what

13   the W3 conference was in 1994?
14              MR. WINTER:  Wait.
15              Can you repeat that?
16          (The court reporter read back the last
17      question as requested.)
18   A.     Do I know in 1994 what it was?
19   Q.     Yes.
20   A.     No.
21   Q.     Do you know now what it was?
22   A.     Yes.
23   Q.     What was it?
24   A.     It's a World Wide Web technology
25   conference.
0139
1          - Frederick Sayward, Ph.D. -
2    Q.     If you had known about the World
3    Wide Web technology conference in July 1996,
4    would you personally -- and you had personally seen
5    the invention of Claim 1 of the '071 patent --
6    would  you personally had known how to come up
7    with the invention of Claim 12 of that same '071
8    patent?
9    A.     Again, I need to write this down.  You
10   asked me three or four hypotheticals.
11              MR. WINTER:  Are you on a different
12      patent?
13              MR. COOKSEY: '071.
14   Q.     You want a piece of paper?
15   A.     Yes.
16   Q.     (Handing to the witness).
17              MR. WINTER:  You want him to read
18      Claim 12, is that right?
19              MR. COOKSEY:  Yes.
20              MR. WINTER:  Which refers to Claim 1,
21      right?
22              So you want him to read 1 and 12?
23              MR. COOKSEY:  Correct.
24   A.     It is 19 --
25   Q.     If you had known in July 1996 about the
0140
1          - Frederick Sayward, Ph.D. -
2    World Wide Web conference in 1994, would you have
3    been able -- would you personally have been able to
4    come up with the invention of Claim 12 by knowing
5    Claim 1 of '071 patent?
6    A.     Let me see if I understand this.

7          July of 1996, and I either attended or
8    read the 1994 WWW conference?
9          Also, I somehow know about Claim 1 of
10   the '071 patent, correct?
11     Q.     Correct.
12     A.     Okay.  So what's the question again,
13   please?
14     Q.     Would you have been able to come up
15   with Claim 12 of the '071 patent if you had known in
16   July of 1996 that the World Wide Web conference
17   happened in 1994, and you also had known at that time
18   of Claim 1 of the '071 patent?
19     A.     I can't give a spontaneous answer to
20   that question.  It is too complicated.
21     Q.     Okay.  Same question but with respect
22   to a person of ordinary skill in the art?
23     A.     I can't answer that.
24     Q.     Okay.  Is the question too complicated?
25     A.     Sure.  It would require doing a lot of
0141
1      - Frederick Sayward, Ph.D. -
2    research before I can answer a question like that.
3      Q.     Do you know what was taught at the
4    World Wide Web conference in general terms?
5      A.     Taught?
6      Q.     Yes.
7      A.     I don't know what sessions they had.  I
8    don't know if they had sessions where papers were
9    presented and/or if they had seminars, and if they
10   had teaching sessions.  I just don't know this.
11     Q.     Would you expect that a person of
12   ordinary skill in the art of these two patents would
13   have knowledge what that conference was about and
14   what was taught there?
15     A.     A person of ordinary skills, if they
16   are supposed to know everything in the background,
17   yes, that's ground rules.
18          MR. WINTER:  What?
19          THE WITNESS:  Those are the ground
20      rules.  A person of ordinary skills in 1996
21      should know what happened at that
22      conference.
23     Q.     Okay.  Dr. Sayward, let me have you
24   look at your rebuttal report, page 7, under the
25   discussion regarding Claim 6.
0142

1           - Frederick Sayward, Ph.D. -
2                   Are you there?
3       A.    Yes.
4       Q.    Okay.  You state, and I quote, "Claim
5    1," of '071, "permits two sets of software, the
6    second software being responsible for generating the
7    images."  End of quotes.
8       A.    I don't see any quotes talking about
9    generating the images.
10      Q.    Do you see what I just read?
11      A.    Yes, but I don't see the quotes.
12      Q.    I'm just quoting your report.  That's
13   why I put quotes.
14      A.    I'm sorry.  I thought you meant there
15   is a quote in my report.
16              There are quotes in that paragraph but
17   in a different area.
18      Q.    Okay.  First of all, what do you mean
19   by a set of software?
20      A.    A set of software?
21      Q.    Yes, in that context.
22      A.    I would say it should be a "process".
23              I am grading my own work here.  "Process"
24   would be better.
25      Q.    So you would replace the word "set"
0143
1           - Frederick Sayward, Ph.D. -
2    with the word "process"?
3       A.    Well, actually, let me take that back.
4    One shouldn't act too hastily when reading.
5              What do I mean by two sets of software?
6       Q.    First of all, what do you mean by a set
7    of software?
8       A.    Okay.  By a set of software, I would
9    think of something -- a set of software is something
10   that is compilable and executable.
11      Q.    Separately by itself?
12      A.    Right.
13      Q.    Okay.  Separable from other sets.  It
14   is a devisable unit of software?
15      A.    Right, that can -- that's what I think
16   I meant.  It is purely speculative.
17      Q.    Two sets of software?
18      A.    Yes.  I think my initial reaction is
19   right, by set of software in this case I mean
20   separately executing processes.

21     Q.     Okay.  Just so I understand that.  That
22   is a separable unit of software that acts
23   independently of --
24     A.     Software is generally thought of as
25   code, sometimes called source code, using a high
0144
1        - Frederick Sayward, Ph.D. -
2   level language, or some compilable language.
3           Process is a dynamic thing that runs on
4   a computer.
5     Q.     Okay.
6     A.     All right.  So in this particular case
7   I believe what I meant is two processes executing on
8   the computer having their origins in separate
9   software modules.
10     Q.     They are devisable, correct?
11     A.     They are not identical.
12     Q.     Can they interact?
13     A.     Sure.
14     Q.     But can they function separately --
15     A.     Yes.
16     Q.     -- in the context of Claim 1 of the '071
17   patent?
18     A.     Can they function separately?
19           I don't know what you mean by in the
20   context of --
21     Q.     Well --
22           MR. WINTER:  Wait until he asks
23        another question.
24     Q.     Let's talk -- I'm quoting your language
25   from your reports.
0145
1        - Frederick Sayward, Ph.D. -
2           It says Claim 1 of the '071 patent
3   permits two sets of software.  That's the context I'm
4   describing.
5     A.     Okay.  It permits an implementation to
6   be done in that way.
7     Q.     Okay.  Where you have two sets of
8   software that can potentially function independent of
9   each other, is that correct?
10     A.     Function independent of each other?
11           Not in the context of Claim 1.  They
12   would have to be knowledgeable of each other.
13     Q.     And for one to function, it would have
14   to work with the other?

15      A.      It would have to cooperate.
16      Q.      And if you pulled one out, the other
17  one would not work?
18      A.      No, not necessarily.  It would behave
19  differently.
20      Q.      Okay.  Getting back to the part that I
21  quoted from this part of your report.
22          You say that these two sets of
23  software, the second software being responsible for
24  generating the image.
25          Do you see that?
0146
1          - Frederick Sayward, Ph.D. -
2      A.      Yes.
3      Q.      Is that correct, Dr. Sayward?
4          Isn't it instead that the second
5  software is for positioning the image?
6      A.      No, this is just permits.  One way of
7  doing it.
8      Q.      I want you to look at Claim 1 of the
9  '071, please.
10          Let me ask my question this way.  Okay.
11  Dr. Sayward, please look at Claim 1 of the '071
12  patent.  And do you see the -- if I may just point it
13  out to you -- actually where your yellow sticky is
14  pointed there -- that would be line 49 of column 7.
15          Is that what you referred to as the
16  second set of software in this claim?
17      A.      Yes.
18      Q.      Okay.  Now, isn't it true that that
19  second set of software in Claim 1 did not generate
20  the image, it instead positions the image?
21      A.      Not necessarily.  This is one possible
22  way to do it.
23      Q.      Okay.  Let me ask you this question,
24  Dr. Sayward.
25          Is the second set of software in
0147
1          - Frederick Sayward, Ph.D. -
2  Claim 1 different from the GUI control software of
3  Claim 6?
4      A.      I would say yes.
5          Well, a qualified yes, depending on
6  what you mean by different.
7      Q.      What do you -- what's the
8  qualification?

9       A.      Well, different is the --
10              Is it different?  I don't know what you
11      mean by different.  I can see one interpretation of
12      that.
13      Q.      Do they both generate images?
14      A.      Yes.
15      Q.      Okay.  Now, let me have you look at the
16      '848 patent, Dr. Sayward, specifically Claim 1.  My
17      question is, does this claim permit -- I'm sorry --
18      yes, does it permit two sets of software?
19      A.      Permit in the sense that that is a
20      way -- a way of implementing it, but not necessarily
21      the only way.
22      Q.      And I'm using the word permit--
23      A.      Right.  That's why I used permit,
24      because it requires --
25      Q.      I'm just using the word permit --
0148
1          - Frederick Sayward, Ph.D. -
2       A.      Stated in --
3       Q.      Stated in your rebuttal report?
4       A.      Hum-hum, right.
5       Q.      Okay.  Would you please compare --
6       strike that.  This is not easy stuff for me.
7       A.      I can appreciate it.
8               MR. WINTER:  Perhaps you can take a
9          bathroom break.
10              MR. COOKSEY:  Yes.
11              (Time noted 3:51 p.m.)
12              RECESS
13              (Time noted 3:55 p.m.)
14      EXAMINATION BY MR. COOKSEY (Cont'g)
15      Q.      Okay.  Dr. Sayward, let's go back on
16      the record.
17              Let me have you look at column 5 of the
18      '071 patent, please, and specifically lines 8 through
19      10.
20      A.      8 through 10?
21      Q.      8 through 10, and I am going to quote.
22      It reads as follows.  "...coding a browser together
23      with the GUI desired for use in a kiosk as a single
24      executable program."
25              Do you see that?
0149
1          - Frederick Sayward, Ph.D. -
2       A.      Yes.

3    Q.    Does this language permit two sets of
4  software?
5    A.    Permits two sets of software where the
6  software now means source code?
7    Q.    Two sets of software as you define
8  sets?
9    A.    Permits?
10        I suppose you could do it that way.
11  Not that it would make sense, it does permit it.
12    Q.    Does this -- okay.
13    A.    But --
14    Q.    I'm sorry, you said it doesn't make
15  sense?
16    A.    It depends again how you define sets of
17  source software.  Here I defined it to be two sets of
18  programs generating two separate processes, but that
19  here is ruled out because it talks explicitly about a
20  single executable.
21        So it doesn't permit it in that sense,
22  in the sense of my explanation on Claim 6.
23    Q.    All right.  Thank you.
24        MR. VINCENT:  We need to confer with
25        our technical expert for a second.
0150
1    - Frederick Sayward, Ph.D. -
2        MR. WINTER:  Another break.
3        (Time noted 4:01 p.m.)
4            RECESS
5        (Time noted 4:18 p.m.)
6        MR. COOKSEY:  Okay.  Let's go back on
7        the record.
8  EXAMINATION BY MR. COOKSEY (Cont'g)
9    Q.    I am going to give you a couple of
10  hypotheticals here, Dr. Sayward.
11        Let me have you -- with respect to the
12  first one, let me have you look at Claim 1 of the
13  '848 patent.
14        Regarding Claim 1 of the '848 patent,
15  self-service computer having all the elements of
16  paragraphs one and two of this claim.  Consider a
17  product which has software executable which generates
18  a document viewing area on the monitor, can access
19  and display a plurality of documents in the viewing
20  area in response to user input, and is capable of
21  moving backward and forward through the plurality of
22  documents and then returning to the Home Page, would

23    that product satisfy paragraph 3 of Claim 1 for
24    infringement purposes?
25              Let me do this.  I am going to put it
0151
 1        - Frederick Sayward, Ph.D. -
 2    to you in print, as I just read it to you.  Maybe
 3    that's easier to follow.
 4              MR. WINTER:  Could you mark this as
 5         an exhibit?
 6              MR. COOKSEY:  Sure.
 7              (Typewritten question marked
 8         Defendants' Exhibit Y.)
 9              MR. WINTER:  What is the question
10         here?
11              MR. COOKSEY:  The question I just
12         read was all but the bottom line of Exhibit
13         Y.  That was the hypothetical I just read.
14              MR. WINTER:  There is two lines.  It
15         says further the product.
16              MR. COOKSEY:  Okay.  Other than the
17         bottom two lines, the hypothetical I read.
18              MR. WINTER:  So what's the question
19         you are asking the witness?
20              Is that the question you want read
21         into the record?
22    Q.        Would that product satisfy paragraph 3
23    of Claim 1 for infringement purposes?
24    A.        I have to read it.
25    Q.        Have you read it?
0152
 1        - Frederick Sayward, Ph.D. -
 2    A.        Not yet.
 3    Q.        Could you, please.
 4    A.        (Witness referring).  I can't answer
 5    you because there are some things that are not clear.
 6    Q.        What can I clarify for you about that
 7    question?
 8    A.        To me backward and forward.  I'm not
 9    quite sure what you mean by that.
10    Q.        May I look at that, please?
11    A.        Backward meaning to the previous
12    document?  Forward meaning to the next document?
13    Standard browser controls?
14              Well, again, I don't know, because you
15    could generate more than one document
16    instantaneously.  So I mean if there is a temporal

17   order, somehow it --
18     Q.     Can you take a half a minute?
19             MR. WINTER:  Sure.
20             (Pause)
21  EXAMINATION BY MR. COOKSEY (Cont'g)
22     Q.     Dr. Sayward, what you mean by backwards
23  and forwards are the backwards and forwards buttons
24  on a standard browser.
25             Do you know what I mean by that?
0153
1        - Frederick Sayward, Ph.D. -
2     A.     Well, there is back and there is
3  forward, yes.
4     Q.     Correct.  And that's all the question
5  is referring to.
6     A.     The browser?
7     Q.     Yes.  You can arrow back to a previous
8  document, or arrow forward to the next document.
9     A.     Well, you still have to explain to me
10  this displaying a plurality of documents.  You have a
11  whole screen full of multiple windows, or is it just
12  one?  It is ill-formed.
13     Q.     Well, that's the language right out of
14  the patent.
15             MR. WINTER:  Out of the '848 patent?
16             Obviously the witness is having
17          trouble understanding the question.
18             I, frankly, don't understand it either,
19          but if you can clarify it, or some way
20          point out the context of the language.
21             We are trying to help you, but it is
22          very difficult when the question is so
23          confusing.
24     Q.     Well, let's do this Dr. Sayward.  Would
25  you look at the fourth paragraph of -- actually the
0154
1        - Frederick Sayward, Ph.D. -
2  third paragraph of Claim 1 of the '848 patent which
3  talks about a plurality of documents.
4             Do you see that?
5     A.     Yes.
6     Q.     Okay.  Do you understand what that
7  means?
8     A.     Yes.
9     Q.     Okay, I want you to apply that
10  definition to the hypothetical.

11      A.      To me this is ill-defined.  There are
12  some ambiguities.  That's why I'm having trouble
13  answering question.
14      Q.      What specifically is about that
15  hypothetical that is ambiguous now?  And you have
16  clarified backwards and forwards, you have clarified
17  plurality of documents.
18          What is remaining in that hypothetical
19  that is throwing you?
20      A.      Okay.  It's unclear if every time I
21  display a new document, if it is in the same window
22  or not.
23      Q.      Well --
24      A.      Because here it says, "which generated
25  a document viewing area on the monitor," and then
0155
1       - Frederick Sayward, Ph.D. -
2  talks about plurality of documents.  In here it talks
3  about the -- T-H-E -- viewing window.
4       Q.      Okay.  Let's do that with the
5  hypothetical.  I'm adding the word "single" to the
6  hypothetical.  Dr. Sayward --
7       A.      I'm waiting for Mr. Winter to look at
8  it, to see if there is an objection.
9          MR. WINTER:  Well, I have an
10        objection.
11          I don't think the question is clear
12        and comprehensible, but I would like
13        Dr. Sayward to try to help you the best he
14        can.
15      A.      Okay.  I have one other thing that I
16  would add and then I could answer the question.
17      Q.      Okay.
18      A.      That the software -- is it the case
19  that when the software generates the single document
20  viewing area on the monitor, it loads a Home Page?
21      Q.      It doesn't say that here, a Home Page
22  is at the very end, so --
23      A.      The difference between this and what is
24  here, there is an implied temple order here.
25      Q.      Talking about this, Claim 1 of the
0156
1       - Frederick Sayward, Ph.D. -
2  '848?
3       A.      That's why I am having trouble
4  answering this.  There is no notion of time order

 5   here.
 6       Q.    Let's modify the hypothetical again by
 7   use of the time order.
 8       A.    Each document you can place a time
 9   stamp on it.
10       Q.    Dr. Sayward, the ambiguity in this
11   question now is whether or not the software
12   executable, which generates a document viewing area,
13   also generates a Home Page?
14       A.    That's correct.  Because you talk about
15   it at the very end, a Home Page.
16       Q.    Okay.  Let's try it that way.
17             MR. WINTER:  I am going to continue
18          my objection.  The question is
19          incomprehensible.
20             And also before you answer the
21          question, could you read into the record
22          what this paragraph says, because there are
23          strikeouts and inserts.  This thing has
24          been changed.  The exhibit actually is a
25          moving exhibit in the sense that it changes
0157
 1       - Frederick Sayward, Ph.D. -
 2          every three minutes here.
 3             So at least if you are going to use
 4          it, I would like to read it into the
 5          record.
 6             It says software --
 7             MR. COOKSEY:  Let me read it, because
 8          I wrote it.
 9             MR. WINTER:  Sure, go ahead.
10             But I want to make sure the record
11          is clear as to what you are asking him,
12          because you changed the document so many
13          times, and now you are changing it again or
14          putting "generating" in.
15       Q.    Here is the hypothetical, doctor.  We
16   can strike the previous hypothetical.
17             The hypothetical now reads, and as
18   stated in Exhibit Y, regarding the Claim of -- the
19   Claim 1 of the '848 patent as follows:  In a
20   self-service computer having all of the elements of
21   paragraphs one and two of the claim, consider a
22   product which has software executable, which
23   generates a single document viewing area on the
24   monitor, and also displays a Home Page, can access

25    and display a plurality of documents in the viewing
0158
1          - Frederick Sayward, Ph.D. -
2    area in response to user input, and is capable of
3    moving backward and forward through the plurality of
4    documents and then returning to the Home Page, would
5    that -- would that product satisfy paragraph 3 of
6    Claim 1 for infringement purposes?
7              MR. WINTER:  Could you read just the
8          first part of the question?
9              (The court reporter read back the last
10         question as requested.)
11             MR. WINTER:  I have a continuing
12         objection that this is confusing.
13             You are omitting paragraph.
14             But I would ask Dr. Sayward to do the
15         best he can.
16             MR. COOKSEY:  Well, the objection is
17         to the form of the question.  Okay.
18    A.      Infringement by equivalence or literal?
19    Q.      Infringement?
20    A.      Infringement?
21             I don't know.  I have to say, I don't
22    know.
23             At this point I think the question is
24    a little bit clearer, but I still can't say what
25    infringement is.
0159
1          - Frederick Sayward, Ph.D. -
2    Q.      Well, I will continue to clarify the
3    question for you.
4             Is there anything about that question
5    that I posed to you now that is ambiguous?
6    A.      No, now it is clear.  Now, it is clear.
7    But the question of infringement, it is too
8    hypothetical for me to answer.  I can't make a
9    judgment.
10    Q.      Okay.  Dr. Sayward, do you find all of
11    the elements of paragraph 3 of Claim 1 of the '848
12    patent in the hypothetical product set forth in
13    Exhibit Y?
14    A.      All the elements?
15    Q.      Yes.
16             MR. WINTER:  Isn't that the same
17         question you just asked?  How is that
18         different?

19          MR. COOKSEY:  It is not the same
20     question.
21     A.     I don't necessarily know.
22     Q.     Which elements are missing?
23     A.     I don't know if there are more
24   functions or not, you know, so I just don't know--
25     Q.     What specific elements in paragraph 3
0160
1          - Frederick Sayward, Ph.D. -
2   of Claim 1 of the '848 patent are missing from the
3   product described in the hypothetical?
4          MR. WINTER:  You just asked that
5        question and he just answered it.
6          That's the same question you asked
7        just a minute ago.
8     Q.     Your answer is functions.  You said
9   there are functions.
10          Is that language found anywhere in
11   paragraph 3 of Claim 1?
12     A.     Plurality of functions, paragraph 3.
13   Paragraph 3.  It refers to a plurality of functions.
14     Q.     Well, what do you think that means,
15   plurality of functions?
16     A.     Many many functions.
17     Q.     Okay.  Well, what about that language
18   is missing from --
19     A.     What about it?
20     Q.     Yes.
21     A.     I can't envision how this thing would
22   look.
23     Q.     How what thing?  You mean the device
24   described in the hypothetical?
25     A.     Right.  If there are other functions or
0161
1          - Frederick Sayward, Ph.D. -
2   if that's the --
3          MR. WINTER:  He is clearly having
4        trouble understanding your hypothetical.
5     Q.     All right.  Dr. Sayward, isn't it a
6   fact the plurality of functions means more than one
7   function, not many many functions?
8     A.     I don't know what -- I assume it means
9   more than one.  I don't know.
10     Q.     Could it mean two?
11     A.     It could mean several.
12          I mean the problem is this is not --

13    still not well defined to me.  I guess I would have
14    to see it.
15        Q.      You have to see the product?
16        A.      Yes, this hypothetical product.
17        Q.      Well, how about the accused NetShift
18    products?  How were you able to determine that those
19    products, version 5.0 and 5.5, infringed Claim 1 of
20    the '848 patent, if you can't tell us why this
21    hypothetical product described in Exhibit Y infringes
22    that same claim?
23        A.      Well, in the --
24            I don't recall in the NetShift product
25    there being a backward and forward.
0162
1        - Frederick Sayward, Ph.D. -
2            I guess there is a back button and
3    forward button you can put in yourself.  These are
4    the only functions in this product.
5        Q.      Just as it is described there?
6            MR. WINTER:  He is clarifying the
7        question.  He has a hypothetical, he asked
8        you for clarification, you didn't give it.
9            MR. COOKSEY:  The hypothetical.
10        He asked if these are the only
11        functions and I just described them.  I
12        said, yes.
13        A.      Well, when you go from document to
14    document, it totally occupies the display window.
15        Q.      Just as a standard browser would
16    operate.
17            I mean I can get on my AOL browser and
18    I can go back to the previous documents and forward
19    to previous documents, and those fill the entire
20    screen.
21            Yes, the answer to your question.
22        A.      That's the only thing that's going on
23    in this hypothetical question?
24        Q.      Yes.
25        A.      Up to the paragraph 3, I guess it does
0163
1        - Frederick Sayward, Ph.D. -
2    have those elements, but that's just the first
3    three.
4        Q.      Okay.  Dr. Sayward you agree that
5    you would have to see a product to judge if it
6    infringes?

7      A.    See a product?
8      Q.    Yes, physically see it?
9      A.    As a general statement or --
10     Q.    Yes.
11     A.    As a general statement, I don't
12  necessarily think that that's true.
13     Q.    All right.  I guess you are not going
14  to be out at 5.
15          All right.  Okay.  Let me further ask
16  you some further questions on this hypothetical
17  described in Exhibit Y.
18          Would that product satisfy paragraph 3
19  of Claim 1 -- I'm sorry.
20          Further, the product has software
21  executable on the microprocessor which has only a
22  fully functional back/forward and home button on it,
23  while having no close button, such that the user has
24  no way of exiting to the operating system.
25     A.    Is this a new exhibit or a new
0164
1        - Frederick Sayward, Ph.D. -
2  question?
3      Q.    This is a further description of the
4  hypothetical product described in Exhibit Y.
5          You want me to read that again?
6      A.    Well, you could write it up.  It would
7  be better.  This one was confusing enough, so if you
8  have it written.
9      Q.    Dr. Sayward, starting with the word
10  further on Exhibit Y, would you please consider that
11  addition to the description of the hypothetical
12  product in Exhibit Y.
13     A.    Well, I don't see the difference
14  between this one and the last one.  You never
15  mentioned the close button in the last one, so I'm
16  not sure what part --
17          Is this a different product?
18     Q.    No.  I'm further describing the
19  hypothetical product.
20     A.    I can't answer it.  There still could
21  be other things in this product.
22     Q.    I just want you to assume the product
23  the way it's described.  In addition to what was
24  previously given to you hypothetically, this product
25  also has software executable on the microprocessor
0165

1         - Frederick Sayward, Ph.D. -
2     which has only a fully functional back/forward and
3     home button on it, while having no close button, such
4     that the user has no way of exiting to the operating
5     system.
6               Now, that's the product as it now
7     stands.
8       A.     It is not complete.
9               MR. WINTER:  Is that the end of the
10         question?
11              MR. COOKSEY:  Yes.
12              MR. WINTER:  That's the question you
13         just asked, and he already answered.
14      Q.     What's unclear to you, Dr. Sayward?
15      A.     I would need to see the complete
16     product.
17      Q.     Well, that is it.
18      A.     Well, then I would have to say yes.
19      Q.     You have to say yes to what question?
20      A.     To the question you are asking.
21      Q.     Here is my question.  I want to see if
22     this is your answer, if your answer is yes to this
23     question.
24              Assuming that the back/forward and home
25     buttons represent authorized functions with respect
0166
1         - Frederick Sayward, Ph.D. -
2     to the plurality of documents, would this product
3     then satisfy all the elements of paragraph 4 of Claim
4     1 of the '848 patent?
5               MR. WINTER:  Now, is that the same
6         question you just asked him or a different
7         question?
8               MR. COOKSEY:  That's the question I
9         asked him.
10              MR. WINTER:  So this is the same
11         question again, right?
12              MR. COOKSEY:  No, it is not.  I never
13         asked him this question until I just read
14         it now.
15      A.     The answer is yes.
16      Q.     The answer is yes to that question?
17      A.     Yes.
18      Q.     Okay.  With regard to this product --
19      A.     Is this now in the records --
20      Q.     Okay.  Here is the new question.

21    Having satisfied all the paragraphs of Claim 1, would
22    this product infringe, this hypothetical product
23    described in Exhibit Y?
24        A.    I can't answer that because that's a
25    legal infringement thing.  It reads on the elements.
0167
1        - Frederick Sayward, Ph.D. -
2    But whether or not it infringes --
3        Q.    You have the word infringement in your
4    report, in your rebuttal report, don't you,
5    Dr. Sayward, and in your May 25th report?  I'm sorry,
6    May 24th report?
7        A.    I thought I just said --
8            MR. WINTER:  He answered the
9        question.  What's the next question?
10        Q.    Do any NetShift products infringe
11    either of the patents-in-suit in this case?
12        A.    Again, that to me is a legal decision.
13    I am only talking about where things read on the
14    elements, technical.
15        Q.    Okay.  Here is a second hypothetical,
16    Dr. Sayward, again regarding Claim 1 of the '848
17    patent, as follows:
18            In a self-service computer having all
19    the elements of paragraphs 1 and 2 of the claim,
20    consider a product which has a fully functional
21    standard industry browser, for example, Mosaic.
22    Okay, that's the product.
23            Question, would this satisfy paragraph
24    3 of Claim 1 for infringement purposes?
25        A.    You have -- I have to understand what
0168
1        - Frederick Sayward, Ph.D. -
2    your hypothetical question is.
3        Q.    In a self-service computer having all
4    the elements of paragraphs 1 and 2 of Claim 1 of the
5    '848 patent?
6        A.    Right.
7        Q.    Consider a product which has a fully
8    functional standard industry browser, for example,
9    Mosaic.
10            Here is the question.  Would this
11    satisfy paragraph 3 of Claim 1 for infringement
12    purposes?
13        A.    No, I don't feel comfortable making a
14    judgment on infringement on that.

15          If you want to talk about whether or
16   not it reads on the elements --
17       Q.     Well, would it read on paragraph 3?
18       A.     With a standard, what kind of browser?
19       Q.     Standard industry browser, for example,
20   Mosaic?
21       A.     Yes.
22       Q.     Okay.  Let's further describe this
23   second hypothetical product as follows:  Further the
24   product has software executable which disables
25   browser menus, and then supplies a menu bar with only
0169
1          - Frederick Sayward, Ph.D. -
2   buttons for back and main menu, such that when the
3   buttons are activated an appropriate command is sent
4   to the browser and is acted upon by the browser.
5          And the question is, would this satisfy
6   paragraph four of Claim 1 of the '848 patent?
7       A.     Do you have that as an exhibit so I can
8   read it?
9       Q.     Sure.
10          (Written question marked Defendants'
11       Exhibit Z.)
12       A.     I don't understand this product and how
13   it works.
14       Q.     What about this is unclear?
15       A.     Well, one thing that's unclear is I
16   don't know what it means.  I don't know what a main
17   menu button means.
18       Q.     That's identical with Home Page?
19       A.     Main?
20       Q.     No.
21       A.     Could you re-ask it then?
22          MR. WINTER:  Well, you are talking
23       about all sorts of different browsers, not
24       just one browser.  And you are talking
25       about Mosaic, which as far as you know
0170
1          - Frederick Sayward, Ph.D. -
2       either doesn't exist or is obsolete.
3          And so which one of these are you
4       talking about?
5          MR. COOKSEY:  I'm talking about
6       standard industry browser.
7          MR. WINTER:  But Mosaic isn't even a
8       standard industry browser, as far as you

9        know.
10              MR. COOKSEY:  It was back then.
11              MR. VINCENT:  It is hypothetical.
12    A.      I know.  But that's why I'm having
13    trouble understanding it, if it is an analogy to
14    something that is obsolete.
15    Q.      All right.  So your ambiguity now with
16    this product, this hypothetical product, is the use
17    of the word main menu, is that correct?
18    A.      I don't know what a main menu button
19    is.
20    Q.      Main menu button is synonymous with
21    Home Page?
22    A.      That doesn't make sense.
23    Q.      Dr. Sayward, if I change the words main
24    menu instead to Home Page, would that clarify your
25    ambiguity?
0171
1              - Frederick Sayward, Ph.D. -
2    A.      Possibly, that would help; but, like I
3    said, there are other questions to that.
4    Q.      All right.  Let's do that, Exhibit Z is
5    modified.
6              What else is about that hypothetical
7    product?
8    A.      I don't know what the content of the
9    Home Page is.  You are talking about a standard
10    browser.  As I said, I would like to see what you are
11    referring to.
12    Q.      Standard browser Home Page?
13    A.      Home Page could be anything.
14    Q.      What if it was an AOL Home Page?
15    A.      That's very, very complex.  That's what
16    I'm saying.  I don't know.  AOL's Home Page is
17    extremely complex.  So --
18    Q.      Let me ask you this, Dr. Sayward.  Why
19    does it matter what the content of the Home Page is
20    for you to be able to answer the question?
21    A.      Because the Home Page could have a
22    variety of things on it.  It can do a variety of
23    different things.
24              So that's why I am saying it is unclear
25    what your product is, especially if you are talking
0172
1              - Frederick Sayward, Ph.D. -
2    about a Home Page, and probably something you should

3    have asked in the previous hypothetical question.
4         But, you know, that's what I'm saying.
5    You need to describe in further detail what this
6    product is.
7    Q.    Does the '848 patent describe any
8    content for Home Page?
9    A.    No.
10   Q.    Why are you adding that limitation to
11   this product?
12   A.    Well, because I need to know --
13        You are asking me about elements and
14   reading elements.  I need to know what this thing
15   does.
16   Q.    Well, does the '848 patent in any way
17   make that a requirement or an element of the claim,
18   specifically Claim 1?
19   A.    Make what an element?
20   Q.    The content of the Home Page?
21   A.    No, I don't believe the --
22        I have to take a look again, but I
23   don't think there is reference to a Home Page at all
24   in any of the claims.  That's something that you
25   people have introduced.
0173
1         - Frederick Sayward, Ph.D. -
2    Q.    Does NetShift's product, and
3    specifically 5.0 and 5.5, maintain a certain Home
4    Page?
5    A.    You have the ability on your displays
6    to set a Home Page.
7    Q.    Okay.  Do you know what that -- what
8    the functions are on the NetShift 5.0 Home Page?
9    A.    I know it no longer exists.  That came
10   bundled with the package.
11        The last time I tried to run it, I got
12   "Web page not found."
13   Q.    How about 5.5?
14   A.    Same thing.
15   Q.    Okay.  So, Dr. Sayward, a user
16   definable Home Page, as in NetShift, causes you no
17   problem in reading on Claim 1.
18        Excuse me.  Let me say it again.
19        Dr. Sayward, so a user definable Home
20   Page, as in NetShift, causes you no problem in
21   reading on Claim 1 of the '848 patent?
22   A.    It causes me a problem.  That's why I'm

23    saying I can't answer your question.
24                MR. WINTER:  Can we take a break.
25                MR. COOKSEY:  Well, then --
0174
1        - Frederick Sayward, Ph.D. -
2                MR. WINTER:  Can we take a break?
3                Why don't you firm up your last half
4          hour or so you can get this done.
5                (Time noted 5:15 p.m.)
6                     RECESS
7                (Time noted 5:25 p.m)
8    EXAMINATION BY MR. COOKSEY (Cont'g)
9        Q.     Dr. Sayward, Exhibit Z -- the
10    hypothetical set forth in Exhibit Z, is it your
11    testimony that it is the Home Page that's causing you
12    the confusion?
13        A.     Well, it's the Home Page that I would
14    need to see, because it is obviously an integral part
15    of the product.
16        Q.     Okay.  Let me ask you this question:
17    Let's say that it is the Home Page causing you
18    problems, a user-definable Home Page.
19                Now, can you tell if this hypothetical
20    product contains all the elements of paragraph four
21    of Claim 1 of the '848 patent?
22        A.     I would have to see the Home Page and
23    what -- from the service side, what the Home Page
24    looks like, not from the client's side.  Because if
25    you have a fully functional standard industry browser
0175
1        - Frederick Sayward, Ph.D. -
2    -- I'm trying to understand this, and make some
3    assumptions like I did on the last one.
4                Even on the last one I didn't feel
5    comfortable.  This one I feel very uncomfortable as
6    to what this product is.  Maybe I shouldn't have
7    answered the last question.  But this one I
8    definitely can't answer.  It is just too incomplete.
9        Q.     Well, if you can't give an opinion on
10    the hypothetical in Exhibit Z, how can you tell
11    whether NetShift, which has a user definable Home
12    Page, breaches the elements of Claim 1 of the '848
13    patent?
14        A.     Because it has a lot more than that.  A
15    lot more.
16                And, as I say, you are talking about an

17    industry standard browser here.  Totally different
18    animal.
19        Q.      Totally different animal than what?
20        A.      Than NetShift's.
21        Q.      Dr. Sayward, doesn't NetShift use
22    Internet Explorer, which is an industry standard
23    browser?
24        A.      It appears to use it, yes, somewhat.
25        Q.      Yes?
0176
1         - Frederick Sayward, Ph.D. -
2                 MR. WINTER:  He answered the
3            question.  Next question.
4        A.      Somewhat.
5        Q.      Is Internet Explorer an industry
6    standard browser?
7        A.      Yes.
8        Q.      Now you said that NetShift's product
9    has so much more than what's set forth in Exhibit Z.
10    Is that your --
11                Am I characterizing your testimony
12    correctly?
13        A.      That's why I was saying that I couldn't
14    compare it to --
15        Q.      What do you mean by so much more?
16        A.      -- many more functions.
17        Q.      Okay.  Well, I just want you to assume
18    the functions that are set forth in Exhibit Z.
19        A.      But there is more to this product you
20    are talking about.
21                The product is not the functions alone.
22    It is all the other stuff.
23        Q.      All right.  For the product described
24    in Exhibit Z, what is missing from paragraph 4 of
25    Claim 1 of the '848 patent?
0177
1         - Frederick Sayward, Ph.D. -
2        A.      The product is not properly defined, so
3    I can't answer any questions on it.
4        Q.      Well, you have the elements of Claim 1
5    of the '848, and I want you to look specifically at
6    paragraph 4?
7        A.      I can't with the definition that you
8    have of this hypothetical product, because it is not
9    fully defined.  It is not --
10        Q.      Okay.  I am going to read from

11  paragraph 4 of Claim 1 of the '848.  It just says
12  software executable on said microprocessor.
13          Do you have that, in Exhibit Z?
14      A.    Yes, software executable.
15      Q.    For displaying at least one image on
16  said screen.
17          Do you have that?
18      A.    As an element, yes, it appears to.
19      Q.    In Exhibit Z?
20      A.    In a fully functional standard industry
21  browser, yes.
22      Q.    Okay.  So as to provide navigational
23  controls for at least one authorized function.
24          Do you have that?
25      A.    Yes.
0178
1        - Frederick Sayward, Ph.D. -
2      Q.    Of said accessing and displaying
3  software.
4          Do you have that?
5      A.    Well, yes.
6      Q.    With respect to the plurality of
7  documents.  Do you have that?
8      A.    Yes.
9      Q.    Without also permitting tampering
10  with said accessing and displaying software.
11          Do you have that?
12      A.    No.
13      Q.    Why not?
14      A.    Because you don't have it.  You haven't
15  given me a complete definition of this product.
16      Q.    Okay.  So it is missing that, correct?
17      A.    Correct.
18      Q.    I will continue on.
19          By not displaying images providing
20  controls for unauthorized functions with respect to
21  plurality of documents.
22          Do you have that?
23      A.    I can't say.
24      Q.    Do you know who Rakov is?
25      A.    I have seen the name mentioned.
0179
1        - Frederick Sayward, Ph.D. -
2      Q.    Have you studied --
3      A.    I don't know him.
4      Q.    Have you studied anything prior

 5    associated with him in this case?
 6      A.    I read things that are purported to be
 7    written by him.
 8      Q.    Whatever you read, have you studied
 9    that?
10      A.    I have read it, I have studied it.
11      Q.    Have you evaluated it for purposes of
12    determining whether it is relevant prior art?
13      A.    Yes.
14      Q.    And what have you concluded?
15      A.    Indefinite, as I said in the report.
16          My conclusions are here.
17          MR. WINTER:  He can look at the
18      report, if you want him to.
19          MR. COOKSEY:  That's not my question.
20          MR. WINTER:  He wants you to answer
21      from your recollection, not look at your
22      report now.
23      Q.    I want to know why you eliminated Rakov
24    as relevant prior art?
25      A.    I can't recall right now.
0180
 1      - Frederick Sayward, Ph.D. -
 2      Q.    You want to take a look at your report?
 3      A.    Yes, if I may look at my report.
 4          I had no evidence as to whether or not
 5    this thing was ever deployed.  When I searched for
 6    it, I couldn't find it.
 7          Also the place where it was supposed to
 8    be deployed no longer existed.  For all I know this
 9    is purely fiction.  I have no basis for it.
10          MR. COOKSEY:  Would you please mark
11      this.
12          (Internet Sampler: A Mosaic-Based
13          Museum Kiosk about the Internet, marked
14          Defendants' Exhibit AA.)
15      Q.    Your rebuttal report, Exhibit L, is
16    dated September 20, 2002, is that correct?
17      A.    September 20, 2002.
18      Q.    I will hand you Defendants' Exhibit AA.
19    Have you seen that?
20      A.    Well, I haven't seen it with this date
21    on it, and I would have to look through it and
22    compare it to what I looked at to see if it is
23    exactly the same line-for-line.
24          I assume this was presented on

25   August 27, 2002.
0181
1          - Frederick Sayward, Ph.D. -
2     Q.     Right, and I provided that to
3   Mr. Winter.  Did he ever give that to you shortly
4   after August 27, 2002?
5     A.     I don't remember.
6            I remember seeing something earlier.  I
7   don't remember if he provided this update.
8     Q.     Did you see any written material --
9            MR. WINTER:  For the record, my
10           recollection is you provided a different
11           version of this to me earlier with a
12           different date and a different print
13           format.
14           So the document you have here is
15           not the same one you provided me with
16           earlier.
17           MR. COOKSEY:  I gave you that on
18           August 27th, Gene.
19           MR. WINTER:  That may be the case,
20           but --
21           Anyhow that's my recollection.  We can
22           go back and look at what you produced
23           earlier.
24           You sent me some copies of Rakov
25           earlier.
0182
1          - Frederick Sayward, Ph.D. -
2            THE WITNESS:  I don't know if this is
3            exactly what it looked like without
4            comparing it.
5     Q.     I will just represent to you I pulled
6   that myself off the internet using the site that's
7   contained in Defendants' Expert Report.
8            Is there any reason why you couldn't
9   have done that, too?
10    A.     There is no reason I couldn't have done
11  that.
12           All I'm saying is that I don't know if
13  this is exactly what I looked at.
14    Q.     Okay.
15    A.     You know, word-for-word.
16    Q.     Okay.
17    A.     I just don't know.
18    Q.     And why is it your testimony that, as

19    far as you know, Rakov is pure fiction?
20        A.    I didn't say it is pure fiction.
21        Q.    Well, why is it that you ruled him out
22    as relevant prior?
23        A.    Because there is no evidence that
24    anything that he talks about was implemented.
25        Q.    Did you ever talk to him?
0183
 1        - Frederick Sayward, Ph.D. -
 2        A.    No.
 3        Q.    Could you have?
 4        A.    I don't know.  I never was provided
 5    with his name, address, telephone number, or anything
 6    else.
 7        Q.    Have you ever reviewed any Netkey
 8    software?
 9        A.    No, I have not.
10        Q.    Would you know version 1.1 from version
11    2 from any other versions?
12        A.    No, I would not.
13        Q.    Do you know what the date of invention
14    of Netkey 2.0 is?
15        A.    The date of invention?
16        Q.    Yes.
17        A.    No.
18        Q.    Okay.  Do you know if 2.0  --Netkey 2.0
19    operates in the same way as Claim 1 of the '848
20    patent?
21        A.    No, I do not.
22        Q.    Same question.  Does Netkey 2.0 have
23    any differences from Claim 1 of the '848?
24        A.    I don't know.
25        Q.    What is the first Netkey version that
0184
 1        - Frederick Sayward, Ph.D. -
 2    has all the elements of Claim 2 of the '848?
 3        A.    I don't know.
 4        Q.    How is the '848 invention in Claim 1
 5    different from the masking invention of Claim 1 of
 6    the '071?
 7        A.    What was that again?  How does --
 8        Q.    How does the invention described in
 9    Claim 1 of the '848 patent differ from the masking
10    invention of Claim 1 of the '071 patent?
11        A.    You want Claim 1 -- claim 1 of the two
12    patents?

13     Q.     Yes.  Tell me what the differences are?
14     A.     Well, just go through the words -- I
15  mean the elements, element by element.  That would be
16  the easiest thing to do, I would think.
17          Well, in the first patent it talks
18  about a monitor having a display screen.  Here it
19  talks about a monitor.
20     Q.     When you say here, let's keep the
21  record clear.
22     A.     In the patent.
23     Q.     In the '848?
24     A.     The '848 which mentions the monitor.
25     Q.     Okay.  So the description of the
0185
1          - Frederick Sayward, Ph.D. -
2  monitor, the display screen is different between the
3  two, is that correct?
4     A.     Well, in the first --
5          Is it okay if I refer to the first one
6  as the '071, and the second as the '848?
7     Q.     Yes, please.
8     A.     In the first patent, element --
9  paragraph 1, it talks about a monitor having a
10  display screen, whereas in the second patent it just
11  talks about a monitor.
12          So there is a difference.
13     Q.     All right.  What else?
14     A.     In the second -- in the second
15  paragraph of each, it talks about displaying on the
16  monitor, where as in the first patent it talks about
17  displaying on the screen.
18          So that's a difference.
19     Q.     Okay.  What else?  Is monitor and
20  screen synonymous?
21     A.     I'm not in a position to make that
22  judgment legally for purposes of this discussion.
23  I'm willing to assume so, but I think that would have
24  to be made by someone else.
25     Q.     Well, would a person of ordinary skill
0186
1          - Frederick Sayward, Ph.D. -
2  in the art think they are the same thing?
3     A.     Maybe not.
4     Q.     Okay.  Go ahead.
5     A.     Okay.  In the third paragraph it
6  explicitly says browser software in the first

7   patent, where as in the second patent it just says
8   software.
9           In the first patent it talks
10  specifically about a GUI in the third paragraph,
11  where as in the second patent they just talk about
12  functions on documents.
13          In the first paragraph they talk
14  explicitly about controls.  In the second, again it
15  is just talking about functions with respect to
16  paragraph 3.
17          In the 4th paragraph, the
18  representation is for using images to perform the
19  mask, where as in the second patent --
20      Q.      I'm sorry, what was that?
21      A.      In the first patent, paragraph 4 of
22  Claim 1 -- paragraph 4 --
23          You are asking for the differences?
24      Q.      Yes.
25      A.      Images are discussed as a way of
0187
1       - Frederick Sayward, Ph.D. -
2   masking, in order to render controls inaccessible,
3   where as in the second patent, paragraph 4, no
4   particular technique is given.  Just that the
5   capability is there.
6       Q.      Okay.
7       A.      So I think that pretty much summarizes
8   the differences.
9       Q.      All right.  How would you implement
10  Claim 1 of the '848 patent?
11      A.      How would I implement it?
12      Q.      Yes.
13      A.      Well, if I were to get into this
14  business, which I'm not about to -- but if I were, I
15  mean I would develop a product.  Implementing Claim 1
16  to me is developing a product.
17      Q.      Well, do you know what --
18          MR. WINTER:  He is not done with the
19      answer.  You interrupted him.
20      A.      And so to develop any product, the
21  first step is to see what the market is.  So I have
22  to do a requirements analysis, figure out what kind
23  of computers are needed, what size monitors I needed,
24  what the cost of those are, what the potential number
25  of sales are, what the potential sales price is, what
0188

1          - Frederick Sayward, Ph.D. -
2     the revenue streams are, how one would start up this
3     product.
4               Essentially, I would implement a first
5     step by developing a business plan.
6          Q.     Assuming that's done, how would you
7     implement it?
8          A.     Well, the next step would be to lay out
9     a system architecture.
10         Q.     Would you write your own browser?
11         A.     I don't know.  I can't say that at this
12    point without really thinking about that, and what
13    the cost of that would be versus the cost of
14    licensing from a browser supplier.
15         Q.     How about Active X?  Do you know what
16    Active X is?
17         A.     Yes.
18         Q.     What is that?
19         A.     Active X is specific to Microsoft's
20    product line.
21               It is essentially a library system that
22    you can use to do certain management of objects in
23    the Microsoft sense from data base to screens to
24    whatever you have.
25         Q.     Isn't it a fact that Active X is one of
0189
1          - Frederick Sayward, Ph.D. -
2     the ways that the invention in Claim 1 of the '848
3     was implemented?
4          A.     I don't know how it was implemented
5     because, like I say, I don't know how Netkey
6     implemented -- I'm not even sure what version
7     numbers, or which ones implemented what.
8          Q.     Does NetShift utilize Active X?
9          A.     No.
10         Q.     Does NetShift --
11         A.     Not that I could determine.  It looks
12    to me like it uses a different technology.
13         Q.     Does NetShift utilize Netscape Soft
14    Source code?
15         A.     It wasn't provided, so I assume it does
16    not.
17         Q.     You don't have any information one way
18    or the other, correct?
19         A.     With respect to Netscape?
20         Q.     Yes.

21      A.      In what version of NetShift are you
22  talking of?
23      Q.      5.0 and 5.5.
24      A.      I didn't see any evidence of that.
25      Q.      All right.  How about OCX.  Do you know
0190
1          - Frederick Sayward, Ph.D. -
2  what that is?
3      A.      OCX?
4      Q.      Yes, OCX?
5      A.      Yes.
6      Q.      What is it?
7      A.      Object, something or another, exchange.
8  I forget exactly.
9      Q.      Is that another way of implementing
10  Claim 1 of the '848 patent?
11      A.      It is not a set of library system
12  calls fundamental to Microsoft operating systems.
13      Q.      Again the answer to my question is, is
14  it another way of implementing Claim 1 of the '848
15  patent?
16      A.      Implementing Claim 1 in OCX?
17          I don't know.  I would have to study
18  that.  I haven't done any graphic type stuff in
19  OCX.
20      Q.      Dr. Sayward, would it be practical
21  without one of these tools, Active X, or OCX,
22  Netscape Soft Code -- would it be practicable
23  without one of those tools to implement Claim 1 of
24  the '848?
25      A.      Practical?
0191
1          - Frederick Sayward, Ph.D. -
2      Q.      Yes?
3      A.      I don't know what you mean by that.
4      Q.      Well, if you were --
5      A.      That's too vague.
6      Q.      If you were to set out to write your
7  own browser to implement Claim 1 of the '848, do you
8  think that would be practical?
9      A.      Again, I don't know what you mean by
10  practical.
11          You left too much out of your question.
12      Q.      Do you agree with the statement that
13  internet protocols change virtually every week?
14      A.      Internet protocols change?  No, I would

15   not agree with that.
16      Q.      Okay.  When did Active X become
17   available, such as it could have been used in the
18   '848 invention?
19      A.      I don't remember the release date.
20      Q.      Do you have an approximate date?
21      A.      Several years back.
22      Q.      Do you know whether a person of
23   ordinary skill in the art might know the approximate
24   time?
25      A.      Ordinary skill in the art for writing
0192
1          - Frederick Sayward, Ph.D. -
2   kiosks?
3      Q.      For these two patents?
4      A.      Implementing these two patents?
5      Q.      Yes.
6      A.      Any business plan to implement these
7   two patents should consider all of those things
8   before making a decision.  So I couldn't say.
9          I mean, that's a business decision,
10   whether you want to use it.  It is not a technical
11   decision with respect to the merits of the claims.
12      Q.      Dr. Sayward, would you point out each
13   and every place in the '071 patent where the '848
14   invention is mentioned?
15      A.      Where it is mentioned?
16      Q.      Yes.
17      A.      Mentioned in what sense?
18      Q.      Any sense?
19      A.      I saw no -- I saw no instances of the
20   number 6,078,848 in the '071 patent.
21      Q.      That's not what I'm asking.
22          What I'm asking is, is the invention,
23   not the serial number of the PTO that the PTO
24   assigns to it -- I want to know where in the '071
25   patent the invention of the '848 patent is
0193
1          - Frederick Sayward, Ph.D. -
2   mentioned.
3          MR. COOKSEY:  Mr. Winter, I would
4          appreciate if you not feed the witness the
5          answers.  He is capable --
6          MR. WINTER:  I'm not feeding.  I am
7          looking at the patent.
8      A.      He can look at it.  I still can't

9    answer it based on your question.  It is too vague to
10   the invention, I mean.
11       Q.    The invention of Claim 1 of the
12   '848 patent, where is that found in the '071
13   patent?
14       A.    Word-for-word?
15       Q.    No.  Where is the invention found in
16   any sense in the '071 patent?
17       A.    Well, one place, I think I mentioned it
18   before, that leads to that --
19            I have to find it.  Paragraph five. I'm
20   sorry, column -- paragraph starting at the end of
21   column 4 and continuing on through the end of the
22   paragraph in column 5.
23       Q.    Are you referring to the '071 patent?
24       A.    Yes.  You asked me where --
25       Q.    Right.
0194
1        - Frederick Sayward, Ph.D. -
2        A.    -- in the '071 that there is reference,
3    any reference at all that I could --
4        Q.    Is that the only reference you are
5    aware of?
6        A.    The only reference?
7        Q.    Yes.
8        A.    In order to answer that, I have to go
9    back and read through here.
10           You know it is nine, ten columns of
11   wording.  Without going through it again, I can't
12   answer that question.
13       Q.    Do you know when the invention
14   described in Claim 1 of the '848 patent was -- do you
15   know when that happened?
16       A.    When it happened?
17       Q.    Yes, do you know when --
18       A.    No, I do not know.
19       Q.    When the invention described in Claim 1
20   of the '848 patent happened?
21           MR. WINTER:  Just let him ask the
22        question.
23       A.    Repeat the question, please.
24       Q.    Do you know when the invention
25   described in Claim 1 of the '848 patent occurred?
0195
1        - Frederick Sayward, Ph.D. -
2        A.    I do not know.

3     Q.     Okay.  Dr. Sayward, at the time of the
4   filing of the '071 patent, if you knew how to mask
5   browser controls as claimed in Claim 1 of that
6   patent, and then were shown Active X browser
7   controls, would you know how to solve kiosk problems
8   as done in Claim 1 of the '848 patent?
9     A.     Would I know personally?
10    Q.     Yes, personally?
11    A.     No.
12    Q.     No?
13    A.     No.
14    Q.     Okay.  Would a person of ordinary skill
15   in the art of these two patents?
16    A.     At that time?
17    Q.     Yes, at the time of the filing of the
18   '071?
19    A.     No.
20          MR. COOKSEY:  That's all I have.
21          MR. WINTER:  Since the Court Reporter
22          has to run off to an emergency operation --
23          if I got that correct, his granddaughter --
24          I have no time for cross examination.
25          So right now we are going to have to
0196
1       - Frederick Sayward, Ph.D. -
2          suspend my cross examination rather than
3          inconvenience the Court Reporter.
4             Dr. Sayward, you wanted me to give
5          you a list of the things?
6             THE WITNESS:  Yes.
7             MR. COOKSEY:  All I need is your
8          current CV.
9             MR. WINTER:  We will get you a copy.
10            (Time noted 6:00 p.m.)
11                 ***
12
13
14
15
16
17
18
19
20
21
22

23
24
25
0197
1                                         197
2                   WITNESS' CORRECTION SHEET
3    PAGE \ LINE \ CORRECTION
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21
22          _____
            FREDERICK SAYWARD, Ph.D.
23
       Subscribed and sworn to before me
24   this _____day of _____, 2002,
25   _____, Notary Public.
0198
1                                         198
2    STATE OF CONNECTICUT )
                           )  SS:
3
       COUNTY OF _____
4
5             I, FREDERICK SAYWARD, Ph.D. a witness
6    herein, do hereby certify that having been first
7    duly sworn to testify to the truth, the whole truth,
8    and nothing but the truth, gave the above deposition,
9    which was recorded stenographically and reduced to this
10    original transcript.
11
12             I FURTHER CERTIFY that the foregoing

13  transcript of the said deposition is a true and correct
14  transcript of the testimony given by me at the time and
15  place specified hereinbefore.
16
17        I FURTHER CERTIFY that any corrections
18  or changes to this testimony have been made by me on
19  the page provided for that purpose captioned "Witness'
20  Correction Sheet," which has also been signed by me
21  before a Notary Public.
22        _____
23              FREDERICK SAYWARD, Ph.D.
24  Subscribed and sworn to before me this _____day
25  of _____ 2002.
0199
1                          199
2              CERTIFICATE
3
4
5        I, BLASE J. SPINOZZI, a Senior Court
6        Reporter and Notary Public within and for
7        the State of New York, do hereby certify:
8              That FREDERICK SAYWARD, Ph.D., the
9        witness whose deposition is hereinbefore set
10       forth, was duly sworn by me, and that the
11       within transcript is a true record of the
12       testimony given by such witness.
13             I further certify that I am not
14       related to any of the parties to this action
15       by blood or marriage, and that I
16       am in no way interested in the outcome of
17       this matter.
18             IN WITNESS WHEREOF, I have hereunto
19       set my hand this _____day of _____,
20       2002.
21
22             _____
23             Blase J. Spinozzi,
24             Sr. Court Reporter
25
0200
1        I N D E X                          200
2  DEFENDANTS' EXHIBITS                          PAGE
3  H - Defendants' Amended Notice of Deposition       4
4  I - Curriculum Vitae Frederick G. Sayward          4
5  J - Expert Witness Report Frederick Sayward
6        dated 3/5/02                          4

7   K - Expert Witness Report Frederick Sayward
8       dated 5/24/02                    4
9   L - Expert Witness Rebuttal Report Frederick
10      Sayward dated 9/20/02                4
11  M - Defendants' Endorsement of Expert Witness
12      Mitchell Hoffman, Andy Pinkard and Timothy
13      Daw dated 2/15/02                4
14  N - AMA '98 Annual Symposium document marked    4
15  0 - U.S. Patent 5,761,071                4
16  P - U.S. Patent 6,078,848                5
17  Q - Document - Applied Informatics          5
18  R - NII Awards                    5
19  S - Netkey Response to Defendants'
20      Interrogatories                5
21  T - Previous Kiosk Newsbits              5
22  U - Page from Calendar                5
23  V - Letter dated 11/14/02 St. Onge, Steward,
24      Johnston & Reens                5
25  W - Declaration dated 11/4/02            5
0201
1           I N D E X              201
2   X - Letter dated 11/19/02 St. Onge, Steward,
3       Johnston & Reens                5
4   Y - Typewritten Question             151
5   Z -    "       "            169
6   AA -  Internet Sampler/Mosaic          180
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25