0001
1
2  UNITED STATES DISTRICT COURT
   DISTRICT OF CONNECTICUT : CASE# 3:00CV1364 (AVC)
3  - - - - - - - - - - - - - - - - - - - - -
4  NETKEY, INC.,
   a Delaware Corporation,
5
            Plaintiff,
6
     -against-
7
   NETSHIFT SOFTWARE, LTD.,
8  AUTOMOBILE CLUB OF HARTFORD,
   MONTEGONET, L.L.C.,
9
            Defendants/Counter-Claimants.
10  - - - - - - - - - - - - - - - - - - - - -
11      ST. ONGE, STEWARD, JOHNSTON & REENS, LLC
            986 Bedford Street
12        Stamford, Connecticut 06905-5619
13            November 20, 2002
14              10:00 a.m.
15
16
17
18      DEPOSITION OF TIMOTHY CHARLES DAW, taken at the
19  above place, date and time, before Blase J. Spinozzi,
20  a Senior Court Reporter and Notary Public within and
21  for the State of New York.
22
23
24            SULLIVAN REPORTING
            One North Broadway
25        White Plains, New York 10601
0002
1
2  A P P E A R A N C E S :
3  ST. ONGE, STEWARD, JOHNSTON & REENS, LLC
        Attorneys for Plaintiff
4    986 Bedford Street
      Stamford, Connecticut 06905-5619
5  BY:  GENE S. WINTER, ESQ.
6
7
8  COOKSEY & COOKSEY, P.A.

```
          Attorneys for Defendants
9      5503 South University Boulevard
          Littleton, Colorado 80121-1702
10    BY:  MICHAEL G. COOKSEY, ESQ.
11
12    ALSO PRESENT:
13        DOUGLAS VINCENT, ESQ.
14        GEORGE RICHARD, ESQ.
15        CATHY DUGAN-O'CONNOR, ESQ.
16        GAIL BENNETT, VIDEOGRAPHER
17
18
19
20
21
22
23
24
25
0003
1
2        IT IS HEREBY STIPULATED AND AGREED, by and
3    between the attorneys for the respective parties
4    hereto, that this examination may be sworn to before
5    any Notary Public.
6
7        IT IS FURTHER STIPULATED AND AGREED that the
8    sealing and filing of the said examination shall be
9    waived.
10        IT IS FURTHER STIPULATED AND AGREED that all
11    objections to questions except as to form shall be
12    reserved for trial.
13
14
15
16
17
18
19
20
21
22
23
24
25
0004
```

1      - Mr. Timothy C. Daw -
2          VIDEO TECHNICIAN:  We are now on the
3      record beginning approximately 10:06 a.m.,
4      November 20th, 2002.
5          This is the deposition of Timothy
6      Charles Daw, called by Plaintiff in the
7      matter of Netkey, Inc. versus NetShift
8      Software, et cetera, Index Number
9      300:CV 1634 (AVC), US District Court,
10      Hartford, Connecticut.
11          The location of this deposition is the
12      law offices of St. Onge, Steward, Johnston
13      and Reens at 986 Bedford Street, Stamford,
14      Connecticut.
15          Present in the room, along with
16      Mr. Daw, is the stenographic reporter,
17      Blase Spinozzi and, currently speaking,
18      the videotechnician, Gail Bennett, both
19      with Sullivan Reporting, One North
20      Broadway, White Plains, New York.
21          I ask counsel please identify
22      themselves for the record.
23          MR. WINTER:  Gene Winter, counsel for
24      Plaintiff.
25          MR. COOKSEY:  Michael Cooksey,
0005
1      - Mr. Timothy C. Daw -
2      counsel for all defendants.
3          MR. WINTER:  We also have George
4      Richard here, who is the general counsel of
5      Netkey.
6          And there is another guest here also
7      present, Douglas Vincent, working with the
8      office Cooksey and Cooksey P.A.
9          Will the Court Reporter please swear
10      in the witness.
11  MR.  T I M O T H Y   C H A R L E S   D A W, a witness
12      herein, having been duly sworn by a Notary Public
13      within and for the State of New York, was examined
14      and testified as follows:
15          COURT REPORTER:  Please state your name
16      and address for the record.
17          THE WITNESS:  Timothy Charles Daw.
18          Cannings Cross Farm, All Cannings, Devizes,
19          Wiltshire SN10 3NP, England.
20  EXAMINATION BY MR. WINTER:

21     Q.     Are you acting as an expert witness for
22  all of the defendants in this case, or any one of the
23  defendants?
24     A.     I am.  Certainly am acting for
25  defendant NetShift, and I think that covers all
0006
1     - Mr. Timothy C. Daw -
2  defendants.
3     Q.     Are you acting as an expert witness on
4  behalf of Montegonet?
5     A.     In that they have been brought unfairly
6  into the case, yes.
7     Q.     So then Montegonet has retained you as
8  an expert?
9     A.     Montegonet has.
10     Q.     Do you have an arrangement with
11  Montegonet to act as their expert?
12     A.     We are providing a general defense.
13     Q.     So it's safe to say that you are
14  Montegonet's expert in this case?
15     A.     I have a feeling that you are probably
16  dropping some legalese here.
17          I'm an expert in this case for the
18  defendants.
19     Q.     Well, are you or are you not an expert
20  for Montegonet?
21          MR. COOKSEY:  I think he just
22        answered that question.  He said for the
23        defendants.
24          THE WITNESS:  Yes.
25          MR. WINTER:  So asked and answered.
0007
1     - Mr. Timothy C. Daw -
2     A.     Hum-hum.
3     Q.     Are you or are you not an expert
4  witness for Montegonet in this case?
5          MR. WINTER:  Asked and answered.
6        Objection.
7     Q.     You are supposed to go ahead and answer
8  that.
9     A.     You asked me -- that's the third time
10  you asked me that, Gene.
11          We do want to get out of here.  If you
12  are going to keep asking these questions three times,
13  you will be here all day.
14     Q.     I want to know whether or not you are

15    authorized by Montegonet to speak on their behalf.
16    Are you?
17       A.    Yes.
18       Q.    Are you authorized on behalf of the
19    American Automobile Association to speak on their
20    behalf?
21       A.    We are providing defense for all the
22    defendants, yes.
23       Q.    Is Montegonet compensating you in any
24    way?
25       A.    No.
0008
 1       - Mr. Timothy C. Daw -
 2       Q.    Is the AAA compensating you in any way?
 3       A.    No.
 4       Q.    Is NetShift compensating you in any
 5    way?
 6       A.    No, apart from my normal salary.
 7       Q.    What is your -- do you have an hourly
 8    rate for this deposition?
 9       A.    No.
10       Q.    Do you have a salary from NetShift?
11       A.    Yes.
12       Q.    What is your salary from NetShift?
13       A.    About 65 thousand a year.
14       Q.    65 thousand pounds or dollars?
15       A.    British sterling pounds.
16       Q.    Is that this year's salary?
17       A.    Current salary.
18       Q.    And do you expect a bonus this year?
19       A.    No.
20       Q.    Are there any other forms of
21    compensation that you've obtained, or that you will
22    have obtained from NetShift this year?
23       A.    The usual senior management add ons,
24    like private health insurance.
25       Q.    Car?
0009
 1       - Mr. Timothy C. Daw -
 2       A.    No.
 3       Q.    What other senior management add ons
 4    are there?
 5       A.    I think there is travel insurance, life
 6    insurance.
 7             I think that's pretty comprehensive,
 8    yes.

9      Q.      Approximately how much are the senior
10  management benefits worth?
11      A.      Benefit is the word.  Yes, yeah, five
12  hundred pounds per month.
13      Q.      Oh, so six thousand pounds per year
14  maybe?
15      A.      Yes, something like that.
16      Q.      What was your salary in 2001,
17  approximately?
18      A.      My salary changed dramatically through
19  the year; but the total remuneration of the year
20  would be about thirty-five thousand.
21      Q.      Plus the senior management benefits
22  worth about six thousand?
23      A.      I don't think any of those had cut in
24  in 2001.  We haven't provided them again in 2001.
25      Q.      What was your compsenation in 2000
0010
1      - Mr. Timothy C. Daw -
2  from NetShift?
3      A.      Twenty-four thousand and no benefits.
4      Q.      How about 1999?
5      A.      I think twenty-four and no benefits.
6      Q.      How about 1998?
7          MR. COOKSEY:  I am going to object to
8        this.
9          This predates his period of his
10         expertise in this case.
11         It sounds like you are getting into
12         discovery that's way past the deadline in
13         this case, fact discovery.
14         If you want to ask him questions
15         pertaining to his endorsement as an expert
16         witness, that's fair game; but you are
17         going back into time periods that have
18         nothing to do with his role as an expert.
19         MR. WINTER:  Well, his compensation
20         certainly is --
21         MR. COOKSEY:  His current
22         compensation since he was endorsed, and you
23         have done that.
24      Q.      Anyhow the question pending is for
25  1998?
0011
1      - Mr. Timothy C. Daw -
2      A.      Nill.

3      Q.      I'm sorry?
4      A.      Nill.
5      Q.      Nill?
6      A.      Nothing.
7      Q.      And no compensation before that, also?
8      A.      NetShift employed a company I owned to
9    provide my management services.
10     Q.      So that was Daw Systems?
11     A.      Cannings Cross Farms Limited.
12     Q.      Did you obtain compensation from them
13   for your work in the kiosk area?
14     A.      Yes.
15     Q.      And how much was that?
16     A.      It would have in the region of
17   twenty-four thousand.
18     Q.      Do you know of a company called
19   NetShift U.S.A., LLC, that's apparently located in
20   Cooper City, Florida?
21     A.      Yes.
22     Q.      Can you tell me the relationship
23   between yourself and that company?
24     A.      Between me or between --
25     Q.      Yes.
0012
1      - Mr. Timothy C. Daw -
2      A.      Or between --
3      Q.      Between you and that company?
4      A.      I have no direct relationship with that
5    company.
6      Q.      Are you a member of that company?
7      A.      No.
8      Q.      Are you a manager of that company in
9    any way?
10     A.      No.
11     Q.      Do you personally own stock interest in
12   that company?
13     A.      No.
14     Q.      What is the relationship between -- and
15   if I can for simplification here -- you will call in
16   this case NetShift, the English company, you will
17   just call them NetShift.  And when I want to
18   differentiate between NetShift and the Florida
19   company called NetShift U.S.A., LLC, I will just
20   refer to the Florida company as NetShift U.S.A.
21         Is that okay with you?
22     A.      That's understandable, yes.

23      Q.      What is the relationship between
24   NetShift and NetShift U.S.A.?
25      A.      NetShift U.S.A. is wholly owned by
0013
1      - Mr. Timothy C. Daw -
2   NetShift.
3      Q.      A limited liability company in the
4   United States typically has managing members.
5              Are there any managing members by name
6   that you can list for NetShift U.S.A.?
7      A.      I -- I don't know for certain names of
8   the management members.
9      Q.      How many people are employed by
10  NetShift U.S.A.?
11     A.      Four.
12     Q.      What are their names?
13     A.      Four or five.
14             Bob GALLNER -- G A L L N E R.  There is
15  a Dan Del Rio -- D E L R I O -- I think.  And there
16  is a Ken.  The second name doesn't come to mind.
17             And I think Angela.  I'm not sure.
18     Q.      Are any of those people -- strike that.
19             Were any of those people formerly with
20  NetShift?
21     A.      No.
22     Q.      Are any of those people U.K. citizens?
23     A.      No.
24     Q.      Are they all U.S. citizens?
25     A.      I believe so.
0014
1      - Mr. Timothy C. Daw -
2      Q.      Do you have any stock ownership in
3   NetShift, Inc.?
4      A.      Not personally.
5      Q.      Do you have any stock ownership through
6   any other entity that may own stock in NetShift?
7              For example, you may own another
8   company that owns stock in NetShift?
9      A.      I have -- there is a family trust that
10  I may be a beneficiary of that has stock in NetShift.
11     Q.      What's the name of the family trust?
12     A.      Robert Hound -- H O U N D -- Trust.
13             There is, also to be clear, there is
14  also a Robert Hound Limited, which I think may own --
15  I get this confused -- one of them owns the shares.
16  I think it is the limited company owns the shares,

17    and the limited company is owned by the trust.
18        Q.      And are you a managing director or in
19    any way involved in the management of Robert Hound
20    Limited?
21        A.      No.
22        Q.      The owner of the stock?
23        A.      No.
24        Q.      Do you personally control any of the
25    stock?
0015
1        - Mr. Timothy C. Daw -
2        A.      No.
3        Q.      Who owns -- strike that.
4                Who is the managing -- who manages
5    Robert Hound Limited?
6        A.      A professional company of -- company of
7    managers.
8        Q.      Managers?
9        A.      Its name is B.W. Limited.
10        Q.      And the trust wholly owns Robert Hound
11    Limited?
12        A.      Yes.
13        Q.      And who are the beneficiaries of the
14    Robert Hound Trust?
15        A.      Myself and my family.
16        Q.      So if the stock of NetShift is worth a
17    lot of money and goes up --
18        A.      Hum-hum?
19        Q.      -- you and your family benefit by that,
20    is that correct?
21        A.      We could benefit.
22        Q.      When you qualify it by you could
23    benefit, why do you use the word could?
24        A.      Because I have no control over how the
25    trust distributes money.
0016
1        - Mr. Timothy C. Daw -
2        Q.      And who has that control?
3        A.      B.W. Limited, the managers.
4        Q.      Is there anyone else than your family
5    that are personal beneficiaries of the trust?
6        A.      The final --
7                No, the final beneficiary of the trust,
8    as all trusts, the perpetual body is the beneficiary,
9    in case we run under a bus together, and that is the
10    Sir John Baptist College, Oxford, England.

11    Q.    Is your wife a beneficiary of the
12  trust?
13    A.    She is a member of my family, yes.
14    Q.    Do you have children?
15    A.    Yes.
16    Q.    How many children do you have?
17    A.    Three.
18    Q.    Are they beneficiaries of the trust?
19    A.    Yes.
20    Q.    So you, your wife and your children
21  have -- stand and could benefit from the success of
22  NetShift, isn't that correct?
23    A.    We could.
24    Q.    What percent of the stock ownership of
25  NetShift is owned by Robert Hound Limited?
0017
1      - Mr. Timothy C. Daw -
2    A.    Approximately 11 percent.
3    Q.    That is as of today, is that correct?
4    A.    As of today.
5    Q.    Was that number formerly higher?
6    A.    Yes.
7    Q.    When was that number higher, in what
8  year?
9    A.    It was higher when we first formed the
10  company in -- it would have been higher in 1998 when
11  Robert Hound Limited acquired the shares.
12    Q.    And what would that percentage have
13  been?
14    A.    Probably 40 percent.
15    Q.    Does anybody in your family own stock,
16  apart from the Robert Hound Limited company?
17    A.    No.
18    Q.    Is NetShift a public company?
19    A.    Yes.
20    Q.    Is it publicly traded?
21    A.    No.  I would --
22          There are differences in company law
23  between England and the United States.  So, I mean
24  public company a -- it is a limited company under
25  English law.
0018
1      - Mr. Timothy C. Daw -
2    Q.    Does the -- do you, your family, and/or
3  Robert Hound Limited obtain stock options in
4  NetShift?

5       A.      Do we obtain or have we obtained?

6       Q.      Well, let's go with either.  In the

7   past have you obtained --

8       A.      No.

9       Q.      And do you now?

10      A.      As of today I have not obtained -- none

11  of those people obtained stock options.

12      Q.      Do you stand to obtain stock options in

13  the future?

14      A.      I would hope I might.

15      Q.      Is there a plan for granting stock

16  options to you in the future?

17      A.      No.

18      Q.      Have there been discussions about

19  granting stock options to you in the future?

20      A.      Not specifically.

21      Q.      Why do you qualify your answer as

22  specifically?

23      A.      There is general -- you have a --

24  NetShift has a stock option plan for some managers,

25  and it has been proposed that stock option plan is

0019

1       - Mr. Timothy C. Daw -

2   extended in some nonspecific way yet to be decided.

3       Q.      And that meaning extended to you

4   personally?

5       A.      Extended to other senior managers

6   and/or other staff.

7       Q.      So the stock options that you may get

8   in the future, if that plan is put through you would

9   obtain these stock options personally?

10      A.      Yes.

11      Q.      Do you control the day-to-day

12  activities of NetShift?

13      A.      No.

14      Q.      Who does that?

15      A.      Nigel Seed -- S E E D, N I G E L.

16              Nigel Seed is the CEO, and would be

17  the lead manager in that respect.

18      Q.      Do you understand what the relief is

19  that Netkey has requested in this case against

20  NetShift?

21      A.      No.

22      Q.      Do you understand that Netkey has

23  requested damages from NetShift in the form of a

24  reasonable royalty?

25    A.    I understand that they have asked for

0020

1        - Mr. Timothy C. Daw -

2    an unreasonable royalty.

3    Q.    Why do you think the royalty is

4    unreasonable?

5    A.    I saw the ridiculous calculations.

6        But, yes, I understand that Netkey has

7    asked for damages.

8    Q.    Were you shown Dr. Shapiro's expert

9    report?

10    A.    I have seen an outline of how the

11    averaging was done.

12    Q.    Did you see the royalty rates of the

13    four licenses?

14    A.    If I have, I can't recall them.  I

15    can't recall.

16    Q.    Did you see a table where there were

17    multiple licenses of Netkey, and that they were

18    ultimately outlined?

19    A.    I saw -- I saw there was a table.

20    Whether there were names attached or an averaging

21    table, I can't recall.

22    Q.    And why were the royalties ridiculous

23    in your view?

24    A.    In my view for an average to be

25    meaningful, it has to be from a similar set of

0021

1        - Mr. Timothy C. Daw -

2    figures.

3        To average, I can't remember the

4    numbers, but I seem to remember they went from

5    somewhere like five to a hundred, which shows there

6    is no correlation between the numbers.

7        They are just near around a set of

8    numbers.  And to try and draw a conclusion by

9    averaging around a set of numbers is ridiculous from

10    a statistical point of view.

11        MR. COOKSEY:  I am going to object to

12        this line of questioning to the extent that

13        you are getting into areas of expert

14        testimony that he has not been

15        endorsed to give opinions about.

16        You are asking him damages questions,

17        and you know he has not been endorsed as a

18        damages witness.

19          MR. WINTER:  You know the purpose of
20      this is to take a look at the credibility
21      of the witness, and his interest in the
22      case.  And so if there is a substantial
23      damage award, because he is an employee, he
24      may have stock options, and the family
25      trust, and tends to benefit from all of
0022
 1     - Mr. Timothy C. Daw -
 2      this.
 3          You know, there is some evidence that
 4      there would be bias.
 5          MR. COOKSEY:  What you attempted to
 6      establish, I think you have done that.  So
 7      I am going to instruct him not to answer
 8      any questions relating to damages.
 9          You are getting into fact discovery.
10      You are getting into areas that he was not
11      endorsed to give opinions on.
12          If you want to ask him questions about
13      the technical side of this case for which
14      he has been endorsed, go ahead; but I'm not
15      going to let him answer questions relating
16      to damages.
17  EXAMINATION BY MR. WINTER:  (Cont'g)
18      Q.      Have you ever seen a table with the
19  royalty rates set forth by the four licensees of
20  Netkey?
21          MR. COOKSEY:  Objection.
22          I instruct him not to answer.  Asked
23      and answered.  And you are outside the
24      scope of this expert's endorsement in this
25      case.
0023
 1      - Mr. Timothy C. Daw -
 2      Q.      If Netkey is awarded substantial
 3  damages in this case, could that adversely affect
 4  your income?
 5      A.      I doubt it.
 6      Q.      Do you understand also that Netkey is
 7  asking for an injunction in this case?
 8      A.      I thought you dropped that.
 9      Q.      At the end of trial, do you understand
10  that if the Court or the jury comes back and says
11  that NetShift is infringing on the patent, do you
12  understand that we are seeking an injunction to

13    prohibit NetShift from selling its product further in
14    the United States?
15        A.    I understand that.
16        Q.    So you understand that that's an
17    objective of the lawsuit?
18        A.    Hum-hum, yes.
19        Q.    What percentage of the sales of
20    NetShift are in the U.S, approximately, today?
21        A.    Last month it was less than two
22    percent.
23        Q.    How about in the year 2000?
24        A.    I don't know those figures.
25        Q.    Was it more than ten percent?
0024
1        - Mr. Timothy C. Daw -
2        A.    It may have been.
3        Q.    Who were the current licensees of
4    Netkey under its patent by name?
5        A.    That I know of?
6        Q.    Yes.
7        A.    I know of a Rocky Mountain Multimedia,
8    and an Omnitech, if they are still in business.  And,
9    I believe, Site -- S I T E -- kiosk.
10        Q.    Do you know Korala Associates Limited?
11        A.    No.
12        Q.    Do you know if they are a licensee of
13    the Netkey software?
14        A.    No, I don't.
15        Q.    How about Provisio GNMBH, do you know
16    if they are a licensee of Netkey?
17        A.    I think Provisio -- I think Proviso is
18    the company name for the company I know as Site
19    kiosk.
20        Q.    I would like to show you the table from
21    Defendants' Exhibit A, and I am going to block off
22    the dollar figures in the table with a sticky note,
23        I can show that to the camera, I
24    blocked it off.
25        Have you ever seen that table before?
0025
1        - Mr. Timothy C. Daw -
2        A.    It does not -- that table does not ring
3    a bell.
4        Q.    Have you ever seen a table with the
5    three or four licensees listed and their royalty
6    rates and payments so you could calculate the

7   average?
8        A.      The table I have in my mind is a -- was
9   a much more compact smaller table.  That might be a
10   formatting issue.
11        Q.      And what was in the table?
12        A.      There was some dollar amounts per unit.
13        Q.      Have you ever seen an expert report of
14   Dr. Steven Shapiro?
15             MR. COOKSEY:  Before he answers this
16          question, I really -- and before I lodge
17          and objection and instruct him not to
18          answer, I want to know what any of this has
19          to do with his expert report in this case,
20          which deals strictly with infringement
21          issues, prior art issues, invalidity
22          issues, the matters that he has been
23          endorsed to testify about.
24             You are way outside the scope of this
25          deposition, and what he has been endorsed
0026
1    - Mr. Timothy C. Daw -
2          to do.  He is not a 30B6 witness on behalf
3          of this company, and the deadlines for
4          doing that have long since passed, and you
5          know that.
6             MR. WINTER:  All this relates to the
7          risk of NetShift in this case and --
8          obviously people don't do things for free,
9          and he is here, so far according to his
10          testimony that he is not compensated on an
11          hourly basis, on a daily basis, so he must
12          be doing this, my argument to the jury is
13          that he has substantial monetary gain
14          through his trust, and through his salary
15          and through his options, and through his
16          benefits, and he has substantial possible
17          loss through an injunction and damages.  So
18          I think this relates to his credibility as
19          an expert witness.
20             MR. COOKSEY:  Do you want to waive
21          any issue as to confidentiality of Netkey's
22          damage report when you ask him these
23          questions because you are teetering on
24          waiving whatever claim of confidentiality
25          you are going to claim as to Dr. Shapiro's
0027

1       - Mr. Timothy C. Daw -
2       damages report.
3              You are getting into areas that if you
4       open the door you are going to waive
5       whatever prospect you had to keep these
6       license agreements confidential from this
7       witness and from his company.
8    Q.    I'd just like you to refer to the first
9  page of Defendants' Exhibit A.  Don't go through any
10  other page.
11             Have you seen that first page before?
12             MR. COOKSEY:  Just for the record,
13        counsel is showing Mr. Daw a "Confidential
14        Attorney's Eyes Only" damage report
15        prepared by Plaintiff Netkey's damages
16        expert, Dr. Steven Shapiro.
17             If you are going to show him this, you
18        are going to waive the privilege.
19             MR. WINTER:  I'm showing him the
20        first page only.
21    Q.    Would you take a look at that first
22  page and tell me whether you've seen that before?
23    A.    I don't recognize that first page.
24    Q.    Does NetShift benefit in any way from
25  the sales or the product of NetShift U.S.A.?
0028
1       - Mr. Timothy C. Daw -
2    A.    Yes.  I think I said it is a wholly
3  owned subsidiary.
4    Q.    Did NetShift invest capital to start up
5  NetShift U.S.A.?
6    A.    A small amount, yes.
7    Q.    What was that amount?
8    A.    No more than at a maximum fifty
9  thousand dollars.  I think it was quite a lot less.
10    Q.    Who is paying the salaries of the
11  personnel at NetShift U.S.A.?
12    A.    They pay it out of their cash flow.
13    Q.    Has NetShift U.S.A. reported dividends,
14  or any other form of compensation back to NetShift?
15    A.    No.
16    Q.    Do you expect NetShift U.S.A. to report
17  any types of earnings to NetShift in the near future?
18    A.    Not in the near future.
19    Q.    Is it the expectation that eventually
20  NetShift U.S.A. will report profits back to NetShift?

21    A.    Yes.
22    Q.    The primary business of NetShift U.S.A.
23  is the sales of kiosk systems that include the
24  NetShift software, is that correct?
25    A.    No.
0029
 1    - Mr. Timothy C. Daw -
 2    Q.    What is the primary business of
 3  NetShift U.S.A.?
 4    A.    As I have pointed out, I'm not a
 5  manager of NetShift U.S.A., but I would think that
 6  their primary business is the sale of software
 7  licenses.
 8    Q.    If a person in the United States wants
 9  to purchase a software license for a NetShift
10  product --
11    A.    Yes?
12    Q.    -- can he purchase that today directly
13  from NetShift?
14    A.    Yes.
15    Q.    And that same person could also
16  purchase it directly from NetShift U.S.A.?
17    A.    Yes.
18    Q.    So when you say NetShift's sales in the
19  United States current through now this year are two
20  percent, does that include NetShift U.S.A. sales?
21    A.    That's not what I said.
22    Q.    What did you say?
23    A.    I said last month it was less than two
24  percent.
25    Q.    Let's talk about year to date,
0030
 1    - Mr. Timothy C. Daw -
 2  approximately what is that?
 3    A.    I would -- I haven't done the analysis
 4  of that.  It would be -- it would be in that order.
 5    Q.    Less than five percent?
 6    A.    My guess would be yes.
 7    Q.    And does that figure --
 8    A.    Definitely.
 9    Q.    It would be definitely less than five
10  percent?
11    A.    Yes.
12    Q.    Does that figure count the sales of
13  NetShift U.S.A.?
14    A.    Yes.

15      Q.      Does NetShift U.S.A. also sell kiosk
16   systems?
17          What I mean by kiosk systems, would be
18   including the monitor, and the hard drive, and a
19   computer system with a screen including the NetShift
20   software?
21      A.      As far as -- I don't have the knowledge
22   to accurately answer that question.
23      Q.      Have you ever seen financial reports
24   that show NetShift U.S.A. reporting sales of 2000
25   dollars or more for kiosk systems?
0031
1       - Mr. Timothy C. Daw -
2       A.      No, I haven't.
3       Q.      Has NetShift ever sold kiosk systems?
4       A.      In total, or in the U.S.A.?
5       Q.      Total?
6       A.      Yes.
7       Q.      And what is the minimum price for a
8    kiosk system including the software?
9       A.      It is a very variable figure.
10          I'm trying to think of the cheapest one
11   we have done.
12      Q.      It would certainly be more than a
13   thousand US dollars, right?
14      A.      Yes, I guess so.
15      Q.      And it would almost certainly be more
16   than two thousand US dollars?
17      A.      Fifteen hundred, two thousand, yes,
18   probably.
19      Q.      And it could be as much as five or six
20   thousand US dollars, is that correct?
21      A.      With consultancy bid front end, it
22   would not be more.
23      Q.      If Netkey succeeds in this lawsuit and
24   obtains an injunction --
25      A.      Uh-huh?
0032
1       - Mr. Timothy C. Daw -
2       Q.      -- would that pretty much shutdown
3    NetShift U.S.A. in your view?
4          MR. COOKSEY:  Objection.
5          NetShift U.S.A. is not a party to
6       this lawsuit.  So you are asking him a
7       legal conclusion.
8          I would instruct him not to answer.

9          And you are also completely outside
10         the scope of what he has been endorsed to
11         do.
12          Again, you are forty-five minutes into
13         this deposition and you still haven't asked
14         him about his expert report.
15     Q.     Are you at all -- are you concerned
16   over the risk of an injunction in this case for
17   NetShift?
18     A.     I'm concerned -- I wouldn't -- we
19   wouldn't be fighting it if we weren't concerned about
20   the outcome of this case.
21     Q.     So how does an adverse outcome
22   vis-a-vis the injunction affect NetShift?
23     A.     It would be -- I certainly don't know
24   contingency planning on that unlikely outcome
25   happening.  So, I can't answer the question.
0033
1      - Mr. Timothy C. Daw -
2      Q.     Would you have to --
3           Currently NetShift is selling software
4   directly into the United States, correct?
5      A.     Yes.
6      Q.     That would have to stop if there were
7   an injunction issued against NetShift, right?
8      A.     Any infringing product would have to
9   stop.
10     Q.     And NetShift sells product to NetShift
11   U.S.A., is that correct?
12     A.     Yes.
13     Q.     And if there were an injunction entered
14   in this case, NetShift would have to stop selling
15   products found to infringe to the NetShift U.S.A.,
16   isn't that correct?
17     A.     Yes.
18          I don't think we ever have sold either
19   5 or 5.2 NetShift to NetShift U.S.A.
20     Q.     What have you sold to NetShift U.S.A.?
21     A.     They have been using NetShift 6.
22     Q.     When was NetShift 6 introduced?
23     A.     The spring of this year.
24     Q.     And how does NetShift differ from --
25   I'm sorry.
0034
1      - Mr. Timothy C. Daw -
2           How does NetShift 6.0 differ from

3    NetShift 6.5?
4            MR. COOKSEY:  There is no NetShift
5        6.5.
6            MR. WINTER:  I will rephrase the
7        question.  That was a mistake on my part.
8    A.    Understood.
9    Q.    How does NetShift 6.0 differ from
10   NetShift 5.5?
11   A.    It's a major evolution in the software.
12   Q.    How does it differ, for terms of
13   analysis of infringement under the patent or the
14   patents?
15           MR. COOKSEY:  Objection.  Instruct
16       him not to answer.
17           You are asking him a legal conclusion.
18           And if you want to ask him what the
19       differences are in these two products, you
20       don't have an expert report on infringement
21       of 6.0, so where are you headed with this?
22           MR. WINTER:  How he understand claims
23       of patents.
24           He is an expert witness that has gone
25       through each of the claims of the patent
0035
1    - Mr. Timothy C. Daw -
2        and he understand, supposedly, how the
3        patent is to be read because he testified
4        to that in his expert report, and I am just
5        getting from him what his understanding of
6        the claims are versus any product.
7    Q.    Have you read the claims of both of the
8    patents owned by Netkey?
9    A.    Yes.
10   Q.    And you feel confident to testify as an
11   expert on the issue of infringement or
12   noninfringement of those claims of those two
13   patents?
14   A.    Can I just ask for a clarification?
15   Q.    Sure.
16   A.    You said that both patents are owned by
17   Netkey.
18   Q.    Yes.
19   A.    I believe Netkey bought another patent
20   recently, and I presume you are not including that
21   one?
22   Q.    That's correct.

23      A.      Okay.  Just to be sure we are talking
24   about the '071 and the '848 patent.
25      Q.      Yes, only those two?
0036
1       - Mr. Timothy C. Daw -
2       A.      Could you repeat your question.
3               MR. WINTER:  The Court reporter will
4           read it back.
5               (The court reporter read back the last
6           question as requested.)
7       A.      The answer is, yes.
8       Q.      How does version 6.0 differ from
9    version 5.5, vis-a-vis infringement of the two
10   patents?
11              MR. COOKSEY:  Objection to the form
12          of the question.
13              Now you have asked him a compound
14          question.  You've got two
15          patents-in-suit.
16              If you want to break it down on a
17          claim-by-claim basis, I think that's a
18          better way to.  You are asking him for a
19          blanket analysis of 6.0 versus 5.0 and 5.5
20          with respect to two different patents.
21              That's a very complicated question
22          and it is multipart.
23              MR. WINTER:  Are you finished with
24          your objection?
25              MR. COOKSEY:  Yes.
0037
1       - Mr. Timothy C. Daw -
2               MR. WINTER:  Would you please read
3           back the question to the witness.
4               MR. COOKSEY:  I object to the form of
5           the question.
6               MR. WINTER:  Are you now finished
7           with your objection?
8               MR. COOKSEY:  Yes.
9               MR. WINTER:  So I would like to have
10          him read the question, and have the witness
11          answer the question in an uninterrupted
12          fashion.
13              So are you done interrupting at this
14          point in time?
15              MR. COOKSEY:  You are not entitled to
16          ask compound questions.

17          MR. WINTER:  So there will be no
18      further interruption from you once the
19      question is read, is that correct?
20          MR. COOKSEY:  That's correct.
21          MR. WINTER:  Would you please read
22      back the question.
23          (The court reporter read back the last
24      question as requested.)
25      A.      I think it is on record that I have
0038
1          - Mr. Timothy C. Daw -
2   done an analysis of version 5.5 for infringement, and
3   in my expert opinion there is no infringement.
4          I have not done a detailed analysis of
5   version 6, but my belief would be that there would
6   also be no infringement.
7      Q.      For the very same reasons there is no
8   infringement of version 5.5?
9      A.      Yes, we got the patents largely valid.
10     Q.      If version 5.5 infringes under our
11  theory of the case, would version 6.0 also infringe?
12          MR. COOKSEY:  Objection to the form
13      of the question.
14          You asked a compound question.
15     Q.      You can go ahead and answer it.
16     A.      If version 5.5 infringes, I think most
17  pieces of software in any store would infringe.
18     Q.      But that was not the question.
19          MR. WINTER:  Can you read the
20      question back to the witness, please.
21          (The court reporter read back the last
22      question as requested.)
23     A.      I don't know.
24     Q.      Why don't you know?
25     A.      I don't fully understand your theory of
0039
1          - Mr. Timothy C. Daw -
2   the case.
3      Q.      Assuming you basically believe the
4   claims of the two patents are invalid, is that
5   correct?
6      A.      A broad brush answer would be yes.
7      Q.      Let's assume those claims are valid,
8   just for the purposes of analysis.
9      A.      Okay.
10     Q.      And that each of the claims has

11    elements that you have analyzed in great detail.
12        A.    Hum-hum.
13        Q.    If version 5.5 comes within the scope
14    of those claims, would version 6.0 also come within
15    the scope of those claims?
16        A.    I think if -- yes, if NetShift 5.5 was
17    found to infringe and the claims were valid, version
18    6, along with a lot of other programs, would be
19    caught under the same catch-all situation.
20        Q.    Thank you.
21            Now, the sales figures you gave me
22    earlier, that 2 percent, 5 percent you were
23    discussing, was that including version 6.0 as well as
24    version 5.5?
25        A.    Yes.
0040
1      - Mr. Timothy C. Daw -
2        Q.    Is version 5.5 currently sold?
3        A.    No.
4        Q.    When did you -- when did NetShift stop
5    selling version 5.5?
6        A.    In the spring of this year.
7        Q.    Do you know a month?
8        A.    No.
9            MR. COOKSEY:  Are you still getting a
10            factual basis for his compensation, because
11            you are asking him questions relating to
12            fact discovery that have nothing to do with
13            his expert opinions in this case.
14            MR. WINTER:  Well, if 6.0 is
15            enjoined, basically that product is at
16            risk.  So I think that's -- we are seeking
17            an injunction, and he is testifying as a
18            witness with a substantial economic loss
19            possible in the case of an injunction.
20            And that's really what I'm trying to
21            elicit, which I have been able to do to
22            this point.
23            So that's what the relevancy of these
24            questions are, because he has got a
25            substantial financial interest in this
0041
1      - Mr. Timothy C. Daw -
2            case.
3    EXAMINATION BY MR. WINTER:  (Cont'g)
4        Q.    By May of 2002, you were selling only

5      version 6.0, is that correct?
6          A.      I believe so.
7          Q.      The same question, but let's have it
8      April of 2002?
9          A.      I wouldn't know.
10         Q.      Did you write the source code for
11     version 6.0?
12         A.      No.
13         Q.      Did you write any of the source code
14     for version 6.0?
15         A.      Apart from very minor suggestions, no.
16         Q.      So who did?
17         A.      A team of developers.
18         Q.      Who is the lead on the team?
19         A.      Andrew Pinkard -- P I N K A R D.
20         Q.      Was Mr. Pinkard previously designated
21     by NetShift to be an expert witness in this case?
22         A.      Yes.
23         Q.      Do you know if Mr. Pinkard had formal
24     training in computer science?
25         A.      I believe he did.
0042
1        - Mr. Timothy C. Daw -
2          Q.      What was his formal training?
3          A.      I don't know.
4          Q.      Do you understand that he was withdrawn
5      as an expert in this case -- strike that.
6               Do you understand he was originally
7      supposed to be an expert in this case but was
8      withdrawn as an expert by NetShift?
9          A.      I don't understand that.
10         Q.      Is Mr. Pinkard going to be an expert
11     witness in this case?
12         A.      I believe he is.
13         Q.      What is the basis for your belief?
14              MR. COOKSEY:  Well, I am going to
15         object.
16              You know he has been withdrawn as a
17         formal witness in this case.  Why are you
18         asking him this question?
19              I mean we sent you a letter consenting
20         to your motion to strike one of the
21         duplicative experts.  Now, where are you
22         headed with this, Gene?  You know that that
23         issue is moot.  He has been withdrawn
24         formally.  The Court has already granted

25          your motion.  What's that got to do with
0043
1      - Mr. Timothy C. Daw -
2          your questioning of this witness?
3              You are spending substantial amounts
4          of time today dealing with issues that have
5          no relevancy to this expert's endorsement
6          as an expert witness and his report.
7              MR. WINTER:  I would like to mark
8          this as Plaintiff's Exhibit 148 that was
9          provided to us with the expert report.)
10             (Resume of Andrew Roger Pinkard marked
11             Plaintiff's Exhibit 148.)
12     Q.     I would also like to show you
13     Defendants' Exhibit M at yesterdays deposition,
14     "Defendants' endorsement of expert witnesses Mitchell
15     Hoffman, Andy Pinkard, and Timothy Daw."
16             Do you see that?
17     A.     Yes.
18     Q.     Do you recall the expert report?
19     A.     Yes.
20     Q.     And that was written jointly by you and
21     Mr. Pinkard?
22             You can feel free to look at it.
23     A.     Let me just check it a second.
24             Yes?
25     Q.     If you look at Plaintiff's Exhibit 148,
0044
1      - Mr. Timothy C. Daw -
2      which is Mr. Pinkard's resume, that resume was sent
3      to us as part of the report, and you probably had
4      seen it one time; is that correct?
5      A.     I think I have seen it, yes.
6      Q.     So Mr. Pinkard wrote the report--
7      substantial portions of the report that is
8      Defendants' Exhibit M, as in Mary, is that
9      correct?
10     A.     He -- I wouldn't use the phrase he
11     wrote substantial portions of it.
12     Q.     What phrase would you use?
13     A.     I would say he reviewed it,
14     commented on it, added suggestions and agreed
15     with it.
16     Q.     Did he edit it?
17     A.     He didn't do a final edit on it.
18     Q.     Did he edit along the way?

19    A.    Yes.
20    Q.    Who is Mitchell Hoffman?
21    A.    I know no more about Mitchell Hoffman
22  than is on the front page of that report.
23    Q.    Did you write those words in the
24  paragraph under Mitchell Hoffman?
25    A.    No.
0045
1      - Mr. Timothy C. Daw -
2    Q.    Who wrote those words?
3    A.    They were provided by the attorneys.
4    Q.    By Mr. Cooksey?
5    A.    Mr. Cooksey and Mr. Vincent.
6    Q.    So either Mr. Cooksey or Mr. Vincent
7  provided word-for-word a full paragraph in the
8  report, is that correct?
9    A.    Yes.
10    Q.    And you did not edit their exact words,
11  is that correct?
12    A.    I -- it was in a report -- it was in
13  the final form of the report.  I did not edit it, and
14  I would have left -- it seemed to be an adequate
15  description, so I left it alone.  But I had
16  editorials and had control over that.
17    Q.    So what else did Mr. Cooksey and/or
18  Mr. Vincent write inside this report?
19    A.    They certainly provided the first
20  paragraph of legalese, which takes down through where
21  it says Mitchell Hoffman, and they would have
22  provided --
23    Q.    Why don't you go through it on a
24  page-by-page basis?
25    A.    Okay.  This page 1, they would have
0046
1      - Mr. Timothy C. Daw -
2  substantially provided the words for me to include in
3  the report.
4    Q.    Okay.  So all of page 1 was written by
5  your attorneys, right?
6    A.    They helped me write it.
7    Q.    But the words are almost all
8  theirs?
9    A.    Yes, there are a lot of quotes in this
10  report.
11    Q.    How about the second?
12    A.    The second page.  The first word on the

13  second page is a follow on from the first page, and
14  the bold type, I believe, was written by yourself,
15  Netkey.
16      Q.     That's just Claim 1 repeated verbatim
17  out of the patent, correct?
18      A.     Yes, I don't claim to have written
19  those words.
20      Q.     How about the paragraph under
21  "infringement", that was Mr. Cooksey's and
22  Mr. Vincent's work, wasn't it?
23      A.     No.
24      Q.     You wrote those words?
25      A.     I wrote those words.
0047
1       - Mr. Timothy C. Daw -
2       Q.     Word by word?
3       A.     Yes.
4       Q.     How about underneath the "prior art"
5   section?
6       A.     I claim those words as well.
7       Q.     Did Mr. Pinkard have anything to do
8   with those words?
9       A.     He would have reviewed an early draft,
10  and he may have had a comment about them which I
11  incorporated.  I can't recall.
12      Q.     So you incorporated -- you at least
13  incorporated significant portions of this report from
14  Mr. Pinkard's comments?
15      A.     Mr. Pinkard would stand by all of this
16  report as well.  We did a joint edit where he was
17  happy with everything in it, and I was happy with
18  everything in it.
19      Q.     But some of the wording in this report
20  does come from Mr. Pinkard, right, that you later
21  reviewed and agreed with?
22      A.     Some of the phrases would have come
23  from him, yes.
24      Q.     Did Mr. Pinkard review each of the web
25  pages that you allege are prior art in this report?
0048
1       - Mr. Timothy C. Daw -
2       A.     I have no reason to believe he didn't.
3       Q.     Did you discuss at any time those web
4   pages of Mr. Pinkard?
5       A.     Yes.
6       Q.     So why don't you describe the process

7    of writing this joint report with Mr. Pinkard?
8            You of course have read the web pages
9    also --
10        A.    Yes.
11        Q.    -- that you are relying on?
12        A.    Yes.
13        Q.    And you assume he has read the web
14    pages you are relying on?
15        A.    Yes.
16        Q.    And why don't you describe now that you
17    both read the web pages, how you would formulate this
18    report?
19        A.    I did the first draft of this report.
20    I had -- I had various notes I made.  I had various
21    bits of prior art which I gathered together into the
22    first draft of this report.  I then talked to Andy
23    about it, and when we were --
24            I talked to him before we were even
25    designated expert witnesses, as a sanity check if
0049
1        - Mr. Timothy C. Daw -
2    nothing else.  I respect his opinion highly.  And we
3    then worked through the report and two colleagues,
4    "Do you agree with this?  Is that the right way of
5    saying it?"
6            And we could bounce back and forth just
7    single words and ended up with a final form of words
8    we were happy with.
9        Q.    And was this process done in the
10    presence of your attorneys?
11        A.    No.
12        Q.    Did you ever have a meeting with your
13    attorneys where you went through this report word by
14    word?
15        A.    I had no meetings.
16        Q.    Did you ever have a meeting in Colorado
17    with Mr. Cooksey about this report?
18        A.    I met with Mr. Cooksey in Colorado.  I
19    can't recall if we were talking about this report,
20    but we may have done it.
21        Q.    Now when you say you respect the
22    opinion of Andrew Pinkard highly --
23        A.    Hum-hum?
24        Q.    -- why is that?
25        A.    He is a very impressive guy.
0050

1       - Mr. Timothy C. Daw -
2       Q.      What's impressive about him?
3       A.      He is very smart, very clever, very
4    switched on, very technical, and generally
5    intelligent.
6       Q.      Does the background set forth in his
7    resume on Plaintiff's Exhibit 148, is that any part
8    of your reason why you highly respect his opinion and
9    let him word the report?
10              MR. COOKSEY:  I object to the form of
11          the question.
12      Q.      You can answer it.
13      A.      Can you repeat the question, please?
14          (The court reporter read back the last
15          question as requested.)
16              MR. COOKSEY:  I object on the further
17          basis that it misstates his previous
18          testimony about who worded the report.
19              MR. WINTER:  Could you read the
20          question back now again without having
21          further interruption, please.
22              MR. COOKSEY:  I am just taking after
23          you, Gene.
24          (The court reporter read back the last
25          question as requested.)
0051
1       - Mr. Timothy C. Daw -
2       A.      The background as set out in the resume
3    is why Andrew is the person he is.
4               I respect him for what he is at the
5    moment, not for his CV.
6       Q.      But his experience on his CV is what
7    you highly regard, is that correct?
8       A.      His experience.  Not necessarily how it
9    is written down in the CV, because I'm not familiar
10   with the CV.
11      Q.      What about his experience makes him
12   highly respected by you in your opinion?
13      A.      He has got -- he has a wide grasp both
14   of technology, both from his former jobs and from his
15   general understanding of the business.
16      Q.      What former jobs are you referring to?
17      A.      The ones in the CV.
18      Q.      Like which ones particularly impress
19   you?
20      A.      They all look like pretty good jobs to

21    me for his -- for the time in his career.
22        Q.     And what about his educational
23    experience that impresses you?
24        A.     I know he is very knowledgeable.
25             I have no view on his particular
0052
1        - Mr. Timothy C. Daw -
2    degree, or his subsequent training.
3        Q.     And so these factors including his work
4    experience and his education, leave you to believe
5    that he is a highly respected expert in the field, is
6    that correct?
7        A.     Yes.
8        Q.     And because he is such a highly
9    respected expert in his field, his collaboration on
10    this report was essential to writing a report, isn't
11    that true?
12        A.     No.
13        Q.     How is that untrue?
14        A.     I think it is highly desirable to have
15    a man of his stature help and endorse this report.
16    But I believe there is nothing in this report that
17    would be substantially different without his help.
18        Q.     How long did it take the two of you to
19    write the report?
20        A.     It was because it was based on notes,
21    and some of which were already existing, and some of
22    which were particularly written for the report, a
23    collection of the report together was a major task,
24    and reviewing it, I think we did it over a month or
25    so.
0053
1        - Mr. Timothy C. Daw -
2        Q.     How many hours did you observe
3    Mr. Pinkard spending on this report and reading the
4    web pages that are referenced in the report?
5        A.     He works in a separate office to me.
6    So I didn't observe him particularly doing much.
7        Q.     How many hours of meetings did you have
8    over this report with Mr. Pinkard?
9        A.     We did a lot of corridor meetings of
10    short duration.
11        Q.     But cumulatively, how many hours do you
12    believe?
13        A.     Cumulatively?  We talked for -- it
14    would be a large -- it would be a guess -- tens of

15    hours.
16      Q.      So tens meaning twenty, thirty, forty
17    hours?
18      A.      Yes, something like that, yes.
19      Q.      And during those tens of hours, did
20    you -- what did you spend that time discussing?
21      A.      All aspects of the case, including all
22    the prior art.
23      Q.      Other than the prior art, what other
24    aspects of the case did you discuss?
25      A.      We discussed how the claims could be
0054
1        - Mr. Timothy C. Daw -
2    read, and what that would infringe if they were read
3    in different ways, and how we should consider that.
4      Q.      So Mr. Pinkard had substantial input on
5    the Claim interpretation aspects of this case, is
6    that correct?
7      A.      He had an input.
8      Q.      Well, how would you characterize his
9    input if it isn't substantial?
10      A.      Had input.
11      Q.      Did he have more input than you did?
12      A.      No.
13      Q.      Did you have review sessions where
14    the two of you would get together and edit the
15    report?
16      A.      No.
17      Q.      How were Mr. Pinkard's put into the
18    report?
19      A.      We E-mailed the document backwards and
20    forwards.
21      Q.      So Mr. Pinkard would get an E-mail from
22    you, and then he would actually type in his own
23    edits, is that correct?
24      A.      That would be one of the ways.
25            The other way we might just meet and/or
0055
1        - Mr. Timothy C. Daw -
2    I might see him and say, "What's the best way of
3    expressing this, or have you got an idea?"
4      Q.      So then he would take that idea of
5    expression and he would go back to his office and
6    type in the expression into the report and then
7    E-mail it to you, or give it to you some way?
8      A.      Or he might just say it to me verbally.

9      Q.      And then you would take his verbal
10    words and type them into the report?
11      A.      Yes.
12      Q.      Are there times that you E-mailed the
13    report to Mr. Pinkard, and Mr. Pinkard made
14    modifications to the report and typed the edits and
15    then E-mailed it back to you?
16      A.      Yes.
17      Q.      On how many occasions did that occur?
18      A.      I could only recall once, but there may
19    have been more.
20      Q.      What makes you recall the one time that
21    that happened?
22      A.      That was -- I am thinking of just
23    before we finalized the report and he went through
24    the whole report and did a few changes.
25      Q.      And did you accept those changes and
0056
1      - Mr. Timothy C. Daw -
2    sign under that?
3      A.      The changes are accepted and I signed
4    on for.
5      Q.      Did you reject any changes that he made
6    on that particular occasion?
7      A.      I think we agreed not to accept some of
8    them.
9            I would not have rejected any of his
10    changes without consulting with him.
11      Q.      So after you got the E-mail with the
12    changes, you consulted with Mr. Pinkard, and then
13    accepted some of his changes and rejected others, is
14    that correct?
15      A.      That would be the sort of a joint --
16    that is sort of a joint way of doing things, yes.
17            I was the gatekeeper of the document,
18    so everything came through me.
19      Q.      And as the gatekeeper, who else did you
20    keep the gate with?
21            You now have wording from your
22    attorneys, and wording from Mr. Pinkard.
23            Was anyone else involved?
24      A.      These various notes have been discussed
25    generally within the company.
0057
1      - Mr. Timothy C. Daw -
2            I can't recall anyone providing any

3    other wording.
4        Q.      Did the attorneys edit this report?
5        A.      They didn't do a final edit, no.
6        Q.      Did they do an edit at any time?
7        A.      I asked for the help, particularly on
8    the topping and title of the report, make sure the
9    legalese was right.
10       Q.      Other than the legalese of the report,
11   did you get any edits from your attorneys?
12       A.      There were -- they did look at it and
13   there were one or two, which was turning it into
14   American from English mainly, I believe.
15       Q.      Who did you send the report to, or
16   which attorney?
17       A.      Mr. Vincent.
18       Q.      Did Mr. Vincent actually type in
19   changes to the report and send it back to you?
20              This would have been done by E-mail,
21   correct?
22       A.      Yes.
23              He might have done, or I think he
24   actually would have sent a comment like, what does
25   the word "latterly" mean, or something like that.
0058
1       - Mr. Timothy C. Daw -
2        Q.      Did you ever define what the word
3    "latterly" meant, or something like that, as you say?
4        A.      "Latterly" -- L A T T E R L Y -- which
5    is a word I use.  And Mr. Vincent was not convinced
6    it came across as the right phrase.
7               I seem to remember that one well.
8        Q.      Did Mr. Vincent make any definitions in
9    the report like defining terms?
10       A.      No.
11       Q.      How many times did Mr. Vincent edit the
12   report?
13       A.      He made suggestions -- he made
14   suggestions over the month or so we were writing it,
15   but there were no -- there were no more than helpful
16   suggestions at various times.
17       Q.      So the suggestions came over the course
18   of a month, is that what you are saying?
19       A.      About -- yes, about a month.
20       Q.      So there must have been four or
21   five revisions of the report that Mr. Vincent looked
22   at and made comments on and you incorporated his

23    comments, is that correct?
24        A.    No, that is not correct.
25        Q.    What's incorrect about that?
0059
 1      - Mr. Timothy C. Daw -
 2        A.    The report is in various sections and I
 3    think we may have reviewed it section by section.
 4        Q.    So then he would make a comment to the
 5    section, and you would put his comments into the
 6    section, and then he would go onto another section?
 7        A.    Yes.
 8        Q.    And how many -- approximately how many
 9    times did you go through this sectional process of
10    the report?
11        A.    I think for each section, we really did
12    it only once.
13        Q.    Did Mr. Vincent make actual editorial
14    changes where he changed the words in the document?
15        A.    He suggested different -- maybe
16    different words, but he didn't change the meaning.
17        Q.    How did he communicate those changes to
18    you?
19        A.    By E-mail.
20        Q.    And was that in the form of a revised
21    document where he actually typed in the words, or was
22    it in some other form?
23        A.    He -- most were just, "Tim, I didn't
24    understand what you are trying to say in this
25    sentence," type comments.
0060
 1      - Mr. Timothy C. Daw -
 2              When the document was near final
 3    format, he returned it to me with the legalese added
 4    top and tale of it.
 5        Q.    Did he ever actually take the document,
 6    edit it by typing new words into the document,
 7    deleting others, and return an E-mail document to
 8    you?
 9              This is Doug Vincent I'm talking about.
10        A.    Hum-hum.  Apart from that addition, I
11    can't recall him doing so.
12        Q.    Did Mr. Cooksey have any input into the
13    creation of the document?
14        A.    I think Mr. Cooksey was copied on all
15    E-mails, I believe, and any inputs he had would have
16    been fed back to me through Mr. Vincent.

17    Q.    So any comments that Mr. Cooksey had
18  were not given direct -- relayed directly to you, is
19  that correct?
20    A.    I don't recall any.
21    Q.    Have you kept records of all these
22  E-mails back and forth between yourself and Doug
23  Vincent, and to the extent Mr. Cooksey was involved
24  in those E-mails also?
25    A.    I have not kept a specific file of
0061
1    - Mr. Timothy C. Daw -
2  particular E-mails.
3        They may exist in among all the other
4  E-mails I possess.
5    Q.    So if I asked you to try to reconstruct
6  this file, you could at least try to do so, and you
7  could also obtain probably at least some of the
8  E-mails, is that right?
9    A.    By "reconstruct the file," you mean
10  construct a file of the E-mails?
11    Q.    Yes.
12    A.    Of course, I will try.
13    Q.    But do you believe there are actual
14  drafts in your system that you could look at
15  draft-by-draft how this report was put together?
16    A.    There is -- I know I have two drafts on
17  my system.  There may be others.
18    Q.    Do you know what drafts are on
19  Mr. Pinkard's system?
20    A.    No.
21    Q.    Does Mr. Pinkard have a separate system
22  than your system, or is it all stored on a central
23  server inside NetShift?
24    A.    He has a separate storage area.
25        MR. WINTER:  I would like to mark
0062
1    - Mr. Timothy C. Daw -
2        this as Exhibit 149, Plaintiff's exhibit.
3        (Curriculum Vitae of Tim Daw marked
4        Plaintiff's Exhibit 149.)
5    Q.    Can you describe what that document is?
6    A.    This is a CV I produced for your good
7  self.
8    Q.    And this is a list of all your relevant
9  experience and publications and educational
10  experience in the field of computer science, is that

11    correct?
12        A.    No.
13        Q.    How is that incorrect?
14        A.    All my relevant experience, I think you
15    used the phrase?
16        Q.    Yes.
17        A.    Every day I gather -- I gather new
18    experience in the world of computers, and to provide
19    a complete list would be a complete diary.
20        Q.    So this resume is incomplete, in the
21    sense that you produced this four or five months ago,
22    and there has been additional experience since then,
23    is that correct?
24        A.    This is -- this CV is just a mere
25    heading CV.
0063
 1        - Mr. Timothy C. Daw -
 2            It doesn't elaborate on what experience
 3    I may have had, or responsibilities I may have had.
 4        Q.    I see that you are currently a farmer,
 5    is that correct?
 6        A.    That's correct.
 7        Q.    Did you buy a farm in 1990?
 8        A.    I -- there was a family farming company
 9    of which I was a member, which we de-merged and I
10    obtained my own farm.
11        Q.    Has that farm grown in acreage since
12    1990?
13        A.    No.
14        Q.    So how many acres are on the farm?
15        A.    Two hundred forty.
16        Q.    And what is farmed on the farm?
17        A.    This year winter wheat.
18        Q.    So this year it is only winter wheat
19    that's on the farm?
20        A.    Winter wheat and set-a-sides --
21    S-E-T  A  S-I-D-E -- three words.
22        Q.    What is a set-a-side?
23        A.    Land left fallow.
24        Q.    And what percentage of the land is left
25    fallow this year?
0064
 1        - Mr. Timothy C. Daw -
 2        A.    Ten percent.  There is also
 3    environmental areas.
 4        Q.    What percent are the environmental

5    areas?
6        A.       About eighteen percent.
7        Q.       So other than the set-a-side, and the
8    environmental areas, it comprises 28 percent,
9    approximately the rest of the acreage is farmed with
10   winter wheat this year?
11       A.       Yes.
12       Q.       And in the past years what crops have
13   you farmed?
14       A.       In the last five years we have farmed
15   winter wheat and oil seed rape -- R-A-P-E.  I believe
16   it is known as canola over here.
17       Q.       Has the approximate acreage farmed
18   remained the same over the last five years?
19       A.       This year is the first year we have the
20   environmental.  Otherwise the area that's in the
21   environmental was in the wheat or the rape.
22       Q.       So in the past years ninety percent of
23   the acreage was farmed?
24       A.       Around ninety percent, yes.
25       Q.       And what percent of your time do you
0065
1        - Mr. Timothy C. Daw -
2    spend say this year managing the farm and working on
3    the farm?
4        A.       Less than five percent.
5        Q.       Do you have a full-time manager for the
6    farm?
7        A.       I have a management agreement with a
8    neighboring farmer, and they do all the actual
9    farming.
10       Q.       So you never run any of the equipment,
11   or do any of the harvesting, or do any of the labor
12   on the farm, is that correct?
13       A.       I just mow a bit of grass.  I don't do
14   any of the harvesting, plowing, scattering.
15       Q.       So the grass around the house,
16   residence?
17       A.       And some of the set-a-side.
18       Q.       So you actually live on the farm?
19       A.       Yes.
20       Q.       Prior to 1979, did you attend any
21   formal education?
22       A.       Yes.
23       Q.       Where was that?
24       A.       Do you want me to go right back to the

25   age of four?
0066
1        - Mr. Timothy C. Daw -
2     Q.      Sure, the age of four.  That's fine.
3     A.      I went to a primary school called
4    St. Francis in a place called Puwsey --
5    P U W S E Y -- in Wiltshire, England from the age of
6    four to until eight, which took me to 1969.
7            1969, I went to a preparatory school
8    called Sandle Manor -- S-A-N-D-L-E -- Manor in
9    Fording Bridgen, Hampshire, England.  That took me to
10   1973 or '74, when I went to Bradfield College near
11   Redding in Barkshire, England, which I left in
12   1978.
13    Q.      And then the next college was at
14   St. John's College at Oxford University, is that
15   correct?
16    A.      That's correct.
17    Q.      During your primary education at
18   St. Francis up through 1969, did that school have any
19   computers?
20    A.      No.
21    Q.      Had you ever worked a computer prior to
22   1969?
23    A.      No.
24    Q.      At Sandle Manor, which you attended
25   from 1969 through 1973, did that school have any
0067
1        - Mr. Timothy C. Daw -
2    computers that were accessible to the students?
3     A.      No.
4     Q.      Did you work on any computers in that
5    school?
6     A.      No.
7     Q.      Did you take any courses that related
8    to computers?
9     A.      No.
10    Q.      Did you take any computer courses that
11   related to development of source code?
12    A.      No.
13    Q.      So through 1973 you had absolutely no
14   experience in computers and/or computer source code,
15   is that correct?
16    A.      Yes.
17    Q.      Bradford (sic) College, you started in
18   approximately 1973, is that correct?

19      A.      I started when I was thirteen, I think.
20   That would be '73, '74.
21      Q.      Did you get a degree from Bradford
22   (sic) College?
23      A.      It is not a degree issuing place.  It
24   is a school.
25      Q.      Is it equivalent to a United States
0068
1      - Mr. Timothy C. Daw -
2   high school?
3      A.      I would guess so.  It is a school that
4   people from ages of fourteen to eighteen go to.
5      Q.      Did Bradford (sic) College have
6   computers that were accessible to the students?
7      A.      You had computing facilities.
8      Q.      Did you ever, during the time you were
9   at Bradford (sic) College, avail yourself of those
10   computing facilities?
11      A.      Just for record it is Bradfield, not
12   Bradford.
13              Yes, I did.
14      Q.      In what way?
15      A.      We did elementary programming using
16   punch cards.
17      Q.      In what language?
18      A.      I can't recall what language it was.
19      Q.      Did you have a course on using punch
20   cards?
21      A.      Yes.
22      Q.      Was the course -- how long was the
23   course?
24      A.      I think it was one term.
25      Q.      How many months would one term be in
0069
1      - Mr. Timothy C. Daw -
2   the U.K. system?
3      A.      It's a third of the year, my
4   recollection.
5      Q.      Was that your first experience using a
6   computer?
7      A.      Yes.
8      Q.      What kind of computer was it?
9      A.      It was a mainframe that was off site,
10   and the school bought time to process students'
11   programs on it.
12      Q.      What kind of programs did you write

13  back then?
14      A.      Something very very simple.
15              It may have been a simple mathematical
16  equation to solve.
17      Q.      You are an expert witness in this case,
18  correct?
19      A.      Correct.
20      Q.      And you are testifying as an expert in
21  computer source code, and computer product
22  development, correct?
23      A.      I'm testifying in kiosk browser
24  systems.
25      Q.      And no other --
0070
1       - Mr. Timothy C. Daw -
2               So you are limiting your expertise to
3  kiosk browser systems, is that correct?
4       A.      That's what I believe I am here to be
5  an expert in.
6       Q.      But is that all you are an expert in in
7  terms of computer systems?
8       A.      I have knowledge of other parts of
9  computing, yes.
10              So the answer is no to your question.
11      Q.      After this course in 1978, do you
12  believe you would have been qualified to be an expert
13  in computer science in the field of kiosk?
14      A.      No.
15      Q.      Do you believe that you would have been
16  qualified to be an expert in any regard with respect
17  to computers in 1978?
18      A.      I was a seventeen-year-old kid, and
19  computers were very primitive in those days.  I would
20  have not been.
21              I probably knew as much as most
22  seventeen-year-old kids who had one term's
23  experience.
24      Q.      So the answer to the question is that
25  you would have not been an expert in 1978?
0071
1       - Mr. Timothy C. Daw -
2       A.      Not -- No, I wouldn't have been an
3  expert.
4       Q.      Now, prior to 1978, besides that one
5  course that lasted a third of the year that had some
6  elementary computing in it, did you have any other

7    experiences prior to 1978 in computers?
8        A.    No.
9        Q.    In 1979 you went on to St. John's
10   College.  Can you describe where that college is, and
11   what your interests were at that college?
12       A.    All right.  Since St. John's College is
13   one of the old established colleges that make up
14   Oxford University, do I need to explain Oxford
15   University to yourself?
16       Q.    Sure, you could give a little
17   explanation.
18       A.    Oxford University is, it is one of the
19   primary universities in England, and would be world
20   renowned as a center of excellence.
21           St. John's College was one of the more
22   respected colleges founded in 1451, if my memory
23   serves me correct.
24           My course was originally titled
25   "Agricultural and Forest Sciences."  It was renamed
0072
1       - Mr. Timothy C. Daw -
2    to "Applied Biology," the more accurate description.
3           It was a three-year course, and covered
4    all parts of science relating to applying biology in
5    the real world.
6           You had opportunities to do additional
7    modules voluntarily, and I spent some time teaching
8    myself some programming in the University computer
9    labs.
10       Q.    What formal course education did you
11   take at St. John's College, and more specifically I
12   am looking for the names of the courses such as
13   biology, chemistry?
14       A.    There were a lot of modules in my
15   course.  But we didn't -- it is not a terminology
16   that we would have used of separate courses.  It is
17   within one large course.
18       Q.    So would it be more appropriate to
19   ask you what were the subject matters that you
20   studied?
21       A.    Yes --
22       Q.    And you took exams of course, right?
23       A.    -- at the end.
24       Q.    So the exams -- if you passed the
25   exams, you would get a degree, is that correct?
0073

1      - Mr. Timothy C. Daw -
2      A.      That's correct.
3      Q.      And if you didn't pass the exams, you
4  would not get a degree?
5      A.      Correct.
6      Q.      What were the -- what were the subject
7  matters of the exams?
8      A.      The subject matters were -- they --
9  general biology, botany, zoology, and farm economics,
10  rural economics, I guess is the phrase, history,
11  international trade I think was one area, forestry.
12         Those are the main ones I recall.
13  There may be some others.
14         Statistics -- sorry -- statistical
15  analysis.
16      Q.      Did you take any -- actually at the end
17  of this program, I take it you passed the exam,
18  right?
19      A.      Yes.
20      Q.      Did you get any degree or
21  acknowledgement?
22      A.      Yes, I got a -- well I ended up with an
23  M.A.
24      Q.      In what?
25      A.      I have an M.A. in Agricultural Forest
0074
1      - Mr. Timothy C. Daw -
2  Sciences.
3      Q.      Were any of the exams related to
4  computer source code?
5      A.      No.
6      Q.      Were any of the exams related to the
7  writing of computer source code?
8      A.      No.
9      Q.      Were any of the exams related to the
10  architecture of computing systems?
11      A.      No.
12      Q.      Were any of the exams related to kiosk
13  systems?
14      A.      No.
15      Q.      Were any of the exams related to
16  computers in general?
17      A.      You -- a knowledge of use of computers
18  as tools was required, or as potential tools.
19      Q.      I asked you whether there was an exam
20  that elicited your knowledge of those computer tools?

21      A.     There may have been a question within
22   one or two of the exams that may have asked for
23   knowledge on computing.
24             There was no specific exam on
25   computing.
0075
1      - Mr. Timothy C. Daw -
2      Q.     Whereas there was a specific exam on
3   zoology, for example?
4      A.     Yes.
5      Q.     And there was a specific exam on
6   botany?
7      A.     Yes.
8      Q.     And all the other ten or so specific
9   fields that you mentioned?
10      A.     Yes.
11      Q.     So there was no specific exam on
12   computer science, is that correct?
13      A.     No.  Computer science would have been
14   seen as a tool within say the statistics on how would
15   you use a computer -- would a computer be a useful
16   tool for this sort of analysis would be a sort of
17   question.
18      Q.     Would they actually test your ability
19   to write source code?
20      A.     No.
21      Q.     To write a program, to do statistics?
22      A.     No.
23      Q.     So at the end of your education at
24   Oxford University in 1981, isn't it true that at that
25   point in time you would not have been qualified as an
0076
1      - Mr. Timothy C. Daw -
2   expert in computers, is that correct?
3      A.     Yes.
4      Q.     Could you tell us what courses you have
5   taken over the course of your entire life, other than
6   the one you talked about in your school at, I believe
7   it was Sandle Manor -- I'm sorry, it was --
8      A.     Bradfield.
9      Q.     Bradfield College, that one-third
10   semester course, what formal education do you have in
11   computer science, or source code writing, or kiosks,
12   or anything relating to computers?
13      A.     I think I mentioned I did an informal
14   course at Oxford University.

15      Q.      I asked you for formal.  But now since
16  we are in informal courses, what is an informal
17  course?
18      A.      They had -- they made the facilities of
19  their computer laboratories available to
20  undergraduates.  And you could go along there and
21  they had work sheets that you could work through on
22  your own time.
23          This was the very early days of
24  computers, so there was a lot of interest.
25      Q.      So as worksheets and self-taught
0077
1      - Mr. Timothy C. Daw -
2  computer science?
3      A.      Yes.
4      Q.      For example, you didn't have a
5  professor that taught you a structured course?
6      A.      No.
7      Q.      You didn't have an exam at the end of
8  the course?
9      A.      No.
10      Q.      And if you didn't show up at the
11  computer lab, nobody really cared, is that correct?
12      A.      Correct.
13      Q.      So the computer lab was purely
14  voluntarily -- purely voluntary?
15      A.      Yes.
16      Q.      And, in fact, if you didn't show up at
17  all, it would not affect you progressing in your
18  degree, which you eventually obtained in agriculture,
19  is that correct?
20      A.      The whole of Oxford University is based
21  around voluntary attendance of everything.
22          There is no compulsion in any lectures
23  or practicals.  It is up to you to make your own way
24  through the system.
25      Q.      But there was no lecture that you
0078
1      - Mr. Timothy C. Daw -
2  attended on computer science on a regular course?
3      A.      No.
4      Q.      Other than that --
5          What do you mean by an informal course?
6  I talked about formal, which, of course, I think --
7          Why don't you describe to me what you
8  mean by informal course, and what you would mean by a

9    formal course?

10        A.      A formal course would be a professor

11   say setting out every Monday 9 o'clock, he will

12   deliver a lecture for the next eight weeks and we

13   will work through these particular items.

14            I think that's my understanding of a

15   formal course.

16            MR. COOKSEY:  Cathy O'Connor.

17            MR. WINTER:  Can I note for the

18        record that another attorney has entered

19        the room.

20            Her name is Cathy O'Connor.  She

21        represents all the defendants in this case,

22        I think.

23            Is that right?

24            MS. DUGAN-O'CONNOR:  I believe we have

25        appearances for ACH and for NetShift thus

0079

1     - Mr. Timothy C. Daw -

2        far.

3            MR. WINTER:  Not Montego?

4            MS. DUGAN O'CONNOR:  I don't know if

5        we have an appearance in the file, but I

6        believe we are representing them as well.

7            MR. WINTER:  Anyhow, we just like to

8        note who is in the room for the record.

9            MS. DUGAN O'CONNOR:  Absolutely,

10        understood.

11   EXAMINATION BY MR. WINTER:  (Cont'g)

12        Q.      So now we defined the formal course --

13        A.      Formal course.

14        Q.       -- why don't we talk about informal

15   course?

16        A.      An informal course is more

17   self-defining in this case as a self-taught course

18   where facilities are made available, and teaching

19   aids are made available, and help is made available

20   that a student can follow and gain some proficiency

21   in an area at his own time and speed.

22        Q.      Again getting back to my original

23   question I asked you about other than -- actually

24   would you -- strike that.

25            Would you consider the course that you

0080

1     - Mr. Timothy C. Daw -

2     had at Bradfield College when you were a teenager --

3    A.    Hum-hum?
4    Q.    -- a formal course?
5    A.    Yes.
6    Q.    That had a professor?
7    A.    Yes.
8    Q.    That had a textbook, or textbooks?
9    A.    We had text to learn from, and it was
10   also a regular once-a-week, twice-a-week basis.
11       Q.    Okay.  Excluding that formal course,
12   are there any other formal courses that you ever had
13   in computers?
14       A.    No.
15       Q.    You have no degree in computer science?
16       A.    I have no degree in computer science.
17       Q.    Is that the appropriate term in the
18   United Kingdom for going through college and getting
19   a certificate?  How would you phrase it?
20       A.    Yes, I would phrase it that way.
21       Q.    So you have no degree in computer
22   source code writing, is that correct?
23       A.    That's correct.
24       Q.    You have no degree in kiosk system
25   development?
0081
1    - Mr. Timothy C. Daw -
2    A.    That's correct.
3    Q.    You have no degree in computer
4    architecture development?
5    A.    Correct.
6    Q.    So when you left Oxford College in --
7    I'm sorry.  Strike that.
8        When you left Oxford University in
9    1981, it would be an accurate statement to say you
10   were not an expert in computers at that time?
11       A.    Just to provide a clarification, it is
12   the academic year in 1981 I left at the end of, so I
13   actually left in the June of 1982.
14       I don't think it alters the question.
15       Q.    I'm just reading from your resume.
16       A.    I'm looking at it.  It is not clear as
17   it should be.
18       Q.    Should we change the resume to read
19   1982, would that be more accurate?
20       A.    Yes.
21       Q.    Why don't you just scribble through '81
22   and put 1982?

23     A.     If that makes it clearer to you, I said
24   it is an academic year, calendar years.
25           The yes was how I had a formal degree
0082
1       - Mr. Timothy C. Daw -
2     in --
3     Q.     No, strike that.
4             MR. WINTER:  Why don't you read back
5         the question.  It will be easier.
6           (The court reporter read back the last
7         question as requested.)
8     A.     That would be an accurate statement.
9             MR. WINTER:  I think we can take a
10        break at this point.  We have been going
11        for awhile.
12            THE WITNESS:  If it is okay.
13            MR. COOKSEY:  Can we have a lunch
14        break?  It is noon.
15            MR. WINTER:  We can go off the
16        record.
17            VIDEO TECHNICIAN:  You are going off
18        the record.  The time is approximately
19        11:55 p.m., November 20, 2002.
20          (Time noted 11:55 p.m.)
21          (Recess)
22              ***
23          (Time noted 12:17 p.m.)
24            VIDEO TECHNICIAN:  You are back on
25        the record.  The time is approximately
0083
1       - Mr. Timothy C. Daw -
2         12:17 p.m.,  November 20th, 2002, and this
3         will be begin videotape number 2.
4     EXAMINATION BY MR. WINTER:  (Cont'g)
5     Q.     Just before the break we established
6     that at least as of 1982 you were not an expert in
7     computer science or computers, is that correct?
8     A.     Yes.
9     Q.     When did you become an expert in
10    computer science?  What date did you consider
11    yourself an expert?
12     A.     Even in 1982 I was above average in
13    computer science, just from my own interests in
14    informal courses I had taken.
15           As I stated earlier, I am here as an
16    expert in kiosk browser systems rather than an expert

17    in writing source code.  So if this was a patent
18    about writing source code, I would not be the right
19    expert for that.
20        Q.    So you have never become an expert in
21    writing computer source code?
22            Well, what would you say would be
23    accurate?
24        A.    I am not an expert in writing computer
25    source code, no.
0084
1        - Mr. Timothy C. Daw -
2        Q.    What are you an expert in?
3        A.    Several things.  But the relevant thing
4    here is kiosk browser systems.
5        Q.    But don't kiosk browser systems have
6    computer source code as part of it?
7        A.    They have computer software in them
8    which is different.
9            Software is a product of source code.
10    They have monitors, they have microprocessors, they
11    have -- they are a complete system.  The source code
12    is just a very small part of the whole system.
13        Q.    So we have established earlier that
14    NetShift sells, and has sold in the past kiosk
15    systems that include the monitor, the computer, the
16    software.  And the course of software includes the
17    source code to originate the software, is that
18    correct?
19        A.    That's correct.
20        Q.    So you are not an expert who is able to
21    testify about the source code that is part of the
22    kiosk system, is that correct?
23        A.    That's not -- that's not correct.
24        Q.    How is that not correct?
25        A.    To go back to your previous question,
0085
1        - Mr. Timothy C. Daw -
2    you said I'm not an expert in writing source code and
3    my answer to that is no.
4        Q.    Are you an expert in source code in
5    general?
6        A.    I consider myself qualified to opine on
7    the system architecture of what source codes should
8    go into a project.
9        Q.    And what formal training do you have in
10    system architecture for computers?

11    A.    No formal training.
12    Q.    So what background leads you to believe
13  that you are an expert in computer architecture?
14    A.    I have been keeping a wife and children
15  clothed and fed for the last six, seven years by
16  using my skills in that area.
17    Q.    With which companies for the last six
18  or seven years?
19    A.    The Internet Shop, Daw Systems,
20  NetShift.
21    Q.    So in the Internet Shop, you actually
22  designed computer architecture -- I'm sorry, you
23  designed software architecture?
24    A.    Yes.
25    Q.    Let's go back to your resume.
0086
 1    - Mr. Timothy C. Daw -
 2        From 1992 to 1995 you were with
 3  Cannings Cross Crop Protection Limited, right?
 4    A.    Yes.
 5    Q.    And in your efforts through 1995 --
 6  actually why don't you tell me what Cannings Cross
 7  Crop Protection is about and what you did for them?
 8    A.    This was a company that I owned myself
 9  and I was involved in supply of agronomy -- A G R O N
10  O M Y -- advice and materials.
11    Q.    And through 1995 and the end of year,
12  in your dealings at Cannings, you were clearly not a
13  computer expert, is that correct?
14    A.    I was -- I mean right from 1981 I have
15  known computers, and done all the things an
16  enthusiast does with computers.
17        I also used computers in the business
18  of Cannings Cross Crop Protection, I think was your
19  specific question, data base products, some attempt
20  at databasing advice.
21        And, obviously, customer relationship
22  records and accounting records were handled on the
23  computer.
24    Q.    But still through 1995 you would
25  not consider yourself a computer expert, is that
0087
 1    - Mr. Timothy C. Daw -
 2  correct?
 3    A.    I was -- I would have had above average
 4  ability in computers.

5      Q.     Would you have been in a position to
6    testify as an expert in 1995 in a lawsuit such as
7    this one?
8              MR. COOKSEY:  I'm sorry.  What year,
9       1995?
10             MR. WINTER:  Yes.
11     A.     I would not have had the experience of
12   kiosk systems, to be an expert in kiosk systems, and
13   I certainly wouldn't have had the expert in browsing
14   technology in 1995, as web browsers were in the very
15   beginning in 1995.
16     Q.     And you certainly wouldn't have had the
17   experience in system architecture, isn't that
18   correct?
19     A.     I would not be as experienced as I am
20   now.
21     Q.     So in 1995 you would not have been an
22   expert in computers, isn't that true?
23     A.     That's not a completely logical
24   sequence of questions.
25     Q.     So is the answer --
0088
1     - Mr. Timothy C. Daw -
2              What's the answer to my question?  Am I
3    inaccurate?  Is it true or false?
4     A.     I would be -- I had expertise in
5    certain areas of computers in 1995.
6     Q.     Did you write source code for Cannings?
7     A.     No.
8     Q.     Did you do system architecture design
9    for Cannings?
10     A.     Yes.
11     Q.     In what way?
12     A.     I designed the entire setup of how I
13   wanted to keep records and management of customers
14   and products and advice.
15     Q.     On what program?
16     A.     I used several different programs --
17   spread sheets and data bases.
18     Q.     What are the several different programs
19   you used?
20     A.     I can't recall the name of the first
21   spread sheet.  It is one of the first ones that came
22   out.  I used --
23              I moved most of it to Microsoft Access
24   when that was very first released, version O.9.

25          I will get the hang of this language
0089
1        - Mr. Timothy C. Daw -
2    one day.
3          I remember that particularly because
4    that was the start of an explosion in new programs,
5    which I was excited to have been involved in and
6    follow about.
7     Q.    What caused you to terminate efforts
8    with Cannings in 1995?
9     A.    The margins were bad and getting worse.
10   By margins meaning profit margins.
11          And also I had been interested in the
12   internet from '93, '94, and I believed there was an
13   opportunity to get to form a new business in a new
14   space, which was the Internet Shop.
15    Q.    Did you dissolve Cannings?
16    A.    It has now been dissolved.
17    Q.    When was it dissolved?
18    A.    Last year.
19    Q.    Did it conduct business up until last
20   year?
21    A.    No.
22    Q.    When did it cease its day-to-day
23   business?
24    A.    90's, '96 maybe.
25    Q.    When did you cease deriving income from
0090
1        - Mr. Timothy C. Daw -
2    Cannings?
3     A.    '95.
4     Q.    And Cannings now is just -- has been
5    completely dissolved and no longer exists?
6     A.    By Cannings, Cannings Cross Crop
7    Protection, yes.
8     Q.    I have been referring to Cannings in
9    the last ten questions.  Did you understand that as
10   Cannings Cross Crop Protection Limited?
11    A.    Yes.
12    Q.    Can you describe the business of the
13   Internet Shop?
14    A.    The Internet Shop was the first local
15   call ISP in Wiltshire.  It provided access to the
16   internet from big towns such as Wyndom, Handover,
17   Milbrook for a local call.
18          It had a public -- a public shop where

19  people could come in and use the internet and learn
20  about the internet and talk to experts.
21        The business was also franchised out to
22  four or five other locations around the country,
23  which ran very similar operations.
24    Q.    By ISP, you mean internet service
25  provider?
0091
1    - Mr. Timothy C. Daw -
2    A.    Yes.
3    Q.    So a local home owner would come to
4  your company to -- and your company would provide
5  them access to the internet, is that correct?
6    A.    Correct, yes.
7        We also did web page design, and all
8  the other activities you would expect from an
9  internet company.
10    Q.    Were you the sole owner of the Internet
11  Shop?
12    A.    Originally.
13    Q.    And did there come a time when you took
14  in a partner?
15    A.    Yes, I took on three partners.
16    Q.    That was during the one year that it
17  was in business?
18    A.    Yes.
19    Q.    Who were the three partners?
20    A.    They were Michael Carr -- C-A-R-R, Tim
21  Taylor -- T-A-Y-L-O-R -- and a Charles Taylor -- no
22  relation.
23    Q.    In 1996 you sold the business to a
24  competitor, is that correct?
25    A.    Not to a competitor.  To a company who
0092
1    - Mr. Timothy C. Daw -
2  wanted to move into the space.
3    Q.    So the reference on your resume that
4  says "sold company to competitor", that's inaccurate?
5    A.    That's actually owned under Cannings
6  Cross Crop Protection.
7        You were talking about the Internet
8  Shop, I believe.
9    Q.    I thought you just said Cannings was
10  dissolved?
11    A.    Go back to that particular one.  The
12  business of the company was sold to a competitor.

13    Q.    And when was that?

14    A.    In '95.

15    Q.    So you operated the Internet Shop for

16  six months, is that correct?

17    A.    We operated the -- I was in the

18  business of the Internet Shop for about a year.  The

19  actual company of the Internet Shop was for about six

20  months.

21    Q.    And the company was sold for one

22  million pounds, is that right?

23    A.    For equities worth one million dollars,

24  not pounds, unfortunately.

25    Q.    And what equity?  In which company did

0093

1    - Mr. Timothy C. Daw -

2  you take equity?

3    A.    A company called Aspen.  Something like

4  as Aspen Communications.

5    Q.    And how many dollars of Aspen

6  Communications did you personally receive?

7    A.    I would have received --

8    Q.    Dollars in stock, I mean?

9    A.    In stock?  I received a quarter of

10  that, two hundred fifty thousand.

11    Q.    And what is the business of Aspen?

12    A.    They were a general multimedia

13  communications company.

14    Q.    Did you ever work for Aspen?

15    A.    No.

16    Q.    Do you still own the stock in Aspen?

17    A.    No.

18    Q.    When did you stop owning the stock in

19  Aspen?

20    A.    I had no confidence in Aspen, so I

21  tried selling the stock as soon as I received it.

22  And I would have gotten rid of it all by the end of

23  '96, at which time it was only worth ten percent of

24  what it was in the beginning of '96.

25    Q.    So you may have made twenty-five

0094

1    - Mr. Timothy C. Daw -

2  thousand dollars in total from the stock?

3    A.    A little bit more.

4    Q.    Less than thirty-five thousand dollars?

5    A.    I would guess fifty thousand.

6    Q.    After you sold the Internet Shop to

7    Aspen, did you then immediately form Daw Systems?
8        A.    Yes.
9        Q.    Within the first month or two, is that
10   correct?
11       A.    I formed it, tried to walk out of one
12   door into the other.
13       Q.    What was the business of Daw Systems?
14       A.    It was -- it started as a general
15   consultancy and vehicle for myself, and from day one
16   I very quickly within a month specialized in internet
17   kiosk.
18       Q.    When you say general consultancy, what
19   do you include in that broad term?
20       A.    Well, when I formed it I didn't know
21   what I was going to be a consultant in; but if
22   someone was going to offer me a contract, I needed a
23   vehicle to do that.
24       Q.    So it would be business consulting when
25   you first formed it.  You would --
0095
1        - Mr. Timothy C. Daw -
2        A.    I would have just general consultancy.
3        Q.    What would you have consulted in in
4    business consultants?
5        A.    I would have consulted about anything
6    they wanted to pay me about.
7        Q.    Including your agricultural background?
8        A.    I might have.
9              It is a very hypothetical question.
10       Q.    Did you ever do brochures when you
11   first started Daw Systems?
12       A.    No.
13       Q.    Who was your first client in this
14   consultancy?
15       A.    My first client was Aspen
16   Communications, who commissioned me to write a report
17   on internet kiosks.
18             Can I just clarify that answer?
19             They commissioned me to write a report
20   on something that I thought was going to be big in
21   the industry.
22             My role had obviously been as a
23   visionary in the Internet Shop, and I chose internet
24   kiosk as a subject that I thought was going to be
25   growing rapidly in this area.
0096

1     - Mr. Timothy C. Daw -
2     Q.     So they just wanted you to consult
3   about something big, and you chose internet kiosk; am
4   I understanding that right?
5     A.     A big opportunity, yes.
6     Q.     So you defined the opportunity to them?
7     A.     Yes.
8     Q.     So when was the first month in which
9   you first started to focus on internet kiosks?
10     A.     I had been -- as I explained about the
11   Internet Shop, we were a public shop front, the
12   people could walk in.  We weren't a cyber cafe.  We
13   had public terminals for people to use, and right
14   from the first day of opening we had all the problems
15   of kids and computer users coming in and upsetting
16   all those lovely systems.
17           So I was interested from right back in
18   '95 of how to public-proof access to the internet.
19   That developed into an interesting kiosk the end of
20   '95 and the beginning of '96.
21           The Internet Shop was sold in the end
22   of March '96, and I wrote the report for Aspen in --
23   I started writing it in April of '96.
24     Q.     When you say upsetting the computers,
25   what do you mean by upsetting the computers?
0097
1     - Mr. Timothy C. Daw -
2     A.     They were, the phrase, tampering with
3   the operating system, or downloading unsuitable
4   material, or generally causing the computers to
5   crash.
6     Q.     Were there any other problems you
7   incurred, specific problems other than those that
8   your customers caused during that time frame?
9     A.     Let's just -- unsuitable material was
10   the major one.
11           They were always -- there was a more
12   general problem of the browsers were too complicated
13   for people walking in off the street to use
14   intuitively.  And --
15     Q.     So basically the problems are
16   unsuitable material, the crash of the computer?
17     A.     Hum-hum, downloading material.
18     Q.     Downloading material?
19           The browsers were too complicated, and I
20   think you said they had access to the operating

21    system?
22        A.    Yes, they could access the operating
23    system.  They could close the browser and access the
24    operating system.
25        Q.    And why was that a problem?
0098
1        - Mr. Timothy C. Daw -
2        A.    We were providing these machines very
3    specifically for people to access the web.  From the
4    operating system they could use the machine for other
5    things.  These machines were on network.  They could
6    do things you didn't want them to do with the
7    computers.
8        Q.    They were on a network, the computers?
9        A.    Yes.
10        Q.    And so they would have access to the
11    internal network of the Internet Shop?
12        A.    Yes.
13        Q.    And that's a big problem, right?
14        A.    That would have been a big problem,
15    yes.
16        Q.    At that point in time at the Internet
17    Shop, did you have knowledge of any kiosk software
18    products?
19        A.    We looked at running the browsers in
20    what's called kiosk mode.
21        Q.    But at that point in time, there was
22    no -- you didn't look at a specific software product
23    such as NetShift, or an equivalent product like that
24    to solve these problems?
25        A.    No.  And the machine -- these machines
0099
1        - Mr. Timothy C. Daw -
2    were to show people how the internet worked, and
3    maybe a kiosk product like that would not have been
4    suitable.
5            We were teaching people.  People were
6    learning how to use these browsers as well as the
7    internet.
8        Q.    So was it in April of 1996 that you
9    first became interested in internet kiosk business on
10    the consulting contract for Aspen?
11        A.    Within a month or so of that, yes.
12        Q.    So it may have been May of 1996?
13        A.    I believe it was April, but -- when I
14    began.

15      Q.      And what did you do in furtherance of
16   that project?
17      A.      Again, this was to build a complete
18   system.  I went and talked to experts at the various
19   components that made up kiosk, specifically touch
20   screen manufacturers and kiosk enclosure
21   manufacturers, and followed up their suggestions.
22              I also searched the internet for any
23   extra information about this whole area.
24      Q.      So prior to April of 1996, you were not
25   an expert in internet kiosk, is that correct?
0100
 1      - Mr. Timothy C. Daw -
 2      A.      Correct.
 3      Q.      Prior to April of 1996, you had no
 4   knowledge of system architecture for internet kiosk,
 5   is that correct?
 6      A.      Correct.
 7      Q.      Prior to April of 1996, you would not
 8   be qualified to testify as an expert witness in a
 9   patent case involving internet kiosks, is that
10   correct?
11      A.      Correct.
12      Q.      In April of 1996, and shortly
13   thereafter, did you ever do a competitive analysis of
14   internet kiosk software that was already on the
15   market?
16      A.      I reviewed several products.
17      Q.      Isn't it true that one of the products
18   you actually ordered and installed on a computer was
19   the Lexitech product, which is now known as Netkey?
20      A.      Yes.
21      Q.      So one of the ways you started to
22   become an expert witness was to study the Netkey
23   product, isn't that right?
24      A.      I reviewed all available product -- all
25   available products, including Netkey.
0101
 1      - Mr. Timothy C. Daw -
 2      Q.      So it would be accurate to say that one
 3   of the ways you became an expert was by studying the
 4   Netkey product, among others?
 5      A.      Among others.
 6              I can't remember actually learning much
 7   from the Netkey product.  That was my qualification,
 8   but in a broader sense, yes.

9     Q.     What are the products you looked at in
10    1996?
11    A.     I can recall one from Digital
12    Equipment.  The name of the product I can't recall.
13           There was one from Microtouch called
14    Prospecta, and one from Rocky Mountain Multimedia,
15    and also the kiosk modes that were built into the
16    various browsers at the time.
17           Those are the ones I recall.
18    Q.     Now today you are an expert by your own
19    designation --
20    A.     Hum-hum.
21    Q.     -- in internet kiosk systems, right?
22    A.     Yes.
23    Q.     When did you become an expert in
24    internet kiosk systems?  When is the actual date that
25    you would --
0102
1     - Mr. Timothy C. Daw -
2     A.     I would say by the end of May,
3     beginning of June '96, I knew as much about kiosk
4     systems as anyone did.
5     Q.     Would that knowledge have included
6     source code?
7     A.     No.
8     Q.     So basically up through June, you would
9     have had no access whatsoever to any source code for
10    internet kiosk, isn't that correct?
11    A.     Yes.
12    Q.     So by reviewing the Netkey -- and by
13    Netkey, what I'm doing is including -- it used to be
14    named Lexitech?
15    A.     The product was always called Netkey.
16    Q.     But the product was called Lexitech at
17    one time.
18    A.     Yes.
19    Q.     And eventually changed to Netkey?
20    A.     Yes.
21    Q.     And for purposes of this deposition,
22    since there is no real distinction, because it is a
23    change of name, I would like to call both of those
24    companies Netkey?
25    A.     I understand.
0103
1     - Mr. Timothy C. Daw -
2     Q.     And if it becomes useful to separate

3     the two out, which I don't think is going to be
4     useful, I will let you -- I will ask a specific
5     question about Lexitech?
6         A.     Understood.
7         Q.     So when you had --
8                Did you actually order the software
9     products of -- let's take them one at a time --
10    Netkey?
11        A.     Yes.
12        Q.     Rocky Mountain?
13        A.     No.
14        Q.     Microtouch?
15        A.     Microtouch is Prospecta, yes, or I
16    obtained a copy.
17        Q.     How would you had obtained a copy?
18        A.     I bought Touch Screens from Microsoft,
19    and I have a feeling they supplied me a copy of
20    Prospecta with it.
21        Q.     And how about Digital Equipment, did
22    you obtain their software?
23        A.     No, I didn't.
24               Your original question was purchased,
25    not obtain.
0104
1       - Mr. Timothy C. Daw -
2        Q.     Well, why don't we talk about obtain.
3     It will be easier.
4        A.     I think Rocky Mountain, I believe I saw
5     a demonstration version of their software -- a demo
6     version of their software.
7        Q.     So when you say you saw it, you meant
8     you actually had a computer disk with a demo version
9     of their software, loaded it onto a computer, and saw
10    it operate, is that correct?
11       A.     Rather than have a computer disk, I
12    downloaded a copy from the internet onto a computer,
13    and would have run it.
14       Q.     So what with respect to all of this
15    software that you had, the Netkey software, the
16    Prospecta software, the Rocky Mountain software, and
17    even if you include the kiosk mode, the browser
18    software, you hadn't had any access whatsoever
19    through July of 1996 to any source code whatsoever,
20    is that correct?
21       A.     Correct, I never had access to those
22    source codes.

23          MR. COOKSEY:  Gene, are you at a
24      point we can break for lunch?
25          MR. WINTER:  Yes, a few more
0105
1    - Mr. Timothy C. Daw -
2      questions.
3          MR. COOKSEY:  All right.
4    Q.     Is it possible to determine the details
5  of the system architecture of a product without
6  accessing the source code?
7    A.     The fine details, no.
8    Q.     So in July of 1996, because you didn't
9  have the fine details, you could not have been as
10  knowledgeable as anybody in the field of kiosk
11  software, isn't that correct?
12    A.     That is not correct.
13    Q.     Well, certainly somebody knowledgeable
14  about the source code of the Rocky Mountain software
15  would be more knowledgeable than you, right?
16    A.     They might have -- To be an expert
17  across this whole system architecture, I take as a
18  balance of knowledge on the whole area.  The fine
19  details of the source code construction.  I like the
20  like the fine details of the operating system
21  program.
22          I have no idea how Microsoft Windows is
23  constructed yet.  That's an integral part as well.
24          So my belief is that the fine details
25  of how the software is written is not an integral
0106
1    - Mr. Timothy C. Daw -
2  part of being an expert in our system.  Right across
3  the whole field, it is the functionality that is
4  important.
5    Q.     So you are an expert of functionality
6  of kiosk systems, not of the underlying source code
7  of the computer system?
8    A.     I think that's a fair summary, yes.
9    Q.     And is it your testimony by July of
10  1996, that you would be an expert in computer
11  kiosks?
12    A.     Yes.
13    Q.     So in the course of two months you have
14  become an expert from not being an expert, is that
15  correct?
16    A.     That's correct.

17      Q.      And you became an expert by obtaining
18  the Netkey, the Prospecta, and the Rocky Mountain
19  software and studying that software, is that correct?
20      A.      No.  I was --
21              Do you want me to expound?
22      Q.      Sure.
23      A.      Before March '96, I was -- I would
24  guess I was above average.  I had taken a detailed
25  interest in this area.  I then had the luxury of
0107
1       - Mr. Timothy C. Daw -
2   being able to concentrate entirely on these systems
3   for two months.
4       Q.      Has anybody ever retained you as an
5   expert in any capacity in the field of internet
6   kiosks, other than NetShift?
7       A.      Yes.
8       Q.      Who is that?
9       A.      Aspen, as mentioned.
10              That was in March -- April '96, and in
11  May, 1996, I constructed an internet kiosk for a
12  company called -- the web factory in Stoke Upon,
13  Trent.
14      Q.      What software did you use in your role
15  as an expert with the Web Factory?
16      A.      That's what I bought a copy of Netkey
17  for.
18      Q.      And so installing Netkey for the Web
19  Factory kiosk was part and parcel of your being an
20  expert in the field, now with two months of learning,
21  is that correct?
22      A.      Yes.
23              MR. WINTER:  I will break for the
24          lunch break.
25              Thank you.
0108
1       - Mr. Timothy C. Daw -
2               VIDEO TECHNICIAN:  You are going off
3           the record.  Time is approximately 12:54
4           p.m., November 20th, 2002.
5               LUNCHEON RECESS
6                   ***
7               AFTERNOON SESSION
8               (Time noted 2:15 p.m.)
9               VIDEO TECHNICIAN:  Back on the
10          record.

11          Time noted 2:16 p.m., November 20th,
12      2002.
13          MR. WINTER:  The Court reporter
14      wanted us to clarify one point of the
15      record.
16          Mr. Daw was shown the first page of
17      the document marked "Confidential,
18      Attorneys' Eyes Only," Defendants' Exhibit
19      A, and he was shown only the first page.
20      And so in the transcript I would ask the
21      Court Reporter to just make a photocopy for
22      Mr. Daw's deposition of the first page.
23          Mr. Daw was also shown another page in
24      there, but I put that on the videotape so
25      you will have a record of what page he was
0109
1      - Mr. Timothy C. Daw -
2          shown and what the -- I put a yellow sticky
3          over the numbers.
4          Is that satisfactory to you,
5      Mr. Cooksey?
6          MR. COOKSEY:  Yes.
7          MR. WINTER:  Is that satisfactory to
8      you, Mr. Court Reporter?
9          COURT REPORTER:  Yes.
10  EXAMINATION BY MR. WINTER:  (Cont'g)
11      Q.     Now, in June or so of 1996 -- we will
12  take you back to that time frame -- you suddenly
13  became an expert; right?
14          That was your earlier testimony, is
15  that correct?
16      A.     I mean there is always bound to be one
17  day when you are not an expert and the next day you
18  are an expert.  And if I got to put down where that
19  hour, second, minute happened, I think that's as good
20  a place as any.
21      Q.     Subsequent to you becoming an expert,
22  did you ever take on any consulting work as an expert
23  in computers after that June 1996 time frame?
24      A.     Not independently of the company.
25          Daw Systems was then fully operational,
0110
1      - Mr. Timothy C. Daw -
2  and that's what we were doing, was providing
3  consultancy, and also obviously we then moved into
4  the software supply.

5     Q.    But by that time Daw systems was solely
6   on internet kiosk, right, by June of 1996?
7     A.    Yes.
8     Q.    So my question is, other than with Daw
9   Systems Limited --
10         Is that the correct name, Daw Systems
11   Limited?
12     A.    Yes.
13     Q.    And I will refer to that as Daw, if
14   that's okay?
15     A.    Yes.
16     Q.    And Daw Systems Limited eventually
17   became NetShift, right?
18     A.    Not quite correct, but --
19     Q.    What happened between Daw and NetShift?
20   I mean how did the two entities merge or come
21   together?
22     A.    NetShift Software was a clean
23   brand-new company formed by myself and Mike Diamond.
24   And Nigel Seed, I think he came aboard at the
25   formation of it as well.
0111
1     - Mr. Timothy C. Daw -
2         We -- Daw Systems had the marketing
3   right, the world-wide marketing right to the product
4   called NetShift at the time, and it gave it to the
5   new company called NetShift.
6         There was no other transaction between
7   Daw Systems and NetShift.  So Daw Systems then became
8   a shell company.
9     Q.    And when did it become a shell company?
10     A.    On the formation of NetShift Software
11   in 1997.
12     Q.    And so since 1997 Daw Systems really
13   conducts no business activity?
14     A.    Correct.
15     Q.    Does it still have a license with
16   NetShift?
17     A.    No.
18     Q.    Was there any compensation for the
19   license at any time?
20     A.    By license --
21     Q.    Well, I thought you gave -- I thought
22   Daw Systems Limited gave NetShift rights to its
23   product, right?
24     A.    Yes, it gave -- transferred all the

25    rights across to NetShift.
0112
1        - Mr. Timothy C. Daw -
2      Q.    Oh, so it was transferred?
3      A.    Yes.
4      Q.    Was there a compensation for that?
5      A.    No.
6      Q.    But you obtained stock ownership in
7    NetShift at that point?
8      A.    Yes.
9            Well -- well, yes, I did.
10     Q.    Okay.  So it is really quite possible
11   to look at the marketing of the NetShift product --
12   the development and marketing of the NetShift
13   product, that all occurred after June of 1996, right?
14     A.    Yes.
15     Q.    Since June of 1996, other than Daw
16   Systems Limited, and your work with NetShift Software
17   Limited, have you done any expert consultancy of any
18   type in the computer field for others?
19     A.    No.
20     Q.    So since June of 1996, you've never
21   been hired as a computer expert by anyone, is that
22   correct?
23     A.    Yes, that's correct.
24     Q.    And since June of 1996, you've never
25   been hired as a source code expert by anyone else, is
0113
1        - Mr. Timothy C. Daw -
2    that correct?
3      A.    Correct.
4      Q.    And since June of 1996, you have never
5    been an expert witness in any type of proceeding for
6    anyone, is that correct?
7      A.    Correct.
8      Q.    That's whether or not it related to
9    computers or not, right?
10     A.    Correct.
11     Q.    So this was the first time you've ever
12   been an expert witness in any case whatsoever?
13     A.    Yes.
14     Q.    And certainly your first time ever
15   being an expert witness in a patent case?
16     A.    Yes.
17     Q.    Have you ever authored any papers in
18   computer science?

19      A.      Without going down the line of what
20   is a paper, could you define what you mean by a
21   paper?
22      Q.      Sure.  Something that is published in a
23   scientific journal.
24              I will start with that.
25      A.      No.
0114
1      - Mr. Timothy C. Daw -
2      Q.      Have you ever authored work that was
3   published by a third party?
4      A.      Yes.
5      Q.      What is that?
6      A.      I have authored some -- I think we call
7   them white papers -- on various aspects of the kiosk
8   industry that have been published on web sites and
9   magazines related to the kiosk industry.
10      Q.      Is that listed in your expert report or
11   on your resume?
12      A.      No.
13      Q.      Are you aware that under the Federal
14   Rules, you are required to list publications in your
15   expert report or resume when you submit one, that
16   that's part of the rules?
17      A.      I wasn't aware of it.
18              MR. COOKSEY:  That's true for
19         retained experts.  He is not a retained
20         expert.
21      Q.      Is there anywhere your publications,
22   internet publications are listed?
23      A.      No, not that I am aware of.
24      Q.      How many internet publications do you
25   have?
0115
1      - Mr. Timothy C. Daw -
2      A.      Using the broadest sense of
3   publication, I couldn't say.
4      Q.      In your expert report that you have a
5   copy of, have you referred to any publications that
6   you are going to use in front of the jury to qualify
7   yourself as an expert?
8      A.      No.
9      Q.      Is that true with your resume also?
10      A.      Yes.
11      Q.      So nowhere in the materials you
12   provided as an expert have you listed any

13   publications that you intend to rely on to show the
14   jury or the judge in this case that you are an
15   expert?
16       A.    Correct.
17       Q.    Are you an expert in patent law?
18       A.    No.
19       Q.    Are you an expert in determining
20   whether or not an internet kiosk infringes claims of
21   a patent?
22       A.    I can -- yes.
23       Q.    So how do you determine whether a
24   patent is infringed or not as an expert witness in
25   patent infringement analysis?
0116
 1       - Mr. Timothy C. Daw -
 2       A.    I don't believe you could infringe a
 3   patent.  I believe you infringe claims of patent.  Is
 4   that correct?
 5       Q.    Yes, you can infringe claims of a
 6   patent.  But infringement of any one claim is often
 7   regarded as infringement of the patent.
 8            But, anyhow, why don't you describe to
 9   me what the analysis is as an expert witness in
10   patent infringement interpretation?
11       A.    You take a patent -- you have to take
12   each claim separately.  And for each claim there is a
13   set of -- a set of objects or methods described in
14   the claim.  And you then match.
15            On one side you have the alleged
16   infringing product, and on this side you have the
17   description in the claim and you compare "A."  Has it
18   got "A", has it got "B", has it got "C"?
19            If all items in the claim are met in
20   the alleged infringing object, it infringes.
21       Q.    Is that the only way a patent claim can
22   be infringed?
23       A.    That would be my understanding -- that
24   would be direct infringement.
25            There is contributory infringement, and
0117
 1       - Mr. Timothy C. Daw -
 2   inducing to infringe.
 3       Q.    What are those?
 4       A.    Contributory infringement --
 5            There is also infringement under the
 6   doctrine of equivalence.

7            Contributory infringement is when a
8    product is supplied that has no other substantial use
9    apart from creation of an infringing product.  And
10   inducing is often the sale of an object to get
11   someone else to encourage the infringement of a
12   patent, encourages -- yes, encouraging infringement
13   of a patent.
14            And you can also -- apart from the
15   direct reading of a patent -- you can use equivalence
16   where one part of the claim, an object can be
17   different to that that's in the claim, but it must be
18   insubstantially different and it would still
19   infringe.
20       Q.     And when did you become an expert in
21   these areas of patent law?
22       A.     Shortly after you sent me your first
23   letter.
24       Q.     And what steps did you take to become
25   an expert?
0118
1    - Mr. Timothy C. Daw -
2        A.     I took several steps.  I read up as
3    much as I could, both in publications and books, and
4    asked questions of attorneys to help me understand
5    what they were talking about.
6        Q.     Which attorneys?
7        A.     There was, apart from the two gentlemen
8    here on the left, Mr. Vincent and  Mr. Cooksey, there
9    was also -- we have an intellectual property
10   specialist firm of lawyers in England that we retain,
11   and there were two lawyers there that I talked to
12   specifically.
13       Q.     What two lawyers?
14       A.     The names were Ben Goodyear, and.
15   Sulinna Connal -- S U L I N N A   C O N N A L, I
16   think.
17       Q.     So prior to receiving the letter
18   alleging infringement, you were not an expert in
19   patent law at all?
20       A.     I had done some research previously.
21            MR. COOKSEY:  I am going to object.
22            He never said he was an expert in
23       patent law.
24            He said he was an expert in
25       evaluating infringement of patent claims.
0119

1      - Mr. Timothy C. Daw -
2      Q.     When did you become an expert in
3   evaluating infringement of patent claims?
4      A.     I have -- my expertise has grown since
5   1998.
6      Q.     And your expertise was learned solely
7   in connection with this case, right?
8      A.     That prompted it.
9          I have taken a general interest in the
10  US patent system since, as anyone involved in the
11  software industry has.
12     Q.     Have you analyzed -- other than the two
13  patents involved in this lawsuit, have you analyzed
14  other patents for possible infringement?
15     A.     Yes.
16     Q.     What other patents?
17     A.     I can't recall any particular names or
18  numbers.
19     Q.     Do you recall who owned the patents?
20     A.     The only name that -- these other
21  patents that have been issued in the kiosk space, I
22  have kept a watching eye as patents had been issued.
23          The only other patent I can recall by
24  name is, I think, Veeman (phonetically), which is one
25  of the prior ones mentioned in the 'O71.
0120
1      - Mr. Timothy C. Daw -
2      Q.     Have you ever studied any other patent
3   owned by NetShift for purposes of analyzing
4   infringement?
5      A.     No.
6      Q.     Did you ever apply for a patent where
7   you are the named inventor?
8      A.     No.
9      Q.     Has NetShift ever applied for a patent?
10     A.     No.
11     Q.     Does NetShift intend to apply for a
12  patent in the next year?
13     A.     To give a long answer, when I was -- I
14  took my family name, which is Babitch (phonetically),
15  and there was a person called Charles Babitch in the
16  Victorian Times who invented computers, and he had a
17  strong aversion to patents, and I think I actually
18  maybe even inherited that.
19          So I would say, I certainly have not
20  encouraged the company to seek a patent.  Whether

21    management would want to do so, I don't know.
22        Q.      So you are adverse to patents in
23    general?
24        A.      The current misuse of them, yes.
25        Q.      And what do you mean by the current
0121
1        - Mr. Timothy C. Daw -
2    misuse of them?
3        A.      I think particularly talking as one --
4    anyone in the art of computer software will be
5    conversant with the debate that's gone on about
6    various software patents that have been issued and
7    various, frankly, nonsensical patents that do get
8    issued particularly in the States.
9              And as a visitor to this country, I
10    don't want to be rude about your systems, but I think
11    that's a generally held view, which I would agree
12    with.
13        Q.      What's a generally held view?
14        A.      That there have been too many patents
15    of dubious validity issued.
16        Q.      So you have a real bias against the
17    issuance of patents in the computer software field,
18    is that correct?
19        A.      I have -- not if they are obviously
20    valid.
21        Q.      So you think patents are good in the
22    computer software field?
23        A.      I didn't say that.
24        Q.      Do you think they are good in the
25    computer software field?
0122
1        - Mr. Timothy C. Daw -
2        A.      I haven't seen the benefit of them.
3        Q.      So we would be better off as a society
4    without patents in the computer software field in
5    your view?
6        A.      I said I hadn't seen any good of them.
7    I'm not -- I have not said they are particularly bad.
8    My view about the total effect is neutral at the
9    moment.
10        Q.      But you personally have a bias against
11    applying for patents, like your great great
12    grandfather, is that correct?
13        A.      I cannot prove he was a great
14    grandfather, by the way.

15          I would not think anything NetShift
16    does -- I have not seen anything that we have done
17    that I would say was worthy of a patent.
18      Q.      Have you promoted yourself as an expert
19    in the computer field in seeking additional jobs as
20    an expert witness?
21      A.      No.  And my employment contract with
22    NetShift, as from 1997, prevents me from taking any
23    external work without approval of the Board.
24      Q.      Have you ever sought approval in an
25    attempt to further your career as an expert witness
0123
1        - Mr. Timothy C. Daw -
2    in --
3      A.      No.
4      Q.      Do you intend ever to be an expert
5    witness again?
6      A.      It hasn't crossed my mind.  I would
7    have no objection to being so.
8      Q.      Now you referenced the standard view in
9    the software industry vis-a-vis patents.
10          What do you believe the standard view
11    of the industry is?
12      A.      I'm not sure I said standard view.  I
13    said there was a widespread view.  I think that was
14    my phrase.
15          But I prefer to say a widespread view
16    that some software patents have been issued that do
17    not stand up to any serious analysis, and that the
18    holders of the patents then use them in sort of an
19    unethical manner.
20          This is some, not even a majority.
21      Q.      Have you ever taught computer science
22    to others in a formal course?
23      A.      No.
24      Q.      Have you ever taught it in the
25    university?
0124
1        - Mr. Timothy C. Daw -
2      A.      No.
3      Q.      Have you ever taught what we consider
4    the equivalent of high school?
5      A.      No.
6      Q.      Have you ever taught an informal course
7    in computer science?
8      A.      I have taught informal groups aspects

9     in the use and functions and possibilities of
10    computers.
11        Q.      Did the participants of that informal
12    course, were they seeking degrees in computer science
13    or computers?
14        A.      I wouldn't know.
15        Q.      Was your informal course part of their
16    seeking a degree in computers?
17        A.      No.
18        Q.      Are you an expert in assessing the
19    validity of patents?
20        A.      I believe I have a good understanding
21    of the validity of the issues involved in validity of
22    patents.
23        Q.      But you are not an expert?
24        A.      Looking at the size of this library
25    that requires me to be an expert, I would be above
0125
1         - Mr. Timothy C. Daw -
2     average in it.  I have enough expertise to satisfy
3     myself.
4         Q.      But do you have enough expertise to
5     satisfy others that you are an expert in determining
6     validity of patents?
7         A.      Yes, I think I do.
8         Q.      So how do you determine the validity of
9     a US Patent?
10        A.      There are probably other areas of the
11    Patent Law that can cause invalidity.  The areas I
12    looked at are prior art, and also how the patent case
13    was brought before the Patent Office, and the
14    disclosures that were necessary.
15        Q.      If I were to hand you a US Patent, how
16    would you determine whether or not that patent was
17    valid as an expert?
18        A.      Two areas I would need to know about;
19    one, the patent file.  I have an understanding of how
20    the patent was presented to the Patent Office.
21            I apologize if I slip between "paytent"
22    and "patent".  We transfer it differently in England.
23            And, also, to look at the prior art.
24            Just by handing me the patent, I would
25    obviously have no knowledge of what other undeclared
0126
1         - Mr. Timothy C. Daw -
2     prior art there was.

3     Q.     And then what would you do with it?
4     What's your next step?
5          Now you have a file history, and now
6     you have the prior art, what do you do next?
7     A.     What -- the simplest test that I have
8     got is that I would examine prior art, and the first
9     step, is there any -- does this prior art read on a
10    particular claim in the same way as an infringing
11    product would read?
12         If it read in the claim, if its date
13    was more than a year -- if it read complete on the
14    term that that was the infringed product, if its date
15    was more than a year before the filing date of the
16    patent, that would say to me that -- I think the
17    phrase is, what infringes later discloses beforehand.
18         If there wasn't a direct reading of
19    prior art from one line by line in the claim, I would
20    consider what a person of ordinary skill in the art
21    would have known at the time of the filing and
22    before, and whether the differences were either
23    insubstantial or obvious, and if so, the obviousness
24    factor would come into being, and it would be invalid
25    for all of that.
0127
1     - Mr. Timothy C. Daw -
2     Q.     And how do you determine what the
3     person of ordinary skill of art knew at the time?
4     A.     He is a hypothetical person, and I
5     picture his having two parts to his character: One,
6     he is omniscient, knows absolutely everything about
7     all prior art that was around; but, on the other
8     hand, he is of average skill.  He is not a genius.
9     He is not stupid.  He is just of average skill, and
10    it is fairly -- it is a subjective judgment, of
11    course.
12         And if he knew all the prior art, and
13    when he solved that problem would it be obvious from
14    what was known how to solve the problem.
15    Q.     And that's it?  That's it?  That's all
16    you have to do to determine the validity of a patent?
17    A.     Well, I mean the third method I
18    mentioned was obviously if the patent -- if the
19    patentees have not performed their duty to the Patent
20    Office by disclosing all the prior art that they
21    should have known about, there would be grounds for
22    declaring the patent invalid because, I think, there

23    is fraud on the Patent Office.
24        Q.      So if an inventor, under your expert
25    testimony as an expert in patent validity, you are
0128
1      - Mr. Timothy C. Daw -
2    saying that an inventor should have known of prior
3    art -- even though he did not know of prior art, he
4    should have disclosed that to the Patent Office.  Is
5    that what you are saying?
6        A.      The key word is he should have known
7    about it.
8              It again is a subjective judgment.
9        Q.      So in this case are the two patents
10    invalid because -- in this case, the two patents
11    involved in this case, are they invalid because the
12    inventors should have known of the prior art?
13        A.      I think there are certain elements of
14    prior art, some of the objects that should have been
15    disclosed that the inventors did know about.
16              To say what they should have known is,
17    again I am going to use again a reasonable man, is
18    what you would expect someone to know about it.
19              Going back a couple of hundred years,
20    if the blacksmith next door was doing the same as
21    you, you should know about it just by general
22    knowledge.
23              But maybe you shouldn't know -- you
24    can't be expected to know something on the other side
25    of the country.
0129
1      - Mr. Timothy C. Daw -
2              Nowadays the world has shrunk, and so
3    it is not quite so clear how far you should search;
4    but you certainly should not be dilatory in your
5    search for prior art.
6        Q.      So under your expert view of patent
7    law, the inventor is required to do a search, and
8    seek out all possible prior art, and then call that
9    to the attention of the Patent Office?
10              Is that your expert opinion on this?
11        A.      He should disclose to the Patent Office
12    all relevant knowledge that he has or should know
13    about.
14        Q.      But you just mentioned he should go
15    searching.  Didn't you just mention that?
16        A.      I think there should be an element of

17    insuring that you have picked up everything that you
18    should know about.
19        Q.    So --
20        A.    And --
21        Q.    Sorry?
22        A.    Continue.
23        Q.    So under U.S. Patent Law, that's how a
24    patent is invalidated?
25            You should have picked up something,
0130
1        - Mr. Timothy C. Daw -
2    even though you didn't know about it, if you should
3    have picked it up, the patent is invalid under your
4    understanding of U.S. law.
5            And what you testified to as an expert
6    is how you invalidate a patent?
7        A.    No, I -- my opinion on that is this
8    particular area is very subjective, and the Patent
9    Office gives a lot of latitude to what an inventor
10   should have known, and it is not as rigorous maybe as
11   I might personally believe it should be, but the law
12   is not completely rigorous, but the Patent Office
13   does not -- does require a professionalism in the
14   preparation of the patent.
15       Q.    Now, what part of the Patent Office
16   rules or the US statutes require that the inventor
17   disclose prior art he should have known about that he
18   didn't know about?
19       A.    I don't know the numbers.
20       Q.    Is there a statute that says that, or a
21   rule?
22       A.    I believe that that is a fair summary
23   of the rulings we have.
24       Q.    I am not talking about rulings of a
25   court.
0131
1        - Mr. Timothy C. Daw -
2        A.    I mean the rulings of the Patent Office
3    -- the rules of the Patent Office.
4        Q.    So you can find a rule in the Patent
5    Office that requires the inventor to disclose art
6    that he should have been aware of but was not aware
7    of.
8            Is that your testimony?
9        A.    There is -- my concept originally was
10   in this particular case there was an art that could

11    be safely assumed was known.
12          It is very hard to tell what someone
13    does know.  So that's why I used the phrase should
14    have known about it, at least to be assumed to know
15    about it.
16          It's -- it's a loose -- my definition
17    is a suitable working definition.  It might not
18    entirely coincide with the legal definition.
19    Q.    But aren't you an expert in determining
20    validity of a patent, and you studied the definition,
21    so you could be an expert about it; isn't that what
22    you are here to do today?
23    A.    I'm saying I can't quote the exact
24    wording from memory.
25    Q.    But you are certain that prior art that
0132
1     - Mr. Timothy C. Daw -
2     the inventor or inventors should have known of at the
3     time of the filing, to not call that to the attention
4     of the Patent Office, even though they weren't aware
5     of it, is a reason to invalidate the patent for
6     fraud?
7     A.    That's not what I said.
8     Q.    How is that statement inaccurate?
9     A.    You qualify it by saying they didn't
10    know about it.
11    Q.    Yes, that's how I qualified it.  But
12    you have testified --
13          So that under your understanding, the
14    patent --
15          Actually, in this area what is your
16    understanding of the patent law?
17          MR. COOKSEY:  I am going to object.
18          This has been asked and answered
19       about five times.
20    A.    I didn't understand the question
21    either.
22          MR. COOKSEY:  And I think he has
23       answered the question.  So let's have the
24       next question.
25    Q.    What is the prior art in this case you
0133
1     - Mr. Timothy C. Daw -
2     mentioned the inventors of two patents should have
3     known about?
4     A.    There was a kiosk-in-the-box, which was

5    the Rocky Mountain product, where at least one of the
6    inventors was joined in a discussion with the
7    inventor of kiosk-in-a-box prior to the filing date
8    in a public forum where both Netkey and the
9    kiosk-in-a-box products were discussed.
10         Kiosk-in-a-box was also discussed
11    alongside Netkey the product in a New Media Magazine
12    prior to the filing date of the patent.
13         Microtouch Prospecta -- which is
14    another kiosk product we talked about --  was on
15    public sale.  And in the discovery documents there
16    are printouts where the press release of Microtouch
17    Prospecta had been downloaded by Lexitech in February
18    of '96.  So that was -- kiosk mode in browsers, the
19    patent discloses that Netscape Navigator 2.01, I
20    think from memory, was a background browser.  The
21    help files of that product instruct the user how to
22    set it up in kiosk mode.
23         Those are pretty certain examples
24    stretching my memory.
25    Q.    Earlier you testified that the prior
0134
1     - Mr. Timothy C. Daw -
2    art had to be more than one year prior to the filing
3    date of the application, isn't that true?
4    A.    I may have -- that is the simplest way
5    to view prior art.  It has to be -- it has to be
6    prior art to the invention of the claims.  And the
7    reason I said one year before is the assumption can
8    be that the invention can be up to a year before the
9    filing date.
10         The prior art that had to be disclosed
11    to the examiner doesn't have -- is anything up to the
12    date of the filing.  It doesn't have to be an exact
13    match.
14         I mean if it was an exact match, there
15    would be no point in applying for the patent.  It has
16    to be examined by the examiner so the difference can
17    be seen.
18    Q.    So if the invention occurred -- I am
19    going to give you a hypothetical.  If the invention
20    occurs --
21    A.    Yes?
22    Q.    -- by the person applying for the
23    patent --
24    A.    Hum-hum?

25    Q.    -- somebody else publishes an article

0135

1    - Mr. Timothy C. Daw -
2    of some relevance after the invention occurs, and
3    then the patent application is filed a week later, is
4    that publication for certainty prior art to the
5    patent in your expert opinion?
6    A.    For invalidating the patent, no; but
7    for disclosure to the Patent Office, which we were
8    talking about, it should be disclosed.
9    Q.    And why is that?  What is the
10    difference?
11    If it doesn't invalidate the patent,
12    why disclose it to the Patent Office?
13    A.    For the examiner to be able to form an
14    educated view of the patent, it is to help -- well,
15    that's it.
16    Q.    But even if -- so basically your
17    understanding is that that article published a week
18    before the patent application was filed is not prior
19    art, is that what your expert opinion is?
20    A.    It may be prior art.
21    Q.    Under what conditions may it be prior
22    art?
23    A.    The invention may be after that.
24    Q.    Well, in this case the patent is
25    applied for July in 1996, the first patent, '071,

0136

1    - Mr. Timothy C. Daw -
2    right?
3    A.    Yes.
4    Q.    The New Media article was published
5    maybe a week or two before the patent was applied
6    for.
7    A.    May, I believe, wasn't it?  May or
8    June.
9    Q.    May or June?
10    A.    May.
11    Q.    And when did you put the Netkey product
12    on an internet kiosk and operate it?
13    A.    About that time.
14    Q.    April is what your earlier testimony
15    is, isn't it?
16    A.    No.  I said I looked at it in April.  I
17    read about it in April.  I think I put it on the web
18    factory kiosk in May or June, I think.

19     Q.     So isn't it safe to assume that Netkey
20   product predated the New Media article?
21     A.     You are moving from the hypothetical
22   one to the actual then?
23     Q.     Yes.
24     A.     I think it is more than a self article
25   that the New Media article was reviewing the product.
0137
1     - Mr. Timothy C. Daw -
2     Q.     So clearly the Netkey product was prior
3   to the New Media article?
4     A.     It had to be.  It was being reviewed.
5     Q.     And in that case the New Media article
6   would not be prior art to the Netkey application that
7   occurred shortly thereafter?
8     A.     The Netkey article as such was not
9   prior art.  I never claimed it is prior art.
10          It disclosed the existence of
11   kiosk-in-a-box, along with the other disclosure of
12   kiosk-in-the-box that we have that Netkey should have
13   known about.
14          Kiosk-in-a-box would be the prior art,
15   not the New Media article.
16     Q.     So it is your testimony that the New
17   Media article is not prior art to the 'O71 patent?
18          I just want to elicit your expert
19   testimony on this.
20     A.     I think it helps it -- no, because I
21   am -- a magazine article would not infringe any of
22   those patent claims so such that the article would
23   not be prior art.
24     Q.     Even if the article infringed the
25   claims of the patent and was published shortly before
0138
1     - Mr. Timothy C. Daw -
2   the application was filed, if you knew the product
3   was invented well prior to that, that would mean the
4   article, even if it had all the elements of the
5   claim, would not be prior art, isn't that correct,
6   under your understanding of patent law?
7     A.     My point about the New Media article
8   was that it should have been disclosed to the Patent
9   Office for the experts in the Patent Office and the
10   examiner in the Patent Office to be able to take a
11   fair view whether the patent should be issued or not.
12          That is my point about the new media

13   article.  Its nondisclosure to the Patent Office.
14        Q.      And if the Patent Office had the New
15   Media article, it's your expert opinion they would
16   never have issued the first patent?
17        A.      It might not had been -- it might have
18   led them to other inquiries which they would not of
19   issued it.
20        Q.      So based on the New Media article
21   alone, there was not really relevant prior art to the
22   Patent Office is what you believe in your expert
23   opinion?
24        A.      No.
25        Q.      That's not what you believe?
0139
1        - Mr. Timothy C. Daw -
2        A.      I think we are getting -- I'm confused
3   with the double negatives.
4            If you could restate the question,
5   please.
6        Q.      If the New Media article was made
7   record in the Patent Office on the '071 patent, is it
8   your testimony that the patent would not had issued?
9            MR. COOKSEY:  I think he just
10           answered that.
11           That's been asked and answered.
12           Object to form of the question.
13           We have been going an hour since
14           lunch.  Can we take a two-minute break?
15           MR. WINTER:  Just let him answer the
16           question.
17           MR. COOKSEY:  He is not going to
18           answer the question.  He answered it
19           already.
20           MR. WINTER:  This is a different
21           question.
22           MR. COOKSEY:  It has been asked and
23           answered.
24           MR. WINTER:  That was a different
25           question.
0140
1        - Mr. Timothy C. Daw -
2            MR. COOKSEY:  You asked it to him
3            about five different times.  All you are
4            doing now is trying to argue with him and
5            confuse him.  So if you want to ask a
6            different question, go ahead.

7          MR. WINTER:  I am going to have the
8     question read back to you, and,
9     Mr. Cooksey, you can instruct him not to
10     answer it if you choose to, or you can have
11     him answer it.
12          MR. COOKSEY:  Go ahead.
13      (The court reporter read back the last
14     question as requested.)
15          MR. COOKSEY:  Now you are asking him
16     to speculate on what the PTO would have
17     done, and he already answered your question
18     stating that they might have looked,
19     inquired further, and they might had done
20     something other than what they did.
21          That was his exact testimony.  So
22     asked and answered.  And if you ask it
23     again, I am going to instruct him not to
24     answer.
25          MR. WINTER:  There is a question
0141
1     - Mr. Timothy C. Daw -
2      pending, and there is no instruction not to
3     answer it.
4          MR. COOKSEY:  What's the pending
5     question?
6          MR. WINTER:  He just read it.
7          MR. COOKSEY:  And I showed you how he
8     answered it.
9          MR. WINTER:  I don't believe your
10     assessment is accurate.
11          So can you either tell him to answer
12     it, or instruct him not to answer it.
13          MR. COOKSEY:  I will instruct him not
14     to answer it.
15     Q.     If the New Media article was made a
16     record in the second patent, would that had changed
17     the outcome of the second patent?
18          MR. COOKSEY:  Objection.  Calls for
19     speculation.  Object to the form of the
20     question.
21          Go ahead.
22     A.     It was made a record in the second
23     patent, I believe.
24     Q.     And what did the Patent Office do with
25     the second patent?
0142

1      - Mr. Timothy C. Daw -
2      A.      They issued it.
3      Q.      And you believe the examiner was wrong
4   in issuing the second patent over the New Media
5   article, is that correct?  Is that your expert
6   testimony?
7      A.      Not over -- I don't believe the article
8   on its own was enough for him not to issue the '848
9   patent.
10      Q.      Do you feel the same way about the '071
11   patent?
12      A.      As I answered previously, the article
13   itself is not prior art.  The article is an indicator
14   of the existence of other prior art, and it is the
15   other prior art that is important.
16      Q.      So the New Media article alone, it's
17   your testimony, would not had changed the outcome of
18   the first patent process relating to the '071 patent,
19   is that correct?
20      A.      It's -- I would have to speculate on
21   what the patent examiner would have done if he had
22   been given the information he should have been given.
23      Q.      Well, you are an expert witness.  I
24   don't want you to speculate, but in your expert
25   witness capacity, I would like you to make a judgment
0143
1      - Mr. Timothy C. Daw -
2   on that issue.
3              MR. COOKSEY:  He has already done
4         that.  This has been asked and answered.
5      A.      Could you define for me the difference
6   between speculation and a judgment?
7      Q.      Well, you are an expert at validity
8   issues.  You testified to that, right, you are an
9   expert?
10      A.      Yes.
11      Q.      And so you are capable of putting
12   yourself in the position of the examiner in making a
13   judgment as to whether or not you would have issued
14   the '071 patent based on the New Media article, and
15   only that article having been added to the patent
16   file.
17              So I'm asking you to make that judgment
18   as an expert witness.
19              MR. COOKSEY:  He already answered the
20         question.  I will instruct him not to

21          answer any further.
22             Now you are just picking on him and
23          arguing with him.
24             You are asking him to tell us what he
25          thinks the PTO would have done.  That's
0144
1      - Mr. Timothy C. Daw -
2          what you are asking him to do.
3             You are not asking him to opine on
4          validity.  You are asking him to speculate
5          on what the PTO would have done.
6             MR. WINTER:  I can have the question
7          read back.
8             The question is quite clear.  That's
9          not what I'm asking.
10             MR. COOKSEY:  I know what the
11          question is, and I am going to instruct him
12          not to answer.
13             You are just trying to argue with him,
14          and you are not getting the answer you
15          like, so you just keep pounding on him.
16             MR. WINTER:  So you are instructing
17          him not to answer the question?
18             MR. COOKSEY:  I already told you
19          that.
20             You can take it up with the judge if
21          you don't like that.
22             MR. WINTER:  Did you want to take a
23          break now?
24             MR. COOKSEY:  Yeah.  I wanted to take
25          a break five minutes ago.
0145
1      - Mr. Timothy C. Daw -
2             VIDEO TECHNICIAN:  We are going off
3          the record.  The time is approximately 3:07
4          p.m., November 20th, 2002, and we are on
5          videotape number 2.
6             (recess)
7             VIDEO TECHNICIAN:  We are back on the
8          record.  The time is approximately 3:19
9          p.m., November 20th, 2002, and this begins
10          videotape number 3.
11   EXAMINATION BY MR. WINTER:  (Cont'g)
12      Q.    You know you testified that you are an
13   expert in assessing patent validity, right?
14      A.    No.

15      Q.      What are you an expert in vis-a-vis
16  assessing patent validity?
17      A.      I'm trying to recall the exact answer I
18  gave to this question when you asked me about an hour
19  and a half ago.
20          I'm an expert in determining -- in
21  reading claims against a patent; particularly in this
22  case I have a level of expertise in knowing what to
23  look for.  I'm not a patent attorney, as you might
24  have guessed.
25          So I think I qualified my previous
0146
1      - Mr. Timothy C. Daw -
2  answer, and I will let that answer stand.
3      Q.      So your previous answer given earlier,
4  you don't want to change that at all?
5      A.      You asked me that question several
6  different times.  The first time I gave a proper
7  definition of where my expertise lay in this field
8  will stand.
9      Q.      So there were other places where you
10  gave an improper definition of what your expertise
11  was?
12      A.      You asked me the question fifteen,
13  twenty times from the beginning.  And among all the
14  stuff, I'm not sure I worded it exactly the same each
15  time I tried to give you the definition.
16      Q.      Were your earlier answers to all the
17  questions you answered accurate?  Because I would
18  like to have you correct them if they were inaccurate
19  now.
20      A.      I believe they were all accurate.
21          You asked me for a definition, at which
22  time I'm trying to give you one definition that you
23  can work from.
24      Q.      So you don't wish to change your
25  previous testimony vis-a-vis your capability as an
0147
1      - Mr. Timothy C. Daw -
2  expert as to patent validity, is that correct?
3      A.      I have no wish to change any of my
4  testimony so far.
5      Q.      Okay.  Now, you started studying the
6  patent law when we sent the first letter, which was
7  when?
8      A.      '98 -- July, August some time.

9      Q.     And then how soon were you an expert
10   after receiving that letter?
11     A.     Not -- it was -- my first cursory
12   glance tended me towards the view that it was fairly
13   baseless.  But as to my expertise, I then proceeded
14   to gather information and read information.  And when
15   I would define myself an expert, I would not put a
16   date on it.
17     Q.     Within a couple of months from your
18   start of your studies?
19     A.     Probably a bit longer.  I didn't have
20   the luxury of just studying it at one time.
21     Q.     So basically over the course of six
22   months working part-time, you became an expert in
23   things you are testifying to today?
24     A.     I gained a level of expertise.
25     Q.     But you are testifying as an expert
0148
1       - Mr. Timothy C. Daw -
2   witness, right?
3     A.     I am today, yes.
4     Q.     When did you gain that level of
5   expertise?  From the day you got the letter, you said
6   it was shortly after a few months.
7          I'm just trying to get an idea whether
8   it is two months, or three months, or four months,
9   you know, how long did it take you to become an
10   41expert?
11     A.     It would help if you can define what
12   level of expertise you need to define yourself as an
13   expert.
14     Q.     Well, you are defining yourself as an
15   expert, right?
16     A.     Yes.
17     Q.     So what level of expertise do you need
18   for you to define yourself as an expert?
19     A.     I need at least the level of expertise
20   I have at the moment.
21          Not at least.  The level of expertise I
22   have at the moment is enough for me to be qualified
23   as an expert.
24     Q.     So this is the first time you are
25   qualified to be an expert?
0149
1       - Mr. Timothy C. Daw -
2     A.     No, that's not what I said.

3     Q.     When was that?  I'm trying to
4   determine --
5     A.     I have not -- in the gradations of
6   expertise, I didn't wake up one morning and say,
7   "Hurrah, I'm an expert today.  I wasn't yesterday."
8     Q.     But there is a time when you weren't an
9   expert, right?
10     A.     Yes.
11     Q.     And that was in 1998, July sometime?
12     A.     Yes, I wouldn't have called myself an
13   expert then.
14     Q.     And there is a time -- certainly you
15   are an expert today under your view of things?
16     A.     The first time I considered the
17   question "Are you an expert?", was when I decided to
18   volunteer my knowledge to write the expert witness
19   report.  And the question I would have asked myself
20   on that day is are you an expert.  And I would have
21   to say yes, I was.
22          I had not considered the question on
23   any previous day.
24     Q.     Concerning the question now, were you
25   an expert before that day?
0150
1     - Mr. Timothy C. Daw -
2     A.     I would have been an expert the day
3   before.
4     Q.     How about the year before?
5     A.     What day would that be?
6     Q.     What day in the calendar year?  You can
7   look at your expert report and see when it was
8   signed and then determine?
9     A.     Yes.  Very good suggestion.
10          This was February this year, wasn't it,
11   2002?
12          Yes, I would be happy -- if
13   hypothetically if you had asked me in February 2001,
14   do you have enough expertise to be an expert witness,
15   I would have said yes.
16     Q.     How about in February of 2000?
17     A.     That may be speculating too far.
18          I have no reason to doubt I would not
19   have said yes then, but I cannot measure my
20   knowledge.
21          Going back hindsight would be a
22   wonderful thing.

23     Q.     What did you do between July of 1998
24   when you weren't an expert and February of 2001 to
25   become an expert in validity assessment?
0151
1      - Mr. Timothy C. Daw -
2      A.     There are two separate things.  I
3   explained before how I went about self-education by
4   reading articles, obtaining books, discussing with
5   people, and that's one part of the expertise.
6             The other part of the expertise, and
7   this is true of being an expert in anything, is
8   learning where to go and get detailed knowledge.
9   Just like your good selves have these books, you
10  don't carry that information in your head.  Part of
11  your expertise is you know where these books are, and
12  which books to turn to.
13            My expertise in this is -- I am not a
14  professional patent attorney -- is knowing where to
15  get the right rulings, to get the right advice to
16  help me come to a decision.
17     Q.     Where do you get the right rulings?
18     A.     I would consult with my attorneys,
19  would be the first step.
20     Q.     So in your great expertise, the way to
21  get the rulings is to ask somebody else for them, is
22  that what your testimony is?
23     A.     My testimony is that to get a correct
24  ruling, you need to examine the reference.
25            I think anyone would be a fool not to
0152
1      - Mr. Timothy C. Daw -
2   check on references if they give -- if they are using
3   a ruling.
4      Q.     So what is the ruling you are talking
5   about?  What kind of ruling do you mean?
6      A.     Any ruling.
7      Q.     Like a court ruling?
8      A.     It could be a court ruling, it could be
9   the definition of -- definition of how to read a
10  claim.  And that's why I checked, and I am fairly
11  happy my memory is good enough, but in writing a
12  report I would have had a written definition beside
13  me to insure I was doing the job properly.  And to
14  obtain that written definition, I would have either
15  obtained that through the good offices of my
16  attorneys, or some other authoritative source.

17    Q.    Like your U.K. patent lawyer?
18    A.    Not in that particular instance. They
19  were always very careful to say -- to get precise
20  wording of rulings, you should go to a US attorney on
21  US attorney books, in that they were experts in
22  English law, rather than US law.
23    Q.    You took no courses in validity
24  assessment of patents, is that correct?
25    A.    Correct.
0153
1    - Mr. Timothy C. Daw -
2    Q.    You never taught validity assessment to
3  anyone else, have you?
4    A.    Not formally.
5    Q.    Informally, you taught validity
6  assessment?
7    A.    I have discussed within NetShift the
8  basis of my beliefs in this case, and in discussing
9  the basis of my beliefs in this case, I have outlined
10  what my bases are.
11    Q.    Aren't you a very much biased expert
12  witness in this case, biased in favor of NetShift?
13        MR. COOKSEY:  I object to the form of
14      the question.
15        Go ahead.
16    A.    No.
17    Q.    You consider yourself completely
18  objective, and you are weighing both sides equally in
19  making your expert assessment, without reference to
20  the fact that you started the company, have official
21  ownership of stock in the company, may get stock
22  options and get paid for the company by the company,
23  so in your view you are a completely unbiased expert,
24  is that correct?
25        MR. COOKSEY:  Objection.  Asked and
0154
1    - Mr. Timothy C. Daw -
2      answered.
3        You are just arguing with him now.  So
4      move on.
5        THE WITNESS:  Do I answer?
6        MR. COOKSEY:  You answered it.
7      Just move on.
8        He is not going to answer it again.
9        I instruct you not to answer.
10    Q.    Do the factors I mentioned affect your

11  bias in this case of the last question?
12      A.    My bias is to make sure that my reading
13  is correct, not to particularly put the case for
14  NetShift.
15          I have great faith that a judge and
16  jury will find the correct answer in this case.  And
17  the biggest disservice I could give to NetShift would
18  be to give a biased report that encouraged NetShift
19  to continue in this litigation if there was no basis
20  in fact.
21          Therefore it is in NetShift's interest
22  for me to be unbiased.
23      Q.    Is Mr. Pinkard a much more qualified
24  technical expert than you are in this area?
25      A.    Which area?
0155
 1    - Mr. Timothy C. Daw -
 2      Q.    The area of these patents?
 3      A.    He --
 4          MR. COOKSEY:  I object to the form of
 5      the question.
 6          Calls for speculation.
 7          MR. WINTER:  Why don't you read the
 8      question back to the witness.
 9          (The court reporter read back the last
10      question as requested.)
11      A.    By more qualified, you mean he has more
12  degrees?
13          That would be the common use of it.
14      Q.    No, I mean generally qualified on all
15  fronts so that --
16          Actually, what do you mean by more
17  qualified?
18          I will use your definition.  What would
19  you mean by more qualified?
20      A.    Well, more qualified could be, and you
21  have a fixation on my education, is I have an M.A.
22  and he has got a B.A., whatever, I don't know.  And
23  does my qualifications trump his in the great poker
24  game of qualifications?  And I wouldn't wish to enter
25  into that argument.
0156
 1    - Mr. Timothy C. Daw -
 2          I'm not one for putting lots of letters
 3  after my name, or on my business card.
 4      Q.    He has a wealth of experience you don't

5    have; isn't that the case?
6        A.    You asked about qualifications a moment
7    ago.
8        Q.    Yes, qualifications meaning --
9            So you understand qualifications to
10   mean just education?
11       A.    I was asking you to clarify your
12   question.
13       Q.    Okay.  I mean overall qualifications,
14   including education, and work experience, and the
15   ability to act as a persuasive expert in this case.
16           My question is, isn't Mr. Pinkard much
17   more qualified than you to act as an expert in this
18   case?
19           MR. COOKSEY:  Objection.  Asked and
20       answered.
21           THE WITNESS:  Do I answer?
22           MR. COOKSEY:  Also calls for
23       speculation.
24           Go ahead.
25           MR. WINTER:  Can you read the
0157
1       - Mr. Timothy C. Daw -
2           question back to the witness.
3        A.    I can recall the question.
4        Q.    Okay.  Go ahead and answer it then.
5        A.    No.
6        Q.    You are more qualified than
7    Mr. Pinkard?
8            MR. COOKSEY:  Same objection.
9        A.    Under the terms of your -- the answer
10   to your previous question is no.
11       Q.    And my second question is, do you
12   believe you are more qualified to testify as an
13   expert witness about these patents than Mr. Pinkard?
14           MR. COOKSEY:  Same objection.
15       A.    Could you qualify the word "qualified"
16   again?
17       Q.    Once again involving his work
18   experience, and his educational experience in toto?
19       A.    My answer is still I'm more qualified
20   than him in the area of these patents.
21       Q.    Is he more qualified than you in any
22   areas?
23       A.    Oh, maybe.
24       Q.    Like what?

25    A.    Walking.
0158
1         - Mr. Timothy C. Daw -
2     Q.    How about in the computer area?
3     A.    In the computer area, yes.
4     Q.    I'm sorry?
5     A.    Yes.
6     Q.    In the architecture of computer
7   software area?
8     A.    Yes.
9     Q.    In source code area?
10    A.    Yes.
11    Q.    He also went through the detailed claim
12  analysis element by element with you together, right?
13    A.    Yes.
14    Q.    He is capable in that area, also?
15    A.    He is very capable.
16    Q.    Is he more knowledgeable than you in
17  the area of source code?
18    A.    Yes.
19    Q.    Is he more knowledgeable than you in
20  the area of computer architecture?
21    A.    Could you define computer architecture?
22          Do you mean computer system
23  architecture, or computer software architecture?
24    Q.    Computer system architecture.
25    A.    I wouldn't know.
0159
1         - Mr. Timothy C. Daw -
2     Q.    How about computer software?
3     A.    Yes.
4           MR. WINTER:  Would you please mark
5       this.
6
7           (Pretrial Order marked Plaintiff's
8       Exhibit 150.)
9     Q.    This is a document that was submitted
10  to the Court several months back called a Pretrial
11  Order.
12          My understanding is that you worked on
13  this Pretrial Order with your counsel, is that
14  correct?
15    A.    May I have time to read it, please?
16    Q.    Sure.
17    A.    (Pause)
18    Q.    Just to shorten things up, I'm not

19  asking you to identify that you worked on that
20  specific document but on a document of that type?
21      A.     There seems to be several different
22  types of documents in here.
23             Which particular type are you referring
24  to?
25      Q.     It is all one document.  It was filed
0160
1     - Mr. Timothy C. Daw -
2   all at the same time.
3             MR. COOKSEY:  That's not true.  It is
4          comprised of jury instructions, it is
5          comprised of witness list, it is comprised
6          of exhibit list.  There are several
7          documents that are attached together.
8             MR. WINTER:  But it was filed as one
9          cohesive unit with the Court; isn't that
10          correct?
11             MR. COOKSEY:  Why don't you ask him
12          which part of it he might have worked on?
13             I mean he didn't work on the jury
14          instruction.  He didn't work on several
15          parts of this.
16             If you want him to read the whole
17          thing, we will be here all afternoon.
18      Q.     Why don't we shorten it up?
19             Did you work on the jury instructions
20  at all?
21      A.     I'm assuming -- Well, it will be
22  dangerous for me to assume.  Can you point to me
23  which are the jury instructions in here?
24      Q.     Tab C.
25      A.     No.  I only had a chance to read or
0161
1     - Mr. Timothy C. Daw -
2   skim read the first ten or fifteen pages of this.
3   But I don't recognize anything as my work in there.
4      Q.     I would like you to turn to a page.
5   They are not numbered, but the top of the page it
6   says "Defendants' Witnesses," actually lists you
7   first, Tim Daw, about ten pages in.
8      A.     Yes?
9      Q.     I think it is the ninth page.
10      A.     Yep, I got it.
11      Q.     Okay.  This is the list provided by
12  defendants of the witnesses they intend to bring to

13    trial.
14         Is Mr. Hoffman still intended to be
15    brought to trial, as far as you know?
16    A.    I have no knowledge.
17    Q.    You don't know whether he is or he
18    isn't?
19    A.    No, I don't.
20    Q.    If you look at several pages further
21    on, George Hripsack?
22    A.    M.D., yes.
23    Q.    Have you ever talked to Dr. Hripsack?
24    A.    I haven't.
25    Q.    Has anyone connected with this case on
0162
1         - Mr. Timothy C. Daw -
2    the side of defendants talked to Dr. Hripsack?
3    A.    I believe the attorneys have.
4    Q.    Which attorneys?
5    A.    Our attorneys.
6    Q.    Has there been an agreement by
7    Dr. Hripsack to attend trial?
8    A.    I have no knowledge.
9    Q.    Have you seen any correspondence
10    between the attorneys and Dr. Hripsack?
11    A.    No.
12    Q.    Do you know the content of the
13    discussions of the attorneys with Dr. Hripsack?
14    A.    No.
15    Q.    Other than the web pages attached to
16    your report, do you know anything about Dr. Hripsack?
17    A.    I have read other items about him on
18    the web.
19    Q.    Have you ever spoken with Lijing Zhang?
20    A.    No.
21    Q.    Who is Lijing Zhang?
22    A.    I don't know.
23    Q.    Anyone on behalf of NetShift, or the
24    defendants in this case, talked to Mr. Zhang?
25    A.    I have no knowledge.
0163
1         - Mr. Timothy C. Daw -
2    Q.    Have you ever seen correspondence to
3    Mr. Zhang?
4    A.    No.
5    Q.    E-mails relating to Mr. Zhang?
6    A.    No.

7      Q.      Is there an agreement by Mr. Zhang to
8   attend trial?
9      A.      I have no knowledge.
10     Q.      Do you know David Heyliger?
11     A.      Yes.
12     Q.      Have you met Mr. Heyliger?
13     A.      Yes.
14     Q.      Are you friends with Mr. Heyliger?
15     A.      I think friends is a strong word.
16     Q.      Has Mr. Heyliger agreed to attend trial
17   in this matter?
18     A.      I have no idea.
19     Q.      Did you talk to Mr. Heyliger about
20   attending trial?
21     A.      No.
22     Q.      Have you talked to Mr. Heyliger in the
23   last year?
24     A.      Yes.
25     Q.      About what?
0164
1      - Mr. Timothy C. Daw -
2      A.      The last time I talked to him was by
3   E-mail, and it was about the death of my mother, and
4   the fire in Glenwood Springs, and the appearance of a
5   bear on his patio.
6      Q.      So you correspond with him on some
7   basis as a friend?
8      A.      That would be -- I learned news that a
9   massive fire was affecting the area where his house
10   was, and I sent a note, as I would to anyone, just
11   hoping he was okay.
12     Q.      Have you ever had -- have you ever met
13   Mr. Heyliger face-to-face?
14     A.      I answered yes just now, and I will
15   answer yes again.
16     Q.      When was that, the last time?
17     A.      When I was skiing in Glenwood Springs.
18     Q.      And when was that?
19     A.      In spring of this year.
20     Q.      Did you go skiing with Mr. Heyliger?
21     A.      I did one run with him.
22     Q.      Did you have lunch with him?
23     A.      Yes.
24     Q.      Were you friendly with him at that
25   point?
0165

1      - Mr. Timothy C. Daw -
2      A.      It was the first time I met him.  He
3  was perfectly friendly.
4      Q.      Did you talk about the case?
5      A.      Not in any -- not in any detail.
6      Q.      Mr. Heyliger has always been verbose
7  about those patents.  Did he say anything about his
8  attitude vis-a-vis these patents?
9              MR. COOKSEY:  Object to the form of
10         the question.
11             THE WITNESS:  Do I have to answer it?
12             MR. COOKSEY:  Go ahead.
13     A.      He made some -- I wouldn't say
14  verbose -- I think the word pithy.  Verbose is at
15  length, and pithy is short.
16             I think he made some pithy comments
17  about the patent case.
18     Q.      And what were those pithy comments?
19     A.      I can't -- I couldn't recall them in
20  any detail.
21     Q.      What was the substance of the comment,
22  not the word-for-word detail.
23             MR. COOKSEY:  Excuse me.  Are you
24         asking him questions as an expert witness,
25         or are you embarking on fact discovery now?
0166
1      - Mr. Timothy C. Daw -
2              MR. WINTER:  Well, he has testified
3         about the prior art these people are
4         bringing forth.  This witness list is -- I
5         mean the documents he is referring to are
6         authored by these people, and in his expert
7         report there is a perfectly fine line of
8         examination to find out what he knows about
9         these web pages and other documents he is
10         referring to.
11             MR. COOKSEY:  Why don't you ask him
12         that instead of asking him about all these
13         conversations.
14             If you wanted to know about all of
15         that stuff, you should have done fact
16         discovery a long time ago.
17             He is not here as a 30B6 witness on
18         behalf of this company.
19             MR. WINTER:  He is relying on
20         Mr. Heyliger's prior art, and I want to

21          know what Mr. Heyliger said about this
22          case, because he is going to apparently
23          testify at trial about the case and about
24          the prior art.
25              MR. COOKSEY:  I think you ought to
0167
1       - Mr. Timothy C. Daw -
2           ask him whether he had any conversation
3           with Mr. Heyliger about prior art.
4               MR. WINTER:  Are you done with your
5           objection?
6               MR. COOKSEY:  Yes.
7               MR. WINTER:  Would you read the
8           question back.
9             (The court reporter read back the last
10          question as requested.)
11      A.      The substance of the comment was that
12      the patents were a pile of manure because his product
13      had predated it, and he hoped that this fact emerged,
14      and wished me luck in bringing this to the attention
15      of the judge.
16      Q.      Did he use the word "manure"?
17      A.      I guess not.
18      Q.      What did he use?  What exact word did
19      he use?
20      A.      Bear in mind his nine-year-old son was
21      with him, so I don't think he said "horse shit", but
22      that was the impression that I got.
23      Q.      Did you discuss what his testimony
24      would be at trial?
25      A.      No.
0168
1       - Mr. Timothy C. Daw -
2       Q.      Did you ever discuss, either orally,
3       by an E-mail, or verbally what his testimony would be
4       at trial?
5       A.      No.
6       Q.      Has your attorney ever told you what
7       his testimony would be at trial?
8       A.      No.
9       Q.      Do you see under the next name on the
10      list, Paolo Tosolini?
11      A.      Yes.
12      Q.      Have you ever met Mr. Tosolini?
13      A.      No.
14      Q.      Have you ever corresponded with

15   Mr. Tosolini by letter or E-mail?
16      A.    No.
17      Q.    Do you know if anyone on behalf of the
18   defendants in this case had corresponded with
19   Mr. Tosolini?
20      A.    I have no knowledge.
21      Q.    Have you ever seen any correspondence
22   from Mr. Tosolini?
23      A.    No.
24      Q.    Do you know if there is any agreement
25   with Mr. Tosolini to attend trial?
0169
1       - Mr. Timothy C. Daw -
2       A.    I have no knowledge.
3       Q.    You don't know whether he will attend
4    or won't attend?
5       A.    I have no knowledge.
6       Q.    Is your knowledge of Mr. Tosolini
7    limited to the web pages listed in your expert
8    report?
9       A.    No.
10      Q.    What other knowledge do you have of
11   Mr. Tosolini?
12      A.    Other web references.  And I recall
13   back in 1998 discussing Mr. Tosolini with Heyliger
14   when these letters were spread out by Netkey.
15      Q.    So in 1998 is the first time you heard
16   of the name Tosolini?
17      A.    He did his work at Bristol University,
18   or did some work at Brystol University, which is
19   about less than thirty miles from where I live, and
20   set up all systems, and I have a vague recollection
21   back in '95, '96 we did some work down in Brystol,
22   and I have a vague recollection we also saw something
23   about kiosk systems down there, but I cannot for
24   certain say it was Mr. Tosolini.
25          So my first date table recollection of
0170
1       - Mr. Timothy C. Daw -
2    the name Tosolini is '98.
3       Q.    And so in September of 1994, you
4    certainly didn't go on the web looking for
5    Mr. Tosolini's web-based publications, if they
6    existed at that time?
7       A.    September of 1994, no.
8       Q.    So you have no personal knowledge

9    whether or not in September of 1994 he posted
10   anything on the web, is that correct?
11        A.     I have -- I have personal knowledge of
12   what was posted.  I don't know whether he posted
13   anything in September of 1994, or someone else posted
14   it for him.
15        Q.     There is a purported posting of
16   something on the web in September of 1994, right?
17        A.     There were several different postings
18   talking about Mr. Tosolini.
19        Q.     But you weren't looking in 1994, so you
20   have no personal knowledge that those products of the
21   web page were actually available in 1994, isn't that
22   correct?
23        A.     I can look at the date of the
24   publication, just like you can, and judge when the
25   publication was made.
0171
1         - Mr. Timothy C. Daw -
2         Q.     So everything that's published on the
3    web -- if published is the right term -- that bears a
4    date, you believe the date is accurate as to exactly
5    the content of the publication on the date listed on
6    the web page, is that your testimony?
7         A.     Can I --
8         Q.     Actually, why don't we strike that.
9    Let's give you a hypothetical.
10        A.     Uh-huh.
11        Q.     In the year 2000 you go on the web.
12        A.     Hum-hum.
13        Q.     And see a page that has written on the
14   web page 1994.  In the year 2000, do you know for a
15   fact that that web page existed exactly as is in
16   1994?
17        A.     Using my knowledge of the web, I can
18   form a judgment of whether that is a genuine document
19   or not.
20               I mean to give you an example, have you
21   any evidence that this page was actually published in
22   1959, or could it have been inserted yesterday?
23               Have you ever seen this page before?
24        Q.     Well, that --
25        A.     Could you give me the benefit of an
0172
1         - Mr. Timothy C. Daw -
2    answer?

3    Q.    Well, we are not here to ask me
4    questions.
5    A.    It would help me understand what level
6    you are looking for.
7         Have you ever seen this page before,
8    Mr. Winter?
9    Q.    The answer to that question is no.
10    A.    Have you any evidence that this page
11    existed before today?
12    Q.    Yes, because the publisher in 1994, or
13    whenever that page was --
14         What is the date?
15    A.    1959.
16    Q.    -- delivered the book to our premises.
17    We have records downstairs that shows there is a
18    delivery of a book.
19    A.    How do you know this page wasn't
20    inserted?
21    Q.    Because it is bound?
22    A.    It could be rebound.
23    Q.    We can go back to the publisher and
24    take his deposition and establish the page is as
25    published then.
0173
1    - Mr. Timothy C. Daw -
2    A.    Exactly the same technique is available
3    for web pages.
4    Q.    So without more information in 2000, if
5    you see a web page that has a date 1994, you
6    automatically assume that that web page has been on
7    the web since 1994 unchanged, no modification, and
8    you believe every web page you see with a date on it?
9    A.    No, that's not what I said.
10    Q.    So what's wrong with that statement?
11    A.    You said without any further
12    information.
13         I believe to every web page I would
14    apply Ockham's Razor.
15         To paraphrase, in this case there is no
16    need to add extra complications, or extra causes
17    unless the simplest doesn't apply.
18         So in this case a reputable
19    publication, there is no monetary gain for it being
20    there dated wrong, no obvious reason why it might be
21    dated wrong, reputable publication on a reputable web
22    site, cross-referenced through many other pages which

23    match up with other references, it can maybe be
24    referenced through the web archive, which is a
25    government-sponsored archive of web pages -- if all
0174
1        - Mr. Timothy C. Daw -
2    these factors come together, and as an expert I have
3    lived on the web day in day out for the last seven
4    years -- if all this comes together, I would have no
5    reason to doubt the dating of that document.
6        Q.    Now, you are an expert at determining
7    patent validity, right?  You testified to that
8    earlier.
9            MR. COOKSEY:  Objection.  Asked and
10            answered.
11            I instruct you not to answer it.
12            You are doing it again.  He will stand
13            on his previous testimony.
14        A.    I will stand on my previous testimony.
15        Q.    Are you an expert at assessing what
16    prior art is for purposes of determining validity?
17        A.    I can read prior art and compare that
18    with the claims.
19        Q.    But are you an expert for determining
20    whether or not a particular web page is prior art for
21    validity purposes?
22        A.    I can read the invention described on a
23    web page and determine whether that is prior art or
24    not.
25        Q.    But are you an expert for determining
0175
1        - Mr. Timothy C. Daw -
2    whether a web page that was purportedly published in
3    1994 in fact is prior art under the patent laws?
4        A.    I have qualified the invention
5    described on the web page, not the web page that is
6    relevant to prior art.
7        Q.    So your testimony is that you are not
8    an expert in terms of determining the date, and
9    whether reference is in fact prior art, aside from
10    the technical content of the article?
11        A.    Could you get the Court Reporter to
12    find that answer I have given, I will be grateful.
13    Not my recollection of any answer I gave before.
14            MR. COOKSEY:  Objection.
15            MR. WINTER:  What is wrong with that?
16            MR. COOKSEY:  It has been asked and

17      answered, and he will stand on his previous
18      testimony.
19          MR. WINTER:  It has not been asked
20      and answered.
21          MR. COOKSEY:  You just keep trying to
22      get him to give you a different answer than
23      before.
24      Q.      I'm not talking about technical content
25   of the article.  Do you understand that?
0176
1      - Mr. Timothy C. Daw -
2      A.      I'm completely lost at what you are
3   talking about then.
4      Q.      Let's forget about the technical
5   content of the article.
6          I am just trying to determine whether
7   or not you are an expert in assessing whether or not
8   a web-based purported publication is prior art, under
9   the patent laws of the United States, and whether you
10   are qualified to make that determination.
11          MR. COOKSEY:  And he has answered
12      that question.
13          Asked and answered.
14      Q.      You can answer that question.
15      A.      I can answer that question?
16          If we were discussing a patent of the
17   arrangement of words on a web page, I think the
18   arrangement of words on a web page may be prior art.
19          The prior art is the publication of an
20   invention.  The web page is a publication of a prior
21   invention.  And so I can judge whether the invention
22   is prior art, and whether it has been publicized or
23   not.
24          Does that answer your question?
25      Q.      Has there ever been an occasion where
0177
1      - Mr. Timothy C. Daw -
2   you have reviewed a web page that's dated 1994, but
3   it has been changed subsequent to 1994?
4      A.      I have not come across a page dated
5   1994, any subsequent amendments haven't also been
6   dated on it.  The publication has been dated as such.
7      Q.      Have you ever come across the situation
8   where a date appears on a web page, and the web page
9   has been changed, but there is no indication on the
10   web page that there has been a change subsequent to

11    the earlier date?
12        A.    Not if it is -- I have not come across
13    a web page where there has been a precise dating of
14    the web page.
15        Q.    So a web page dated one date could
16    possibly be changed and there is no way for you to
17    know that, isn't that correct?
18        A.    That is -- I have explained to you
19    there is a process of validating web pages, as in
20    validating a page in a book.  And that there is,
21    theoretically I could have snuck in here last night
22    and snuck that page into that book and had the book
23    rebound, and that is a theoretical possibility.
24            You would apply Ockham's Razor to that
25    possibility.  And without strong evidence that I
0178
1     - Mr. Timothy C. Daw -
2    broke in here, I had a bookbinder handy, and antique
3    presses and all the rest, you would find it so
4    unlikely that I did that that you would be safe to
5    assume that that was a genuine page.
6        Q.    Is Ockham's Razor the test that's --
7    strike that.
8            In your expert opinion, is Ockham's
9    Razor the test that's done for determining whether or
10    not a particular purported web publication is prior
11    art?
12            MR. COOKSEY:  Object to the form.
13            Are you trying to get him qualified
14        as an archive advisor for web pages now?
15        Because that's exactly what you are asking
16        him.
17            He hasn't been endorsed as a witness
18        in authenticating archived web pages.
19            MR. WINTER:  Can you read him back
20        the question?
21        (The court reporter read back the last
22        question as requested.)
23        A.    Ockham's Razor is a shorthand I use for
24    my own thought process.
25            If you are not familiar with it, or you
0179
1     - Mr. Timothy C. Daw -
2    are not happy with it, I am quite happy to drop the
3    term.
4        Q.    I am just trying to understand as an

5    expert witness in assessing validity and prior art,
6    whether that is the test under U.S. law for assessing
7    prior art.
8            And you are an expert.  I just want to
9    know if you believe that's the test?
10    A.    Could you read that question again,
11    please?
12            (The court reporter read back the last
13        question as requested.)
14            MR. COOKSEY:  I am going to object
15        also from the standpoint of your
16        questioning him on the elements of U.S. law
17        that may or may not apply to this issue.
18    Q.    Do you understand the question?  Do you
19    want it read back again?
20    A.    In English would be helpful.
21            (The court reporter read back the last
22        question as requested.)
23    A.    I am afraid I don't understand the
24    question.
25    Q.    What is it about the question you don't
0180
1    - Mr. Timothy C. Daw -
2    understand?
3    A.    Its meaning.
4            Are you saying that it appears, you are
5    asking is Ockham's Razor part of U.S. law?
6    Q.    Yes, I guess that's a good question, in
7    your expert opinion?
8    A.    No.
9    Q.    But that's the test you used to
10    determine whether something is prior art, even though
11    it is not part of U.S. law, isn't that correct?
12    A.    Ockham's Razor is a technique used by
13    scientists and by any other intelligent person to --
14    it's a tool to be used in judging the validity of the
15    hypothesis.
16            You have given me a hypothesis on a web
17    page.  And I have given you, based on my hypothesis,
18    this book here.  You are presenting two hypotheses on
19    a web page.
20            One there is a document that is dated
21    precisely on a date in 1994, it is cross-referenced
22    to other documents, it is held on a secure web
23    server, it appears in archives that this document is
24    on this web server.  There is no gain of financial or

25    prestige in having that document dated any other
0181
1          - Mr. Timothy C. Daw -
2     date, and Ockham's Razor is --
3              The other hypothesis is is this page is
4     a fake.  To fake that page, the faker would need
5     access to not only the server the page it is on, but
6     the archive servers.  He would have to create a false
7     paper trail of other references, and fake the
8     server, and insert those pages onto other secure
9     servers.
10             All of this could be done, and I'm sure
11    Her Majesty's Government may give up this sort of
12    dirty trick, but that faking is a horrendously
13    complicated thing to do compared to the simple
14    explanation that the page is genuine.
15             Ockham's Razor is a technique that's
16    held good for seven hundred years, that would have
17    the convincing evidence, the simpler explanation is
18    likely to be true.
19        Q.    So that I understand what you are
20    saying, all I'm asking you is a simple question, is
21    Ockham's Razor the way the U.S. Patent Law works in
22    determining whether or not something is published
23    prior art or not?
24        A.    I'm sorry.  I obviously have not been
25    clear.
0182
1          - Mr. Timothy C. Daw -
2              I am using Ockham's Razor, the tool,
3     merely to help the authentication of the dates of
4     documents.  It is merely a tool.  It is merely --
5              I should have not mentioned it.  It is
6     how -- your original question is how did I know, to
7     paraphrase, how did I judge that this page was
8     actually published in 1994?
9              I have given you the full workings of
10    how I would approach that problem of judging whether
11    that was from 1994.
12             Once it is established that that page
13    is done in 1994, the contents of that page, the
14    invention described on that page, that then enters
15    into the cycle of whether it is prior art or not.
16             That is a separate step from the
17    authentication of the date of the page.
18        Q.    And the authentication of the date of

19    the page, is that how you authenticate a page under
20    U.S. law as far as you understand as an expert
21    witness versed in determining patent validity and
22    prior art?
23        A.    I would think all that is required is
24    the expert is satisfied of the authenticity of the
25    page, and it is prepared for use in an expert witness
0183
1        - Mr. Timothy C. Daw -
2    report. I am satisfied of the authenticity of all
3    the dates of all the pages that I used for my report.
4        Q.    And that's what the U.S. Patent Law
5    says, as far as you know?
6        A.    As an expert, I would -- to get the
7    rulings of U.S. Patent Law, I would, as any other
8    expert, I would ask -- I would go to my references,
9    either my attorneys, and through them or separately
10    from them, to actually read the ruling, the exact
11    ruling.
12        Q.    So in this case you haven't read the
13    exact ruling, and you don't know whether this is
14    prior art under the U.S. Patent Law, correct?
15            MR. COOKSEY:  You are just quarreling
16        with him.
17            I object to the form of the question.
18        A.    I --
19            MR. COOKSEY:  Objection,
20        argumentative.
21        A.    I have no reason to doubt that they are
22    authentic documents, as such prior art.
23        Q.    But have you done the investigation
24    with your attorneys to determine whether your
25    analysis of what authentication is is the same as
0184
1        - Mr. Timothy C. Daw -
2    what a -- what U.S. law would determine -- the
3    standards U.S. law would use in determining
4    authentication?
5        A.    I don't think there can be any standard
6    way of authenticating the date of things. It would
7    always require expert analysis.
8        Q.    Who is Rawn Shah, the next witness on
9    there?
10        A.    He is a consultant for I.B.M. He wrote
11    some papers on kiosks that were published at World
12    Wide Web conferences in 1994, I believe.

13     Q.     Now, you have never attended a World
14 Wide Web conference, have you?
15     A.     No.
16     Q.     Have you ever spoken with Mr. Shah?
17     A.     No.
18     Q.     Have you ever corresponded with
19 Mr. Shah?
20     A.     I have -- no, I haven't directly.
21     Q.     Have you in any way communicated with
22 Mr. Shah, whether by correspondence, by E-mail, by
23 phone, by any other means?
24     A.     I have past him -- I have past
25 information by Mr. Shah through E-mail,
0185
1       - Mr. Timothy C. Daw -
2     Q.     And can you describe the circumstances
3 and what information you passed to him?
4     A.     Mr. Shah was -- there was
5 correspondence with Mr. Shah and I was able to send
6 him a URL -- Uniform Resource Locater -- that Mr.
7 Shah was looking for.
8     Q.     And when did this correspondence occur?
9     A.     Eighteen months ago.  It was only one
10 line.
11     Q.     Did he contact you first?
12     A.     No.
13     Q.     Did you contact him?
14     A.     No.
15     Q.     How was the contact made?
16     A.     I believe one of our attorneys had
17 asked him a question, and my help was required with
18 this particular URL.
19     Q.     What was the question?
20     A.     It was about a URL for one of his
21 papers.
22     Q.     Is that the last time you heard
23 anything about, or seen anything about Mr. Shah?
24     A.     Yes.
25     Q.     Do you know whether Mr. Shah is alive?
0186
1       - Mr. Timothy C. Daw -
2     A.     No.
3     Q.     Do you know whether or not he has
4 agreed to come and testify as a witness in this
5 trial?
6     A.     I have no knowledge.

7       Q.      Have you seen any correspondence on
8    that issue?
9       A.      No.
10      Q.      Who is Craig Keefner.
11      A.      Craig Keefner.  He is an industry
12   authority since about, I think, 1993.
13              He is from the premier portal about
14   kiosks of the internet kiosk "dot" "org".
15      Q.      When was the last time you spoke with
16   Mr. Keefer?
17      A.      I had an E-mail correspondence with him
18   over last weekend.
19      Q.      About what?
20      A.      About -- what was it about?  Oh,
21   average price of a -- some industry figures.
22      Q.      Is he aware that he has been listed as
23   a trial witness?
24      A.      I don't know.
25      Q.      Have you told him that he is listed as
0187
1       - Mr. Timothy C. Daw -
2    a trial witness?
3       A.      No.
4       Q.      Do you know if he has agreed to attend
5    as a trial witness?
6       A.      I have no knowledge.
7       Q.      Have you seen any correspondence
8    between the attorneys and Mr. Keefner relating to his
9    testifying as a witness?
10      A.      No.
11      Q.      Would it surprise you to find out that
12   Mr. Keefner has told our client that he was unaware
13   that he was listed as a witness?
14      A.      It would surprise me.
15      Q.      Would it surprise you to learn that
16   Mr. Keefner stated that he would not testify in a
17   trial voluntarily for either party?
18      A.      I understand that Netkey has large
19   advertisers with Mr. Keefner's organization, and he
20   may be worried about upsetting a large advertiser,
21   and financial pressure may have been brought to bear
22   on him.  So it would not surprise me.
23      Q.      Who is George Funkey.
24      A.      I have no information about George
25   Funkey.
0188

1      - Mr. Timothy C. Daw -
2      Q.      You've never spoken with him?
3      A.      No.
4      Q.      Never met him?
5      A.      No.
6      Q.      Never worked with him with a
7   kiosk-in-a-box product?
8      A.      Have I ever worked with a
9   kiosk-in-a-box product?
10     Q.      Right.
11     A.      I have worked with kiosk-in-a-box
12   product.
13     Q.      When was that?
14     A.      Back in 1996.
15     Q.      So you have no idea whether or not
16   kiosk-in-a-box was available then in the marketplace
17   prior to July of 1996, do you?
18     A.      Yes, I do.
19     Q.      What was your information about that?
20     A.      My information is at least four fold.
21            Firstly, from the product itself.  I
22   believe there was information within the product
23   about the previous versions.  And I have knowledge
24   from there mentioned from references to it of various
25   web sites.
0189
1      - Mr. Timothy C. Daw -
2            I have knowledge of it from letters,
3   copies of letters I have seen from Colorado School of
4   Mines about how it was used, and I have -- I have got
5   data assurances that it predated Netkey considerably.
6      Q.      Predated the filing date of the U.S.
7   application?
8      A.      Certainly.
9      Q.      Predated anything else?
10     A.      I can't remember his exact testimony of
11   what the dates were.
12     Q.      Has Mr. Heyliger agreed to come to
13   trial?
14     A.      I have no idea.
15     Q.      I would like you to take a look at your
16   Expert Report, Exhibit M.
17     A.      Is this a natural break?  If I may take
18   a break for a second or two?
19            MR. WINTER:  Sure.
20            VIDEO TECHNICIAN:  We are going off

21      the record, the time is 4:24 p.m., November
22      20th, 2002.
23              (RECESS)
24          VIDEO TECHNICIAN:  Back on the
25      record.  Time approximately 4:42 p.m.,
0190
1      - Mr. Timothy C. Daw -
2          November 20th, 2002.
3   EXAMINATION BY MR. WINTER:  (Cont'g)
4      Q.      Have you taken a look at your expert
5   report?
6              In fact, is that your expert report?
7      A.      Yes, this is our expert report.
8      Q.      It says on the second page under
9   infringement, can you read that paragraph, that
10  sentence, only one sentence there?
11     A.      "Current NetShift products do not mask
12  browser control and so do not infringe Claim 1.  This
13  is also true of all claims dependent on Claim 1 and
14  for any others involving masking."
15     Q.      I notice you limited that statement to
16  current NetShift products, is that correct?
17     A.      That's what it says.
18     Q.      By current NetShift products, what do
19  you mean?
20     A.      I meant the products that we were
21  currently supplying, as of the date of this report,
22  which would have been, I believe, version 5.5.
23     Q.      What was the product --
24     A.      I meant NetShift also does other
25  software products apart from version 5.5.  So I was
0191
1      - Mr. Timothy C. Daw -
2   including those.
3      Q.      What are the other products it does?
4      A.      We got KeyOn, a/k/a  NSViewer, all one
5   word.
6              Probably video E-mail at that time,
7   Enterprise Managed Services, and Keyon Builder, and
8   also Business Spoke -- sorry, Business Spoke is an
9   English word for made-to-measure products.
10     Q.      Is this statement true with respect to
11  version 5.0, in your opinion?
12     A.      Yes.
13     Q.      Is this statement true with respect to
14  the version prior to 5.0?

15    A.    Yes.
16    Q.    What version would that be?
17    A.    Previous was 4.65, I believe, or there
18    might have been a 4.7.
19    Q.    What is your definition of the word
20    quotes, mask, end of quotes, as specified in Claim 1
21    of the patent?
22    A.    Have you a copy of the 'O71 patent
23    handy?
24    Q.    Well, I would like to hear from your
25    recollection first.  Then you can have a copy of the
0192
1    - Mr. Timothy C. Daw -
2    '071 patent, if you need it.
3    A.    My recollection is mask has its
4    ordinary meaning in the English language, unless it
5    is being modified by its use.
6         But the definition of it, it has been
7    defined within the patent.
8    Q.    And what is that definition?
9    A.    Which one?  I mentioned two different
10    things there.
11    Q.    Mask in the ordinary English language
12    definition?
13    A.    Mask means to hide something by placing
14    something between it and the viewer.
15    Q.    Did the patent modify that definition?
16    A.    No, it describes masking in the context
17    of using overlaying windows, which can be seen as
18    objects placed on top of another object to hide the
19    underlaying object.
20    Q.    Did any NetShift products ever mask, in
21    accordance with your understanding of the word mask?
22    A.    There is a possibility, and I have not
23    done the full analysis, that the very first versions
24    of NetShift released in 1996, prior to version 1.4,
25    may have contained masking in some versions of them.
0193
1    - Mr. Timothy C. Daw -
2    Q.    And when were those products sold
3    until?
4    A.    May '97.
5    Q.    And what did those products include
6    that you would consider to quote mask end of quotes?
7    A.    They were based on quite simple
8    products that had a frame that was set on top of an

9     industry standard browser -- in that case Netscape --
10    and may have hidden some of the Netscape frame.
11        Q.     And under your definition, that would
12    be masking, the way you defined it?
13        A.     Yes.  I'm not sure whether it was
14    masking the controls in the patent, but it was
15    masking some of the frame.
16        Q.     And which versions had that function?
17        A.     Versions numbered below 1.4.; 1.1.;
18    1.2; 1.3; and any further subdivisions.
19        Q.     And when was the last time that version
20    1.4 was sold?
21        A.     1.4 was not the masking version.
22        Q.     1.4 was the version under your
23    interpretation that did not have masking?
24        A.     Yes, it is the first one that did not
25    have masking.
0194
1         - Mr. Timothy C. Daw -
2         Q.     So 1.3?
3         A.     1 .3 would have masked.  Whether it was
4     masking -- whether it was fulfilling all the elements
5     of this claim is a separate question, but it did mask
6     the browser frame.
7         Q.     When was the last time this version 1.3
8     was sold?
9         A.     We would have sold it up to the release
10    date of 1.4, and then immediately switched people or
11    new customers to 1.4.
12        Q.     Do you recall the year that occurred
13    in?
14        A.     It's in May, May '97, I believe, as far
15    as I recall.
16        Q.     I would like you to look at Claim 1 of
17    the '071 patent, and tell me whether or not version
18    1.3 meets each and every limitation of that claim in
19    your opinion as an expert witness?
20        A.     No.
21        Q.     And what is the reason for it not
22    meeting each and every limitation?
23        A.     1.3 is a software product.  It is not a
24    kiosk browser system.
25        Q.     1.3 -- strike that.
0195
1         - Mr. Timothy C. Daw -
2                Version 1.3 installed on a kiosk

3    product, would that kiosk product meet each and every
4    limitation of Claim 1?
5        A.    If we assume the kiosk product fulfills
6    paragraph 1 and 2?
7        Q.    I'm not asking you to assume that.  I'm
8    asking you to analyze the claim as an expert witness
9    and tell me whether or not 1.3 installed on a kiosk
10    meets every limitation of Claim 1?
11        A.    Without you defining what else is on
12    kiosk, I can't judge what else, whether the kiosk has
13    a monitor or microprocessor or browser software.
14        Q.    Did you ever install 1.3 on a kiosk
15    having those features?
16        A.    I can't recall doing so.
17        Q.    Did you ever see a customer do that?
18        A.    For version 1.3, I have no recollection
19    of any particular installations of 1.3.
20        Q.    Was 1.3 ever installed on a kiosk in
21    your office?
22        A.    We would have run it on machines in the
23    office on PCs.
24        Q.    Let's take those PCs, for example, that
25    you ran it on.
0196
1        - Mr. Timothy C. Daw -
2        A.    Okay.
3        Q.    Would version 1.3 installed on there
4    meet the limitations of -- would meet the limitations
5    of Claim 1?
6        A.    This is a long time.  I -- I cannot
7    recall version 1.3 separately from any -- from 1.2 or
8    1.
9            My judgment, and this is not -- I'm
10    not a hundred percent certain, you understand that,
11    is that, yes, it would have fulfilled all those
12    features.
13            I'm not -- I don't have the detailed
14    knowledge and access to the software to do that, and
15    if I was doing a full infringement analysis, I would
16    want more time and access to materials.
17            But as a judgment, I would have to say
18    yes.
19        Q.    Did the version 1.3 -- strike that.
20            Was the version 1.3 actually withdrawn
21    and customers were asked to return it?
22        A.    Not -- they were -- they were

23    instructed to upgrade to 1.4, which was provided free
24    to them.
25        Q.      Were there any versions of 1.3 in use
0197
1        - Mr. Timothy C. Daw -
2    in the United States after the date of June 2, 1998?
3        A.      I have no knowledge, and I would be
4    immensely surprised if there were any.
5        Q.      How does the word anticipated differ
6    from the word obvious, as used in your report, in
7    terms of definition as an expert witness?
8        A.      I'm sorry.  Where have you -- which
9    context is this?
10       Q.      Well, for example if you look under
11   Tosolini, there is a statement that Tosolini's
12   application does this without any modification and
13   thus anticipates claim 1.
14              What do you understand the word
15   anticipates to mean?
16       A.      Which page are you on?
17       Q.      Unfortunately they are not numbered,
18   but it is under Tosolini 4.
19       A.      Page four, there is a small number at
20   the top.
21       Q.      Oh, I see it.
22       A.      Cut off.
23       Q.      Down two-thirds of the way down?
24       A.      Yes, I see it.
25       Q.      And there is anticipation by Tosolini?
0198
1        - Mr. Timothy C. Daw -
2        A.      My recollection of using the word
3    anticipation, is that the application -- actually
4    does the product that we are discussing actually
5    exist?  Whereas "obviousness", I believe was the
6    other word you wanted me to compare.  "Obviousness"
7    doesn't necessarily mean that the product actually
8    existed, only that it was obvious how to create the
9    product.
10       Q.      Can something be obvious based upon the
11   one reference alone -- strike that.
12              Can something be obvious based upon one
13   prior reference alone?
14       A.      Yes.
15       Q.      You don't need a second reference under
16   U.S. Patent Law to make something obvious?

17    A.    No.  I mean if -- my understanding of
18  obviousness, if by combining one reference with
19  knowledge that one skilled in the art would have,
20  which I suppose could be considered to be other
21  references, you would reach obviousness.
22          One reference on its own, you are sort
23  of implying that there is no other knowledge in the
24  universe surrounding that one reference; but within
25  the basis of the knowledge that is generally known,
0199
1      - Mr. Timothy C. Daw -
2  one reference would be enough.
3    Q.    That's enough under your understanding
4  of what the U.S. Patent Law is, and that's how you
5  use the term obviousness in your report?
6    A.    I'm using the term obviousness in
7  considering a person's knowledge of the art, which
8  would obviously combine lots of other separate bits
9  of knowledge.  Combine that with one reference,
10  obviousness could occur from one other reference.
11    Q.    But without combining that one
12  reference with other knowledge, you cannot have
13  obviousness based on one reference alone, is that
14  correct?
15    A.    If you only have one reference, you are
16  in a blank with no other knowledge in the whole
17  universe.
18          It has to be read within the context of
19  what would be generally known.
20    Q.    In this case can you describe how you
21  determine what the ordinary -- a person of ordinary
22  skill -- I'm sorry, strike that.
23          What does an ordinary person skilled in
24  the art mean to you in the context of this report?
25    A.    Didn't I answer that before?
0200
1      - Mr. Timothy C. Daw -
2          A person -- a hypothetical person who
3  is -- hypothetical person who is not a genius, not an
4  idiot, but is of normal average skill, and as of the
5  date that you have been referring to, he has
6  knowledge of all prior art.
7    Q.    In this case can you describe other
8  characteristics of this hypothetical person?
9          MR. COOKSEY:  In the context of the
10          patent-in-suit?

11        MR. WINTER:  Yes.  Strike that.
12     Q.     Can you tell me where in your report
13  you outline the qualifications, the education, the
14  experience of this hypothetical person that we are
15  supposed to apply to this situation?
16     A.     I don't make such.  I felt there was no
17  need to teach attorneys stuff they knew better than I
18  do, so I don't put any definitions of such in here.
19     Q.     So what definition did you use in your
20  mind as you concluded things were obvious?
21     A.     A person of ordinary skill in the art.
22     Q.     Can you describe that person, that
23  hypothetical person that you --
24     A.     He is a hypothetical person.
25     Q.     You said you envisioned a hypothetical
0201
1     - Mr. Timothy C. Daw -
2  person?
3     A.     Yes.
4     Q.     Can you describe that hypothetical
5  person?
6     A.     I think I have already.
7          In the context of these patents, we are
8  talking about a guy in 1996 who is working in the
9  field of creating kiosks -- just a hypothetical
10  picture of him.
11          He knows all the prior art, he knows
12  the standard way of -- his standard way.  He knows
13  about kiosk systems.  He is familiar with them, he
14  has handled them, he has seen them, and he is
15  familiar with the problems of the art itself.
16     Q.     And this hypothetical man you applied
17  in this report, what was his level of experience?
18     A.     Again, not a genius.  Not someone who
19  benefits from hindsight, but not an idiot.
20          A good workman level of experience.
21     Q.     Had he been working in the kiosk field
22  for two days, two months, three years, twenty years,
23  what level of time experience did he have in the art
24  in your estimation?
25     A.     Well, based on my own experience, this
0202
1     - Mr. Timothy C. Daw -
2  isn't -- this isn't rocket science, and it is a
3  standard computer, it is a standard monitor, it's a
4  standard browser, all things that anyone is familiar

5    with.
6            It's a very very simple set of problems
7    in the art.  The solution is not hard.  I think two
8    months working it would be perfectly adequate,
9    average.
10      Q.      So the level of ordinary skill in the
11   art that you applied in this case to your
12   determination of obviousness was that a person had
13   two months' worth of experience, is that what you are
14   saying?
15      A.      I would -- you have asked me for a
16   definition.  It is not one I formulated beforehand.
17      Q.      So when you concluded that these
18   certain claims are obvious, which you concluded,
19   correct?
20      A.      Hum-hum.
21      Q.      You had no definition of this
22   hypothetical person skilled in the art that would
23   tell you how long he had been working in this field?
24      A.      I had a definition of -- what I am
25   saying, I hadn't enumerated whether it was two weeks
0203
1       - Mr. Timothy C. Daw -
2    or two months.  Its come very --
3            You asked me that question, I'm quite
4    clear in my mind that two years would be excessive
5    and not needed.  Two weeks would be not quite there.
6    But two months would be adequate.
7            So ball park, that is I'm describing
8    the figure out of my mind to you.
9       Q.      So the hypothetical person would have
10   somewhere between two weeks of experience in the art
11   and two months of experience, under your assessment
12   of a person of ordinary skill in the art?
13      A.      I am saying around two months of
14   experience in kiosk systems, and around -- a working
15   knowledge of general I.T. -- information technology.
16      Q.      And at the time you made these
17   conclusions of obviousness in your report, how much
18   education did that person skilled in the art have?
19      A.      It's a balancing act.  There is always
20   a trade off between experience, aptitude,
21   intelligence and formal qualifications.
22            And I know from people who work for
23   us--we have got some of the brightest people, have
24   got no qualifications, and some people with

25    qualifications have been the most useless people we
0204
1         - Mr. Timothy C. Daw -
2    got.
3              So I'm taking an average across the
4    board.
5              I certainly would not say that this is
6    a science that you need a university degree.  It is
7    not that complicated.
8     Q.      So a few weeks of course work would be
9    enough to describe the hypothetical person of
10   ordinary skill in the art at the time this invention
11   was made?
12    A.      Someone who is more than a few weeks of
13   course work.  Someone who is comfortable with setting
14   up computers, changing the settings on computers,
15   installing, de-installing software.
16    Q.      I'm just asking you at this point, we
17   have qualified that this hypothetical person has
18   between two weeks and two months of experience?
19    A.      I said around two months.
20    Q.      And we now -- I am just simply trying
21   to qualify when you made your judgment of
22   obviousness, what was the level of education of this
23   person, this hypothetical person?
24    A.      I don't -- there is no need for a
25   university degree.  An intelligent high school level
0205
1         - Mr. Timothy C. Daw -
2    with an active interest in computers would be enough.
3     Q.      So a person of ordinary skill in the
4    art would be a person with high school education,
5    with no further computer education, would be somebody
6    who would be the hypothetical person skilled in the
7    art?
8     A.      I said with an active interest in
9    computers, which would be either fulfilled through
10   self-taught study, or through further computer
11   courses.
12    Q.      But the other side of that is the two
13   months of experience that we talked about?
14    A.      That was two months in kiosk, I said.
15             I said the basis of the two months in
16   kiosks was to be computer literate, is a phrase I
17   would use.
18    Q.      So once again going back to at the time

19    you made this judgment that these claims are obvious
20    to the hypothetical person skilled in the art, had
21    two months of kiosk expert experience?
22        A.    Yes.
23        Q.    He had a high school education and not
24    anything more, and then after that he had an interest
25    in computers, is that correct?
0206
 1       - Mr. Timothy C. Daw -
 2        A.    After he had more than interest.
 3              Interest is not quite a strong enough
 4    word.  Familiarity, literacy in computers, or
 5    literate in computers.
 6        Q.    So once again, this person -- strike
 7    that.
 8              When you made your determination of
 9    obviousness in your expert witness report, this
10    hypothetical person had these three characteristics:
11    Two months of experience in kiosks?
12        A.    Hum-hum.
13        Q.    Familiarity with computers?
14        A.    Yes.
15        Q.    And a high school education and no
16    more, is that correct?
17        A.    At least a high school education, yes.
18        Q.    But this hypothetical person you
19    envisioned, which you describe as having a high
20    school education or --
21        A.    Being English, the education level I
22    was thinking of what we call A levels, which are
23    exams that are taken at up to the age of normally
24    eighteen.
25        Q.    And didn't you testify earlier that
0207
 1       - Mr. Timothy C. Daw -
 2    that would be essentially equivalent to a US high
 3    school student?
 4        A.    I believe so.  I'm not sure how your
 5    students spend time in high school and go off to
 6    university.
 7        Q.    Once again getting back to the ordinary
 8    person skilled in the art that you hypothetically
 9    developed when you wrote your expert report, that's
10    the person with familiarity in computers, two months
11    of kiosk experience?
12        A.    Hum-hum.

13      Q.      And an education normally up through
14  age eighteen, and has passed the exams that you would
15  pass when you were eighteen in the United Kingdom?
16      A.      Yes.
17      Q.      Would you look at page 6, I believe it
18  is.  I'm sorry.  Yes, I think it is page 6?
19      A.      Are you referring to this top?
20      Q.      Yes, that's the correct page.  So if
21  you look at Claim 3.
22      A.      Hum-hum, yes?
23      Q.      In your analysis of this -- and your
24  analysis of this is read as follows:  "The addition
25  of a second image is obvious -- if you cover one bit,
0208
1         - Mr. Timothy C. Daw -
2  it is mere engineering to cover another bit as well."
3              Now, when you were answering this, you
4  were envisioning a person of ordinary skill in the
5  art making this obviousness determination, that was
6  approximately eighteen years old and had passed his
7  exams, had some familiarity in computers and had two
8  months experience in kiosk; is that correct?
9      A.      Over eighteen, but yes --
10      Q.      But his education was through
11  18-year-old?
12      A.      Yes.
13      Q.      And the exams that followed that?
14      A.      Yes.
15      Q.      And not a college degree?
16      A.      Yes.
17      Q.      That's a correct statement, right?
18      A.      Correct, yes.
19      Q.      Okay.  If you look at number 4.  You
20  stated, "Adding a third image is obvious -- if you
21  cover one bit, it is mere engineering to cover
22  another bit as well."
23      A.      Yes.
24      Q.      Isn't that --
25      A.      Yes.
0209
1         - Mr. Timothy C. Daw -
2      Q.      You applied the -- in using the word
3  obvious, you applied the same hypothetical person of
4  skill in the art that we discussed with respect to
5  Claim 3, correct?
6      A.      Yes.

7      Q.    If you look at Claim 5 on that same
8   page, you said that "this is obvious-- Rakov uses
9   Mosaic," and then the quotes continue.
10     A.    Yes, I see that.
11     Q.    Once again, this is the same
12   hypothetical person that is making this judgment.  He
13   is eighteen years old, he passed his exams at
14   eighteen without any University experience,
15   familiarity in computers, and two months of
16   experience in kiosks, right?
17     A.    Yes.
18     Q.    If you look at Claim 6, and then the
19   wording under that you said, "The addition of the GUI
20   control software is obvious --"
21     A.    Hum-hum.
22     Q.    Once again, when you were writing this
23   report you envisioned the hypothetical person to have
24   the characteristics you described with respect to the
25   other claims, correct?
0210
1      - Mr. Timothy C. Daw -
2      A.    Yes.
3      Q.    And did Mr. Pinkard, who also signed
4   under this report, have the same understanding with
5   respect to the hypothetical person skilled in the
6   art?
7      A.    I believe we were thinking of the same
8   sort of person.  Whether he would describe him in
9   exactly the same terms, I don't know; but I don't
10   think we have any difficulty in identifying the type
11   of person we were thinking about.
12     Q.    So Mr. Pinkard agreed wholeheartedly
13   with the statements of obviousness with respect to
14   Claims 3 through 6 at the time this was written, is
15   that correct?
16     A.    Yes.
17     Q.    And he agreed wholeheartedly with the
18   hypothetical person skilled in the art that you both
19   envisioned?
20     A.    Yes.
21           I mean we didn't describe him in
22   particularly the terms you have done, but he
23   understood what this hypothetical person was required
24   would be.
25           I have no reason to doubt it would be
0211

1      - Mr. Timothy C. Daw -
2   any different.
3      Q.     This Claim 7 has reference to the
4   quotes, "The use of FTP server software executable is
5   obvious."
6           Do you see that, Number 7.
7      A.     I have "use of FTP server software
8   executable."
9      Q.     Once again making that determination of
10   obviousness, both you and Mr. Pinkard used
11   essentially both the same definition for the person
12   of ordinary skill in the art; is that correct?
13      A.     Yes.
14      Q.     And that's the same definition you
15   would use for obviousness today, right?  You never
16   changed your view?
17      A.     Yes.
18      Q.     Claim 8 states, "This is an obvious
19   addition," end of quotes.
20      A.     Yes.
21      Q.     Do you see that?
22      A.     Yes.
23      Q.     You used the same standard with respect
24   to the hypothetical person skilled in the art?
25      A.     Yes.
0212
1      - Mr. Timothy C. Daw -
2      Q.     Claim 9 it says, quotes, "This is
3   obvious."
4           You used the same hypothetical person
5   of "skilled in the art" in making that assessment at
6   that time?
7      A.     Yes.
8      Q.     Now, with respect to Claim 10 --
9      A.     Hum-hum?
10      Q.      -- in your report, there really isn't
11   any conclusion that I can see as to whether or not
12   you believed this claim is obvious.
13           Do you see anywhere where you make the
14   conclusion as to the validity of Claim 10?
15      A.     In the context of describing all the
16   claims, I think the meaning is clear; but I do notice
17   that I have not written the word it is obvious.  I do
18   in those particular paragraphs.
19      Q.     But do you believe the reason for
20   invalidity of Claim 10 is that it is obvious?

21    A.    Yes.
22    Q.    And you use the same test, with the
23    hypothetical person that we described previously, to
24    make that analysis as to Claim 10?
25    A.    Yes.
0213
1    - Mr. Timothy C. Daw -
2    Q.    And so did Mr. Pinkard at the same
3    time?
4    A.    Yes, he agreed with it.
5    Q.    If you look at your comments with
6    respect to claim 11, I once again don't see the
7    conclusion that this claim was invalid because it was
8    obvious.
9        Can you look and see if you made any
10    conclusions with respect to Claim 11?
11    A.    Only in the context of declaring the
12    obvious of all these claims.  That is the reason I
13    take from what is written here, we concluded that it
14    is obvious.
15    Q.    So the -- your basis for invalidating
16    Claim 11, as a legal expert -- strike that.
17        Your basis for invalidating Claim 11,
18    as an expert witness, is that the content of that
19    claim is obvious, is that correct, even though it is
20    not specifically stated so in your expert report?
21    A.    I think Claim 11 particularly, the
22    argument even stronger than obviousness is that it
23    exactly been read on by prior art.
24        So not only is it obvious, but there is
25    absolute prior art read on that claim.
0214
1    - Mr. Timothy C. Daw -
2    Q.    But that Claim 11 also includes all the
3    limitations of Claim 10, which includes all the
4    limitations of Claim 11, right?
5    A.    Yes.  Let me just -- (referring) -- you
6    were correct in your first that it was obvious.  I
7    was arguing that in that particular claim.
8    Q.    And not anticipation?  I'm just
9    trying --
10    A.    Yes, yes.  That's right, I did not
11    put --
12    Q.    So your reason for invalidating Claim
13    11 is that it's obvious, and your reason is not that
14    it's anticipated, is that correct?

15          Actually, you know, I'm not trying to--
16   I'm just trying to understand --
17      A.      I appreciate it.  I want to make sure I
18   give you --
19      Q.      What I would like you to do is tell me
20   if it is obviousness -- it is invalid on the basis of
21   obviousness, or its basis of anticipation also.
22      A.      Okay.
23      Q.      One, the other, or both.  Just I want
24   to know.
25      A.      So I'm just going back through, because
0215
1      - Mr. Timothy C. Daw -
2   obviously eleven depends on ten, and ten depends on
3   one.
4          So obviousness for eleven, and not
5   anticipation?
6      Q.      And not anticipation?
7      A.      Yes.
8      Q.      And in determining Claim 11 was
9   obvious, you once again used that hypothetical person
10   that we described earlier, that was eighteen years
11   old, passed his exams, had familiarity with
12   computers, and two months of experience in kiosks?
13      A.      The hypothetical person I described had
14   education up to the age of eighteen.  It was not
15   necessarily still eighteen.
16          But otherwise, yes.
17      Q.      If you look at Claim 13 -- I'm sorry,
18   Claim 12.
19      A.      Yes?
20      Q.      Your reason for saying Claim 12 is
21   invalid, is it based upon obviousness, or is it based
22   upon anticipation or both?
23      A.      Both.
24      Q.      So a claim can be anticipated and
25   obvious both at the same time under your
0216
1      - Mr. Timothy C. Daw -
2   understanding of the way the law works?
3      A.      I suppose so.
4          Anticipation is a stronger argument
5   than obviousness.  So that would be the first
6   argument you put.
7      Q.      So with respect to Claim 12, the
8   anticipation would be an argument, right?

9      A.     Yes.
10      Q.     And then after you are done making that
11   argument, you would make the argument that it's
12   obvious?
13      A.     I would.
14      Q.     And so under your understanding as an
15   expert, this claim can be both anticipated and
16   obvious at the same time?
17      A.     I would need to review whether that is
18   the precise legal point or not.
19          It could satisfy both arguments.
20   Whether you could legally make both arguments is
21   something I would need to refer.
22      Q.     Refer to who?
23      A.     I would need to refer to sources of
24   reference.
25      Q.     What sources of reference?
0217
1      - Mr. Timothy C. Daw -
2      A.     Either my attorneys, or suitable
3   reference books.
4      Q.     But at the time you wrote the
5   sentence--this is not new--all the W3 conference
6   papers are on how to connect a kiosk to the web, and
7   there are some other words after that?
8      A.     Yes.
9      Q.     What was your belief as to whether the
10   claim was obvious at that time?
11      A.     My belief, at the time, it was both
12   obvious and anticipated.
13      Q.     The same question with respect to Claim
14   13?
15      A.     The same.
16      Q.     It was both obvious and anticipated?
17      A.     I think Claim 13 is maybe -- is
18   particularly covered by anticipation, which is also
19   obvious.
20      Q.     Both?
21          And in determining -- making your
22   determination of obviousness with respect to Claims
23   12 and 13, you used the same hypothetical person that
24   we described earlier?
25      A.     Yes, I done both claims with Posta --
0218
1      - Mr. Timothy C. Daw -
2   P O S T A -- in mind, and I found them obvious.

3          Further research, or other research,
4    also found they were anticipated, which is in my mind
5    they were both obviously anticipated.
6          I will repeat my point. Whether you
7    can legally challenge on both points is another
8    matter, and it is not -- would need to be checked in
9    a reliable reference.
10    Q.      With respect to Claim 14, you refer to
11    "See discussion under claim 11." And under Claim 11,
12    if I'm not mistaken, you concluded your reason for
13    stating was that this was invalid was based solely on
14    obviousness and not anticipation.
15          Do you maintain that same answer with
16    respect to Claim 14?
17    A.      I think as to 14, I would say although
18    anticipated as well as obvious.
19    Q.      But the discussion with respect to
20    Claim 11 only has to do with obviousness; isn't that
21    correct?
22    A.      It has to do with various security
23    controls--software modules. The conclusion you have
24    drawn from me is that obviousness is the reading for
25    Claim 11.
0219
1    - Mr. Timothy C. Daw -
2          Using the same discussion under Claim
3    14, I would also draw the conclusion of anticipation.
4    Q.      So when you wrote this report you
5    concluded that this claim was both anticipated and
6    obvious; is that correct?
7    A.      That's my belief.
8    Q.      And when you made that conclusion that
9    it was obvious, you used this same hypothetical
10    person that we talked about earlier?
11    A.      Yes.
12    Q.      Claim 15, the same question. When you
13    wrote this report did you conclude the claim was
14    invalid due to obviousness and/or anticipation?
15    A.      Anticipation and obviousness.
16    Q.      And at the time you made that
17    conclusion as to obviousness, you used that same
18    hypothetical person skilled in the art that we have
19    been discussing?
20    A.      Yes.
21    Q.      And with respect to Claim 16, you are
22    stating that this claim -- it's your expert opinion

23    that this claim is invalid.
24          But what is the basis?  Is it
25    obviousness, is it anticipation, or is it both, at
0220
1      - Mr. Timothy C. Daw -
2    the time you wrote this report?
3      A.      Anticipation and obviousness, as judged
4    by the hypothetical person we discussed before.
5      Q.      The same question with respect to claim
6    17.
7          Actually, the only reason stated with
8    respect to Claim 17 is obviousness, right?
9      A.      There is known and obvious.  This was
10   known in that it was anticipated.
11     Q.      So with respect to Claim 17, it is both
12   known and obvious?
13     A.      Yes.
14     Q.      And for the conclusion of obviousness,
15   you once again used the same hypothetical person?
16     A.      Yes.
17     Q.      With Claim 18, is the basis for your
18   expert opinion that this is invalid--is this
19   obviousness, is it anticipation, is it both?
20     A.      The discussion under Claim 2 starts off
21   by discussing the obviousness.  I always wrote that
22   it was anticipated.  So it is the same conclusion.
23     Q.      So with respect to Claim 18, the basis
24   would be obvious and anticipated?
25     A.      Yes.
0221
1      - Mr. Timothy C. Daw -
2      Q.      And with respect to the obviousness
3    analysis, you used that same hypothetical person we
4    discussed earlier?
5      A.      Yes.
6      Q.      Claim 17, the same question:  Is this
7    based upon obviousness and/or anticipation?
8      A.      Obvious and anticipated.
9      Q.      Once again you use the same
10   hypothetical person we described earlier?
11     A.      Yes.
12     Q.      With respect to Claim 21, the same
13   question.  Is this obvious, or anticipated, or both?
14     A.      Obvious.
15     Q.      And not anticipated?
16     A.      I will stick to obvious, I think, on

17    that one.
18        Q.      And you use the same hypothetical
19    person at the time you did this report and analysis?
20        A.      Yes.
21        Q.      And Claim 21, the same question,
22    obvious, anticipated, or both?
23        A.      Obvious.
24        Q.      And not anticipated?
25        A.      No.
0222
1        - Mr. Timothy C. Daw -
2        Q.      And you used the same hypothetical
3    person in your analysis of Claim 21, is that correct?
4        A.      Yes.
5        Q.      Same question with respect to Claim 22?
6        A.      Anticipated and obvious.
7        Q.      And you used the same hypothetical
8    person in determining obviousness with respect to
9    Claim 22 at the time you did this report?
10       A.      Yes.
11       Q.      We will take a break because we are out
12    of tape.
13       A.      Yes.
14            VIDEO TECHNICIAN:  Going off the
15         record.  The time is approximately 5:35
16         p.m., November 20th, 2002.
17            (RECESS)
18            VIDEO TECHNICIAN:  We are back on the
19         record.
20            The time is approximately 5:41 p.m.,
21         November 20th, 2002.
22    EXAMINATION BY MR. WINTER:  (Cont'g)
23       Q.      Have you read any of Dr. Sayward's
24    expert reports?
25       A.      Yes.
0223
1        - Mr. Timothy C. Daw -
2        Q.      Do you recall his definition of masking
3    is different from your definition?
4        A.      Yes.
5        Q.      For what reasons do you disagree with
6    Dr. Sayward's definition of masking?
7        A.      Which one of his definitions?  I think
8    he uses a couple.
9        Q.      Do you recall what his definition is?
10       A.      I would prefer to see it word-for-word.

11      Q.      Take a look at Defendants' Exhibit K,
12  which is Frederic Sayward's Expert Witness Report,
13  which is dated May 24, 2002, and I'll point you to
14  the part of the report on page 4 that talks about
15  quotes, masking term.
16              Do you see that?
17              Is that what you understood was
18  Dr. Sayward's definition of mask?
19      A.      The phrase Dr. Sayward also provides a
20  definition of masking in a report that is in an
21  indented paragraph with quotation marks around it.
22              I think that is in his rebuttal report,
23  and that was the definition I thought you were going
24  to ask me about.
25      Q.      Well, why don't we start with his
0224
 1      - Mr. Timothy C. Daw -
 2  comments here.  Where do you disagree with his
 3  comments?
 4      A.      Have you got Exhibit 1012 and 1013 and
 5  1011?
 6      Q.      Not handy.
 7      A.      Well, this definition is illustrated in
 8  those exhibits.
 9      Q.      Did you review those exhibits at the
10  time you looked at his report?
11      A.      No.
12      Q.      So you can't agree or disagree with
13  those exhibits?  You have no knowledge of those
14  exhibits.
15      A.      I have no knowledge of those exhibits.
16              MR. COOKSEY:  Those exhibits are
17          marked confidential, and he was not allowed
18          to see them anyway.
19              MR. WINTER:  These are exhibits that
20          are publications.
21              MR. COOKSEY:  Pardon me?
22              MR. WINTER:  I don't think those are
23          confidential.  Those are published.
24              Anyhow, whether they are confidential
25          or not, I want to find out whether he has
0225
 1      - Mr. Timothy C. Daw -
 2          read those before.
 3              I think they are not confidential
 4          since they are publications.

5          Well, he answered the question.  We
6      will go on to the next question.
7      Q.     You haven't read those exhibits before?
8      A.     I have not read those exhibits.
9      Q.     Okay.  Have you read the deposition of
10  William Goucher from the Automobile Club?
11     A.     No.
12     Q.     Have you read this part of
13  Dr. Sayward's report where there is a question and
14  answer by the witness?
15     A.     Yes.
16     Q.     This is a co-defendant of yours talking
17  about his definition 6 of the word "mask".
18          Do you agree or disagree with what he
19  is saying?
20     A.     I do not -- I don't know the context
21  that it was said in.  The phrase "mask", I presume he
22  describes what does mask mean.  He says almost
23  equivalent to hidden, I would think.  And then
24  carries on to say, mask, like say in computers, can
25  mean many things.
0226
1    - Mr. Timothy C. Daw -
2      Q.     But do you agree with his statement,
3  "that almost equivalent to hidden, I would think"?
4          Is hidden alone to enough to mask?
5      A.     No.  Mask is a -- hidden is almost
6  equivalent, but it is not the same as masking.
7      Q.     And what in the definition is
8  different?
9          What is the difference in your view?
10     A.     Masking has a very specific meaning in
11  ordinary language, and specifically in these patents
12  of having an overlaying object to provide the hiding.
13     Q.     So you would disagree with
14  Mr. Goucher?
15     A.     I would disagree.  "Almost equivalent
16  to hidden" is not a bad phrase, but it almost
17  equivalent is not equal to hidden.  It does not mean
18  it is equivalent.
19          You can hide things by just turning the
20  lights out.
21     Q.     So hidden is a broader term than you
22  would use to describe masking?
23     A.     Yes.
24          But if I was trying to teach a foreign

25    language student what masking is, this is a sort of
0227
1         - Mr. Timothy C. Daw -
2    phrase I might use and then further qualify it.
3        Q.      But you would have to further qualify
4    it?
5        A.      Yes.
6        Q.      So unqualified, you disagree with
7    Mr. Goucher's statement?
8        A.      No.  It is almost equivalent to hidden
9    is fine.  But it is not -- that does not mean that it
10   is equivalent.  It is a qualified form of hiding.
11       Q.      Now, you never filed a rebuttal report
12   to Dr. Sayward's report, is that correct?
13       A.      I didn't, no.
14       Q.      Well, did you ever get Dr. Sayward's
15   report and create a second report that countered what
16   he said in the report you are looking at?
17       A.      I wrote some notes.
18       Q.      And those notes went to whom?
19       A.      They were certainly circulated to Andy
20   Pinkard, and I believe Mr. Vincent and Mr. Cooksey
21   may have also received copies.
22       Q.      And what did you say in those reports
23   about Dr. Sayward's report?
24       A.      I said many things.
25       Q.      Well, can you summarize what you said?
0228
1         - Mr. Timothy C. Daw -
2        A.      It would be hard to summarize.
3               Briefly I would say that his new
4    rebuttals were without foundation, and that there was
5    nothing new that made me want to change any of my
6    conclusions of the previous report.  That it was done
7    on a claim-by-claim line-by-line basis.
8        Q.      And this was generally given to your
9    attorney?
10       A.      I believe they had a copy.
11       Q.      And this is even though you did not
12   review the publications Dr. Sayward referred to in
13   making a determination of what he meant by masking,
14   you never looked at those even to this date?
15       A.      Can I just review this again, the one
16   you referred to?
17              His reviewing, his whole description of
18   masking here, he describes Exhibits 1012, 1013, and

19    1011 merely illustrate that mask can be used as a
20    noun and a verb, and that's not a conclusion that I
21    would disagree with.
22           He further goes on to draw a conclusion
23    from Mr. Goucher's quote that anyone skilled in
24    computing art should know how to mask, that the word
25    has multiple meanings in computing.
0229
1       - Mr. Timothy C. Daw -
2            I haven't gotten the background of
3    Mr. Goucher, and I don't know if he is qualified as
4    one skilled in computing arts.  So I don't know if
5    that conclusion can be drawn from that quote.
6            And, furthermore, whether even if one
7    person skilled in computing art thinks that anyone
8    skilled in computing art would think that.
9       Q.    So you never read any of these papers
10    that are referred to by Dr. Sayward where he
11    concludes later on in the report that mask is used as
12    a verb in that certain controls are hidden from the
13    user's view.  And so in analyzing Dr. Sayward's
14    report, you never ever read any of those
15    publications?
16            I'm referring to the paragraph.
17       A.    Let us be clear here.  He said in the
18    above patent claim the word mask is being used as a
19    verb.
20            That is not referring to anything that
21    is written in those three papers.  The only
22    conclusion that can be drawn from those three
23    reference papers in Dr. Sayward's discussion here is
24    that mask is used as a noun and a verb.
25            It is not a conclusion I could disagree
0230
1       - Mr. Timothy C. Daw -
2    with.  It is not necessary to particularly chase down
3    three exhibits.
4            The fact I wasn't given the exhibits, I
5    assumed it was good reason, and my attorney believes
6    they were confidential, and that's why I wasn't given
7    them.  But I can't imagine that they would change my
8    belief that a mask is a noun and a verb, and that's
9    what Mr. Sayward believes -- or Dr. Sayward believes.
10            The word mask being used as a verb in
11    certain controls are hidden is above in the patent
12    claim, is not claiming that in the attached reference

13    papers.
14        Q.      So you don't know whether that is a
15    meaning that was used in those attached reference
16    papers one way or the other?
17        A.      Dr. Sayward doesn't make that --
18    doesn't make that assertion.  So there was no need to
19    look to see whether that assertion was valid.
20        Q.      So are there any other things in
21    Dr. Sayward's report that you didn't bother to read,
22    and references you didn't bother to go get copies of?
23            MR. COOKSEY:  You want him to read
24        the whole document?
25        A.      I think I can pick out the reference
0231
1      - Mr. Timothy C. Daw -
2    numbers fairly quickly.
3            I have not -- I have previously said I
4    did not read the deposition of William Goucher.  I
5    believe was one of his quotes, those three items we
6    talked before.  And I'm reading from this material.
7            If you want me to read the whole
8    argument, and item 1003 is a large website.  I do not
9    know which particular bit he referred to.
10        Q.      So you did not review any of that
11    website?
12        A.      No, I didn't say that.  I said I do not
13    know which bit he was referring to.
14        Q.      Had you reviewed any of that website?
15        A.      Yes.
16        Q.      Anything else?
17        A.      On this list in the beginning of the
18    document, I am familiar with all the rest of the
19    items.
20            I do not -- I don't know if he
21    referenced any other items later on.  I can look
22    through it, if you require me to.
23        Q.      You can stop there.
24            Where did you stop at?  What page?
25        A.      I was going backwards, because it is
0232
1      - Mr. Timothy C. Daw -
2    easier to look through.
3            On page 13 he says, "I am informed that
4    Montegonet provides microphones for some of its
5    kiosks."
6            He doesn't give any reference for that

7    information.  So obviously I have not reviewed his
8    information.
9              MR. COOKSEY:  Just for the record, it
10       is 5:59 p.m.
11            You will be done in a minute.
12    Q.     What was the product being sold by
13    NetShift at the time the '071 patent issued in June
14    of 1998?
15    A.     Without looking at my records, I don't
16    know.
17    Q.    Was it 2.0?
18    A.     I said, without looking at my records,
19    I don't know which particular number it was.
20            Those records are public knowledge and
21    should not be hard to find.
22    Q.     What version came before, immediately
23    before version 5.0?
24    A.     I think 4.  I think there was a 4.7,
25    but there was certainly a 4.65.
0233
1      - Mr. Timothy C. Daw -
2    Q.     What came before version 4.65?
3    A.     We did various builds of 4.6.  There
4    was a 4.60, there may have be a 4.61, 62, 63, 64
5    somewhere, publicly released somewhere.
6              MR. WINTER:  I have no further
7         questions at this time.
8              MR. COOKSEY:  Okay.
9            He will read and sign.
10            MR. WINTER:  Do you have any cross
11       examination?
12            MR. COOKSEY:  No.
13            VIDEO TECHNICIAN:  This will conclude
14       the videotape portion of this deposition,
15       and we are going off the record.
16          The Time is approximately 6 p.m.,
17       November 20, 2002.
18              ***
19
20
21
22
23
24
25
0234

1
2        WITNESS' CORRECTION SHEET
3  PAGE \ LINE \ CORRECTION
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21
22      _____
         TIMOTHY C. DAW
23
   Subscribed and sworn to before me
24  this _____day of _____, 2002,
25  _____, Notary Public.
0235
1               235
2  STATE OF CONNECTICUT    )
               ) SS:
3
  COUNTY OF_____
4
5      I, TIMOTHY C. DAW, a witness herein, do
6  hereby certify that having been first duly sworn to
7  testify to the truth, the whole truth, and nothing but
8  the truth, gave the above deposition, which was
9  recorded stenographically and reduced to this original
10  transcript.
11
12      I FURTHER CERTIFY that the foregoing
13  transcript of the said deposition is a true and correct
14  transcript of the testimony given by me at the time and
15  place specified hereinbefore.
16

17          I FURTHER CERTIFY that any corrections
18  or changes to this testimony have been made by me on
19  the page provided for that purpose captioned "Witness'
20  Correction Sheet," which has also been signed by me
21  before a Notary Public.
22          _____
23          TIMOTHY C. DAW
24  Subscribed and sworn to before me this _____day
25  of _____ 2002.
0236
1                           236
2
3                 CERTIFICATE
4
5
6          I, BLASE J. SPINOZZI, a Senior Court
7          Reporter and Notary Public within and for
8          the State of New York, do hereby certify:
9             That TIMOTHY C. DAW, the witness whose
10         deposition is hereinbefore set forth, was
11         duly sworn by me, and that the within
12         transcript is a true record of the testimony
13         given by such witness.
14            I further certify that I am not
15         related to any of the parties to this action
16         by blood or marriage, and that I
17         am in no way interested in the outcome of
18         this matter.
19            IN WITNESS WHEREOF, I have hereunto
20         set my hand this _____day of _____,
21         2002.
22
23         _____
24               Blase J. Spinozzi,
25               Sr. Court Reporter
0237
1                           237
2                 I N D E X
3
4  DEFENDANTS' EXHIBITS                    Page
5
6  A - Analytic Resources, LLC (Page 1 only)      24
7  M - Defendants' Endorsement of Expert Witnesses   43
8
9
10  PLAINTIFF'S EXHIBITS

11
12   148 - Resume Andrew Pinkard                    43
13   149 - C.V. Tim Daw                    62
14   150 - Pretrial Order               159
15
16
17
18
19
20
21
22
23
24
25